**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed: June 14, 2005 |
| v. | ) | No. 00-169 L<br>Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS**

Pursuant to the Rules of the Court of Federal Claims ("RCFC") 12(b)(1) and RCFC 12(h)(3), Defendant respectfully moves this Court to dismiss, in part, Plaintiff's Tranche One claims for lack of jurisdiction on the following grounds: (a) Plaintiff has failed, under the Tucker Act and the Indian Tucker Act[1/], to set out any Acts, regulations, or lease provisions, that impose specific duties or full managerial responsibility on the Secretary of the Interior with respect to calculating royalties, collecting royalties, or imposing and collecting late fees on oil and gas leases; (b) Plaintiff's claims related to royalty calculation and collection are already squarely before the Court of Federal Claims ("CFC") in a separate case filed earlier than the instant case, *See Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999), which claims in that separate case are currently subject to a Motion to Dismiss of the United States on statute of limitations grounds; (c) Plaintiff's claim that Defendant failed to properly calculate royalties is barred by the applicable six-year statute of limitations, 28 U.S.C. § 2501; (d) Plaintiff has failed to sufficiently articulate the fiduciary duties associated with its investment claims; (e) Defendant's

[1/] 28 U.S.C. § 1491(a)(1) and 28 U.S.C. § 1505, respectively.

exercise of its discretionary authority to invest and manage Plaintiff's funds under 25 U.S.C. §§ 161a and 162a should be evaluated under an arbitrary and capricious or abuse of discretion standard; and (f) Plaintiff has failed, under the Tucker Act and Indian Tucker Act, to show that Defendant has a duty to earn interest on Plaintiff's funds between the time the funds are disbursed and the time that the Payee obtains those funds ("disbursement lag time" claim). A memorandum in support of this motion follows.

Respectfully submitted, on June 14, 2005,

KELLY A. JOHNSON
Acting Assistant Attorney General

*s/ Brett D. Burton*
BRETT D. BURTON
United States Department of Justice
Environment and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0212
Fax: (202) 353-2021

Counsel of Record for Defendant

*s/ Martin J. LaLonde*
MARTIN J. LALONDE
United States Department of Justice
Environment and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0247
Fax: (202) 353-2021

Attorney for Defendant

OF COUNSEL:

Stephen Simpson
Attorney
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
MS 6456
Washington, D. C. 20240
Telephone: (202) 219-1659
Fax: (202) 208-3490

Teresa E. Dawson
Senior Counsel
Office of Chief Counsel
Financial Management Services
U.S. Department of the Treasury
401 14th Street, S.W.
Room 552A
Washington, D.C. 20227
Telephone: (202) 874-2567
Fax: (202) 874-6627

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| | ) | Electronically Filed: |
| Plaintiff, | ) | June 14, 2005 |
| | ) | |
| v. | ) | No. 00-169 L |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS**

TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . 1

II. STATEMENT OF THE QUESTIONS INVOLVED . . . . . . . . . . 3

III. STATEMENT OF THE FACTS . . . . . . . . . . 4

A. THE 1906 ACT . . . . . . . . . . 4

B. OIL AND GAS ROYALTIES . . . . . . . . . . 5

C. FUNDS MANAGEMENT . . . . . . . . . . 6

D. THE LITIGATION . . . . . . . . . . 6

IV. ARGUMENT . . . . . . . . . . 7

A. LEGAL STANDARDS FOR EVALUATION OF THE COURT'S JURISDICTION UNDER THE TUCKER ACT AND INDIAN TUCKER ACT . . . . . . . . . . 7

1. Standards for a Motion to Dismiss for Lack of Jurisdiction . . . . . . . . . . 7

2. Standards for Determining Whether the Court of Federal Claims Possesses Jurisdiction under the Tucker Act and Indian Tucker Act . . . . . . . . . . 8

B. PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE COURT HAS JURISDICTION OVER ITS OIL AND GAS ROYALTY CALCULATION AND COLLECTION CLAIMS . . . . . . . . . . 15

1. Plaintiff's Claims and the Statutory, Regulatory, and Lease Provisions Relevant to Their Claims . . . . . . . . . . 15

2. The Statutory and Regulatory Provisions are not Sufficiently Specific or Directive to Allow Plaintiff to Pass the Threshold Test of *Navajo* . . . . . . . . . . 19

3. The 1906 Act and its Implementing Regulations do not Establish in Interior Sufficiently Pervasive Managerial Control Over the Calculation and Collection of Royalties to Establish a Fiduciary Duty . . . . . . . . . . 23

4. Precedent Supports the Conclusion that the 1906 Act and its Regulations do not Establish Money-Mandating Duties to Calculate and Collect Royalties . . . . . 27

5. The Court Should Dismiss Plaintiff's Claims Related to the Calculation and Collection of Royalties Because that Claim is Before Another Court . . . . . 31

6. Plaintiff's Claim that the United States Failed to Calculate Royalties is Barred by the Statute of Limitations . . . . . 34

a. The Tribe knew or should have known of its claim at the time that royalty payments were received . . . . . 36

b. The Interior Appropriations Act Language excepting certain claims from the application of statutes of limitations until an accounting is completed does not apply to Plaintiff's royalty calculation claim . . . . . 39

C. PLAINTIFF HAS FAILED TO SUFFICIENTLY ARTICULATE THE FIDUCIARY DUTIES ASSOCIATED WITH ITS INVESTMENT CLAIMS AND, TO THE EXTENT THE DUTIES CAN BE INFERRED FROM PLAINTIFF'S STATEMENTS, THEY SHOULD BE DISMISSED . . . . . 41

1. Defendant's Discretionary Authority to Invest and Manage the Osage Funds Is Grounded in Sections 161a and 162a, and Is Evaluated under an Arbitrary and Capricious or Abuse of Discretion Standard . . . . . 43

2. Plaintiff Has Not Set Forth a Standard Against Which to Measure Defendant's Duty to Timely Deposit Funds . . . . . 49

3. Plaintiff Has Failed to Articulate Any Fiduciary Duty Related to "Disbursement Lag Times" Nor Any Standard Against Which Such Alleged Duty Should Be Measured . . . . . 49

V. CONCLUSION . . . . . 50

TABLE OF AUTHORITIES

FEDERAL CASES

*Andrade v. United States*, 202 Ct. Cl. 988, 485 F.2d 660 (Ct. Cl. 1973) . . . . . . . . . . . . . . . . . . 36

*Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728 (1982) . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Blankenship v. Boyle*, 329 F.Supp. 1089 (D.D.C. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 38

*Brown v. United States*, 42 Fed. Cl. 538 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 13, 23, 43

*Capoeman v. United States*, 440 F.2d 1002, 194 Ct. Cl. 664 (1971) . . . . . . . . . . . . . . . . . . . . . 36

*Carter v. United States*, 62 Fed. Cl. 66 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Cheyenne-Arapaho Tribes of Oklahoma v. United States*,
966 F.2d 583 (10th Cir.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 33 Fed. Cl. 464 (1995) . . . . . . . . . . . 45

*CheyenneArapaho Tribes of Indians of Oklahoma v. United States*,
512 F.2d 1390 (Ct. Cl. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984) . . . . . . . . . . . . . . 7

*Common Cause v. Judicial Ethics Comm.*, 473 F. Supp. 1251 (D.D.C. 1979) . . . . . . . . . . . . . . 34

*Fisher v. United States*, 402 F.3d 1167 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hart v. United States*, 910 F.2d 815 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573 (Fed. Cir. 1988) . . . . . . . . . . 35

*LaMear v. United States*, 9 Cl. Ct. 562 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Laughlin v. United States*, 22 Cl. Ct. 85 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*McDonald v. United States*, 37 Fed. Cl. 110 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158 (1942) . . . . . . . . . . . . . . . . . . . . . 43

*Menominee Tribe v. United States*, 726 F.2d 718 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . 35, 36

*Mitchell v. United States*, 445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 19, 20

*Mitchell v. United States*, 463 U.S. 206 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 13, 43, 47

*Mitchell v. United States*, 664 F.2d 265, 229 Ct.Cl. 1 (1981) . . . . . . . . . . . . . . . . . . . . . . . 47, 48

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) . . . . . . . . . . 48

*Nager Electric Co. v. United States*, 177 Ct. Cl. 234, 368 F.2d 847 (1966) . . . . . . . . . . . . . . . . 35

*Navajo Tribe of Indians v. United States*, 624 F.2d 981 (Ct. Cl. 1980) . . . . . . . . . . . . . . . . . . 48

*Ochran v. United States*, 19 Cl. Ct. 455 (1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*OPM v. Richmond*, 496 U.S. 414 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Osage Nation v. United States*, 57 Fed. Cl. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 39

*Pawnee v. United States*, 830 F.2d 187 (Fed. Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 48

*Poafpybitty v. Skelly Oil Co.*, 390 U.S. 372 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Renne v. Geary*, 501 U.S. 312, 315 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . . 8

*Sankey v. United States*, 22 Cl. Ct. 743 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Sauer v. United States*, 173 Ct. Cl. 642, 354 F.2d 302 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Short v. United States*, 25 Cl. Ct. 722 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Shoshone Indian Tribe of the Wind River Reservation v. United States*,
364 F.3d 1339 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 3, 7, 29, 30, 33, 39, 40, 42, 46

*Shoshone Indian Tribe v. United States*, 51 Fed. Cl. 60 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476 (D.C. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 25

*United Nuclear Corp. v. United States*, 12 Cl. Ct. 45 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*United States v. King*, 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Mason*, 412 U.S. 391 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Mottaz*, 476 U.S. 834 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Navajo Nation*,
537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 14, 20, 21, 24, 27, 43, 45, 46

*United States v. Sherwood*, 312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*United States v. Testan*, 424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*West Gulf Maritime Ass'n. v. ILA Deep Sea Local 24*, 751 F.2d 721 (5th Cir. 1985) . . . . . . . . . 34

*White Mountain Apache Tribe vs. United States*, 249 F.3d 1364 (Fed. Cir. 2001) . . . . . . . . . . . 47

*White Mountain Apache v. United States*, 537 U.S. 465 (2003) . . . . . . . . . . . . . . . . 12, 13, 14, 47

*Wright v. United States*, 32 Fed. Cl. 54 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FEDERAL STATUTES

25 U.S.C. § 161a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

25 U.S.C. § 161a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 45

25 U.S.C. § 162a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

25 U.S.C. § 162a(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 44, 45

25 U.S.C. § 162a(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 44

25 U.S.C. § 396f . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

25 U.S.C. § 4011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

28 U.S.C. § 1491 . . . . . . . . . . 2, 9, 10, 34

28 U.S.C. § 1505 . . . . . . . . . . 2, 9, 34

28 U.S.C. § 2501 (1992) . . . . . . . . . . 34, 36, 39

30 U.S.C. § 1701(b)(3) . . . . . . . . . . 28

30 U.S.C. § 1702(3) . . . . . . . . . . 28

30 U.S.C. § 1711(a) . . . . . . . . . . 28

Pub. L. No. 86392, 74 Stat. 8 ("1960 Act") . . . . . . . . . . ibid

FEDERAL REGULATIONS

25 C.F.R. Part 226 . . . . . . . . . . 5

25 C.F.R. § 183.11 (1975) . . . . . . . . . . 5, 19, 20, 37

25 C.F.R. § 183.11(a) (1975) . . . . . . . . . . 5, 21, 26

25 C.F.R. § 183.11(b) (1975) . . . . . . . . . . 21

25 C.F.R. § 183.13 (1975) . . . . . . . . . . 17, 22

25 C.F.R. § 183.13(a) (1975) . . . . . . . . . . 21

25 C.F.R. § 183.2 (1975) . . . . . . . . . . 24

25 C.F.R. § 183.42 . . . . . . . . . . 18, 22

25 C.F.R. § 183.43 (1975) . . . . . . . . . . 22

25 C.F.R. § 183.5 (1975) . . . . . . . . . . 25

25 C.F.R. § 211.3 . . . . . . . . . . 30

25 C.F.R. § 211.40 . . . . . . . . . . 29

25 C.F.R. § 211.6 . . . . . . . . . . 30

25 C.F.R. § 226.11 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 C.F.R. § 226.11(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

25 C.F.R. § 226.11(a)(2) (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 26, 37

25 C.F.R. § 226.11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

25 C.F.R. § 226.13(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 26

25 C.F.R. § 226.2 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25 C.F.R. § 226.42 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

25 C.F.R. § 226.5 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

25 C.F.R. §§ 183.11, 183.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

25 C.F.R. §§ 183.16 183.41 (1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

30 C.F.R. chapter II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

30 C.F.R. § 206.103 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

30 C.F.R. § 206.52 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

30 C.F.R. § 218.200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

**APPENDIX TO DEFENDANT'S EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS**

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 1 | Letter from George E. Tallchief, Principal Chief of Osage Tribal Council, to Jack Shoemate, Superintendent Osage Indian Agency (Aug. 29, 1984) | 1 |
| 2 | Letter from George Tallchief, Principal Chief, Osage Tribe to Jack Shoemate, Superintendent, Osage Indian Agency (undated) | 6 |
| 3 | Resolution of the Osage Tribal Council, No. 26-624 (Aug. 21, 1985) | 8 |
| 4 | Resolution of the Osage Tribal Council, No. 28-363 (Sept. 18, 1991) | 11 |
| 5 | Resolution of the Osage Tribal Council, No. 26-659 (Oct. 8, 1985) | 14 |
| 6 | Memorandum from Jim Littleton, Tribal Auditor, to Mary Lou Drywater, Realty Specialist (April 24, 1987) | 16 |
| 7 | Memorandum from Jim Littleton, Tribal Auditor, to Jack Shoemate, Superintendent Osage Indian Agency, *et. al.* (Aug. 28, 1987) | 18 |
| 8 | Letter to Dark Oil Co. from E.A. Green, Acting Superintendent, Osage Indian Agency (undated) | 20 |
| 9 | Complaint, *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999) | 22 |
| 10 | Plaintiff's Motion to Amend and Consolidate and Brief in Support, No. 99-550L (May 1, 2000) | 42 |
| 11 | Defendant's Motion to Reconsider Consolidation Order, No. 99-550L, No. 00-169L (May 26, 2000) | 47 |
| 12 | Order, No. 99-550L (September 14, 2000) | 54 |

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 13 | Third Amended Complaint, No. 99-550L (Oct. 24, 2005) | 55 |
| 14 | Amended Joint Preliminary Status Report, No. 99-550L (Feb. 11, 2005) | 113 |
| 15 | Motion to Dismiss, No. 99-550L (April 15, 2005) | 121 |
| 16 | Memorandum from Superintendent Osage Agency to Joseph C. Johnston, Chief, Division of Energy & Mineral Resources (May 30, 1986) | 157 |
| 17 | Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991 | 180 |
| 18 | Memorandum from Jim W. Littleton to Osage Tribal Council (July 11, 1986) | 181 |

## I. INTRODUCTION

In its April 15, 2005, Order, the Court required Plaintiff to identify issues for Tranche One of this case through a statement that, *inter alia*, was to include "legal authorities supporting recovery, and time frames for which recovery is sought under each legal authority." April 15, 2005, Order at § 2, p. 3. In turn, Defendant is to "file any dispositive motions with respect to legal authorities supporting recovery and time frames for which recovery is sought under each legal authority. . ." *Id.* § 3, p. 3. Pursuant to the Order, Plaintiff, on May 13, 2005, filed a Statement of Claims and later, during a status conference before the Court, provided further explanation of its claims. Pursuant to the April 15 Order, Defendant herein moves for dismissal under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") of certain of Plaintiff's stated claims.

In its Statement of Claims and during the status conference with the Court, Plaintiff asserted that the Act of June 28, 1906, 34 Stat. 539 ("1906 Act") and its implementing regulations, as well as lease terms, establish in the Department of the Interior ("Interior") specific fiduciary duties to calculate and collect royalties on oil and gas leases. In addition, Plaintiff contended that 25 U.S.C. §§ 155, 161a, 161b, and 162a establish specific fiduciary duties to deposit the collected royalties in a trust fund and to invest those funds according to law.

As to Plaintiff's royalty calculation and collection claims, nothing in the 1906 Act, its implementing regulations, or leases imposes any specific duties on the Secretary of the Interior with respect to calculating royalties, collecting royalties, or imposing and collecting late fees. The 1906 Act is silent as to the calculation of royalties, their collection, and imposition and collection of late fees. The regulations implementing the 1906 Act, and lease terms that mirror and incorporate the

regulations, require the lessees, not Interior, to calculate and pay royalties by dates certain.

In addition, the sources of law do not together give the United States full management responsibility or plenary or pervasive control of the royalty calculation or collection process. For these reasons, the Court should find that, under the Tucker Act, 28 U.S.C. § 1491, and Indian Tucker Act, 28 U.S.C. § 1505, it has no jurisdiction to consider Plaintiff's claims related to the calculation or collection of royalties or late fees for the oil and gas leases that are the subject of this case.

In addition, the Court should dismiss Plaintiff's claim related to royalty calculation and collection because these claims are squarely before another Court in an earlier-filed case. *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999). In that case, the specifics of Plaintiff's royalty underpayment claim and collection claim have been expressly articulated in Plaintiff's original complaint and rearticulated in several amended complaints. *See* Case No. 99-550L, Docket entries 1, 52, 65, 69. Further, in rejecting Plaintiff's attempt to consolidate these cases, the other Court deemed that the two actions were distinct and unrelated. Order, (September 14, 2000), Docket entry 32. In addition, these claims are currently subject to the United States' Motion to Dismiss on statute of limitations and other grounds in Case No. 99-550L. Docket entry 80. Accordingly, this Court should dismiss Plaintiff's royalty calculation claim, which is Plaintiff's royalty underpayment claim in a different guise, and its royalty collection claim to allow those claims to be adjudicated in Case No. 99-550L.

If, despite the existence of the identical claim in Case No. 99-550L, this Court should proceed in considering the royalty calculation and collection claims, it should dismiss the royalty calculation claim as barred by the statute of limitations. The Osage Tribe knew or should have know about the claim six years before the initiation of this case. Moreover, the Appropriations Act

provision that this Court has interpreted to limit the commencement of the accrual of the statute of limitations on claims of mismanagement or loss to funds, Public Law No. 108-447, 118 Stat 2809, does not apply to the royalty calculation claim under the reasoning of *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d 1339 (Fed. Cir. 2004), *cert. denied,* 73 USLW 3338 and 73 USLW 3415 (2005).

As to Plaintiff's investment claims, Plaintiff has failed to articulate the fiduciary duties of the Government. Nevertheless, Defendant maintains that, to the extent Plaintiff's claim is that the United States has a duty to invest that entails a higher standard of care than the arbitrary and capricious or abuse of discretion standard, that claim should be dismissed. As to Plaintiff's "deposit lag time" claim, Defendant does not dispute the existence of a duty to place in the Treasury of the United States royalties received from oil and gas leases, but notes that Plaintiff has not articulated a standard for measuring the scope of that duty. As for Plaintiff's "disbursement lag time" claim, Plaintiff has failed to provide any legal authority on which the Court could find a related money-mandating fiduciary duty. That claim, therefore, should be dismissed for lack of jurisdiction.

## II. STATEMENT OF THE QUESTIONS INVOLVED

1. Does the Court have jurisdiction under the Tucker Act and Indian Tucker Act over Plaintiff's royalty calculation or collection claims?

2. Should the Court dismiss Plaintiff's royalty calculation and collection claims because they are subject to an earlier-filed case?

3. Is the Tribe's royalty calculation claim barred by the statute of limitations?

4. Does the Court have jurisdiction under the Tucker Act and Indian Tucker Act over Plaintiff's investment claims?

## III. STATEMENT OF THE FACTS

### A. THE 1906 ACT

The Osage Tribe, at the turn of the last century, occupied a reservation which now constitutes Osage County, Oklahoma. By virtue of the 1906 Act,[2/] the surface interests were allotted to individual tribal members. Section 3 of the 1906 Act reserved "the oil, gas, coal, and other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage Tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six . . . ." The ownership of the minerals by the Osage Tribe has been extended from time to time and was last extended in perpetuity by the Act of October 21, 1978, Pub. L. No. 95-496, 92 Stat. 1660. The 1906 Act provides that leases are to be made by the Osage Tribal Council and approved by the Bureau of Indian Affairs ("BIA"). The Act also created a trust fund consisting of proceeds from the sale of Osage lands in Kansas and income from the Osage mineral estate. *See* H.R. Rep. No. 92-963, at 8.

The history of the 1906 Act shows that the Tribe sought the legislation and was closely involved in its formulation. By 1906, the Osage Tribe of Indians had, for several years, "been considering the question of asking the Government to divide its lands and moneys among the members of the tribe." House Committee on Indian Affairs, Division of Lands and Funds of Osage Indians, Oklahoma, H.R. Rep. No. 59-3219, at 1. In 1906, the Tribe had agreed on a plan to divide its lands and moneys. *Id.* The final bill enacted by Congress "was submitted to the Osages at [a] general election held by them, and it was adopted by all factions of the tribe. It was brought to

---

[2/] Defendant will provide to Plaintiff a proposed appendix of the relevant statutes, legislative history, and regulations and will work with Plaintiff to file jointly the appendix with the Court by the time the briefing on Defendant's Motion to Dismiss is complete.

Washington by delegates representing those factions, submitted to the Secretary of the Interior for his consideration, and the committee has given the measure very careful consideration and recommends its passage . . . ." *Id.*

**B. OIL AND GAS ROYALTIES**

Oil and gas from the Tribe's mineral estate has been extracted pursuant to leases that provide for, among other things, the payment of royalties from production. In general, a royalty under an oil lease is calculated by applying the "royalty rate," which has historically been and is currently stated in the regulations as being not less than 16 ⅔ percent[3/] or 12 ½ percent if the oil is produced by secondary recovery processes, to the gross proceeds obtained from the sale of the oil after subtracting out the oil used by the lessee for development and operational purposes. *See* 25 C.F.R. § 226.11(a)(1).[4/]

The "gross proceeds" are the total monies or other consideration received at an established sales price for the oil. The established sales price is the higher of either the actual selling price or the highest posted price in a particular geographical area. 25 C.F.R. § 183.11 (1975); 25 C.F.R. § 226.11 (1990). Although the "royalty rate" has remained at its historical rate of 16 2/3 percent of the gross proceeds, the geographical area for determining the sales price has changed over time. *Compare* 25 C.F.R. § 183.11(a)(2) (1975) (actual selling price or highest posted or offered price in the Kansas-Oklahoma area) *with* 25 C.F.R. § 226.11(a)(2) (1990) (selling price or highest posted

---

3/ The current regulations provide that the royalty rate shall not be less than 16 2/3 percent. This allows the Tribe to execute leases at other rates as it deems appropriate. For ease of reference, however, the United States refers herein to the royalty rate as being 16 2/3 percent.

4/ Unlike the regulations that apply to other Tribes' oil royalties, *see* 30 C.F.R. § 206.52, the regulations applicable to the Osage Tribe do not require major portion analysis, *see* 25 C.F.R. Part 226.

price in Osage County).[5]

## C. FUNDS MANAGEMENT

The royalties that are received by Interior are deposited in the United State Treasury ("Treasury"). 1906 Act § 4. The funds in Treasury are initially invested in public debt securities. 25 U.S.C. § 161a(a). At the discretion of the Secretary of the Interior, the funds may be withdrawn from the Treasury and invested in banks, 25 U.S.C. § 162a(a), or, at the request of the Tribe, in other restricted investments, 25 U.S.C. 162a(c). On a quarterly basis, the funds are disbursed to the "headright" owners. 1906 Act § 4.

## D. THE LITIGATION

Plaintiff Osage Tribe sues the United States here for "money damages for breach of fiduciary duty in the management of tribal trust funds and for failure to account." Complaint ¶ 4. Reciting and partially quoting language from two treaties between the Osage and the United States, the Treaty of November 10, 1808, and the Treaty of September 29, 1865; various statutes from 1906 to 1978; and assorted federal regulations, the Tribe asserts that United States has "exercised involuntary, pervasive management and complete control over the mineral assets of the Osage." Complaint ¶ 12. It further asserts that Government control extended to funds held originally in trust by treaty, appropriations, statutory allotment, "lease bonuses and rentals, royalties, and income from investments of funds since the early 1800s." *Id.* The Osage Complaint sets forth two counts or causes of action.

---

[5] Royalty on gas is determined by multiplying the royalty rate of 16 ⅔ percent by the market value of all natural gas and products extracted under the lease that have been produced and sold, less the natural gas used in the operation and development of the lease. *See* 25 C.F.R. § 182.11(b)(2) (1975); 25 C.F.R. § 226.11(b)(2) (1990).

On April 15, 2005, the Court amended its Order issued on March 25, 2005, setting forth the schedule for the first phase of this case. Therein, the Court stated that

> The first tranche will encompass those of plaintiff's trust fund mismanagement claims falling within the parameters described in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1350-51 (Fed. Cir. 2004), for five oil and gas leases for the following six months: January 1976, May 1979, November 1980, February 1986, July 1989, and October 1990.

April 15, 2005 Order, at 1. Pursuant to this Order, Plaintiff on May 13, 2005, filed the Osage Nation's Statement of Trust Fund Mismanagement Claims for Tranche One ("Tribe's Statement of Claims"). Therein, Plaintiff identified five oil and gas leases that would form the basis of Tranche One. Furthermore, Plaintiff set forth two broad trust fund mismanagement claims that it asserts are within the parameters of *Shoshone Indian Tribe v. United States*. Tribe's Statement of Claims at 2. In a broad sense, Plaintiff seeks damages for "payments due under the Tranche One leases for the Tranche One months that the trustee failed to collect," *id.*, and "investment income from the proceeds of the Tranche One leases during the relevant months that the United States failed [to] earn as required by law," *id.* at 5.

## IV. ARGUMENT

### A. LEGAL STANDARDS FOR EVALUATION OF THE COURT'S JURISDICTION UNDER THE TUCKER ACT AND INDIAN TUCKER ACT

#### 1. Standards for a Motion to Dismiss for Lack of Jurisdiction

RCFC 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. A party seeking federal court jurisdiction bears the burden of demonstrating that it is so entitled. *Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487, 492 n. 9 (D.C. Cir. 1984). The Supreme Court presumes that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *See United States Department of Energy v. Ohio*,

503 U.S. 607, 614 (1992); *Renne v. Geary*, 501 U.S. 312, 315 (1991). A plaintiff must also provide and support a jurisdictional basis for judicial review. *See Wally Packaging, Inc. v. United States*, 578 F. Supp. 1408, 1410 (Ct. Int'l Trade 1984); *McDonald v. United States*, 37 Fed. Cl. 110, 113 (1997).

To the extent that Defendant relies on evidence outside the pleadings, the Court may properly consider such evidence in ruling on jurisdictional issues. *Carter v. United States,* 62 Fed. Cl. 66, 67-68 (2004). "Plaintiff cannot rely merely on the allegations in the complaint if jurisdiction is challenged." *Osage Nation v. United States*, 57 Fed. Cl. 392, 396 (2003). "[I]f the truth of jurisdictional facts is challenged, then the court may consider relevant evidence in order to resolve the factual dispute." *Id.*, *citing Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988).

**2. Standards for Determining Whether the Court of Federal Claims Possesses Jurisdiction under the Tucker Act and Indian Tucker Act**

"It is elementary that '[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . . , and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.'" *Mitchell v. United States*, 445 U.S. 535, 538 (1980) ("*Mitchell I*") (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). In determining whether such consent is present, the Supreme Court has long held that "[a] waiver of sovereign immunity 'cannot be implied but must be unequivocally expressed.'" *Mitchell I*, 445 U.S. at 538 (quoting *United States v. King*, 395 U.S. 1, 4 (1969)).

Congress has consented to suit against the United States for certain claims for money damages in the Court of Federal Claims ("CFC"). The Tucker Act grants the CFC jurisdiction with respect to any claim against the United States founded either upon the Constitution, any Act of

Congress, any regulation of an executive department, upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort. 28 U.S.C. § 1491(a)(1).

The Indian Tucker Act grants jurisdiction to the same court with respect to claims by an Indian Tribe against the United States, "whenever such [a] claim is one arising under the Constitution, laws or treaties of the United States, or Executive orders of the President, or is one which otherwise would be cognizable in the Court of Federal Claims if the claimant were not an Indian tribe." 28 U.S.C. § 1505. The Indian Tucker Act was enacted in 1946 to ensure that Indian or tribal claimants would enjoy the "same" rights and remedies in suits against the United States as non-Indians, but no more. *Mitchell I*, 445 U.S. at 539; *see Mitchell v. United States*, 463 U.S. 206, 212 n.8 (1983) ("*Mitchell II*"); H.R. Rep. No. 79-1466 at 13 (1945) (Indian "claimants are to be entitled to recover in the same manner, to the same extent, and subject to the same conditions and limitations, and the United States shall be entitled to the same defenses, both at law and in equity, . . . as in cases brought [under The Tucker Act] by non- Indians.").

The Tucker Acts themselves do "not create any substantive right enforceable against the United States for money damages." *Mitchell II*, 463 U.S. at 216; *see also Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 738 (1982); *United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, in order to state a cause of action under one of the Tucker Acts, a plaintiff suing other than for breach of contract must point to an "Act of Congress" or "regulation of an executive department," 28 U.S.C. 1491(a)(1), that "can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained." *Mitchell II*, 463 U.S. at 217 (quoting *Testan*, 424 U.S. at 400, and *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009 (Ct. Cl. 1967)); *see*

*Bowen v. Massachusetts*, 487 U.S. 879, 905-906 n.42 (1988); *Sheehan*, 456 U.S. at 739. The requisite waiver of sovereign immunity is present under the Tucker Acts only if "a claim falls within th[at] category." *Mitchell II*, 463 U.S. at 218; *see OPM v. Richmond*, 496 U.S. 414, 431 (1990).

The Supreme Court has observed that "the substantive source of law may grant the claimant a right to recover damages either 'expressly or by implication.'" *Mitchell II*, 463 U.S. at 217 n.16; *but cf. Sheehan*, 456 U.S. at 739-740 ("Testan [held] that the Tucker Act provides a remedy only where damages claims against the United States have been authorized explicitly."). But the Court has been reluctant to recognize a damages remedy against the United States under the Tucker Acts when a statute does not clearly sanction one. *See Testan*, 424 U.S. at 400 ("We are not ready to tamper with these established principles [concerning the reach of the Tucker Act] because it might be thought that they should be responsive to a particular conception of enlightened governmental policy."); *see also Mitchell II*, 463 U.S. at 218 ("Of course, in determining the general scope of the Tucker Act, this Court has not lightly inferred the United States' consent to suit.") (citation omitted). That restraint reflects the general rule that waivers of sovereign immunity must be unequivocally expressed. *See Mitchell I*, 445 U.S. at 538; *OPM*, 496 U.S. at 432.

The Supreme Court's *Mitchell* decisions, the seminal cases involving claims brought by Indian claimants under the Tucker Acts, were governed by the general principles outlined above. In the *Mitchell* litigation, the Quinault Tribe and individual Indians sought damages from the United States for alleged breach of fiduciary duties with respect to timberlands on the Quinault Indian Reservation that had been allotted in trust to individual Indians. In *Mitchell I*, the Court held that the General Allotment Act, under which the United States holds allotted lands "in trust for the sole use and benefit of the Indian [allottees]," 445 U.S. at 541 (quoting 25 U.S.C. 348), did not authorize a

damages action against the United States for alleged mismanagement of timber resources on allotted lands. The Court explained that the General Allotment Act created "only a limited trust relationship between the United States and the [Tribe]," and that it did "not unambiguously provide that the United States has undertaken full fiduciary responsibilities as to the management of allotted lands." *Id.* at 542. Thus, the Court held, the General Allotment Act did not support "[a]ny right of the [Indians] to recover money damages for Government mismanagement of timber resources." Id. at 546.

In *Mitchell II*, the Court considered a different set of statutes and regulations and held that those provisions, unlike the General Allotment Act, could "fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the duties they impose[d]." 463 U.S. at 219 (citations omitted). In so holding, however, the Court emphasized that the provisions established "'comprehensive' responsibilities of the Federal Government in managing the harvesting of Indian timber," *id.* at 222 (citations omitted); *see id.* at 221 (regulations "required the preservation of Indian forest lands in a perpetually productive state"), and that "the statutes and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources." *Id.* at 226.

In *United States v. Navajo Nation*, 537 U.S. 488, 506 (2003), the Supreme Court reiterated the two-stage inquiry developed in *Mitchell I* and *Mitchell II*. In summary, first, "a Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties." *Id.* (citing *Mitchell II*, 463 U.S. at 216-17, 219). "[T]he analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions." *Id.* If Plaintiff meets that threshold, "the court must then determine

whether the relevant source of substantive law 'can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of duties [the governing law] impose[s]." *Id.* (citing *Mitchell II*, 463 U.S. at 219). "[T]he availability of such damages may be inferred. *Id.* (citing *Mitchell II*, 463 U.S. at 217 n.16).

Both *Navajo* and *White Mountain Apache v. United States*, 537 U.S. 465 (2003), decided the same day as *Navajo*, were primarily concerned with the threshold issue "of whether the United States owed fiduciary duties to Indian tribes under the laws relevant to the cases." *Fisher v. United States*, 402 F.3d 1167, 1174 (2005). "In *White Mountain* a duty was found to exist; in *Navajo Nation* it was not." *Id.* The Court in *White Mountain* also determined that the statute creating the Tucker Act right mandated a right of recovery in damages. 537 U.S. at 475-76.

In addressing the threshold question of whether the Tribe has identified "a substantive source of law that establishes specific fiduciary or other duties," 537 U.S. at 506, the Court in *Navajo* determined that the Indian Minerals Leasing Act ("IMLA") and its implementing regulations did not establish such duties over the Secretary of Interior's approval of leases or lease amendments. *Id.* at 511.[6] It noted that the IMLA did "not 'give the Federal Government full responsibility to manage Indian resources . . . for the benefit of the Indians. . . . The Secretary is neither assigned a comprehensive managerial role nor, at the time relevant here, expressly invested responsibility to secure 'the needs and best interests of the Indian owner and his heirs.'" *Id.* at 507-508 (internal quotation marks omitted in original), *citing Mitchell II*, 463 U.S. at 224. Further, the Court held that "the IMLA and its regulations do not assign to the Secretary managerial control over coal leasing."

---

[6] The relevant provisions of IMLA do not apply to the Osage Reservation. 25 U.S.C. § 396f.

*Id.* at 508.[7]

In *White Mountain Apache*, the Court held that a fiduciary duty did exist to preserve trust property based on the legislation that provided that land would be held in trust for the Tribe *and* that the land would be occupied by the Government so long as it was needed for certain purposes. Pub. L. No. 86-392, 74 Stat. 8 ("1960 Act"). Justice Ginsberg wrote a concurrence in *White Mountain Apache* clarifying the difference between *White Mountain Apache* and *Navajo Nation*, noting that she joined the Court's opinion in *White Mountain Apache* because it was consistent with her opinion in *Navajo Nation*. *Id.* at 479-81. As Justice Ginsberg described, *Navajo Nation* is a *Mitchell I* case, turning on the threshold question of whether a substantive source of law establishes specific fiduciary or other duties. *Id.* at 480-81. *White Mountain Apache*, on the other hand, is a *Mitchell II* case because the Tribe met the threshold by showing that the 1960 Act necessarily entailed fiduciary obligations. *Id.* at 480. Justice Ginsberg concluded that "[t]he plenary control the United States exercises under the Act as sole manager and trustee . . . places the case within *Mitchell II's* governance." *Id.* at 481.

The majority opinion in *White Mountain Apache* emphasized that the Federal Government exercised even more control than in *Mitchell II*: "the United States has not merely exercised daily supervision but has enjoyed daily occupation and so has obtained control at least as plenary as its authority over the timber in *Mitchell II*." 537 U.S. at 475. *White Mountain Apache* entailed a

[7] *Navajo* undermines the reasoning set forth by the Federal Circuit in *Brown v. United States*, 86 F.3d 1554, 1560-61 (Fed. Cir. 1996), where the court stated that a fiduciary duty can be established if the Government merely has supervision over trust assets without having control over the assets. In *Navajo*, the Court rejected the assertion that the approval authority of the Secretary of the Interior, which also formed the basis for finding a fiduciary duty in *Brown*, was sufficient to establish a money-mandating fiduciary duty. 537 U.S. at 509 & 510 n.13.

situation where the Government was physically occupying, using, and controlling property that was specifically held in trust for the Tribe. In short, to establish the necessary threshold fiduciary duty, the Tribe must identify sources of law that either, by their terms, plainly establish the duty or that provide full managerial responsibility or plenary control that would necessarily encompass the fiduciary duty that the Tribe claims has been breached.

In examining whether the Government sufficiently controlled the trust property or funds for purposes of establishing a money-mandating duty, the Court should also consider the extent of the Tribe's involvement with the exercise of those duties. *Navajo* introduced this additional factor in its consideration of whether there was a specific fiduciary duty on the Government in that case. The Court stated:

> imposing fiduciary duties on the Government here would be out of line with one of the statute's principal purposes. . . The IMLA aims to enhance tribal self-determination by giving Tribes, not the Government, the lead role in negotiating mining leases with third parties. . . As the Court of Federal Claims recognized, '[t]he ideal of Indian self-determination is directly at odds with Secretarial control over leasing.'"

537 U.S. at 508 (citations omitted). In considering whether the substantive law creates a fiduciary duty, the Court should examine not only the duties of the Government but also the rights, role, and responsibilities that the statute and its implementing regulations grant to the Tribe. The Court should not impose a money-mandating duty on the Government if doing so would be inconsistent with the role delegated to or reserved for the Tribe.

As explained below, a proper understanding of the *Mitchell* decisions-and application of the basic principles governing suits against the United States and limitations on implied rights to recover money damages-compels the conclusion in this case that several of the Tribe's claims do not involve a breach of money-mandating duties.

## B. PLAINTIFF HAS FAILED TO DEMONSTRATE THAT THE COURT HAS JURISDICTION OVER ITS OIL AND GAS ROYALTY CALCULATION AND COLLECTION CLAIMS

### 1. Plaintiff's Claims and the Statutory, Regulatory, and Lease Provisions Relevant to Their Claims

Plaintiff asserts that the United States "failed to collect payments due under the Tranche One Leases for the tranche one months. . ." Plf.'s Statement of Claims at 4. Specifically, Plaintiff states that the United States (1) "failed to compute the royalty in the manner prescribed by the applicable lease provisions and regulations," (2) "failed to collect these payments in a timely manner as required by the terms of the leases and applicable regulations," (3) "damaged the Osage Nation by depriving it of late payment fees . . . for payments that were not collected in a timely manner," and (4) "damaged the Osage Nation by depriving it of investment income on the payments due" that the United States failed to collect. *Id.* at p. 5.

In support of these claims, Plaintiff points to the 1906 Act, lease terms, and, generally, to Interior regulations. Section 4 of the 1906 Act provides:

> That all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . .
>
> . . . .
>
> That the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this Act, . . .

1906 Act § 4; Transcript of May 23, 2005 Telephonic Status Conference ("May 23 Tr."), at 32. Plaintiff also cites to various lease terms as creating the substantive money-mandating duty. Plaintiff cites to the first paragraph of one of the leases for the proposition that the "lease is issued pursuant to the 1906 Act[, which] confirms that it's subject to whatever statutory provisions are in

the 1906 Act." May 23 Tr. at 43, *citing to* Kewanee Oil Company Lease for the Stanley Stringer Unit, Contract No. 14-20-201-2679 (Jan. 20, 1954) (hereinafter "Stanley Stringer Lease") (attached as Exh. A to Plaintiff's Statement of Claims). Specifically, the leases provide that they are entered "under and in pursuance of Section 3, of the Act approved June 28, 1906, (34 Stat. L., 539-543); the Act approved March 3, 1921, (41 Stat. L., 1249); and the Act of March 2, 1929, (45 Stat. L., 1478), and the Act of June 24, 1938, (52 Stat. 1034); and the Act of June 15, 1950, (P. L. 548-81st Congress)." Stanley Stringer Lease at 9. Section 3 of the 1906 Act provides that "leases for all oil, gas, and other [Osage] minerals may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe. . . ." *See also* Stanley Stringer Lease, § 1, p. 11; May 23 Tr. at 44-45.

Section 2 of the Lease sets forth a lessee's responsibility to pay royalties: "The lessee agrees to pay, or cause to be paid, to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty" varying royalty percentages of the "gross proceeds" from the sales of specified volumes of oil from specified sands. Stanley Stringer Lease at 11-13. Further, Section 2 provides that "[p]ayment for the royalty hereunder shall be made at the time of sale or removal of the oil from the leased premises, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at no less than the highest posted market price in the Mid-Continent Field on the day of sale or removal." *Id.* at 13. Although the obligation set forth in Section 2 is placed on the lessee, Plaintiff asserts that this provision relates back to the statutory language of Section 4 of the 1906 Act in that it establishes "a payment that will come due to the tribe. . ." May 23 Tr. at 46. The royalty payment under Section 2 "is a check that belongs to the Osage Tribe, and it's going to be deposited in a trust for the Osage Tribe." *Id.* Further, Plaintiff

stated that it was putting "together two provisions: one, the statutory provision that . . . requires the United States to affirmatively collect money and get [it] into a trust. The other provision simply identifies a payment that is due the Osage Tribe and, therefore, falls within the statutory duty to collect this money and get it into the United States Treasury." *Id.* at 48-49.

Plaintiff also points to Section 15 of the lease, which provides that "[a]ll amounts due and payable under this lease shall be paid to the Superintendent by check or bank draft on a solvent bank in favor of the Treasurer of the United States." Stanley Stringer Lease at 19; May 23 Tr. at 42.

In addition, Plaintiff cites to Section 16 of one of the leases to be addressed in Tranche One of the case, which section provides:

> This lease is subject to the regulations now or hereafter prescribed by the Secretary of the Interior, relative to such leases, all of which are made a part of this lease; PROVIDED, that no regulation made after the approval of this lease shall operate to affect the term of the lease, rate of royalty, rental or acreage, unless agreed to by both parties.

Stanley Stringer Lease at 19-20; May 23 Tr. at 37-39. As for the regulations incorporated into the leases, Plaintiff noted "the provisions of the regulations that require the collection of late-payment fees if a royalty isn't made on time." May 23 Tr. at 52. As cited in the Tribe's Statement of Claims, the late-fee provision is found at 25 C.F.R. § 183.13 (1975), the provision in place from April 1975 to March 1982 when the provision was redesignated as section 226.13. Section 183.13 provides, in full, that:

> (a) Royalty payments due may be paid by either purchaser or Lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the preceding month. Failure to make such payments shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 ½ percent for each month or fraction thereof until paid.
>
> (b) Lessee shall furnish certified monthly reports by the 25th of each following

> month covering all operations whether there has been production or not, indicating therein the total amount of oil, natural gas, casinghead gas, and other products subject to royalty payment.
>
> (c) Failure to remit payments or reports shall subject Lessee to further penalties as provided in §§ 183.42 and 183.43 . . . .

Section 226.13(a) was amended in August 1990 with the following additional language: "The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charges." 25 C.F.R. § 226.13(a).

Plaintiff further referenced, without any citation to sections of regulations, "provisions in the regulations that say the government can assess civil penalties against lessees that don't comply with the lease." May 23 Tr. at 53. Presumably, Plaintiff refers to 25 C.F.R. § 183.42, subsequently redesignated as section 226.43, which provides, in part:

> Violation of any of the terms or conditions of any lease or of the regulations in this part shall subject the lease to cancellation by the Superintendent, or Lessee to a fine of not more than $500 per day for each day of such violation or noncompliance with the orders of the Superintendent, or to both such fine and cancellation. . . Payment of penalties not received within 10 days after notice of final decision is given shall be subject to late charges at the rate of not less than 1 ½ percent per month for each month or fraction thereof until paid.

25 C.F.R. § 183.42 (1975). In August 1990, this language was amended through the addition of the following language: "The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charge." 25 C.F.R. § 226.42.

Although Plaintiff did not cite to the section in the Tribe's Statement of Claims or during the May 23, 2005 Status Conference, section 183.11, redesignated as section 226.11 in 1982, would also appear relevant to Plaintiff's claims related to royalty calculations. The section provides, in part:

> (a) Lessee shall pay or cause to be paid to the Superintendent, as royalty, the sum of not less than 16 ⅔ percent of the gross proceeds from sales after deducting the oil used by Lessee for development and operation purposes on the lease . . . The Osage

> Tribal Council may, upon presentation of justifiable economic evidence by Lessee, agree to a revised royalty rate subject to approval by the Superintendent, applicable to additional oil produced from a lease or leases by enhanced recovery methods, which rate shall not be less than 12 ½ percent of the gross proceeds from sale of oil produced by enhanced recovery processes, . . .
>
> (b) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of the sale or removal.

25 C.F.R. § 183.11 (1975). In August 1990, subsection 226.11(b) was amended to provide as follows: "settlement shall be based on the actual selling price, but at not less than the highest posted price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases." 25 C.F.R. § 226.11(b).

### 2. The Statutory and Regulatory Provisions are not Sufficiently Specific or Directive to Allow Plaintiff to Pass the Threshold Test of *Navajo*

To support an action for money damages, Plaintiff must show that the statutes or regulations "unambiguously provide that the United States has undertaken full fiduciary responsibilities" as to the particular activity at issue. *Wright v. United States*, 32 Fed. Cl. 54, 56 (1994), *citing Mitchell I*, 445 U.S. at 542. Plaintiff's fatal flaw is that it is unable to cite to any controlling provision directing the United States to undertake any duties with respect to the calculation or collection of royalties. Accordingly, Plaintiff fails to meet the threshold requirement under *Navajo* for articulating "a substantive source of law that establishes specific fiduciary or other duties. . ." 537 U.S. at 506.

The language of the 1906 Act does not place an unambiguous or specific fiduciary duty on the United States to calculate or collect royalties owing on oil and gas leases. The Act provides generally that, *inter alia*, the United States shall hold in trust "all funds belonging to the Osage tribe,

and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians," 1906 Act § 4. As in *Mitchell I*, this broad language creates a limited trust relationship but does not impose specific duties with respect to these funds or moneys. *Mitchell I*, 445 U.S. at 542. It does not create functional obligations to calculate or collect the moneys due. Other language in the Act provides more specific directives. The Act provides that "the royalties *received* from oil [and] gas . . . leases shall be placed in the Treasury" and held in trust by the United States. 1906 Act § 4 (emphasis added). This provision places the specific duty on the United States to deposit royalties that are received. It also, however, falls short of establishing a specific duty on the United States to calculate or collect the royalties.[8] The duties related to the calculation and payment of royalties are found in the regulations implementing the 1906 Act, and those duties fall on the lessees.[9]

The regulations provide that the "[l]essee shall pay or cause to be paid to the Superintendent,

---

[8] The 1906 Act also provides that "the royalties to be paid to the Osage tribe under any mineral lease . . . shall be determined by the President of the United States." 1906 Act § 3. As Plaintiff recognizes, under this provision "the *royalty rate* for such leases had to be determined by the President of the United States." Statement of Claims at 3 (emphasis added). Establishing royalty rates is a different function than calculating royalties based on those rates. Under the authority of this provision, Interior promulgated implementing regulations that established the royalty rates at 16 ½ percent and 12 ½ percent for for oil produced by secondary recovery processes. *See* Preamble, 39 Fed. Reg. 22254; 25 C.F.R. § 183.11 (1975). Also, in 1950, Congress amended section 3 of the 1906 Act to provide that the "royalties to be paid to the Osage tribe under any mineral lease . . . shall be determined by the Osage Tribal Council, subject to the approval of the Secretary of the Interior." Pub. L. No. 548, 64 Stat. 215 (1950).

[9] Plaintiff's attempt to rely on the provisions of the leases themselves must fail. The Supreme Court addressed this argument in its decision in *Navajo* by recognizing that the Secretary of the Interior is not a signatory to the lease and the lease, therefore, is not contractually binding on her. *Navajo*, 537 U.S. at 511 n.13. In any event, in relevant respects, the lease terms mirror those of the regulations. *Compare, e.g.,* Stanley Stringer Lease § 1, pp. 10-14 *with* 25 C.F.R. §§ 183.11, 183.13 (relating to calculation and payment of royalties).

as royalty, the sum of not less than 16 2/3 percent of the gross proceeds from sales" or, if approved by the Osage Tribal Council, "12 ½ percent of the gross proceeds from sale of oil produced by enhanced recovery processes." 25 C.F.R. § 183.11(a) (1975). The payment "shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of the sale or removal." 25 C.F.R. § 183.11(b) (1975). The regulations also provide that "[r]oyalty payments due may be paid by either purchaser or Lessee" and that "all payments shall be due by the 25th day of each month and shall cover the preceding month." 25 C.F.R. § 183.13(a) (1975). These duties, as reiterated in the leases, fall on the lessees, not the United States. Nowhere is there a money-mandating directive requiring the United States, acting through Interior, to calculate the royalties for the lessees, to audit the lessees to determine if they have properly calculated the royalties, to actively collect the royalties, or to guarantee that the lessees have paid royalties.

Plaintiff has suggested that the regulations' requirement that lessees must pay late fees shows that Interior is obligated to collect the underlying royalties as well as any late fees. The regulations provide that the lessee's failure to make such payments "shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 ½ percent for each month or fraction thereof until paid." 25 C.F.R. § 183.13 (1975). This language does not direct Interior to collect the late fees or make the Government liable for late fees.

Similarly, the regulatory provision relating to the assessment of civil penalties against non-compliant lessees does not place on the United States a duty to calculate or collect royalties. The regulation provides that the "[v]iolation of any of the terms or conditions of any lease or of the regulations in this part shall subject the lease to cancellation by the Superintendent, or Lessee to a

fine of not more than $500 per day for each day of such violation or noncompliance with the orders of the Superintendent, or to both. . ." 25 C.F.R. § 183.42 (1975). This provision does not require Interior to recalculate or collect royalties or late fees. Rather, if a lessee violates the regulations or lease terms, section 183.42 leaves Interior with a starkly limited set of options – it may cancel the lease or impose a fine. In any event, in the context of the regulations as a whole, this provision does not appear to be aimed principally at violations in payment terms, but, instead, focuses on the violations of the regulations pertaining to operations. 25 C.F.R. §§ 183.16 - 183.41 (1975); *see* 25 C.F.R. § 183.43 (1975) (setting forth alternative penalties for violations of certain operating regulations). As explained above, failure to make correct or timely payments are specifically addressed elsewhere, in section 183.13, which imposes late fees. Accordingly, the regulations do not unambiguously obligate Interior to cancel leases or impose daily fines for payment failures.

To impose a duty on Interior to calculate and collect royalties would require the Court to go beyond the prescriptions of the 1906 Act and its implementing regulations. The regulations and leases expressly require the lessee or purchaser to calculate and pay royalties and late fees. They do not require Interior to calculate and collect royalties and late fees. Thus, as in *Pawnee*, "[t]he difficulty with [Plaintiff's] claim is that it runs counter to the governing regulation and the terms of the leases." *Pawnee v. United States*, 830 F.2d 187, 191 (Fed. Cir.1987); *See also Brown v. United States*, 86 F.3d 1554, 1563 (Fed. Cir. 1996) ("where no specific statutory requirement or regulation is alleged to have been breached by the Secretary, the money claim against the government must fail."). Because Plaintiff has failed to identify substantive law that creates relevant specific fiduciary duties, the Court should dismiss its claims related to the calculation and collection of royalties and late fees.

### 3. The 1906 Act and its Implementing Regulations do not Establish in Interior Sufficiently Pervasive Managerial Control Over the Calculation and Collection of Royalties to Establish a Fiduciary Duty

The 1906 Act and its regulations establish that the receipts of royalties for oil and gas leases are to be held in trust by the United States. These sources of law do not, however, require Interior to calculate or collect the royalties owing. In the absence of such specificity, Plaintiff has also suggested that the general fiduciary duties established by section 4 of the 1906 Act would allow the Court to determine that there is a fiduciary duty to calculate and collect royalties because, Plaintiff asserts, Interior has exclusive or pervasive control over those functions. May 23 Tr. at 53-55. Plaintiff further asserts that evidence that it is gathering will demonstrate a "course of conduct" that they argue will show the type of control that would give rise to the fiduciary duties it claims exist. *Id.* But the fact that the Osage Agency may have taken on activities related to calculating or collecting royalties that are not required by the 1906 Act or its implementing regulations should not transform those activities into fiduciary duties, the violation of which would require compensation. The ultimate duties to calculate and pay are specifically placed on the lessees, thus it is the lessees that are liable for any breach of those duties, not the United States.[10/] Because the sources of law do not establish control in the Government over the royalty calculation and collection functions, and, as explained below, significant control remains with the Tribe over the lease terms and their enforcement, no such money-mandating duty can be deemed to exist without more explicit prescriptions establishing the duties that Plaintiff claims were breached.

Significantly, the Tribe has substantial rights by virtue of its role as the signatory and lessor

---

[10/] Nevertheless, Plaintiff has not yet presented the evidentiary support for its proposition. If it does so in its responsive brief, Defendant will address the assertion in its reply.

to the oil and gas leases. The 1906 Act and the regulations specifically provide that Interior has approval authority over the entry of leases only, but that the Tribe has the authority to enter the leases. 1906 Act at § 3 ("leases for all oil, gas, and other minerals . . . may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior. . . ."); 25 C.F.R. § 183.2 (1975) ("The Superintendent may approve oil leases, gas leases, and oil and gas leases made by the Osage Tribe. . . ."); 25 C.F.R. § 226.2 (1990) ("The Osage Tribal Council may utilize the following procedures among others, in entering into a mining lease. . ."). [11] Moreover, a 1950 amendment to the 1906 Act provides that the "royalties to be paid to the Osage tribe under any mineral lease . . . shall be determined *by the Osage Tribal Council*, subject to the approval of the Secretary of the Interior." Pub. L. No. 81-548, 64 Stat. 215 (1950). Thus, not only does the Tribe control entry into the leases, but it also controls the setting of the royalties to be paid.

The Osage Tribal Council has exercised its authority to enter leases and the Principal Chief of the council is the signatory on each of the leases that are subject to Tranche One of this case. The Tribe plainly has its own independent right to enforce the terms of the leases it has entered –which, specifically adopt the Osage oil and gas regulations (*e.g.*, Plf.'s Exh. A § 16; 25 C.F.R. § 183.5 (1975); 25 C.F.R. § 226.5 (1990)) – including those related to the calculation and payment of royalties.

It is well-established that tribes have the right to bring their own lawsuits to enforce the terms of leases that they enter. In *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 372 (1968), the Supreme Court considered whether Indian allottees have standing to sue under an oil and gas lease in a situation

---

[11] Interior's approval authority over leases and other decisions of the Tribe does not itself give rise to a fiduciary duty. *Navajo*, 537 U.S. at 509 & 510 n.13.

involving regulations similar to those involved here. The court stated that "we find nothing in this regulatory scheme which would preclude petitioners from seeking judicial relief for an alleged violation of the lease." 390 U.S. at 373.[12] The Court also noted that, while the regulations empowered the Secretary to cancel a lease for violations of its terms–as Interior may do under the Osage regulations–"there is not justification for concluding that the severe sanction of cancellation of the lease is the only relief for all breaches of the lease terms or for any failure to pay royalties. Both the lessor and the lessee may wish to resolve their disagreement by the payment of damages and not by the cancellation of a basically satisfactory lease." *Id.* at 374. The fact that the Tribe has the ability to enforce the terms of the leases, including terms for proper and timely payment, demonstrates that the United States has neither full responsibility nor plenary control over these functions.

The regulations provide the Tribe with additional control over other aspects of the payment of royalties. For example, "[t]he Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charges" established in the regulations. 25 C.F.R. § 226.13(a) (1990). The Tribal Council may also choose, with the approval of the Secretary of the Interior, to "elect to take the royalty in kind. . ." in lieu of royalties. 25 C.F.R. § 183.11(a)(2) (1975); 25 C.F.R. § 226.11(a)(2) (1990).

---

[12] The Court also, in dicta, suggested that the Government, upon determining that a lease term was violated, would "satisfy its trust obligations by filing the necessary court action." 390 U.S. at 373. The United States does not, however, have a money-mandating duty to file actions on behalf of the Osage Tribe to vindicate lease terms, and thus is not obligated to do so. *See Shoshone-Bannock Tribes v. Reno*, 56 F.3d 1476, 1482 (D.C. Cir. 1995) (concluding that there was no specific duty requiring the Government to bring an action on behalf of the Tribe and stating that "an Indian tribe cannot force the government to take a specific action unless a treaty, statute or agreement imposes, expressly or by implication, that duty").

In practice, the Osage Tribal Council exercises significant control over various aspects of its oil and gas operations related to royalties received. For instance, it is plain that the Tribe was fully capable of determining, and did determine, royalty under-payments. In a 1984 letter to the Superintendent of the Osage Agency, the Principal Chief of the Osage Tribal Council, explained that "the Osage Agency is now faced with a total of thirteen companies or individuals, involving (to date) six leases, owing the Osage Tribe $336,003.23 for underpaid royalties and related penalty amounts. . . ." Letter from George E. Tallchief, Principal Chief of Osage Tribal Council, to Jack Shoemate, Superintendent Osage Indian Agency (Aug. 29, 1984), at 4-5 (attached as exhibit 1); *see also* Letter from George Tallchief, Principal Chief, Osage Tribe to Jack Shoemate, Superintendent, Osage Indian Agency (undated) (attached as Exhibit 2).

Evidence also abounds showing the Tribe to be a sophisticated manager of its oil and gas assets. For example, the Tribe has negotiated and set royalty rates on oil and gas leases, *see* Resolution of the Osage Tribal Council, No. 26-624 (Aug. 21, 1985) (attached as Exhibit 3); negotiated and set the pricing methodology for gas leases, *see* Resolution of the Osage Tribal Council, No. 28-363 (Sept. 18, 1991) (attached as Exhibit 4); set the methodology for calculating deductions from the royalties paid on gas, *see* Resolution of the Osage Tribal Council, No. 26-659 (Oct. 8, 1985) (attached as Exhibit 5); audited and sought corrections of royalty payments, *see* Memorandum from Jim Littleton, Tribal Auditor, to Mary Lou Drywater, Realty Specialist (April 24, 1987) (attached as Exhibit 6) and Memorandum from Jim Littleton, Tribal Auditor, to Jack Shoemate, Superintendent Osage Indian Agency, *et. al.* (Aug. 28, 1987) (attached as exhibit 7); and addressed delinquent payments, Letter to Dark Oil Co. from E.A. Green, Acting Superintendent, Osage Indian Agency (undated) (attached as Exhibit 8). In addition, the Tribe's extensive auditing

of its trust funds and its involvement in remedying identified problems demonstrate that the Tribe was closely involved, rather than passive, in the management of its trust funds. *See* Def.'s Motion to Dismiss (July 25, 2001) at 16-20 and exhibits cited therein.

Plainly, Interior does not exercise "full responsibility" or "managerial control" over ensuring that royalties are properly calculated or timely paid. *See Navajo*, 537 U.S. at 507, 508. Lacking specific language imposing these duties and the necessary pervasive or plenary control, the Court should decline to find that Interior has a money-mandating duty to calculate or collect royalties or late fees on oil or gas leases and should dismiss these claims for want of jurisdiction.

**4. Precedent Supports the Conclusion that the 1906 Act and its Regulations do not Establish Money-Mandating Duties to Calculate and Collect Royalties**

Other cases carefully considering statutory and regulatory language related to other leasing regimes have relied on more specific prescriptions to find money-mandating duties.

For example, this Court, in finding a money-mandating duty to collect royalties, relied on language more explicit than that found in the Osage statute and regulations. In its opinion considering defendant's motion for summary judgment on the Tribe's claims related to valuation and collection of royalties on oil and gas leases in *Shoshone Indian Tribe v. United States*, this Court held that the Federal Oil and Gas Royalty Management Act ("FOGRMA") obligated the United States, through Interior, to "ensure the prompt and proper collection and disbursement of royalties." 58 Fed. Cl. 77, 82 (2003).[13] The Court relied, in part, on the plain language of FOGRMA, which requires "the development of enforcement practices that ensure the prompt and proper collection and disbursement of oil and gas revenues to . . . Indian lessors" *id., citing* 30 U.S.C. § 1701(b)(3), and

---

[13] FOGRMA does not apply to the Osage oil and gas. The Osage lands subject to the 1906 Act are excepted from the Indian lands subject to that Act. 30 U.S.C. § 1702(3).

provides that "[t]he Secretary [of the Interior] shall establish a comprehensive inspection, collection and fiscal and production accounting and audit system to provide the capability to accurately determine oil and gas royalties . . . and to collect and account for such amounts in a timely manner," *id., citing* 30 U.S.C. § 1711(a). The Court concluded that FOGRMA established "clear duties with respect to the collection of royalties" and "can also be inferred to be money mandating because they are 'duty-imposing' . . . in that they impose an obligation on defendant to collect moneys on behalf of Indian tribes." *Id.* In contrast, and as explained *supra*, such duties are not spelled out in either the 1906 Act or its implementing regulations.

In its earlier ruling in the same case on Defendant's motion to dismiss and plaintiff's motion for summary judgment, this Court determined that the Government has a money-mandating duty to value oil and gas royalties under the IMLA and FOGRMA. The Court held that the "comprehensive valuation framework" of IMLA, FOGRMA, and, especially, their implementing regulations "creates fiduciary responsibilities on the part of the government." 56 Fed. Cl. 639, 648 (2003). The regulations examined by the Court provided that "[t]he value of production for the purpose of computing royalty, *shall* be the estimated reasonable value of the product as determined by the Associate Director . . ." *Id.* at 647 (emphasis added in original), *citing* 30 C.F.R. § 206.103 (1987). In addition, the 1988 amended regulations provide:

> For any Indian leases which provide that the secretary may consider the highest price paid or offered for a major portion of production (major portion) in determining value for royalty purposes, if data are available to compute a major portion, *MMS will*, where practicable, compare the value determined in accordance with this section with the major portion. The value to be used in determining the value of production, for royalty purposes, shall be the higher of those two values.

30 C.F.R. § 206.201(a)(2)(i) (1988), *cited in* 56 Fed. Cl. at 647 (emphasis added). The Court found that these regulations plainly place the duty to value, or calculate, the royalties on oil or gas leases

that are subject to IMLA, FOGRMA, and their implementing regulations on Interior. In contrast, the language in the 1906 Act and its implementing regulations contain no such directives to Interior, instead placing the duties to compute and pay royalties on the lessees.

In the phase of the *Shoshone Indian Tribe* litigation that involved the tribes' claims related to the income received from their sand and gravel leases, this Court and the Federal Circuit addressed, to a limited extent, a duty of the United States to collect revenue from mineral leases. In the appeal of this Court's ruling on defendant's motion to limit recovery based on the statute of limitations, the Federal Circuit concluded that the Government had a duty to collect proceeds from approved mining contracts under the implementing regulations of IMLA. *Shoshone Indian Tribe*, 364 F.3d at 1350. For this conclusion, the Court specifically cited, without analysis, to 25 C.F.R. § 211.40, which provides that "all payments shall be made to the MMS or such other party as may be designated, and shall be made at such time as provided in 30 C.F.R. chapter II, subchapters A and C." 364 F.3d at 1350, 1353. The Court also cited to "related regulations in 30 C.F.R., Subchapters A and D." *Id.* at 1350; *see also* 25 C.F.R. § 211.6 ("[t]he functions of the MMS for reporting, accounting, and auditing are found in 30 CFR chapter II, subchapters A and C, which apply to leases approved under this part.").

Section 211.40 requires MMS to collect the revenues by incorporating specific regulations relating to MMS duties, which are substantially more directive than those applying to the BIA in the Osage regulations. In 30 C.F.R., Subchapter A, section 201.100 (which is not applicable to the Osage Tribe) provides that "[t]he Associate Director [of MMS] is responsible for the collection of certain rents, royalties, and other payments; for the receipt of sales and production reports; for determining royalty liability; for maintaining accounting records; for any audits of the royalty

payments and obligations . . ." 30 C.F.R.§ 201.100. Specifically with regard to solid minerals – which includes sand and gravel, 25 C.F.R. § 211.3 – MMS is obligated to calculate and collect royalties. 30 C.F.R. § 218.200 (lessee shall submit payments for all royalties for solid minerals "in the amount determined by MMS to be due."); *id.* § 218.202 ("[t]he failure to make timely or proper payment of any monies due pursuant to leases and contracts subject to these rules will result in the collection by MMS of the full amount past due plus a late payment charge."). In contrast, no such specific duties are placed on the BIA in the regulations related to the calculation and collection of royalties from Osage oil and gas leases.

In short, the cases that have found a duty on the Government to calculate and collect revenues on Indian leases have relied on comprehensive, specific, and plain statements of substantive law prescribing those duties. Because no such prescriptions are in the 1906 Act or its implementing regulations, the Court should find that it does not have jurisdiction over the Tribe's claims related to the calculation and collection of royalties from Osage oil and gas leases.

**5. The Court Should Dismiss Plaintiff's Claims Related to the Calculation and Collection of Royalties Because that Claim is Before Another Court**

The Court should dismiss Plaintiff's claims related to royalty calculation and collection because they are squarely before the Court of Federal Claims in a separate case filed earlier than the instant case. *See* Complaint, *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999) (attached as Exhibit 9). In the original Complaint in Case No. 99-550L, Plaintiff described the nature of that action as one for money damages for underpayment of royalties and failure to collect, Compl., No. 99-550L ¶ 4, and claimed that the United States failed to collect royalty income based on the highest posted price. *Id.* ¶¶ 12-14, 18, and 21-23. Plaintiff here has described the nature of this case as "an action for money damages for

breach of fiduciary duty in the mismanagement of tribal trust funds and for failure to account." Compl., No. 00-169L ¶ 4.

Shortly after the filing of this case in 2000, Plaintiff filed a motion to amend and consolidate this case with Case No. 99-550L. In briefing that motion, Plaintiff plainly distinguished between the issues and claims in Case No. 99-550L (*i.e.*, the "pricing" case) from those in this one. In Plaintiff's words, Case No. 99-550 involved

> Plaintiff's claim that the Defendant breached its fiduciary duty to Plaintiff and mismanagement of Plaintiff's trust by not collecting the proper royalty amount on oil produced and sold from lands held in trust by the Defendant for the benefit of Plaintiff. This issue includes both the amount of production and price obtained.

Plaintiff's Motion to Amend and Consolidate and Brief in Support, No. 99-550L, May 1, 2000, at 2 (attached as Exhibit 10). As to this case (Case No. 00-169L), Plaintiff stated that

> the Defendant has, to the detriment of Plaintiff, further mismanaged Plaintiff's trust money assets, composed primarily of oil royalties, by not prudently and properly accounting for the money paid into the U.S. Treasury and investing the same (as required by federal law) for the benefit of Plaintiff.

*Id.* Further, Plaintiff explained that Case No. 99-550 "directly relates to Defendant's failure to properly collect royalty for oil[,] and Case No. 00-169L relates to Defendant's mismanagement of the oil royalty money that was collected, as well as other assets of the Osage." *Id.* The Court initially issued an Order consolidating the cases, but, upon Defendant's motion for reconsideration, (attached as Exhibit 11), it vacated its consolidation order, recognizing the separate nature of the cases. *See* Order, No. 99-550L (September 14, 2000) (attached as Exhibit 12).

In October 2004, Plaintiff filed a third amended complaint in Case No. 99-550L, in which Plaintiff made clear, once again, that it is bringing its claims for undervaluation of royalties in that case, not in the one before this Court. *See* 3rd Amended Compl., No. 99-550L (Oct. 24, 2005)

(attached as Exh. 13). In the third amended complaint, Plaintiff characterized Defendant's role in issuing and collecting on oil and gas mining leases for portions of the Osage mineral estate. *Id.* ¶¶ 11-15. Also, Plaintiff averred that Defendant had failed to collect the appropriate royalties for crude oil produced during calendar year 1995, and that Defendant "as trustee, has made crude oil royalty underpayments with respect to other oil and gas leases and other periods." *Id.* ¶¶ 25, 28. Additionally, Plaintiff claimed that it "has been damaged by not receiving payments under the oil and gas mining leases that the United States, as trustee, issued for the benefit of the Osage Tribe and should have collected but did not collect." *Id.* ¶ 30.

In a status report filed as recently as February 11, 2005, Plaintiff defined the relevant issues in Case No. 99-550L as including the extent to which the "United States, as trustee, damaged the Osage Nation by failing to collect payments under oil and gas mining leases that the United States issued for the benefit of the Osage Nation." *See* Amended Joint Preliminary Status Report, No. 99-550L (Feb. 11, 2005) at 4 (attached as Exhibit 14). Later in this same report, Plaintiff described this case (No. 00-169L) as "involving Osage claims for federal mismanagement of tribal trust funds." *Id.* at 1.

In short, Plaintiff's royalty calculation and collection claims are not part of the case before this Court. This Court should defer to the Court's judgment in Case No. 99-550L in declining to consolidate these matters and, in doing so, recognizing the distinctions between the actions. The Court should reject Plaintiff's attempt to re-inject claims into this matter that have clearly been deemed distinct and subject to another case.

Further, on April 15, 2005, Defendants filed a motion to dismiss in Case No. 99-550L. Case No. 99-550L, Motion to Dismiss (attached as Exhibit 15). In part, Defendant is arguing in that

motion that Plaintiff's claims related to whether the United States failed to timely collect oil and gas royalties that are due and owing are barred by the statute of limitations and are outside the application of the Appropriations Acts as addressed in *Shoshone Tribe of Indians*, 364 F.3d at 1350-51. Case No. 99-550L, Mot. to Dismiss at 10-13. If the Court in Case No. 99-550L, which was filed before the instant case, rules that Plaintiff's royalty underpayment claims are barred by the statute of limitations, Plaintiff should not be allowed a second opportunity to litigate that claim in this trial court.[14] Thus, to preserve judicial resources, to avoid the possibility of inconsistent rulings on the same legal and factual issues, and to avoid interference in Case No. 99-550L, this Court should dismiss Plaintiff's royalty calculation and collection claims. *See, e.g., West Gulf Maritime Ass'n. v. ILA Deep Sea Local 24*, 751 F.2d 721, 728-29 (5th Cir. 1985) (holding that district court abused its discretion in issuing a preliminary injunction in light of a previously filed action involving the same issue in another court); *Common Cause v. Judicial Ethics Comm.*, 473 F. Supp. 1251, 1253 (D.D.C. 1979) ("When a court is confronted with an action that would involve it in a serious interference with or usurpation of [another court's] continuing power, considerations of comity and orderly administration of justice demand that the nonrendering court should decline jurisdiction." (quoting *Mann Mfg., Inc. v. Hortex, Inc.*, 439 F.2d 403, 408 (5th Cir. 1971)).

**6. Plaintiff's Claim that the United States Failed to Calculate Royalties is Barred by the Statute of Limitations**

If this Court should decide to address Plaintiff's royalty calculation claim, it should conclude

---

[14] Indeed, once the judgment of that Court becomes final, the parties would be barred by *res judicata* from relitigating the claim in this case. *See, e.g., Insurance Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n. 9, (1982) (explaining that principles of res judicata apply to issues of subject matter jurisdiction, and that "[a] party that has had an opportunity to litigate the question of subject matter jurisdiction may not ... reopen that question in a collateral attack upon adverse judgment").

that it is barred by the statute of limitations. It is a basic tenet that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tribe asserts that this Court has jurisdiction over its claims, including the claim related to the calculation of royalties, under the Tucker Act, 28 U.S.C. § 1491, and the so-called "Indian Tucker Act," 28 U.S.C. § 1505. Compl. ¶ 1. The Tribe's royalty calculation claim is time-barred, however, and, thus, neither of the Tucker Acts can serve as a proper waiver of sovereign immunity to sue the United States. Accordingly, the Court should dismiss the Tribe's claim related to royalty calculation.

The governing statute of limitations for Plaintiff's claims here is 28 U.S.C. § 2501 (1992), which provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

The Federal Circuit has held that § 2501 "is jurisdictional in nature and, as an express limitation of the waiver of sovereign immunity, may not be waived." *Hart v. United States*, 910 F.2d 815, 818-19 (Fed. Cir. 1990); *Laughlin v. United States*, 22 Cl. Ct. 85, 99 (1990), *aff'd*, 975 F.2d 869 (Fed. Cir.1992); and *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). This Circuit also held that "[t]he 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). The limitation language is "a dispositive jurisdictional inquiry for

this court." *LaMear v. United States*, 9 Cl. Ct. 562, 568, *aff'd* 809 F.2d. 789 (Fed. Cir. 1986).

A claim against the United States accrues "when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Ass;n v. United States*, 178 Ct. Cl. 630, 632, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971; *Nager Electric Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966); *Mitchell v. United States*, 10 Cl. Ct. 63, 66-67 (1986); *United Nuclear Corp. v. United States*, 12 Cl. Ct. 45, 49 (1987) (citing *Sauer v. United States*, 173 Ct. Cl. 642, 647, 354 F.2d 302, 304 (1965). The statute of limitations will not be tolled unless the facts underlying the claim are either fraudulently concealed or inherently unknowable. *See Menominee Tribe v. United States*, 726 F.2d 718, 721-22 (Fed. Cir. 1984); *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577. In such an event, the burden of proof rests upon the plaintiff to justify and prove that the facts are so concealed or unknowable so as to delay or toll the running of the limitations period against each respective claim. *Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 2000); *Cochran v. United States*, 19 Cl. Ct. 455, 458 (1990).

The fact that the Plaintiff here is an Indian tribe and that issues of a trust relationship between the United States and the Tribe are involved in the claims does not toll the running of the claims bar established by 28 U.S.C. § 2501. *Menominee Tribe*, 726 F.2d at 721. Statutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the Government. *See United States v. Mottaz*, 476 U.S. 834, 844-48 (1986); *Andrade v. United States*, 202 Ct. Cl. 988, 991, 996, 485 F.2d 660, 661, 664 (Ct. Cl. 1973), *cert. denied*, 419 U.S. 831 (1974); *Capoeman v. United States*, 440 F.2d 1002, 1007-08, 194 Ct. Cl. 664 (1971).

**a. The Tribe knew or should have known of its claim at the time that royalty payments were received**

Plaintiff cannot prevent application of 28 U.S.C. § 2501 by claiming it was not aware of how royalties were calculated for payment of oil and gas leases. That the Tribe knew or should have known of any claim related to the calculation of royalties is demonstrated by its involvement in the promulgation of regulations related to the calculation of royalties and its close supervision, participation in, and auditing of the management of the Tribe's trust assets and funds.

The Tribe has been closely involved in the promulgation of regulations related to the calculation of royalties. For example, in 1990, Interior modified the regulations to change the geographical area upon which the sales price was established against which the lessee would apply its royalty rate to determine the payment due. The regulations had provided that payment "shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of the sale or removal." 25 C.F.R. § 183.11 (1975). In August 1990, subsection 226.11(a)(2) was amended to provide as follows: "settlement shall be based on the actual selling price, but at not less than the highest posted price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases." 25 C.F.R. § 226.11(a)(2). The Tribe approved the amended provision. *See* Memorandum from Superintendent Osage Agency to Joseph C. Johnston, Chief, Division of Energy & Mineral Resources (May 30, 1986) and attachments thereto (attached hereto as Exhibit 16); Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991 (attached hereto as Exhibit 17).

That the Tribe has long had knowledge of its potential claim is clear. For example, in 1984, the Tribe stated that "[o]ver the past ten years, at a minimum, the Osage Agency Minerals Branch

has not properly reviewed the waterflood lease reports, related purchaser run statements, and collections of royalties due the Osage Tribe" and alleged that the performance of the BIA was negligent. Letter from George E. Tallchief, Principal Chief of Osage Tribal Council, to Jack Shoemate, Superintendent Osage Indian Agency (Aug. 29, 1984), at 4-5, Exh. 1. In this circumstance, the Tribe had actually calculated the extent of underpaid royalties. *Id.* While that is powerful evidence of actual knowledge, Tribal knowledge may also be inferred from the fact that tribal auditors monitored royalty payments and, where necessary, sought corrective action. For example, a tribal auditor worked with the BIA Branch of Minerals to address a backlog of additional royalty calculations and proposed to undertake a full audit of selected lease owners' royalty payments. Memorandum from Jim W. Littleton to Osage Tribal Council (July 11, 1986) (attached as Exhibit 18). The same tribal auditor in April 1987 examined the December 1986 oil run statements of one purchaser, noted discrepancies in royalty payments, and made "the changes which best reflected the oil sales." Memorandum from Jim Littleton, Tribal Auditor, to Mary Lou Drywater, Realty Specialist (April 24, 1987), Exh. 6.; *see also* Memorandum from Jim Littleton, Tribal Auditor, to Jack Shoemate, Superintendent Osage Indian Agency, *et. al.* (Aug. 28, 1987), Exh. 7.

When a Tribe is aware of its claim, has not demonstrated that it was excusably ignorant of the problem, and yet failed to bring its claim in a timely manner, this Circuit has held that such a claim is time-barred:

> Because the plaintiffs-appellants knew or should have known of the underreporting and underpayment as of 1979 and have failed to show that, collectively, they were excusably ignorant of the breach by the lessee, we hold that the statute of limitations has expired with respect to their claim that the United States breached a fiduciary duty by failing to discover that [the lessee] was underreporting its gross receipts.

*Brown*, 195 F.3d at 1338. In fact, the Court of Federal Claims has previously held that, in a situation similar to this one, the statute of limitations began to run upon receipt of the very first royalty payment. *See Sankey v. United States*, 22 Cl. Ct. 743, 746-47 (1991). Specifically, the Court concluded that receipt of the first royalty payment constituted constructive notice of the issue:

> Plaintiffs offer no evidence that the original lessors did not review the leases prior to execution, and once plaintiffs began to receive royalty payments a simple phone call and/or visit to BIA would have secured answers to any questions that might have arisen. There plainly was no concealment by defendant such that would toll the statute of limitations. Nor were the facts of a potential claim 'inherently unknowable' at the ordinary accrual date of 1962.

*Id.* at 746 (citation omitted). Accordingly, because the Tribe had actual knowledge of such a claim and cannot reasonably claim, and indeed has failed to proffer a colorable allegation, that, as of March 31, 1994 -- six years prior to the filing of its original Complaint -- it was unaware that it had a potential claim for mismanagement related to the calculation of royalties, that claim is now time-barred under 28 U.S.C. § 2501.

**b. The Interior Appropriations Act Language excepting certain claims from the application of statutes of limitations until an accounting is completed does not apply to Plaintiff's royalty calculation claim**

The 2004 Interior and Related Agencies Appropriations Act, Pub. L. No. 108-447, 118 Stat. 2809 provides, in pertinent part:

> notwithstanding any other provision of law, the statute of limitations shall not commence to run on any claim, including any claim in litigation pending on the date of the enactment of this Act, concerning losses to or mismanagement of trust funds, until the affected tribe or individual Indian has been furnished with an accounting of such funds from which the beneficiary can determine whether there has been a loss.

*Id.* at 3060-61. An earlier version of the Act was first adopted in 1990, with similar language enacted each year thereafter.

In its ruling on Defendant's Motion to Dismiss, this Court, relying on its decision in

*Shoshone Indian Tribe v. United States*, 51 Fed. Cl. 60 (2001), concluded that the Osage Tribe's claims are timely under the Appropriations Act language. *Osage*, 57 Fed. Cl. at 397. Since then, the Federal Circuit, in the appeal of the *Shoshone Indian Tribe* ruling, has clarified its understanding of the scope of the claims affected by the Appropriations Acts. *Shoshone Indian Tribe*, 364 F.3d at 1348-51. The Federal Circuit concluded that the Appropriations Act does not apply to claims alleging the United States' mismanagement of trust assets: the Appropriations Acts only applies to "claims that allege the Government mismanaged *funds* after they were collected, as well as any claims that allege the Government failed to timely collect amounts due and owing to the Tribes under its sand and gravel contracts." *Shoshone Indian Tribe*, 364 F.3d at 1351 (emphasis added).

Under *Shoshone Indian Tribe*, the "failure or delay . . . in collecting payments" is construed as a claim related to "losses to . . . trust funds," and thus within the scope of the Appropriations Acts. *Id.* at 1350-51. Plaintiff accordingly seeks to frame its calculation claim as relating to failure or delay in collecting payments.[15/] But the calculation claim puts the basis for determining the royalty amount due and owing in dispute and, thus, is more akin to an allegation that the United States failed to *maximize* the return from the Tribe's mineral and non-mineral leases rather than failed to collect.

One basis for the distinction in the treatment of the maximization claim in *Shoshone Indian Tribe* (and the calculation claim here) from one related to collecting payments is found in the function of an accounting under the Appropriations Acts. To commence the running of the statute of limitations under the Court's interpretation, the Appropriations Acts require an "accounting of such funds from which the beneficiary can determine whether there has been a loss." Pub. L. No.

---

[15/] Of course, as explained *supra*, Interior has no duty to calculate or collect royalties in the first place.

108-447, 118 Stat. at 3061. As the Court noted in *Shoshone Indian Tribe*, "[a]n accounting alone will not reveal the mismanagement of tribal assets [e.g., the maximization claim]; a comparison with historical market prices is required, creating a large burden on the parties and the courts." *Shoshone Indian Tribe*, 364 F.3d at 1351. In other words, the accounting that the Court perceived as being required – one that shows "what [the trustee] received, what [the trustee] expended, what gains have accrued, and what losses have resulted," *id.*[16] – would not, in itself, allow the beneficiary to determine whether there was a loss related to asset mismanagement, and particularly to failure to maximize revenues.

Similarly, an accounting for the Osage Tribe would not provide the information that the Tribe would require to assess its calculation claim. The Tribe would have to go outside the accounting to compare prices received with historical price postings and, presumably, would have to go to other sources to determine the validity of oil and gas volumes used in the calculations. This basic proof for Plaintiff's claim relates to BIA management and oversight of oil and gas production and is more akin to an asset mismanagement claim (*i.e.,* a maximization claim) than it is to the presumably simpler claim of failure to track and properly collect accounts receivables based on the evidence in an accounting. The Federal Circuit deemed that claims requiring such burdensome inquiries are not within the application of the Appropriations Acts.

---

[16] The Federal Circuit drew on the common law of trusts to define what would constitute an accounting. Any accounting responsibility of the Government should, instead, be informed, in the first instance, by statutory requirements. Legislation requires the "Secretary to account for the daily and annual balance of all funds held in trust . . . invested pursuant to" 25 U.S.C. § 162a, and to provide periodic statements of performance with respect to funds deposited pursuant to section 162a, which statements are to identify "(1) the source, type, and status of the funds; (2) the beginning balance; (3) the gains and losses; (4) receipts and disbursements; and (5) the ending balance." 25 U.S.C. § 4011.

Accordingly, consistent with *Shoshone Indian Tribe*, the Court should, if it does not dismiss this claim on other grounds, find that Plaintiff's royalty calculation claim falls outside of the application of the Appropriations Acts and should dismiss it as time barred.

**C. PLAINTIFF HAS FAILED TO SUFFICIENTLY ARTICULATE THE FIDUCIARY DUTIES ASSOCIATED WITH ITS INVESTMENT CLAIMS AND, TO THE EXTENT THE DUTIES CAN BE INFERRED FROM PLAINTIFF'S STATEMENTS, THEY SHOULD BE DISMISSED**

Plaintiff asserts that the United States failed to earn investment income from the proceeds of the Tranche One leases during the relevant months. Plaintiff's Statement of Claims at 5. Specifically, Plaintiff claims that the United States (1) "failed to invest the income that it collected from the Tranche One Leases . . . in the manner prescribed by law;" (2) "failed to deposit funds in an interest bearing account within a reasonable time after it received the funds," and (3) failed to credit the Osage account "with the full amount of investment income that the funds earned" prior to disbursement. *Id.*, 5-6. Plaintiff lists several investment statutes, 25 U.S.C. § 155, 161a, 161b, and 162a, but does not specify which obligations arising under those statutes Defendant allegedly breached. *Id*. Plaintiff merely alleges a breach of a generalized, unspecified duty to "invest the funds as required by law." The most specificity that Plaintiff provides is a reference to Section 161a by way of example. *Id.* at 5. Plaintiff posits that: "For example, under . . . 25 U.S.C. § 161a, the United States, as trustee, is required to invest funds held in trust for the Osage Nation in certain public securities bearing interest at rates determined by the Secretary of the Treasury." *Id.* During a status conference before the Court, Plaintiff expressed the conviction that "the real obligation arises under 161(a)." May 23 Tr. at 84.

Although Plaintiff alleges that Interior has breached a duty to invest and cited federal statutes, it has not specified the contours of that duty, defined the standard of care, or asserted facts

supporting its theory that a duty has been breached. Without the advantage of further specifics on Plaintiff's legal theory or supporting facts, the United States submits this memorandum refuting, to the extent the current record allows, Plaintiff's legal theories and assertions of governing law, and sets forth its understanding of the duties imposed on the United States under the investment statutes. This discussion stops short of defining the precise standard of care that Interior was obliged to meet as it applies to the claims asserted here, since a meaningful discussion requires further development of Plaintiff's claims.

**1. Defendant's Discretionary Authority to Invest and Manage the Osage Funds Is Grounded in Sections 161a and 162a, and Is Evaluated under an Arbitrary and Capricious or Abuse of Discretion Standard**

Under the Supreme Court's holding *Mitchell II*, the "contours of the United States' fiduciary responsibilities" are governed by the relevant statutes. *Mitchell II*, 463 U.S. at 224.; *see also Navajo*, 537 U.S. at 506; *Brown,* 86 F.3d at 1560. Interior had authority to invest Osage monies under Sections 161a and 162a. Section 161a(a) authorizes Interior[17] to invest tribal trust funds in public debt securities taking into consideration the maturity needs of the fund; it provides that:

> . . . [A]ll funds held in trust by the United States and carried in principal accounts on the books of the United States Treasury to the credit of Indian tribes shall be invested by the Secretary of the Treasury, at the request of the Secretary of the Interior, in public debt securities with maturities suitable to the needs of the fund involved, as determined by the Secretary of the Interior, and bearing interest at rates determined by the Secretary of the Treasury, taking into consideration current market yields on outstanding marketable obligations of the United States of comparable maturities.

Pub. L. No. 98-451, 98 Stat. 1729, codified at 25 U.S.C. § 161a (1990).[18] Prior to 1984, Section 161a guaranteed at least a four percent simple interest rate of return on tribal trust funds. *See Short v. United States*, 25 Cl. Ct. 722, 726-77 (1992), *aff'd* 50 F.3d 994 (Fed. Cir. 1995); *Menominee Tribe of Indians v. United States*, 97 Ct. Cl. 158, 163-65 (1942). That changed with the 1984 amendment, which authorized payment of varying interest rates on tribal trust funds.

Section 162a authorizes Interior to withdraw tribal trust funds from Treasury and deposit the

---

[17] During the time period under consideration, there were no implementing regulations for either statute.

[18] This memorandum analyzes the statutes in effect from 1976 through 1990, the period covered by the Tranche One leases. Aside from editing changes and other modifications not relevant to the issues addressed here, there were no other material changes to Sections 161a and 162a between 1984 and 1990. *See* Pub. L. No. 101-644, Pub. L. No. 98-146, Pub. L. No. 98-146.

funds in banks; it provides that:

> The Secretary of the Interior is hereby authorized in his discretion, and under such rules and regulations as he may prescribe, to withdraw from the United States Treasury and to deposit in banks to be selected by him the common or community funds of any Indian tribe which are, or may hereafter be, held in trust by the United States and on which the United States is not obligated by law to pay interest at higher rates than can be procured from the banks . . .[T]he Secretary of the Interior, if he deems it advisable and for the best interest of the Indians, may invest the trust funds of any tribe or individual Indian in any public-debt obligations of the United States and in any bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States . . . .

25 U.S.C. § 162a(a) (1990). Language at the end of this provision modifies the scope of allowable investments for Osage tribal funds: "the foregoing shall apply to the funds of the Osage Tribe of Indians, and the individual members thereof, only with respect to the deposit of such funds in banks." *Id.* At the request of the Osage Tribe, however, Osage tribal funds can be invested in public debt securities under authority conferred by Section 162a(c), which currently provides that:

> (1) Notwithstanding subsection (a) of this section, the Secretary of the Interior, at the request of any Indian tribe, in the case of trust funds of such tribe, . . . is authorized to invest such funds, or any part thereof, in guaranteed or public debt obligations of the United States or in a mutual fund, otherwise known as an open-ended diversified investment management company if–
>
> (A) the portfolio of such mutual fund consists entirely of public-debt obligations of the United States, or bonds, notes, or other obligations which are unconditionally guaranteed as to both interest and principal by the United States, or a combination thereof;
>
> (B) the trust funds to be invested exceed $50,000;
>
> (C) the mutual fund is registered by the Securities and Exchange Commission; and
>
> (D) the Secretary is satisfied with respect to the security and protection provided by the mutual fund against loss of the principal of such trust funds.

25 U.S.C. § 162a(c).

The plain language of section 161a and 162a provides Interior with discretion in selecting

among the investment options and vehicles authorized. In the context of a trust relationship, the court reviews "the Secretary's exercise of discretion to determine whether it conforms to fiduciary standards." *Brown v. United States,* 42 Fed. Cl. 538 (1998). "[T]he Secretary's discretion is governed by fiduciary standards and limited by fiduciary duties." *Id., quoting Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 966 F.2d 583, 589 (10th Cir.1992); *see also Cheyenne-Arapaho Tribes of Oklahoma v. United States*, 33 Fed. Cl. 464, 468 (1995) (tribe alleged breach of fiduciary duty concerning cooperative agreements subject to Secretary's discretionary approval). In the first instance, the fiduciary duties against which the Secretary's exercise of discretion should be measured are defined by statute and regulations. *Navajo*, 537 U.S. at 506.

Certain restrictions on the exercise of Interior's discretion are provided in Sections 161a and 162a. Section 161a provides that Interior, when it exercises its discretion to request that the Secretary of Treasury invest trust funds, is to determine the "maturities suitable to the needs of the fund involved." 25 U.S.C. § 161a(a). Section 162a comes into play if, in the exercise of Interior's discretion, Osage funds are withdrawn from Treasury and deposited in banks under 162a(a). If Interior elects to deposit trust funds in a bank, it must choose a bank that meets the collateral requirements of Section 162a. 25 U.S.C. § 162a(a); *see also id.* § 162a(c)(1)(A)-(D).

These provisions, however, offer minimum prescriptions against which to measure the exercise of the Government's investment discretion. That duty cannot, however, be to maximize returns on the investment of the funds.[19/] Nothing in Sections 161a or 162a, or any other statutory

---

[19/] Due to Plaintiff's minimal elaboration of its theory regarding the Government's investment duties, it is not yet clear whether Plaintiff takes the position that Interior is required to maximize returns on investment.

or regulatory authority identified by Plaintiff imposes such a duty. Sections 161a and 162a authorize Interior to invest and deposit Osage trust funds, and provide parameters and guidelines that it must follow. Nothing set out in those parameters provides for or even suggests a duty to guarantee beneficiaries that they will receive the maximum rate of return. Only if the statute reasonably supports such a duty can it be inferred. *See Navajo*, 537 U.S. at 507 (Indian Mineral Leasing Act does not impose a duty to maximize coal leasing revenues); *Shoshone Indian Tribe,* 364 F.3d. at 1349 (United States does not have a fiduciary or statutory duty under the Indian Mineral Leasing Act to maximize revenue for sand and gravel leases).

Plaintiffs who have advanced the theory that Interior has a duty to maximize investment returns typically rely on *Cheyenne-Arapaho Tribes of Indians of Oklahoma v. United States,* 512 F.2d 1390, 1394 (Ct. Cl. 1975). One cannot read the holding of *Cheyenne-Arapaho* so broadly under the statutorily-driven analysis required by *Mitchell II* and *Navajo*. In *Cheyenne-Arapaho,* the Court of Claims offered the observation[20] that the United States has an "`obligation to maximize the trust income by prudent investment,'" and bears the burden of justifying "less than a maximum return." *Id., citing Blankenship v. Boyle*, 329 F.Supp. 1089, 1096 (D.D.C. 1971) and *Restatement (Second) of Trusts* § 181 (1959). That statement was not based on Section 161a, Section 162a or any other statutory authority cited by the Court. *Id.* The statutorily-driven analysis mandated by *Mitchell II* and *Navajo* makes it impossible to demonstrate that an alleged duty to maximize exists

[20] Any analysis of the import of the maximization language found in *Cheyenne-Arapaho* must factor in the Court's own unease and concern about making "pronouncements" of law in a case where the record was not sufficiently developed by either side to allow the court to consider the motions before it. *Cheyenne-Arapaho,* 512 F.2d at 1394; *see also id.* at 1397 (Nichols, J., concurring).

under the statutes governing Interior's management of Osage trust funds.[21/]

Indeed, even before the Supreme Court's decision in *Mitchell* and *Navajo,* the Court of Claims *en banc* read the holding in *Cheyenne-Arapaho* far more narrowly, not as mandating maximum returns. In its decision in *Mitchell v. United States*, 664 F.2d 265, 274, 229 Ct.Cl. 1, 15 (1981)*, aff'd* 463 U.S. 206 (1983), the Court of Claims *en banc* stressed that the "holding of *Cheyenne-Arapaho* is that defendant must as trustee exercise *reasonable management zeal* to get for the Indians the best rate," a different proposition than holding it to a duty to guarantee maximum returns. *Id.* (emphasis added)*; see also Mitchell,* 664 F.2d at 274 n. 17, 226 Ct. Cl. at 16 n. 17 (comparing investment fiduciary duties to duties to manage other trust property); *cf. White Mountain Apache Tribe vs. United States*, 249 F.3d 1364, 1378-80 (Fed. Cir. 2001) ("general principles of trust law obligate the United States 'to use reasonable care and skill'" to preserve trust assets "' from loss, damage or diminution in value'"), *aff'd* 537 U.S. 465 (2003).[22/]

As the Court of Claims *en banc* has held, the "controlling standards for determining breaches

---

[21/] Even private trustees are not held to a "maximization" standard, but rather are most commonly held to the standard that a reasonable, prudent person would follow. *See generally Restatement (Second) of Trusts,* § 176 (1959); *Restatement (Third) of Trusts,* § 227 (1992).

[22/] Because statutory authority requiring maximization of returns is wholly lacking, imposing such a duty would essentially revise the governing statutes and place the United States in the role of an insurer or guarantor of the highest possible rate of returns given the advantage of "20/20 hindsight." Any time that investments made did not earn the highest possible yield, regardless of the care taken in making investment decisions or the soundness of its decisions, the Untied States would presumably be liable for the difference. That is not a duty that Congress imposed in Sections 161a and 162a, and it also conflicts with long-standing precedent. "It has long been recognized that a trustee is not an insurer of trust property," and is not subject to a surcharge for losses to trust property unless he failed to exercise the requisite skill and care. *United States v. Mason,* 412 U.S. 391, 398 (1973), citing 2 A. SCOTT, TRUSTS 1408, 1419 (3d ed. 1967). If Congress had intended such marked departure from established, generally accepted trust responsibilities, it would surely have spelled that out with clarity and specificity so there could be no mistaking that intention.

of fiduciary obligations," 664 F.2d at 274 n. 17, 229 Ct. Cl. at 16 n. 17, including for determining whether Interior performed the duties adequately under section 161a and 162a is as follows:

> . . . [T]he standard by which Interior's actions are to be judicially tested is, not the court's or plaintiffs' own view of the preferable conduct, but *the normal standard for government fiduciaries-were their actions in good faith and within the realm of their acceptable discretion, or were they arbitrary, capricious, an abuse of discretion, or contrary to law?* We repeat, too, the caution that all the rules governing the relationship between private fiduciaries and their beneficiaries do not necessarily apply in full vigor to Indian claims against the United States. "In each situation, the precise scope of the fiduciary obligation of the United States and any liability for breach of that obligation must be determined in light of the relationships between the Government" and the Indians.

*Mitchell*, 664 F.2d at 274, 229 Ct. Cl. at 14 (emphasis added), *citing Navajo Tribe of Indians v. United States,* 624 F.2d 981, 988 (Ct. Cl. 1980); *see also Pawnee*, 830 F.2d at 191 n.6 (finding that plaintiff had not alleged an abuse of discretion or arbitrary and capricious action). In evaluating whether the United States appropriately fulfilled its duties under section 161a and 162a, the Court should consider whether Defendant considered the relevant factors, whether it had a rational basis for its actions, and whether it acted within the scope of its statutory authority. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). At this stage of the litigation, however, Plaintiff has not provided sufficient explanation of its claims to permit the parties or the Court to undertake this examination. Nevertheless, at this stage of the case, the Court can determine the governing standard of care, the violation of which would presumably constitute the breach of duty that Plaintiff claims. Thus, to the extent Plaintiff's investment claims entail a higher standard of care than the arbitrary and capricious or abuse of discretion standard, the Court should, pursuant to this Motion, dismiss those claims for lack of jurisdiction.

**2. Plaintiff Has Not Set Forth a Standard Against Which to Measure Defendant's Duty to Timely Deposit Funds**

There is no dispute that the United States has a duty to deposit funds that it receives for the Osage Tribe into Treasury: "the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States to the credit of the members of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the provisions of this Act, . . ." 1906 Act § 4. The Tribe has not, however, articulated the standard against which the timeliness of deposits should be measured. In the absence of such articulation, presumably a reasonableness, or abuse of discretion, standard applies and will be addressed at a later stage of this litigation. To the extent that Plaintiff is asserting a claim applying some other standard, its claim should be dismissed for lack of jurisdiction.

**3. Plaintiff Has Failed to Articulate Any Fiduciary Duty Related to "Disbursement Lag Times" Nor Any Standard Against Which Such Alleged Duty Should Be Measured**

Plaintiff claims that the United States "failed to credit the Osage Nation with the full amount of investment income that the funds earned prior to the time the funds were disbursed to the beneficiaries of the trust." Tribe's Statement of Claims at 6. During the May 26, 2005, status conference with the Court, Plaintiff described this claim as one involving a "disbursement lag time – the Department of the Interior, in its account, keeps track of the interest on these trust funds – cuts off that interest as of a certain date in anticipation of paying out funds." These two statements are the entire explanation offered by the Plaintiff on this particular claim, and fall far short of the articulation of legal authorities necessary for Defendant to respond to this particular claim. The claim could involve any number of scenarios, some of which could involve a fiduciary duty, others which plainly would not.

Unlike in its first two investment-related claims, where Plaintiff has identified a source of

a fiduciary duty although it has failed to sufficiently define the duty, on its disbursement lag time claim, Plaintiff has failed to plainly explain the sources of law for a claim that it is entitled to interest after trust funds are disbursed. In the absence of such articulation, no money-mandating fiduciary duty can be found to exist. Based on Plaintiff's articulation of its claim to date, Plaintiff has not met its burden to show that the Court has jurisdiction over its "disbursement lag time" claim and that claim should, therefore, be dismissed.

## V. CONCLUSION

For the forgoing reasons, the Court should grant Defendant's Motion to Dismiss, in part, and should dismiss plaintiffs royalty calculation and collection claims, its late-fee collection claims, its investment claims to the extent that Plaintiff is claiming a duty to maximize investments, and its "disbursement lag time" claim.

Respectfully submitted, on June 14, 2005,

KELLY A. JOHNSON
Acting Assistant Attorney General

*s/ Brett D. Burton*
BRETT D. BURTON
United States Department of Justice
Environment and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0212
Fax: (202) 353-2021

Counsel of Record for Defendant

*s/ Martin J. LaLonde*
MARTIN J. LALONDE
United States Department of Justice

Environment and Natural Resources Division
P. O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0247
Fax: (202) 353-2021

Attorney for Defendant

OF COUNSEL:

Stephen Simpson
Attorney
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
MS 6456
Washington, D. C. 20240
Telephone: (202) 219-1659
Fax: (202) 208-3490

Teresa E. Dawson
Senior Counsel
Office of Chief Counsel
Financial Management Services
U.S. Department of the Treasury
401 14th Street, S.W.
Room 552A
Washington, D.C. 20227
Telephone: (202) 874-2567
Fax: (202) 874-6627

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| | ) | Electronically Filed: June 14, 2005 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 00-169 L |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**APPENDIX TO DEFENDANT'S EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS (DATED JUNE 14, 2005)**

**Index to Defendant's Exhibits in Support of**
**Defendant's Motion to Dismiss, In Part, Plaintiff's Tranche One Claims**
**(Dated June 14, 2005)**

**Summary of Exhibits:**

Exhibit No. 1 (Pages 1 – 5)
Exhibit No. 2 (Pages 6 – 7)
Exhibit No. 3 (Pages 8 – 10)
Exhibit No. 4 (Pages 11 – 13)
Exhibit No. 5 (Pages 14 – 15)
Exhibit No. 6 (Pages 16 – 17)
Exhibit No. 7 (Pages 18 – 19)
Exhibit No. 8 (Pages 20 – 21)
Exhibit No. 9 (Pages 22 – 41)
Exhibit No. 10 (Pages 42 – 46)
Exhibit No. 11 (Pages 47 – 53)
Exhibit No. 12 (Page 54)
Exhibit No. 13 (Pages 55 – 112)
Exhibit No. 14 (Pages 113 – 120)
Exhibit No. 15 (Pages 121 – 156)
Exhibit No. 16 (Pages 157 – 179)
Exhibit No. 17 (Page 180)
Exhibit No. 18 (Page 181)

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 1 | Letter from George E. Tallchief, Principal Chief of Osage Tribal Council, to Jack Shoemate, Superintendent Osage Indian Agency (Aug. 29, 1984) | 1 |
| 2 | Letter from George Tallchief, Principal Chief, Osage Tribe to Jack Shoemate, Superintendent, Osage Indian Agency (undated) | 6 |
| 3 | Resolution of the Osage Tribal Council, No. 26-624 (Aug. 21, 1985) | 8 |
| 4 | Resolution of the Osage Tribal Council, No. 28-363 (Sept. 18, 1991) | 11 |
| 5 | Resolution of the Osage Tribal Council, No. 26-659 (Oct. 8, 1985) | 14 |

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 6 | Memorandum from Jim Littleton, Tribal Auditor, to Mary Lou Drywater, Realty Specialist (April 24, 1987) | 16 |
| 7 | Memorandum from Jim Littleton, Tribal Auditor, to Jack Shoemate, Superintendent Osage Indian Agency, *et. al.* (Aug. 28, 1987) | 18 |
| 8 | Letter to Dark Oil Co. from E.A. Green, Acting Superintendent, Osage Indian Agency (undated) | 20 |
| 9 | Complaint, *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999) | 22 |
| 10 | Plaintiff's Motion to Amend and Consolidate and Brief in Support, No. 99-550L (May 1, 2000) | 42 |
| 11 | Defendant's Motion to Reconsider Consolidation Order, No. 99-550L, No. 00-169L (May 26, 2000) | 47 |
| 12 | Order, No. 99-550L (September 14, 2000) | 54 |
| 13 | Third Amended Complaint, No. 99-550L (Oct. 24, 2005) | 55 |
| 14 | Amended Joint Preliminary Status Report, No. 99-550L (Feb. 11, 2005) | 113 |
| 15 | Motion to Dismiss, No. 99-550L (April 15, 2005) | 121 |
| 16 | Memorandum from Superintendent Osage Agency to Joseph C. Johnston, Chief, Division of Energy & Mineral Resources (May 30, 1986) | 157 |
| 17 | Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991 | 180 |
| 18 | Memorandum from Jim W. Littleton to Osage Tribal Council (July 11, 1986) | 181 |

GEORGE E. TALLCHIEF
Principal Chief
Osage Tribe of Indians

ED RED EAGLE, SR.
Assistant Principal Chief

MEMBERS OF COUNCIL

RALPH R. ADKISSON
DON H. BIG ELK
FRANCIS (FRISCO) DREXIL
D. E. (BILL) MARTIN
CAMILLE W. PANGBURN
HARRY RED EAGLE, JR.
JOHN TALLCHIEF
GEORGE ED REVARD

SEAL OF OSAGE NATION

OSAGE TRIBAL COUNCIL
PAWHUSKA, OKLAHOMA
74056

AUG 29 1984

Mr. Jack Shoemate
Superintendent
Osage Indian Agency
Pawhuska, Oklahoma 74056

Dear Mr. Shoemate:

The Osage Tribe of Indians has been furnished a copy of the Summary of Trust Funds and Detail of Trust Funds for the month ending July, 1984, for all Osage Tribal appropriations. It is the policy of the BIA that these reports will be used by all jurisdictions to monitor and manage tribal trust funds. Our staff has reviewed these reports and other financial problems confronting the Osage Agency and we would like to share with you their comments.

In Mr. Pappan's memo to you, under date of August 8, 1984, he outlined the responsibilities of the Osage Agency, Anadarko Area Office and the Branch of Finance and Accounting. The purpose being to reduce the accounting errors to a very minimum and to manage Osage Tribal Funds more effectively and efficiently. The Osage Tribe of Indians has not received any comments regarding the Trust Fund Reports whether they are good, bad, or indifferent. According to our staff, these Trust Fund Financial Reports contain many errors and these errors are not corrected without the urging of the Osage Tribal Council.

Mismanagement of Osage Tribal Funds

Your office has been repeatedly notified that daily deposits are not being made consistently according to the BIA regulations, which results in loss of interest to the Osage Tribe. The loss of interest to the Osage Tribe would be subject to litigation against the U.S. Government (Osage Agency) for mismanagement of Trust Funds. Recently, members of your staff (Mrs. Sloan, Mrs. Hartness, and Miss Nave), informed Mr. Pappan that the cash collection clerk cash box contained several days collections that had not been deposited. Mr. Pappan personally advised you of the contents of the cash box, and you discussed this matter with Mrs. Sloan. During the absence of the cash collection clerk, it is quite obvious

EXHIBIT 1

that no daily deposits are being made, which causes the loss of interest to the Osage Tribe. It appears that your employees do as they please in making deposits. If no improvements are noted in the next review of the daily deposit procedure, then other alternatives will be assessed.

Tribal Appropriation 14X7385

Summary of Trust Funds for tribal appropriation 14X7385 shows "Unallotted Funds - U.S. Treasury" in an overdraft status in the amount of $5,001.21. Overdraft in this appropriation has existed for several months, but again, no action has been taken by the Osage Agency, Anadarko Area Office, nor the Branch of Finance and Accounting.

Tribal Appropriation 14X7386

Osage Agency accounting records for month ending July, 1984, shows total cash available in the amount of $13,259,509.01, whereas, the Summary of Trust Funds shows $13,410,972.31 available or a difference of $151,463.30, which has been identified as:

| | |
|---|---|
| C/D 4514, dated 6-27-84, Encoded into the accounting system as $61,621.60. Correct amount should be $61,661.60. Mr. Sisco's office was informed of this discrepancy, but no action was taken in July, 1984. | $ 40.00 |
| C/D 4573, dated 7-26-84, Encoded into the accounting system as $65,661.01, whereas, correct amount should be $65,660.51. Mr. Sisco's office was informed of this error. | ( .50) |

It is apparent, as indicated by the two discrepancies noted above, that documents encoded in the accounting system are not being verified.

| | |
|---|---|
| C/D 4582, dated 7-31-84, in transit. | 9,961.27 |
| EFT transfer by Osage Oil and Transportation Company in the amount of $161,464.07 was posted into the Bureau's accounting system on C/D 209, and again, on C/D 212. | (161,464.07) |
| TOTAL | $(151,463.30) |

Miscellaneous

During the month of July, 1984, several hundred thousand dollars were collected from the Lease Sale held in June, 1984. Funds were deposited into tribal receipt symbol X7386 and invested to mature on September 13, 1984, the date of the headright payment. July collections are available for distribution to shareholders in December, 1984. Mr. Sisco's office should have notified the Bureau's Investment Office in Albuquerque to that effect.

Appropriation 14X7730

Appropriation 14X7730 shows an Unallotted Balance of $3.16. Please instruct your staff to transfer this amount to X7386 as previous balances were handled. This will close this appropriation balance, which should not be used again for any purpose.

Appropriation 14X7885

Appropriation 14X7885 shows Unallotted Funds in the amount of $147.21, which should be invested at the highest rate available. Please instruct your staff to initiate investment procedures.

Appropriation 14X7886

Appropriation 14X7886 shows Unallotted Funds, in the amount of $22,822.33, were requested to be used in the September, 1984 headright payment. This request was made to John Vale, who in turn, made the request to the Branch of Finance and Accounting. They informed him that this amount was in error and could not be used. Why hasn't the Osage Agency, Anadarko Area or the Branch of Finance and Accounting, said anything about this amount not being available to the Osage Tribe? This is another example of nobody doing anything.

Appropriation 14X9771

Appropriation 14X9771 shows Unallotted Funds in the amount of $2,816.59. If correct, this amount should be invested at the highest rate available. Please have your office make this request.

Again, we request that you inform Mr. Sisco that all financial documents covering the September, 1984 headright payment

carry the same effective date. The June, 1984 headright payment covered by FB349, was not dated the same as the investment maturity date, which costs the Osage Tribe several thousand dollars loss in interest earning.

Minerals

Over the past ten years, at a minimum, the Osage Agency Minerals Branch has not properly reviewed the waterflood lease reports, related purchaser run statements, and collections of royalties due the Osage Tribe. The accounting responsibilities of the lease compliance section, within the Branch of Minerals, reach far beyond the minimal review procedures that were employed. Royalty rates were not properly monitored and enforced. The lessee production information was not emphasized, (even though the lease agreements key on production for the proper royalty rate, and 6-month non-production grace period, before shutdowns are to be enforced), The Production History report, that has been on the Agency computer system since 1980, is not a production history at all, but a sales history. There are many factors which have contributed to the negligent performance of the Minerals Branch over the last few years, such as:

1. Turnover in personnel.
2. Lack of proper accounting procedures.
3. Accounting policy and procedures developed by inexperienced, uneducated personnel.
4. Lack of concern for accountability.
5. Unsupervised on-the-job training of accounting clerks.
6. Lack of Internal controls.
7. Disregard for coordination between IIM and Minerals Sections at the Osage Agency and the Albuquerque BIA Office.

As a result of the problem areas listed above, the Osage Agency is now faced with a total of thirteen companies or individuals, involving (to date) six leases, owing the Osage Tribe $336,003.23 for underpaid royalties and related penalty amounts as of the date of this memo, of which only three companies have paid in $9,910.20, leaving an outstanding balance of $326,093.03. An aged accounts receivable breakdown is as follows:

| Days outstanding | Amount |
|---|---|
| 0 - 30 | $161,121.24 |
| 31 - 60 | 53,429.39 |
| 61 - 90 | 18,605.42 |
| over 90 | 92,936.98 |
| Total A/R Outstanding | $326,093.03 |

One lessee, Mr. Don Cornelius, was notified as long ago as March 1, 1984, concerning his Sand Creek Unit, Contract No. 14-20-G061284, for underpayment of royalties and related penalties totalling $86,332.44 (per Superintendent's letter dated April 25, 1984). This particular claim is nearly six months old with no settlement expected in the near future. Mr. Cornelius was to have notified the Agency no later than August 15, 1984, of his intent to pay the amount due or show reasonable cause why he should not pay the full amount due. No reason has been offered to the Agency for this delay. The Agency has not made an effort to proceed with the collection of the delinquent amount (as of the date of this memo).

May we have your comments at an early date.

Sincerely yours,

OSAGE TRIBAL COUNCIL

By [signature]
Principal Chief

cc: Mr. Don Moon, Acting Area Director, MAO

GEORGE E. TALLCHIEF
PRINCIPAL CHIEF
OSAGE TRIBE OF INDIANS

ED RED EAGLE, SR.
ASSISTANT PRINCIPAL CHIEF

MEMBERS OF COUNCIL
RALPH R. ADKISSON
DON H. BIG ELK
FRANCIS DREXIL
D. E. (BILL) MARTIN
CAMILLE W. PANGBURN
HARRY RED EAGLE, JR.
GEORGE E. REVARD
JOHN TALLCHIEF

**OSAGE TRIBAL COUNCIL**
**PAWHUSKA, OKLAHOMA**
**74056**

Mr. Jack Shoemate, Superintendent
Osage Indian Agency
Bureau of Indian Affairs
Pawhuska, Oklahoma 74056

Dear Mr. Shoemate:

The attached worksheets were presented to my office by Mr. Bert Pappan, Tribal Auditor. These documents summarize the results of a review of the royalty payments made to the Osage Agency by CRA (Farmland) during the period January 1, 1973 to April 30, 1984, in relation to the Alameda/Damson Lease (SE 13-26-11), Contract No. 14-20-201-9551. Attached to the worksheets are the Lessee Reports and related purchaser's payment summary for the month of underpayment indicated. This review established that a total of $39,891.20 in underpaid royalties and related penalties are due through April 30, 1984.

This lease was selected from a group of 24 waterflood leases that had been chosen by Mr. Charles Hurlburt, Petroleum Engineer, for review. The royalty rate on this particular lease was 16 2/3% for "gross proceeds from sales when the production from the Bartlesville sand amounts to less than four hundred sixty-one (461) barrels during any calendar month" ... per the May 27, 1959 Amendment to Blanket Oil Mining Lease. When the production equals or exceeds 461 barrels per month, the royalty rate is 12 1/2%. The Minerals Branch policy has not emphasized barrels of production, but rather barrels sold per month. Schedule A/3 shows the results of a review of the royalty rates based on barrels sold per month. This review indicated a $23,224.74 total underpayment plus penalties amount due (a difference of $17,237.26 between the two methods).

The underpayments indicated above do not appear to be isolated events. Other leases, not yet fully examined, indicate similar royalty payment errors that were previously undetected by Osage Agency personnel. On the lease mentioned above,1 the review was expanded to January 1, 1973 through April 30, 1984. This review found an additional amount due of $16,666.46 for a total amount of the royalty underpayments and penalties due of $39,891.20. (See Schedule A/2.)

There are approximately 150 waterflood leases that are still active in Osage County.



**EXHIBIT 2**

I am submitting the documents described above to you so that the Osage Agency can prepare an invoice for collection of the $39,891.20 amount indicated plus any additional penalties due to date. I would also request that any negotiations with the lessees concerning this matter be coordinated with my office.

Thank you for your cooperation in this matter.

Sincerely,

George Tallchief, Principal Chief
Osage Tribe of Indians

Attachments

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL No. 26-624

WHEREAS,

1. During the past several years many Osage oil and/or gas lessees have requested to negotiate new leases on areas where they had mineral leases that were terminated for failure to pay advanced rental in a timely manner as required by their lease terms. Said lessees have negotiated new leases with the Osage Tribal Council as provided for in 25 CFR 226.2(f), and

2. The Osage Tribal Council passed Resolution No. 26-47 on September 15, 1982, authorizing the Principal Chief to execute new leases and authorizing the Superintendent to approve said leases on property that had been terminated for non-payment of advanced rental provided that on all leases the following provisions be included in the lease:

1/6 royalty be increased to 25%, and
3/16 royalty be increased to 27%, and

the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect, and

3. Mineral lessees have informed the Osage Tribal Council that the royalty rates set forth in Osage Tribal Council Resolution No. 26-47 are deemed to be excessive under existing operating conditions. They have advised that it is not economically feasible for them to operate their mineral leases at the higher royalty rate because of recent decreases in the oil prices. They have requested that the Osage Tribal Council consider negotiating new leases at the same royalty rate prescribed in their original lease with the requirement that some monetary bonus be paid for said lease, and

4. It is the consensus of the Osage Tribal Council that it would be in the best interest of the Osage Tribe, in the management of Osage Mineral Estate, that the Principal Chief or in his absence the Acting Principal Chief execute new leases and that the Superintendent be given the authority to approve such leases on properties that have been terminated for non-payment of advanced rental provided that on all new leases that the following provisions be included therein: The new lease will contain the same royalty provisions as those stipulated within the

**EXHIBIT 3**

original lease, and the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease plus an additional $750 bonus for each lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect: Therefore, be it

RESOLVED, That,

1. The Osage Tribal Council hereby rescinds Osage Tribal Council Resolution No. 26-47.

2. The Osage Tribal Council hereby grants the Principal Chief or in his absence the Acting Principal Chief the authority to execute new leases and the Superintendent of the Osage Agency is hereby authorized to approve such leases on properties that had been terminated for non-payment of advanced rental provided that on all new leases that the following provisions be included therein: The new lease will contain the same royalty provisions as those stipulated within the original lease; and the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease plus an additional $750 bonus for each lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect, provided that the lessee submits the proper written request for a new lease within 30 days of the date of the notice of termination.

3. The Principal Chief, or in his absence, the Acting Principal Chief, is authorized to sign this resolution on behalf of the Osage Tribe.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of 5 in favor and 1 against this 21 day of August, 1985.

Ed [signature]

Acting PRINCIPAL CHIEF

ATTEST:

[signature]

SECRETARY

DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
OSAGE INDIAN AGENCY
PAWHUSKA, OKLAHOMA

DATE: AUG ? 9 [illegible]

APPROVED: [signature]
ACTING Superintendent
Osage Indian Agency
Pawhuska, Oklahoma

Copy

FILE COPY
SURNAME
Brown
NBaker
Nuyvater

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

No. 28-363

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, acknowledges that WHR Corporation is the successor to Ajax Gas Corporation for Gas Lease I-68-Ind-3751 containing 1280 acres, more or less, and Gas Leases 14-20-201-0406-171 and 14-20-201-6917 containing 1280 acres, more or less, located in Osage County, Oklahoma;

2. Osage Tribal Council Resolution No. 27-267 sets forth the terms and conditions by which the subject gas mining leases were modified on August 1, 1988;

3. Specifically, Osage Tribal Council Resolution No. 27-267 Part 2C requires that lessee will, 30 days prior to August 1st of each year, arrange for discussion of the gas resale price negotiations with the Osage Tribe;

4. WHR Corporation has proposed that the price to be paid for gas should be based on the posting price contained in the first posted issue for the month in which gas is purchased under the heading: Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually;

5. The Osage Tribal Council and the Gas Lessee have agreed that the price to be paid for gas should be based on the posting price contained in the first posted issue for the month in which gas is purchased under the heading: Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually. Therefore, be it

RESOLVED,

1. That the Osage Tribal Council is agreeable to renegotiate the price to be paid for gas based on the posting price contained in the first posting issue for the month in which gas is purchased under the heading Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, or any new contract entered into with provisions for a higher gas price for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually. Further, WHR Corporation will meet with the Osage Tribal Council 30 days prior to August 1 of each year to determine the base price for gas that will be utilized for royalty calculations for the ensuing year;

2. The basis of value on which royalty shall be paid for gas produced from acreages which are part of said gas lease contracts shall be equal to 70% of the price WHR Corporation receives for resale of the gas, but no less than the minimum resale price set forth in paragraph 1 above;

3. The basis of value on which royalty shall be paid for gas produced from acreages which are not a part of said gas mining contracts but delivered into the WHR Corporation Gas Gathering System shall be equal to 58% of the price WHR Corporation receives for resale of the gas, but no less than the minimum resale price set forth in paragraph 1 above;

4. Royalty paid based on the WHR Corporation resale price will be adjusted by multiplying the fraction, the numerator of which shall be the BTU content per cubic foot of the gas produced and the denominator of which shall be one thousand (1000) times the basis of value of the price for each lease;

5. For gas produced by WHR Corporation, or its assigns, or gas delivered by other gas producers to WHR Corporation, or its assigns, shall be measured at prevailing meter pressures and the volumes thereof shall be computed on a pressure base of 14.65 psi and on a temperature of sixty (60) degrees Fahrenheit;

6. If any of the quarter sections remaining in Gas Mining Leases I-68-Ind-3751, 14-20-201-6917, and 14-20-0406-171 fail to produce gas, a six-month period of time shall be allowed, from cessation of production to properly evaluate and re-establish gas production. Upon failure to establish gas production within the six-month period, such quarter section shall be deleted from the Gas Mining Leases except that the Superintendent may, with the consent of the Osage Tribal Council, grant an extension of time not to exceed ninety days;

7. This resolution shall be of no force or effect until accepted by WHR, or its assigns, and approved by the Secretary of the Interior or his authorized representative. A copy, when approved, shall be attached to and made a part of the Gas Mining Contracts;

8. The Principal Chief, or in his absence the Acting Principal Chief, is authorized to sign this resolution; and,

9. We respectfully recommend that the Superintendent approve the resale price as above described.

CERTIFICATION

I hereby certify that the foregoing resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of September 1991.

PRINCIPAL CHIEF

ATTEST:

SECRETARY

Kent

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

No. 26-659

WHEREAS,

1. On Monday, September 23, 1985, a meeting between the Minerals Committee and Consultant, Mr. George Daly, was held in Tulsa, Oklahoma, to discuss the current $0.31/MCF service charge now being deducted by CEJA Corporation. This charge covers the cost of pipeline construction and operation;

2. This charge had existed since 1977 when the pipeline was built and completed;

3. The leases involved are in T24N, R4E; T25N, R3E; T25N, R4E; T25N, R5E; and T26N, R5E. Gas is being sold to Oklahoma Natural Gas Company. A cost analysis of the pipeline investment led to a service charge of $0.31/MCF sold. At the time when the $0.31 charge was agreed to, CEJA had a choice of selling to ONG or selling to Phillips Petroleum Company. Selling to ONG got approximately $0.80 more per MCF than selling to Phillips; however, this required that CEJA build a pipeline to the ONG selling point. The Osage Agency felt that it was in the best interest of the Osage Tribe to accept the higher price, even though it included a $0.31 transportation fee. At this point in time it is still advantageous to the Osage Tribe to have CEJA continue selling to ONG;

4. Mr. George Daly brought forth a method of calculating the service charge. This method is published by the USGS and is widely accepted throughout the oil industry. The method calculates the maximum allowable deduction on an annual basis. The formula is presented below:

$$\text{Maximum Allowable Service Charge } (\$/MCF) = \frac{D + I + E}{F}$$

D = Depreciation rate in dollars per year over a 20-year period

I = Return (in dollars) on undepreciated investment

E = Annual operating cost or ten percent (10%) of the initial investment; whichever is less

F = Total volume of gas sold (in MCF) annually;

5. It was determined that this method is appropriate for the current situation involving the gas pipeline; and,

6. The Osage Agency calculations indicate that an overcharge has occurred. To recover this overcharge, CEJA has agreed to discontinue the service charge as of September 1, 1985. No deductions will be withheld through 1986. In January 1987, the overcharge will have been recovered and the correct service charge will be assessed based on the USGS Guidelines outlined above. Therefore, be it

**EXHIBIT 5**



G06PLF0001536

RESOLVED, That

1. The Osage Tribal Council and CEJA Corporation agree to use the USGS Guidelines (Geological Survey Conservation Manual, Chapter 5A, Part 647.5A.1). To calculate maximum allowable annual service charge per MCF gas produced from the CEJA Corporation pipeline system in western Osage County;

2. CEJA will cease deduction of the service charge from September 1, 1985, to December 31, 1986, to recover the current overcharge;

3. Beginning January 1, 1987, CEJA can begin deducting the service charge using the guidelines presented above

4. The Principal Chief, or in his absence the Acting Principal Chief, is authorized to sign this resolution on behalf of the Osage Tribe; and,

5. We respectfully recommend that the Superintendent of the Osage Agency approve this resolution as described above.

CERTIFICATION

I hereby certify that the foregoing resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this eighth day of October 1985.

PRINCIPAL CHIEF

ATTEST:

SECRETARY

UNITED STATES GOVERNMENT
# memorandum

Held for MLD's response

DATE: April 24, 1987

REPLY TO
ATTN. OF: Jim Littleton, Tribal Auditor.

SUBJECT: Posting of Oil Runs Statements for the Additional Royalty Calculation.

TO: Mary Lou Drywater, Realty Specialist.

I keypunched Union Oil Company of California's Oil Run Statements for December 1986 into the Additional Royalty program on the computer. This task was performed in the exact manner that I had performed it for the months of October and November 1986. The information entered into the computer was taken from the Oil Run Statements verbatim. While performing this duty, I noticed that Union had paid a higher amount of royalty than the oil run statements displayed, so I attached a note to the file so other personnel would be sure to post the amount of Additional Royalty paid.

When all of the December data had been entered, and the checking of this data by two of the Oil Accounting Sections personnel (Reta Carnegy and Larraine Wilcox), and myself for errors had been completed, an edit run was made.

It was at this point that Reta Carnegy came across the notes I had left on the file to remind her to post what I assumed to be Additional Royalty payments. Reta then informed me that Union Oil had a work sheet attached to the oil run statements which refigured the oil sales at the highest posted price. Therefore, the amounts I thought were Additional Royalty payments were, in reality, included in the recalculation based on the Highest Posted Price and need not be posted separately to the Ledger.

The posting of the Union Oil of California's oil run statements for the month of December 1986, amounted to a $415.27 difference from the worksheets. These postings were corrected by changing the price on the individual entries in the Additional Royalty program prior to the final run being made. The correction could also have been made by the posting of these amounts in the Ledger. The Ledger posting are what I

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114

☆U.S. Government Printing Office: 1980—311-153/6017

had anticipated, assuming that they had been payment of Additional Royalty. Either handling of the situation is acceptable and would result in the correct monies recorded, but the changing of the prices to the amounts on Union's worksheet best reflects the payment of royalties to the Osage Tribe.

This problem did not arise in the other months I had punched into the computer because there was just one price for the each month. With no price changes, the oil run statements and the work sheets are in agreement. Union's oil run statements use an average monthly price to allocate oil to different leases in the unit, and when price changes occur, create an Additional Royalty amount due. Union then creates a worksheet which recalculates the oil sales based on the Highest Posted Price negating the Additional Royalty due.

The problem was created because I was unaware that this worksheet was a correction to the Highest Posted Price. Reta Carnegy, with the most seniority in the Oil Accounting Section, was aware of this, and we were then able to make the changes which best reflected the oil sales. A procedures manual for the calculation of Additional Royalty and the handling of the various purchaser information would be of great benefit to the employee who is not familiar with this process. For that matter, each desk in the Oil and Gas Accounting Section, Branch of Minerals, could utilise a procedures manual to ease the strain caused by absenteeism and vacations.

cc. Jack Shoemate, Superintendent.

NITED STATES GOVERNMENT

# memorandum

DATE: August 28, 1987

REPLY TO
ATTN. OF: Jim Littleton, Tribal Auditor

SUBJECT: Biweekly Status Report

TO: Mr. Jack Shoemate; Superintendent, Osage Indian Agency.
Mrs. Camille Pangburn, Chairman, Finance Committee, Osage Tribal Council.
Mr. George Tallchief, Principal Chief, Osage Indian Nation.
Mr. Newell Barker, Chief, Branch of Minerals.

Minerals personnel have began to calculate Additional Royalty again. It appears that the amount due will be considerably less than previous billings.

Investigation of the information which was received from Chevron Petroleum is nearly complete. At this point, given the information we now have that the amount of royalty due from Chevron will be several thousands of dollars. Further investigation and communication with purchasers will reveal the correct amount due.

The examination of waterfloods which have both 1/6 and 1/8 royalty oil is continuing. Correspondence with the various lessees have corrected some of the problems which we feared might exist.

An example of one such correspondence was a letter received from Lamamco Drilling Company. Lamamco is paying 1/6 royalty on all the oil which is produced on a lease which has both 1/6 & 1/8 royalty agreements. Lamamco determined that this method of royalty payment would be more economical than setting a tank battery for the 1/8 royalty oil. A letter was requested, detailing this agreement. This letter was requested to protect the Tribe from a claim, in the future, for repayment of the overpayment of royalty. This letter was presented to the Field Solicitor's office for approval. Mr Woods directed that the letter would become binding upon the approved by the Superintendent.

The waterflood reports and production reports for other waterflood units are also being examined and a full report will be issued when a conclusion can be reached.

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114
★ U.S.G.P.O.: 1986-491-248/40011

0505KAN0038935

EXHIBIT 7

I have also participated in numerous discussions with Kent Sanborn, Charlene Cozad, & Reta Carnegy concerning problems with the gas accounting system. Several changes have been initiated, with a few more discussed. There seems to be some corrections that have to be made in prior gas reports. Initial estimations show that some royalty payments were not correct. An audit of the total gas accounting picture could benefit the Tribe.

ADDRESS: SUPERINTENDENT ONLY

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

OSAGE AGENCY
PAWHUSKA, OKLAHOMA
74056

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Dark Oil Co.
P.O. Box 1139
Pawhuska, OK 74056

Gentlemen:

Mr. Dwayne Carnes of Osage Oil and Transportation, Inc., (Osage) has advised the Principal Chief, George E. Tallchief, and the Superintendent that the May 1984 oil royalty payment due June 25, 1984, to the Osage Tribe of Indians could not be timely made and proposed that said payments be made over the next three (3) months. He further advised that funds would be available to pay the June 1984 royalty payment.

The oil royalty payment due the Tribe is governed by 25 CFR 226.13(a), (c), and .14(a) (1983), which provide as follows:

> Royalty payments due may be paid by either purchaser or Lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the preceding month. Failure to make such payments shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 1/2 percent for each month or fraction thereof until paid.
>
> Failure to remit payments or reports shall subject Lessee to further penalties as provided in §§ 226.42 and 226.43 and shall subject the division order to cancellation.
>
> Lessee may enter into division orders or contracts with the purchasers of oil, gas, or derivatives therefrom which will provide for the purchaser to make payment of royalty in accordance with his lease: Provided, That such division orders or contracts shall not relieve Lessee from responsibility for the payment of the royalty should the purchaser fail to pay. . . . (emphasis added)

The Osage Tribal Council met with Mr. Carl Carnes concerning the delinquent payment and declined to accept the proposal made by Osage. The Council invoked 25 CFR 226.14(a), which requires oil lessees to pay oil royalty payments to the Tribe, should the purchaser fail to make such payments. However, the Council waived all late charges and penalties, provided the payments are received by this office on or before the close of business __ days from the date of this letter. The Superintendent has approved the decision made by the Council.

EXHIBIT 8

0505KAN0040739

Enclosed are copies of the run statements furnished by Osage, which indicate the amount of the oil royalty which you owe the Tribe for May 1984. You are responsible to ascertain whether these amounts are correct. Checks should be made payable to the Bureau of Indian Affairs.

Please advise if you have any questions concerning this matter.

Sincerely yours,

E.A. Green

Acting Superintendent

Enclosures

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 99-550 L |
| UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS, | ) | FILED AUG 2 1999 |
| Defendant. | ) | |

# COMPLAINT

## Jurisdiction

1. This action is filed pursuant to 28 U.S.C. § 1491 and 28 U.S.C. § 1505, the due process clause of the Fifth Amendment and equal protection clause of the Fourteenth Amendment to the United States Constitution.

## Parties

2. The Plaintiff, the Osage Nation, or Tribe of Indians of the State of Oklahoma ("Osage"), is a federally recognized Indian tribe.

3. The Defendant is the United States of America ("United States").

## Nature of the Action

4. This is an action for money damages for underpayment of oil royalties, an accounting, and for declaratory and/or injunctive relief, related to the loss of trust funds and property rights owned by the Plaintiff that were and are being lost by the United States by failing to collect and account for revenues from the production of oil on Osage land, including failing to obtain or assist the Plaintiff in obtaining the highest price that could have been and could be obtained from the sale



EXHIBIT 9

of oil produced from the Osage mineral estate located in Osage County, Oklahoma, which mineral(s) are held in trust by the United States for the benefit of the Osage.

## Contractual Basis for Damages

5. Article 1 and 10 of the United States Treaty with the Osage dated November 10, 1808, states:

> Art. 1. The United States being anxious to promote peace, friendship and intercourse with the Osage tribes, to afford them every assistance in their power, . . .
>
> Art. 10. The United States receive the Great and Little Osage nations into their friendship and under their protection: and the said nations, on their part, declare that they will consider themselves under the protection of no other power whatsoever, disclaiming all right to cede, sell or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorised by the President of the United States to make the said purchase or accept the said cession on behalf of the government.

and Article X of the United States Treaty with the Osage Indians dated September 29, 1865, states:

> The Osages acknowledge their dependence on the government of the United States, and invoke its protection and care; they desire peace, and promise to abstain from war, and commit no depredations on either citizens or Indians; . . .

## Statutory Basis for Damages

6. By Act of June 28, 1906, Chapter 3572, 34 Stat. 539; Act of March 31, 1921, Chapter 120, 41 Stat. 1249; Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034; Act of July 25, 1947, Chapter 334, 61 Stat. 459; Act of October 6, 1964, 78 Stat. 1008; and Act of October 21, 1978, 92 Stat. 1660, title and/or control and the rights and responsibilities appurtenant to ownership to the Osage mineral estate in Oklahoma have been continuously, at all times relevant to this case, and is currently vested in the United States in trust for the benefit of the Osage Tribe:

(a) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 542, Sec. 2, seventh paragraph: . . . *And provided further*, That nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided; . . .

(b) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 543, Sec. 3. That the oil, gas, coal or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; . . .

(c) Act of June 28, 1906, Ch. 3572, 34 St. 539 at 544, Sec. 4. That all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States for the period of twenty-five years from and after the first day of January, nineteen hundred and seven, except as herein provided:

(d) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1250, Sec. 3. That all members of the Osage Tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be provided by law; . . .

(e) Act of March 31, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trust and supervision until January 1, 1959, unless otherwise provided by Act of Congress.

(f) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035, Sec. 3. . . . The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trusts and supervision until January 1, 1984, unless otherwise provided by Act of Congress. . . .

> (g) Act of October 21, 1978, 92 Stat. 1606 at 1606, Sec. 2(a). The first paragraph of section 3 of the Act of June 24, 1938 (52 Stat. 1034, 1035), as amended, extending the mineral estate reserved to the Osage Tribe by the Act of June 26, 1906 (34 Stat. 539), is further amended by striking the phrase "until the eighth day of April, 1983, and thereafter until otherwise provided by Act of Congress" and substituting, in lieu thereof, the phrase "in perpetuity".

7. The above statutes also provide for the management of the Osage mineral estate by the Secretary of the Interior ("Secretary") for the United States:

> (a) Act of June 28, 1906, Cha. 3572, 34 Stat. 539 at 543, Sec. 3. . . . leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: *Provided*, That the royalties to be paid to the Osage tribe under any mineral lease so made shall be determined by the President of the United States. . . .

> (b) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1249. . . .the Secretary of the Interior and the Osage Council are hereby authorized and directed to offer for lease for oil and gas purposes all of the remaining portion of the unleased Osage land prior to April 8, 1931, offering the same annually at the rate of not less than one-tenth of the unleased area.

> (c) Act of March 2, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas, and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil and gas mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(d) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil- and gas-mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(e) Act of October 21, 1978, 92 Stat. 1660 at 1661. Sec. 4. In order to conserve natural resources and provide for the greatest ultimate recovery of oil and gas underlying the Osage mineral estate, the Secretary of the Interior is authorized to establish rules and regulations under which oil and gas leases producing from a common source of supply may be unitized.

**Regulatory Basis for Damages**

8. 25 C.F.R. Part 226 contains the current regulations for leasing the Osage mineral estate by the United States:

a. § 226.2 establishes oil and gas lease "sale" procedures.

b. § 226.3 describes the procedure to surrender an oil and or gas lease.

c. § 226.4 requires payment of oil and gas lease obligations to the Bureau of Indian Affairs ("BIA").

d. § 226.5 makes oil and gas leases subject to the regulations of the Secretary.

e. § 226.6 requires certain bonds of lessee.

f. § 226.7 requires oil and gas leases to be on forms prescribed by the Secretary.

g. § 226.8 sets forth information required of corporate lessees.

h. § 226.9 describes delay rental and drilling obligations to keep an oil and or gas lease in effect.

i. § 226.10 governs the primary term of an oil and/or gas lease.

9. Regulations also govern the marketing/royalty revenue for production attributable to the Osage and the payment of royalties.

a. § 226.11 provides for payment of royalties based on "gross proceeds", except where payments are made on division orders in which case settlement is based on "actual selling Price" but not less than the "highest posted price" and provides for taking royalty oil in kind.

b. § 226.12 allows the United States to purchase Osage oil at the highest posted price.

c. § 226.13 sets forth the time when payment is due and requires certain operational information.

d. § 226.14 provides for the lessee to contract for the sale of oil and the effect of division orders.

e. § 226.15 contains rules governing unitization of oil and or gas leases and assignments of leases and overriding royalty interests.

10. § 226.16 through § 226.27 govern operations; § 226.28 and § 226.29 govern cessation of operations; § 226.30 through § 226.41 set forth the requirements on lessees, including record keeping, prevention of waste, measurement of oil and other matters; § 226.42 and § 226.43 describe penalties for violations of the regulations and § 226.44 through § 226.46 govern appeals and notices.

## STATEMENT OF FACTS

11. Under the commerce powers of the Constitution, the above-described treaties, statutes and regulations and the decisions of this Court, and other applicable Federal decisions and the United

States Supreme Court, the United States has a fiduciary duty to the Osage requiring the exercise of "the most exacting fiduciary standards" in managing Plaintiff's minerals and trust funds. Navajo Tribe of Indians v. United States, 176 Ct. Cl. 502, at 507 (1966); Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

12. The United States has historically allowed the sale of the oil produced from Osage lands for "the highest posted price" and not for the highest price that could be and/or was obtained for said oil.

13. Pursuant to 25 C.F.R. § 226.11, the United States is also authorized to sell oil produced from Osage lands at values described as "gross proceeds" and "actual selling price"; however, said regulations do not define either term nor do they define "highest posted price."

14. The price obtained by the United States for oil produced from Osage lands is at least $1 to $2 less than its value and or market price or prices readily available from the sale of said oil to the detriment of Plaintiff.

15. The United States, by and through its legislative arm, enacted The Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396 through § 396.g which specifically excludes the Osage. The United States failed to enact similar legislation for the benefit of the Osage, which failure resulted in detriment to the Osage.

16. In 1994, The United States, through its Department of Interior Minerals Management Service ("MMS") began an investigation into royalty underpayments based on "posted prices" which culminated in a 1996 demand on various major oil companies for hundreds of millions of dollars dating back to 1980. The United States failed to do the same for the Osage.

17. As a result of the above investigation in 1996, the United States changed its regulations governing payment of royalties on Indian Oil (30 C.F.R. § 206.51 and § 206.52) and on oil produced from federal lands (30 C.F.R. § 206.101 and § 206.102) to require payment based on market value; however, the United States failed to change and/or improve regulations governing the sale of oil from Osage lands.

18. The United States has failed to judiciously collect the highest price available and account to the Osage for revenues from the sale of oil production form Osage lands in breach of the United State's solemn duty.

19. The United States has failed and refused to allow the Osage to review records in the custody of the United States, including those involving oil production, revenues received from oil purchasers, revenue statements from oil producers, prices paid for the production of oil, and production records, gross volumes of oil produced, and costs of storing, transporting, or selling same.

20. Due to the failure and refusal of the United States to allow review of the records as alleged above, the Osage cannot state with exact specificity, but based upon information and belief, the Osage hereby allege that the United States has continued to allow the sale of Osage oil for less than the value of the oil produced from the Osage land for a period of years, the exact time period is currently unknown to the Osage.

21. Further that the United States has knowingly and continually allowed the sale of Osage oil for less than its full value for a period of years, the exact time period of which is currently unknown to the Osage.

22. The actions and or inaction of the United States in failing to obtain the highest value for Osage oil, and its failure to account to the Osage for revenues due the Osage under the terms of

various oil and gas leases for the production of oil from Osage lands, including, without limitation, all allegations of fact herein, and as may be proven at trial in the instant proceeding, constitute a continuing claim from the date of the first such action or inaction, to the present.

23. The actions of the United States in failing to properly and judiciously administer its assumed and statutory obligations and duties over the mineral estate of the Osage are of such a nature and in such reckless disregard of the property rights and interest of the Osage that the trust relationship between the Osage and the United States has been, in effect and result, repudiated by the United States.

## FIRST CAUSE OF ACTION

**Breach of Fiduciary Duty in Failing to Make Demand on Purchasers of Osage Oil For Past Underpayments of Royalty**

The Osage incorporate all factual allegations hereinabove stated, including paragraphs 1 through 23 herein, and further allege as follows:

24. The United States, through the MMS, determined that the "highest posted price" is less than the price that the United States should receive for the sale of oil from federal lands and has made demand on the purchasers of said oil for royalty underpayments. The United States has not made a similar demand on behalf of the Osage.

25. The United States knew and or has knowledge that similar underpayments have occurred on payment of royalty for the sale of oil from Osage lands and has taken no action to correct or remedy this problem.

26. Defendant has breached its fiduciary duty to Plaintiff by failing to make demand on and collect from the purchasers of Osage oil for similar royalty underpayments as the MMS has collected for the United States under the same circumstances.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duty in Failing to Market Osage Oil at Market Price to the Detriment of Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and hereby further state as follows:

27. Located at Cushing, Oklahoma, a short distance from the Osage mineral estate, is a public oil market readily accessible to the United States at which the United States could have marketed and or caused the oil produced from Osage Lands to be marketed to the credit of the Osage at a higher price than received.

28. The United States knew that federal regulations provided for storage of Osage oil at no cost, at or near the Cushing distribution center, to facilitate the marketing of said oil.

29. The United States knew that a higher price was available.

30. The United States breached their fiduciary duty to the Osage by failing to either market, facilitate the marketing or cause the Osage oil to be marketed at the highest price readily available and/or by failing to comply with its own regulations in the sale of Osage oil to the detriment of the Osage.

## THIRD CAUSE OF ACTION

**Breach of Fiduciary Duty by Failing to Pass Legislation and/or Promulgate Regulations which Would Maximize the Benefit of the Osage Mineral Estate to Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and further state as follows:

31. The United States has enacted legislation (supra) and the Secretary issued regulations (supra) governing the sale of Osage oil, but said legislation and regulations were not promulgated to maximize the value of the Osage mineral estate.

32. The United States breached its fiduciary duty to the Osage by failing to enact legislation and/or draft regulations governing the sale of Osage oil so that the Osage would receive the maximum benefit from the minerals produced from their lands.

## FOURTH CAUSE OF ACTION

**Breach of Fiduciary Duty by Failing to Promulgate Oil Lease Forms Which Would Maximize the Benefit of the Osage Mineral Estate to Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and further state as follows:

33. The United States has assumed responsibility for and made a mandatory form of oil lease which must be has been used by persons leasing Osage minerals.

34. The lease form promulgated by the United States to lease Osage minerals for oil exploration fails to contain safeguards to maximize the value of oil production to the Osage.

35. The failure of the United States to promulgate an oil lease form containing additional provisions to maximize the royalty revenue received by the Osage is a breach of its fiduciary duty to the Osage.

## FIFTH CAUSE OF ACTION

**Request for Declaratory Relief**

The Osage incorporate the factual allegations hereinabove stated, and further state as follows:

36. Pursuant to the applicable lease terms and federal laws, the Osage are entitled to be paid royalties (pursuant to the terms of oil and gas leases administered by the United States on its lands), based upon the highest value of the oil, not limited by a "posted price" designation.

37. The United States has failed to obtain said value for the Osage, despite their duty to do so under Federal law.

## SIXTH CAUSE OF ACTION

**Request for an Accounting**

The Osage hereby incorporate the above paragraphs herein, and further state as follows:

38. Based upon the treaties, statutes, regulations, and oil and gas leases cited herein, the Osage are entitled to an accounting for the royalty share of all proceeds of oil production from Osage land, as administered by the United States in its capacity as trustee and fiduciary for the Osage. That upon information and belief, the Osage hereby allege that the United States has failed to account to the Osage for its rightful share of revenues for oil production under the terms of various oil and gas leases and laws governing the drilling, development, and production of oil from Osage lands despite the duties assumed by and delegated to the United States to so account.

39. In fact, the United States has wholly failed to account to the Osage for the highest value of the oil produced, and has further failed to obtain and account to the Osage for amounts in excess of the "posted price", despite the United States' knowledge that the "posted price" was not

the actual highest value of the oil in and at the wellhead location of said production within Osage County.

40. The United States has failed to take any steps necessary in order to render such an accounting or account to the Osage for the proceeds of oil revenues produced from the Osage lands during the tenure of the United States' position as trustee and fiduciary over such matters.

## SEVENTH CAUSE OF ACTION

**Breach of the Constitutional Rights of the Osage**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

41. The United States has undertaken, and in fact, effectively promulgated various regulations, otherwise known as the Code of Federal Regulations, which purport to govern the activities and interpretation of both the Statutes of the United States and various oil and gas leases affecting the mineral interest of the Osage.

42. Pursuant to said regulations, the United States has promulgated rules which are constitutionally infirm and constitute a taking of the Osage property and property rights without due process and or equal protection, as guaranteed by the United States Constitution..

## EIGHTH CAUSE OF ACTION

**Request for Injunctive Relief**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

43. The Osage, upon information and belief hereby allege that the United States has, within the scope of its assumed responsibility and obligations pursuant to the above cited statutes and regulations, the ability to take action, both now and in the future, to obtain, secure, and otherwise reduce to possession, the royalty for the Osage based upon the actual value of said oil, both for production in the past and in the future, based upon the geographic location of production and the time of said production, rather than a "posted price" nomination.

44. Based upon information and belief, the Osage allege that the United States has failed to take action necessary to recover the full value of oil royalties based upon said production from the Osage lands for the past, the present and for production in the future.

## NINTH CAUSE OF ACTION

**Breach of Fiduciary Duty by Preventing the Osage from Marketing Oil Production in Kind**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

45. The Osage have in the past pursued, planned and have attempted to take such action as the Osage deemed proper to market oil production "in kind" from the wells located on Osage lands in order to obtain a higher price for its royalty share.

46. The United States intended, attempted, and in fact did, impede the Osage in their attempts to lawfully obtain and sell royalty production in kind, under the terms of the various oil and gas leases covering oil producing wells on Osage lands. Such action by the United States, impeding the Osage attempts to market oil production in kind, caused damage to the Osage.

## TENTH CAUSE OF ACTION

**Rights to Documents and Information**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

47. The United States is in possession of various records, receipts, revenue check stubs, and numerous other documents indicating the various locations, times, amounts, and type of production and revenue payments that relate to the proceeds of revenues from oil production from Osage lands. All of said documents, pursuant to the above cited statutes, regulations, and assumed duties of the United States, are obtained, held, and used strictly for the benefit of the Osage.

48. The Osage have ownership rights and are the legal owner of said documents above described. Despite the Osage interest in and request for said records, the United States has failed and refused to allow the Osage full access to said records, including to copy or inquire into the complete nature, scope, and organization of said records, except for a very limited number of documents acquired through a Freedom of Information Act request.

49. The United States has taken such action with the direct intent and effect of impeding the Osage in its pursuit to verify the United States' breach of its fiduciary duties, including the issues alleged in all causes of action stated herein, including but not limited to accounting and or valuation verification.

## ELEVENTH CAUSE OF ACTION

**Fraud and/or Constructive Fraud**
**Committed by the United States**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

50. That based upon information and belief, the Osage allege that the United States has knowingly participated in a deception to the detriment of the Osage, i.e., that the "posted price" was the actual value and/or highest available price of the oil being produced from Osage lands. That the United States specifically had knowledge that the "posted price" was less than the true value of the oil, but failed to reveal this information to the Osage, or take any action thereon, resulting in damage to the Osage. These actions by the United States constitute fraudulent conduct.

51. That pursuant to the United States' fiduciary and trustee duties to the Osage, the above actions constitute constructive fraud, based upon such relationship between the Osage and the United States.

52. The United States knew or should have known that the Osage were not being paid the highest royalty proceeds available under the terms of its oil and gas leases according to the terms thereof, upon both the true volume and value of the oil, as produced at the wellhead.

(a) Despite such knowledge, the United States participated in deceiving the Osage and perpetuating the falsehood that the "posted price" was the highest available price or the true value of the oil at the wellhead. This deception has effectively resulted in a great disadvantage to the Osage, causing the Osage damages.

(b) The Osage further allege that the United States knowingly failed to report the full amount of royalty revenues, based upon both production volumes and value. That the United

States had a duty to fully report and account to the Osage for all production and corresponding royalty revenues. The United States represented that it had fully reported, when in fact it had not.

53. The above described fraudulent acts of the United States caused the Osage damages.

## TWELFTH CAUSE OF ACTION

### Repudiation of Trust Relationship

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

54. Based upon the acts of the United States as alleged herein as may be proven at trial, the United States has failed and refused to perform its fiduciary or even ordinary duties to the Osage regarding the production and preservation of their mineral estate, including their duty to obtain the highest value for oil production from said mineral estate for the benefit of the Osage.

55. That the United States has, by its actions as herein alleged, repudiated the trust relationship by its careless and reckless disregard for the Osage in continuously failing to judiciously account for revenues for the volumes of oil production from Osage lands for an extended period of time, the exact length and or period of which is currently unknown to the Osage, but known to the United States.

56. That the United States' actions are of such nature as to call for the exercise of this Court's power and jurisdiction to find that the trust relationship between the Osage and the United States has been breached by the United States and that the Osage are entitled to relief by way of judicial decree and judgment in order to ensure that the mineral estate of the Osage Nation be preserved and protected from this point forward.

## PRAYER FOR RELIEF

**WHEREFORE**, in consideration of the above premises and each of them, the Osage hereby pray they recover judgment from the United States, including their costs and attorney's fees as may be allowed by law, and such relief as the Court may deem appropriate, compensable, just and equitable, including, but not limited to the following:

(a) **Compensatory damages** against the United States in an amount necessary to compensate the Osage for the actions/inactions of the United States as above alleged, in a sum in excess of $100,000,000.00, or as may be proven at trial;

(b) A **finding, order and judgment**, that the Osage are entitled to royalties on the production of oil under oil and gas leases covering mineral interests of the Osage Nation, based upon the highest value of said hydrocarbon production at the time and location of said production, as a continuing claim, without any limitation, including the limitation of a "posted price";

(c) **An accounting** by the United States to the Osage for the full percentage share of revenues due under the terms of its various oil and gas leases for the full volume of production of oil from Osage lands, inclusive of the highest value of oil production, based upon the time and location of the production at the well site, rather than the highest "posted price", as a continuing claim from the date to be established as the first failure of the United States to accurately account, including the accounting and payment for the full value of the oil produced, up to the present;

(d) **Order** the United States to pursue such action as may be necessary to obtain oil royalties for the Osage based upon full value of the oil produced at the wellhead, rather than the highest posted price for past, current and future production;

(e) **Order** the United States to promulgate legislation and regulations to maximize the benefit of the Osage mineral estate and oil production therefrom to the Osage;

(f) **Order** all provisions of the Code of Federal Regulations, as may be determined to limit the Osage in their ability to receive the proceeds of oil production based on the full value of the oil at the well site location, to be invalid, unconstitutional, void, and unenforceable. This request is inclusive of, but not limited to 25 C.F.R. Sections 226.11 and 226.15, et seq.;

(g) **An order, judgment and decree** determining the interest and ownership of the Osage in all documents and records of any nature that either address or pertain to oil revenues, oil production, oil leasing activities of any kind and/or other records of any kind relating to the past and present mineral estate of the Osage; **further**, that the Osage be allowed full, complete and unfettered access to said records at any time, and in such a manner as not to disturb the normal business activities of the United States;

(h) **Order** the United States to cease and desist all efforts and attempts to impede the Osage from marketing oil production in kind; and,

(i) **A determination, by judicial decree**, that the United States has breached its fiduciary duties as alleged herein and has done so in a continuing manner; **and to order** the United States to take any and all actions as may be necessary to prevent further breach of their duties, fiduciary and otherwise to the Osage, which actions, as may be determined by the Court herein, would include any and all direction necessary to protect the value of the Osage mineral estate and the rights of the Osage in and to said mineral estate. **Further**, that a finding be entered that the United States has in fact repudiated the trust relationship between the Osage and the United States by its actions as hereinabove alleged, and that this Court take such action as within its jurisdiction and power to modify and amend the powers and duties of the United States and their right to supervise, administer, oversee, and manage

the mineral estate of the Osage in order that the same may be preserved to the benefit of the Osage from this time forward, and for such other and further relief as the Court deems just.

Respectfully submitted,

**MAHAFFEY & GORE, P.C.**

By: ______________________________

BRADLEY D. BRICKELL, OBA #1117
RICHARD J. GORE, OBA # 3479
R. BRUCE KERR, OBA # 4990
Two Leadership Square, Suite 1100
211 North Robinson
Oklahoma City, Oklahoma 73102
Telephone: (405) 236-0478
Facsimile: (405) 236-1520
ATTORNEYS FOR PLAINTIFF

Passarelli

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND THE SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS,<br><br>Defendant, | ) | No. 99-550 L<br>Judge John P. Wiese |
| and | ) | |
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND THE SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS,<br><br>Defendant. | ) | No. 00-169 L<br>Judge James T. Turner |

DEPARTMENT OF JUSTICE GENERAL LITIGATION SECTION
00 MAY -5 AM 9: 34

**MOTION TO AMEND AND CONSOLIDATE**
**AND BRIEF IN SUPPORT**

COMES NOW the Plaintiff, pursuant to Rules 7 and 42(a) of the Rules of the United States Court of Federal Claims and moves the Court to consolidate Case No. 00-169 L, styled *The Osage Nation and/or Tribe of Indians of Oklahoma v. United States of America, by and through The Department and Secretary of the Interior and Bureau of Indian Affairs* and filed in this Court on March 31, 2000, with this case.

90-2-20-09634



**EXHIBIT 10**

In support of said Motion, Plaintiff represents to the Court that:

1. Pending before this Court is Plaintiff's claim that the Defendant breached its fiduciary duty to Plaintiff and mismanaged Plaintiff's trust by not collecting the proper royalty amount on oil produced and sold from lands held in trust by the Defendant for the benefit of Plaintiff. This issue includes both the amount of production and price obtained. (*See* Complaint, Exhibit "A")

2. Case No. 00-169 L will combine herewith the claim(s) that the Defendant has, to the detriment of Plaintiff, further mismanaged Plaintiff's trust money assets, composed primarily of oil royalties, by not prudently and properly accounting for the money paid into the U.S. Treasury and investing the same (as required by federal law) for the benefit of Plaintiff. (*See* new Complaint, Exhibit "B")

3. As can be seen, the original Complaint directly relates to Defendant's failure to properly collect royalty for oil and Case No. 00-169 L relates to Defendant's mismanagement of the oil royalty money that was collected, as well as other assets of the Osage.

4. Consequently, the two cases are extremely interrelated and it would be highly efficient for one judge to hear both causes of action, to eliminate duplication of discovery, the possibility of inconsistent rulings, and judicial efficiency. *See* F.R.C.P. 18 and reasoning express in *Glendale Joint Venture v. U.S.*, 13 Cl.Ct. 325 (1987). The basis for consolidation stated by this Court in *Navajo Tribe v. United States*, 222 Cl.Ct. 584 (Opinion January 25, 1980), i.e., judicial economy, etc. applies, even though the request for consolidation was overruled therein on the basis that the two (2) cases were far apart in preparation time, i.e., one had been open for twenty-seven (27) years. In the instant proceeding, should the cases not be consolidated, there could be a potential for "double recovery" of overlapping claims in the two cases as argued in *Navajo*, at 588.

5. The consolidation of Case No. 00-169 L with this case will not prejudice the Defendant or its ability to defend on the merits since this new Complaint is filed close in time with the original action and is unquestionably intertwined with the original Complaint and the facts and circumstances alleging mispayment, underpayment and accounting for oil production, as set forth in the original Complaint. The consolidation, in fact, will conserve the legal resources of the Defendant.

6. Granting of the Motion to Consolidate will not cause undue delay because discovery is in the initial stages and neither case is set for trial.

7. Plaintiff has consulted with Defendant, who opposed amending the original Complaint to add the causes of action in Case No. 00-169 L. Defendant's counsel suggested a Motion to Consolidate would be more appropriate and the Plaintiff is complying with Defendant's request by the filing of this motion.

8. Plaintiff further states it will amend (in the newly consolidated Complaint if this relief is granted) to more specifically set forth facts and issues related to the failure to require royalty be paid pursuant to the oil and gas lease terms, as indicated to this Court in the initial scheduling conference, wherein this Court did grant Plaintiff such leave to amend.

WHEREFORE, Plaintiff requests this Court(s) to grant its Motion to Consolidate Case No. 00169L within the original and surviving Case No. 99-550L, before the Honorable John P. Wiese and for leave to file such amended, consolidated Complaint, in accordance with Judge Wiese's ruling at the scheduling conference relating to amended allegations on royalty pricing. For purposes of

ease of administration, this Motion has been filed in both cases and it is believed that either Judge has jurisdiction to grant the relief requested.

Respectfully submitted,

MAHAFFEY & GORE, P.C.

Bradley D. Brickell, OBA #1117
Richard J. Gore, OBA 3479
Two Leadership Square, Suite 1100
211 North Robinson
Oklahoma City, Oklahoma 73102
(405) 236-0478
(405) 236-1520 (facsimile)
and

Nancy Skancke
Grammar Kissel Robbins Skancke & Edwards
1225 Eye Street, N.W., Suite 1225
Washington, D.C. 20005
(202) 408-5400
(202) 408-5406 (facsimile)
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF MAILING**

This is to certify that on the 28 day of April, 2000, a true and correct copy of the above and foregoing document was mailed, postage prepaid, to the following:

Edward J. Passarelli
Environment and Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Alan Woodcock
Office of the Field Solicitor
United States Department of the Interior
7906 E. 33rd Street, Suite 100
Tulsa, Oklahoma 74145

Stephen L. Simpson
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240

Bradley D. Brickell

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAY 26 2000
U.S. COURT OF FEDERAL CLAIMS

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

No. 99-550 L
No. 00-169 L
Judge John P. Wiese

**DEFENDANT'S MOTION TO RECONSIDER CONSOLIDATION ORDER**

Defendant respectfully moves the Court to reconsider its Order, dated May 5, 2000, consolidating the two captioned cases. In support of this motion, defendant states the following:

**STATEMENT OF THE TWO CONSOLIDATED CASES**

***Docket No. 99-550 L.***

In Docket No. 99-550 L, filed on August 2, 1999, the Osage Nation ("the Osage" or "the Nation") is seeking money damages related to the collection by the Bureau of Indian Affairs of allegedly undervalued royalties on oil and gas income from plaintiff's mineral properties. The Osage also seek equitable and declaratory relief to challenge the validity and require the amendment of both federal statute and regulation governing defendant's royalty collection for plaintiff, as well as to reform other related administrative practices and procedures, and to mandate that defendant perform an accounting of Osage oil and gas revenues. Complaint ¶¶ 15, 17, and 27-44. The Nations' complaint and their attorney's explanation at the March 2, 2000 status conference with the Court both emphasize that the central issue is defendant's claimed



EXHIBIT 11

failure to collect royalty income based upon the highest possible price. Complaint, ¶¶ 12-14, 18, and 21-23; Transcript of Status Conference, March 2, 2000 ("Tr."), pp. 8-9.

Plaintiff's requested relief in Docket 99-550 L for monetary, declaratory, injunctive and accounting remedies is focused exclusively on *collection of oil and gas royalties*, that is, defendant's asserted *failure to bring into the Nation's trust fund accounts in the first place* the full value for tribal income-generating properties or interests

***Docket No. 00-169 L.***

The Osage Nation in this docket asks first and foremost for an accounting of *all moneys already received into its trust fund accounts*. Filed on March 31, 2000, following the March 2 status conference in Docket No. 99-550 L, this case alleges defendant mismanaged tribal trust funds *after they had been received* into plaintiff's accounts.[1]

**LEGAL STANDARDS REGARDING CONSOLIDATION**

A trial court has broad discretion in ordering consolidation of cases for trial, where there is a common question of law or fact. *Gillette Motor Transport v. Northern Oklahoma Butane Co.*, 179 F.2d 711 (10th Cir. 1950); *Rando v. Luckenbach Steamship Co.*, 155 F.Supp. 220 (E.D.N.Y.1957). Existence of common questions of law and fact, however, is *prerequisite* for any consolidation. *Magnavox Co. v. APF Electronics, Inc.*, 496 F.Supp. 29, 209 U.S.P.Q. 1094 (N.D. Ill. 1980).

The Court of Federal Claims has its own rule respecting related cases for the purpose of

---

[1] To the extent that a limited portion of the Complaint in Docket No. 00-169 L can be read to allege federal failure to collect full value for tribal income-generating properties or interests, *e.g.*, ¶ 21, the charges appear to be duplicative of issues raised in the Nation's Docket No. 99-550 L Complaint.

contemplating the appropriateness of consolidating actions or not in the interests of judicial economy or other factors. RCFC 77(f), as amended in 1994 by General Order 36, deems cases related if they "(A) involve the same parties *and* are based on the same or similar claims; or (B) involve the same contract, property or patent." (Emphasis added.)

Although defendant is mindful that this Court has initially determined, based upon plaintiff's motion to amend or consolidate, to grant that request, the government respectfully suggests that this case does not involve common questions of law or of fact.[2] We further suggest that, while the two consolidated actions involve the same parties, they do not involve the same or even similar claims. Finally, defendant suggests that the two cases do not even ultimately involve the same property of plaintiff, even though both cases involve plaintiff's money. The property in Docket No. 99-550 L is oil and gas royalty income; the property in Docket No. 00-169 L is moneys received not only from oil and gas production but from other sources, as well.

**THE DIFFERENCES BETWEEN THE TWO CONSOLIDATED CASES**

Docket No. 99-550 L, being a royalty-collection case, and docket no. 00-169 L, being a trust fund management action, will necessarily and almost entirely involve different aspects of federal operations, different documents, different potential witnesses and, of special importance,

---

[2]It should be stressed that it was plaintiff's decision to file separately these two distinct actions, involving separate statutory and factual predicates. Defendants's attorney of record in Docket 99-550 L never consented to consolidation, nor does plaintiff's motion reflect that defense counsel agreed that consolidation had merit or that any motion to consolidate would not be opposed. When consulted on whether defendant would agree to an amended Docket 99-550 L Complaint, defendant's counsel indicated his opposition. He informed plaintiff's attorney that amendment would be inappropriate because the actions were separate claims involving separate factual and legal predicates. That is precisely the same basis on which defendant now opposes consolidation.

different statutory and regulatory authority. In essence, except for involving the same plaintiff and the same defendant, the two suits have nothing in common. This essential distinction is specifically acknowledged in plaintiff's own Motion to Amend and Consolidate and Brief in Support, filed herein on or about May 1, 2000, ¶¶ 1 and 2.[3]

***Differences in Controlling Statute and Regulation.***

Taking first the difference deemed the most significant, at least in defendant's view, the Court should consider the two separate statutory-regulatory schemes involved in a royalty-collection suit and in a trust funds management suit.

On their faces, the two Complaints in these cases make clear the two operative sets of laws at issue in each. In the royalty-collection suit, the Osage refer to and focus the issues on the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396-396g, as well as cite various oil and gas laws (Complaint, ¶¶ 6-7) and to federal oil and gas leasing regulations contained in 25 C.F.R. Part 226 (Complaint ¶¶ 8-9 and 13) and 30 C.F.R. Part 206 (Complaint ¶ 17) because they are the legal structure governing Indian oil and gas issues generally or Osage oil and gas issues specifically.

In the new trust funds accounting suit, the Osage refer to and focus the issues on the Indian Trust Funds Management Act of 1994, 25 U.S.C. § 4011 and, more generally, 25 U.S.C. § 162a(d) (Complaint, ¶ 8).

---

[3]The points at issue concerning consolidation will, of course, be discussed herein, *infra*. Of immediate and central disagreement, however, are plaintiff's assertion in its Motion that "the two cases are extremely interrelated" (¶ 4) and that "consolidation, in fact, will conserve the judicial resources of Defendant" (¶ 5) and that "Defendant's counsel suggested a Motion to Consolidate would be. . . appropriate" (¶ 7).

The two statutory-regulatory structures deal with different Secretarial responsibilities, obviously quite distinct from one another. So distinct in fact that by Congressional decision, the responsibilities are carried out by two separate offices of the Department of the Interior – the Superintendent, Osage Agency, Bureau of Indian Affairs, for minerals and minerals royalty matters (25 C.F.R. Part 226) and the Office of Trust Funds Management, Office of the Special Trustee for American Indians ("OST/OTFM") for handling moneys already received into tribal accounts (U.S. Department of the Interior Manual,110 DM 28 (copy attached hereto is located at http://elips.doi.gov/ELIPS/toc/ACT_MAN.htm); *see also, e.g.*, 25 C.F.R. Part 1200).

***Differences in Management of the Presently Consolidated Cases.***

For purposes of this litigation, these two sets of separate federal responsibilities translate directly into two distinct case management tasks for both parties and for the Court itself. Arising under two different structures, the royalty-accounting case and the trust funds management case will quickly and permanently involve two different sets of documents and exhibits. Those papers produced by the Superintendent, Osage Agency, will not relate at all to the papers produced by the OST/OTFM. Thus, whatever discovery takes place and whatever exhibits are prepared will proceed as they would with two different cases. For the same reasons, the personnel knowledgeable in the two areas will be entirely different groups of people. Thus, the witnesses that may be deposed or eventually called will not be the same people in each case.

Given this condition, there is no reason to think that the cases will necessarily proceed on the same schedule, unless the progress on one is artificially halted awaiting completion of the other. Defendant submits that consolidation is wholly adverse to the general interests of judicial economy and may be prejudicial to the efficient resolution of the separate actions that have

separate attorneys of record for the defendant. Docket No. 99-550 L is already in the discovery stage, while the defendant has yet to receive a litigation report, yet alone file an answer in Docket No. 00-169 L. Indeed, defendant foresees on the not-too-distant horizon the further complicating specter of plaintiff moving to amend the two complaints in an attempt to fuse together distinct claims that the Osage initially chose to keep separate. Even if such an effort does not materialize, the consolidation itself forces into one proceeding two stand-alone actions that were not pled together originally and that involve varying jurisdictional issues, such as different statute of limitations periods.

Defendant reminds the Court that during the May 9, 2000, telephone status conference among the parties to both cases and the Court, plaintiff's counsel stated that when he filed Docket No. 99-550 L, he had not then been authorized by the Osage Nation to file the claims now present in Docket No. 00-169 L. Clearly, plaintiff itself viewed the cases as entirely different ones to such a degree that it first withheld approval of proceeding on the more recent filing.

Finally, and of great significance, given the two different areas of trust responsibility law in play here and the two different factual situations that certainly exist between royalty supervision by BIA over third-party oil and gas companies, on the one hand, and OST/OTFM management of funds directly and solely within that agency's own responsibility, it is almost impossible to conceive that the Court would be making findings of fact or rulings of law that would overlap. Therefore, the chance of two different judges reaching conflicting findings or rulings is virtually non-existent.

## CONCLUSION

For the foregoing reasons, the Court should vacate its Order of March 5, 2000, and separate Docket Nos. 99-550 L and 00-169 L into two individual cases.

Dated this 26th day of May, 2000.

Respectfully submitted,

EDWARD J. PASSARELLI
Attorney of Record for Defendant in Docket No. 99-550 L
Telephone: (202) 305-0468

R. ANTHONY ROGERS
Attorney of Record for Defendant in Docket No. 00-169 L
RENITA Y. FORD

General Litigation Section
Environment and Natural Resources Division
United States Department of Justice
P. O. Box 663
Washington, D. C. 20044-0663
Telephone: (202) 305-0483
Fax: (202) 305-8273/0506

Of Counsel:

Stephen Simpson
Attorney
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
Washington, D. C. 20240
Telephone: (202) 219-1659
Fax: (202) 208-3490

# In the United States Court of Federal Claims

No. 99-550 L
No. 00-169 L

Filed: September 14, 2000

FILED
SEP 14 2000
U.S. COURT OF FEDERAL CLAIMS

SEP 18 PM 3:52
DEPARTMENT OF JUSTICE
GENERAL LITIGATION SECTION

| | |
|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) |
| Plaintiff, | ) |
| v. | ) |
| THE UNITED STATES, | ) |
| Defendant | ) |

## ORDER

## VACATING CONSOLIDATION ORDER

On May 26, 2000, defendant filed a motion asking the court to reconsider its Order of May 5, 2000, directing the consolidation of Case Nos. 99-550L and 00-169L. Based on the reasons set forth in defendant's motion, and the supplementary views expressed by counsel during the hearing on this matter held on September 12, 2000, the Order allowing consolidation of the referenced cases is hereby vacated.

The Clerk is instructed to return Case No. 00-169 L to the originally-assigned judge.

John P. Wiese
Judge



EXHIBIT 12

Passarelli

DEPARTMENT OF JUSTICE
GENERAL LITIGATION
SECTION

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA | ) | |
| PLAINTIFF, | ) | |
| V. | ) | Case No. 99-550L |
| | ) | (Judge Mary Ellen Coster Williams) |
| THE UNITED STATES OF AMERICA, | ) | |
| DEFENDANT. | ) | |

**PLAINTIFF OSAGE TRIBE'S THIRD AMENDED COMPLAINT**

**Nature of Action**

1. This is an action for money damages brought by the Osage Tribe of Indians ("Osage Tribe" or "Tribe"), as beneficial owner of the trust lands of the Osage Tribe ("Osage surface estate"), and the oil, gas, and other minerals underlying lands within the exterior boundaries of the Osage Reservation ("Osage mineral estate"), against the United States of America ("United States" or "Federal Government"), which serves as trustee for the Osage surface and mineral estates. In this action, the Osage Tribe seeks damages for mismanagement of certain Osage trust assets committed by the United States as trustee.

**Parties**

2. Plaintiff Osage Tribe is a sovereign Indian nation based in Pawhuska, Oklahoma, acknowledged by the United States as an Indian tribe, with all the legal rights and responsibilities of a federally recognized Indian tribe.

3. Defendant United States acts as trustee for certain tribal monies, lands, and other assets belonging to the Osage Tribe, including the Osage surface estate and the Osage mineral



EXHIBIT 13

estate. The United States has delegated certain of its trust responsibilities over such assets to the Secretary of the Interior ("Secretary"), who is charged by law with carrying out certain duties and responsibilities of the United States as trustee for the Osage Tribe.

**Jurisdiction and Venue**

4. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1491 and 1505.

**The United States is Trustee of Certain Property Belonging to the Osage Tribe**

5. The Osage Tribe first entered into a treaty relationship with the United States in 1808. Treaty with the Osage, Nov. 10, 1808, 7 Stat. 107, 2 CHARLES J. KAPPLER, INDIAN AFFAIRS, LAWS AND TREATIES 95-99 (1904). In that treaty, the Osage Tribe agreed to cede certain lands to the United States in exchange for a reservation, monies, goods, and the protection of the United States. Specifically, the Osage Tribe "declare[d] that they will consider themselves under the protection of [the United States]; disclaiming all right to cede, sell or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorized by the President of the United States..." Article 10, Treaty with the Osage, Nov. 10, 1808, 7 Stat. 107, 2 CHARLES J. KAPPLER, INDIAN AFFAIRS, LAWS AND TREATIES 95-99 (1904).

6. This treaty relationship continued until 1865, when the United States and the Osage Tribe entered into a final treaty. Treaty with Osage, Sept. 29, 1865, 14 Stat. 687, 2 CHARLES J. KAPPLER, INDIAN AFFAIRS, LAWS AND TREATIES 878-883 (1904). In that treaty, the United States agreed to purchase lands in what is now the State of Oklahoma to serve as a permanent home for the Osage should the Tribe decide to leave its reservation in Kansas.

7. Pursuant to acts of Congress in 1872, 1873, and 1883, the United States purchased a tract of land for the Osage Tribe in what is now the State of Oklahoma. This land consisted of approximately 1,472,000 acres and now comprises the Osage Reservation and the contiguous boundaries of Osage County, Oklahoma. Acts of June 5, 1872, 17 Stat. 228; Mar. 3, 1873, 17 Stat. 530; and Mar. 3, 1883, 22 Stat. 603.

8. The Osage Tribe was the exclusive beneficial owner of these lands until 1906 when Congress enacted a law that allotted the majority of the Reservation surface lands to individual members of the Tribe. The unallotted lands remained in trust for the Osage Tribe. Act of June 28, 1906, 34 Stat. 539 ("1906 Act"). Since 1906, the Tribe has reacquired other lands within the exterior boundaries of the Osage Reservation that the United States now holds in trust.

9. The 1906 Act also reserved to the Osage Tribe all the oil, gas, sand and gravel, and other minerals beneath the surface of the Osage Reservation, allotted or otherwise, for a period of twenty-five years from April 8, 1906, or until April 8, 1931. Act of June 28, 1906, 34 Stat. 539.

10. Subsequent acts of Congress have extended the trust created by the 1906 Act and, as a result, the Osage mineral estate is today still held in trust by the United States for the benefit of the Tribe. Acts of Mar. 31, 1921, 41 Stat. 1249; Mar. 2, 1929, 45 Stat. 1478; June 24, 1938, 52 Stat. 1034; July 25, 1947, 61 Stat. 459; Oct. 6, 1964, 78 Stat. 1008; and Oct. 21, 1978, 92 Stat. 1660; and Oct. 30, 1984, 98 Stat. 3163.

11. The 1906 Act and subsequent acts of Congress permit the Osage Tribal Council to enter into leases covering portions of the Osage mineral estate, but such leases are not valid without the approval of the Secretary. The Secretary is also directed to promulgate rules and

regulations governing the Osage mineral estate. These acts also direct the Secretary and the Osage Tribal Council to offer for lease portions of the Osage mineral estate for oil, gas, and other mining purposes, in such quantities and at such times as may be deemed for the best interest of the Osage Tribe. Acts of June 28, 1906, 34 Stat. 539; Mar. 3, 1921, 41 Stat. 1249; Mar. 2, 1929, 45 Stat. 1478, 1479; June 24, 1938, 52 Stat. 1034, 1035; July 25, 1947, 61 Stat. 459; Oct. 6, 1964, 78 Stat. 1008; and Oct. 21, 1978, 92 Stat. 1660. Congress also has exercised control over Osage assets by mandating that the Secretary of the Interior and Osage Tribal Counsel offer for lease not less than twenty-five thousand acres of the Osage Reservation for oil and gas mining purposes during any one year. Act of March 3, 1921, 41 Stat. 1249; Act of March 2, 1929, 45 Stat. 1478.

12. Congress also has exercised control over Osage assets by mandating that the Secretary of the Interior and Osage Tribal Council offer for lease not less than twenty-five thousand acres of the Osage Reservation for oil and gas mining purposes during any one year. Act of March 3, 1921, 41 Stat. 1249; Act of March 2, 1929, 45 Stat. 1478.

13. The United States, as trustee acting through the Secretary, has promulgated an elaborate regulatory framework for the comprehensive and pervasive control over the management of the Osage mineral estate. See. Leasing of Osage Reservation Lands, Oklahoma, for Mining, Except Oil and Gas, 25 C.F.R., Part 214 (2004); and Leasing of Osage Reservation Lands for Oil and Gas Mining, 25 C.F.R., Part 226 (2004).

14. The Department of the Interior regulations governing the leasing of the Osage mineral estate for oil and gas mining were originally published in 1915 and have been subsequently amended several times. *See Okie Crude Co., et al. v. Muskogee Area Director,*

*Bureau of Indian Affairs*, 23 IBIA 174 (Feb. 5, 1993); 39 Fed. Reg. 22254 (June 21, 1974), 41 Fed. Reg. 50648 (Nov. 17, 1976), 43 Fed. Reg. 8135 (Feb. 28, 1978), 43 Fed. Reg. 11815 (Mar. 22, 1978), 55 Fed. Reg. 33112 (Aug. 14, 1990), 59 Fed. Reg. 22104 (Apr. 28, 1994). The Department of the Interior's current regulations for the leasing and management of the Osage mineral estate for oil and gas mining are contained in Part 226 of Title 25 of the Code of Federal Regulations. 25 C.F.R. Part 226 (2003). The current regulations, like their predecessor regulations, provide for the comprehensive and pervasive control of the Secretary over the leasing of the Osage mineral estate for oil and gas mining.

15. As trustee for the Osage Tribe, the United States has issued numerous oil and gas mining leases covering portions of the Osage mineral estate. The oil and gas leases issued by the United States, as trustee for the Osage Tribe, generally provide for the payment of rentals and, if crude oil and/or natural gas are discovered in commercial quantities, the payment of royalties based on the value of the crude oil and natural gas produced. The lessee must generally pay royalties monthly to the United States as trustee for the Osage Tribe.

16. As trustee for the Osage Tribe, the United States has issued other leases covering portions of the Osage surface and mineral estates, including grazing leases, rights of way, and land and building leases and rentals. Under these leases, the lessee generally makes a monthly or annual payment to the United States as trustee for the Osage Tribe.

17. The 1906 Act directed that "all funds belonging to the Osage Tribe, and all moneys due, and all money that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States . . . ." Act of June 28, 1906, 34 Stat.

539, 544. The United States continues to hold funds belonging to the Tribe, including funds derived from the Osage surface and mineral estates, in trust for the benefit of the Osage Tribe.

18. Other acts of Congress also authorized the Secretary to collect income derived from Osage tribal trust assets. These funds were and are still required to be collected and deposited in the United States Treasury and other depositary institutions in trust for the benefit of the Osage Tribe. *E.g.*, Act of Mar. 3, 1883, c. 141, § 1, 22 Stat. 590. The United States is also required to pay interest on these tribal trust funds, and to properly invest such funds. *See e.g.*, Act of Feb. 12, 1929, c. 178, 45 Stat. 1164, *codified as amended*, 25 U.S.C. § 161b; Act of June 24, 1938, 52 Stat. 1037, *codified as amended*, 25 U.S.C. § 162a.

19. The U.S. Department of the Treasury disperses Osage tribal trust funds, including trust funds derived from the Osage mineral estate, to the Osage Tribe and to "headright" holders in the Osage mineral estate on a quarterly basis. A "headright" is the right to receive a disbursement of funds derived from the Osage mineral estate. *See Globe Indem. Co. v. Bruce*, 81 F.2d 143, 148-9 (10th Cir. 1935); COHEN'S HANDBOOK OF FEDERAL INDIAN LAW, 790 n.187 (1982 ed.). Headright holders include Osages and Indians of other tribes, who receive funds paid into Individual Indian Money (IIM) accounts, and non-Indian individuals and entities, who receive checks directly from the Department of the Treasury.

**<u>As Trustee, the United States Owes the Osage Tribe the Highest Fiduciary Responsibilities Concerning the Management of Tribal Assets Held in Trust for the Benefit of the Osage Tribe</u>**

20. As trustee for the Osage Tribe, the United States has a fiduciary relationship with the Tribe and obligations of the highest responsibility to administer Osage tribal trust assets with the greatest skill and care possessed by the trustee. The United States "'has charged itself with

moral obligations of the highest responsibility and trust' in its conduct with Indians, and its conduct 'should therefore be judged by the most exacting fiduciary standards.' " *Cobell v. Norton*, 240 F.3d 1081, 1099 (D.C. Cir. 2001) (quoting *Seminole Nation v. United States*, 316 U.S. 286, 297 (1942)).

21. The United States has assumed the obligations of a trustee at common law because it holds Osage tribal monies, lands, and other assets in trust for the benefit of the Osage Tribe. *United States v. Mitchell*, 463 U.S. 206, 225 (1983); *Cobell*, 240 F.3d 1081; *Cobell v. Norton*, 283 F. Supp. 2d 66 (D.D.C. 2003). These duties include, but are not limited to, the duty to properly administer the trust; to administer the trust solely in the interest of the Osage Tribe; to keep and render clear and accurate accounts with respect to the administration of the trust; to furnish complete and accurate information to the Osage Tribe as to the nature and amount of trust assets; to exercise the proper care and skill in the administration of the trust; to preserve the trust assets and protect them from loss, theft, or damage; to keep the trust assets of the Osage Tribe separate from other property not subject to the trust; to properly deposit the trust funds of the Osage Tribe; and to make the assets of the trust productive for the benefit of the Osage Tribe.

22. The United States also has certain statutory trust duties to the Osage Tribe that, in some cases, reaffirm the pre-existing trust duties imposed upon the United States at common law. Acts of June 28, 1906, 34 Stat. 539; Mar. 3, 1921, 41 Stat. 1249; Mar. 2, 1929, 45 Stat. 1478, 1479; June 24, 1938, 52 Stat. 1034, 1035; July 25, 1947, 61 Stat. 459; Oct. 6, 1964, 78 Stat. 1008; Oct. 21, 1978, 92 Stat. 1660; Dec. 22, 1987, Pub. L. No. 100-202, 101 Stat. 1329; Oct. 23, 1989, Pub. L. No. 101-121, 103 Stat. 701; Nov. 5, 1990, Pub. L. No. 101-512, 104 Stat. 1915, Nov. 3, 1991, Pub. L. No. 102-154, 105 Stat. 990; 25 U.S.C. § 4001-61; and 25 U.S.C. § 162a. These duties include the duty to offer for lease the Osage mineral estate in such quantities and at

such times as may be deemed for the best interest of the Osage Tribe and the duty to audit, reconcile, and provide an accounting for Osage tribal trust funds.

**Count One**

**Damages Resulting from the Defendant United States' Breach of Its Trust Duties to the Osage Tribe with Respect to Oil and Gas Mining Leases Covering Portions of the Osage Mineral Estate**

23. The Osage Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 21 above.

24. As trustee for the Osage Tribe, the United States has issued numerous oil and gas mining leases covering portions of the Osage mineral estate. For that purpose, the United States, as trustee, has developed form oil and gas leases that it generally requires that a lessee use. Under those form leases, the royalty on crude oil is generally a specified percentage of the higher of (a) the selling price realized by the lessee for the crude oil or (b) the price posted or offered for crude oil in a specified geographic area, such as the geographic area consisting of Kansas and Oklahoma. Under those form leases, all royalties are paid to the United States, as trustee, or its delegate, and held in trust for distribution to the headright owners of the Osage Tribe at regular intervals. Attached as Exhibit A are examples of the royalty provisions of the form oil and gas leases the government generally requires lessees to use.

25. At the conclusion of the original status conference in this matter, the Court requested the United States to make its oil and gas records available to the Osage Tribe so that the Tribe could compare the royalties it had actually received from the United States for crude oil with the royalty that the Tribe was entitled to receive under the oil and gas leases that the United States, as trustee, had issued for the benefit of the Tribe. The Tribe's comparison is set forth in

Exhibit B. That exhibit shows numerous instances during 1995 where the royalty actually received by the Osage Tribe for crude oil was significantly less than the highest posted price for crude oil and also significantly less than the price offered for crude oil at Cushing, Oklahoma. As a result, the royalties actually received by the Osage Tribe on that crude oil were less than the royalties dues under the applicable form oil and gas lease. As set forth in Exhibit C, the Osage Tribe estimates that the royalty payments it received from the United States for crude oil produced during calendar year 1995 are about $1.3 million less than the royalties that the United States, as trustee, was required to pay to the Osage Tribe for crude oil produced from the Osage mineral estate for calendar year 1995.

26. The documents in Exhibit A were included in Exhibit 1 to Plaintiff's Claim Verification filed with this Court on November 12, 2002. The documents in Exhibits B and C were included in Exhibit 8 to Plaintiff's Claim Verification. Plaintiff hereby incorporates by reference Plaintiff's Claim Verification in its entirety.

27. Defendant United States has never provided the Osage Tribe with an accounting of the revenue that the United States, as trustee, has collected or was required to collect under the oil and oil gas leases that the United States issued for the benefit of the Tribe. In addition, the United States is the custodian of the federal trust records relating to Osage trust assets. Except for the single visit to the Interior Department's Osage Agency in Pawhuska where a small number of the Osage trust records are kept, the United States has not provided the Osage Tribe with access to the oil and gas records that the United States, as trustee, is required to maintain for the benefit of the Tribe. As a result, at the present time, the Osage Tribe cannot identify each and every oil and gas lease where the United States, as trustee, has paid a crude oil royalty to the

Tribe that is less than the amount of royalty required by the form oil and gas mining lease that the United States, as trustee, has issued for the benefit of the Tribe.

28. On information and belief, Plaintiff alleges that, in addition to those set forth in Exhibits A, B, and C, the United States, as trustee, has made crude oil royalty underpayments with respect to other oil and gas leases and other time periods.

29. On information and belief, Plaintiff also alleges that the United States, as trustee, has also made royalty underpayments with respect to natural gas that has been produced from the form oil and gas leases that the United States, as trustee, has issued for the benefit of the Osage Tribe.

30. As a result of the above failures, the Osage Tribe has been damaged by not receiving payments under the oil and gas mining leases that the United States, as trustee, issued for the benefit of the Osage Tribe and should have collected but did not collect. The Osage Tribe was also damaged by not being able to receive interest or other investment income from the funds that the United States, as trustee, should have but failed to collect. Accordingly, the Osage Tribe is entitled to a money judgment against the United States, as trustee, for the full amount of these damages.

## Count Two

## Damages Resulting From the Defendant United States' Breach of its Trust Duties to the Osage Tribe With Respect to Leases Covering the Osage Surface and/or Mineral Estates, Other Than Oil and Gas Leases

31. The Osage Tribe realleges and incorporates by reference the allegations contained in paragraphs 1 through 28 above.

32. As trustee for the Osage Tribe, the United States has issued other leases covering portions of the Osage surface and mineral estates, including grazing leases, rights of way, and land and building leases and rentals. Under these leases, the lessee generally makes a monthly or annual payment to the United States as trustee for the Osage Tribe.

33. Defendant United States has never provided the Osage Tribe with an accounting of the revenue that the United States, as trustee, has collected or was required to collect under the leases that the United States issued for the benefit of the Tribe for purposes other than oil and gas mining. In addition, the United States holds the records relating to these Osage trust assets and has not provided the Osage Tribe with access to the records with respect to those leases that the United States, as trustee, is required to maintain for the benefit of the Tribe. As a result, at the present time, the Osage Tribe cannot identify each and every non-oil and gas lease where the United States, as trustee, has made a payment to the Tribe that is less than the payment required by the lease that the United States, as trustee, issued for the benefit of the Tribe.

34. On information and belief, Plaintiff alleges that, in addition to the royalty underpayments set forth in Exhibits A, B, and C, the United States, as trustee, has made payments to the Tribe that are less than the payments required by the non-oil and gas leases that the United States has issued for the benefit of the Tribe.

35. As a result of the above failures, the Osage Tribe has been damaged by not receiving payments under leases that the United States, as trustee, issued for the benefit of the Tribe and should have collected but did not collect. In addition, the Osage Tribe was damaged by not receiving interest or other investment income on the funds the United States should have

but failed to collect. Accordingly, the Osage Tribe is entitled to a money judgment against the United States, as trustee, for the full amount of these damages.

**WHEREFORE,** the Plaintiff Osage Tribe prays:

1. For an award of damages to the Osage Tribe in an amount to be determined at trial, for Defendant United States' breaches of its compensable fiduciary duties;

2. For an award to the Osage Tribe of reasonable attorneys' fees, costs, and such other relief as the Court deems just.

Dated this 20th day of October, 2004.

Respectfully submitted,

Wilson K. Pipestem
Pipestem Law Firm, P.C.
1333 New Hampshire Ave., NW
Washington, D.C. 20036
(202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

ATTORNEY FOR THE OSAGE TRIBE
OF INDIANS OF OKLAHOMA

# EXHIBIT A

CONTRACT NUMBER
14-20-G06 5619

# BLANKET OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

THIS LEASE, made and entered into in duplicate on this 3rd day of March, 1978, by and between the OSAGE TRIBE OF INDIANS IN OKLAHOMA by Sylvester J. Tinker, Principal Chief, under authority of the resolution of the Osage Tribal Council dated February 15, 1978, and numbered 24-429. Party of the First Part, designated as Lessor, and Charles W. Oliphant, an undivided .469641 interest, Gertrude O. Oliphant, an undivided .115472 interest, Allene O. Mayo, an undivided .132062 interest, Bank of Oklahoma, Trustee, u/t/w A. G. Oliphant, deceased, an undivided .078561 interest, Eric B. Oliphant, an undivided .044456 interest, Nancy B. Oliphant, formerly Nancy B. Wyrick, an undivided .044456 interest, John D. Mayo II, an undivided .009857 interest, Peter O. Mayo, an undivided .009857 interest, J. P. Freeman an undivided .009857 interest, W. J. McAulay, an undivided .009857 interest, Martha R. Gillespie, an undivided .012124 interest, Katherine O. Croteau, an undivided .006900 interest, and Dorothy O. Johnston, an undivided .006900 interest, parties of the second part, designated as Lessee, under and in pursuance of Section 3 of the Act approved June 28, 1906 (34 Stat. L. 539-543); the Act approved March 3, 1921 (41 Stat. L. 1249); the Act of March 2, 1929 (45 Stat. L. 1478); the Act of June 24, 1938 (52 Stat. L. 1034); the Act of June 15, 1950 (Stat. L. 215); and the Act of October 6, 1964 (78 Stat. 1008):

WITNESSETH:

WHEREAS, Lessee is the owner of oil mining leases duly executed by the Principal Chief of the Osage Tribe under authority of resolution of the Osage Tribal Council and thereafter approved by the Secretary of the Interior, or his duly authorized representative, as now shown by the records of the Osage Indian Agency at Pawhuska, Oklahoma, covering lands in Osage County, Oklahoma, more particularly described as follows:

| | | | |
|---|---|---|---|
| NE/4 | 5-T25N-R5E | Contract No. | 14-20-G06-663 |
| SE/4 | 5-T25N-R5E | Contract No. | " |
| NW/4 | 5-T25N-R5E | " | " |

[based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal.]

D. Casinghead Gas - All casinghead gas shall belong to the oil lessee subject to any rights under existing gas leases. All casinghead gas removed from the lease from which it is produced shall be metered unless otherwise approved by the Superintendent and subject to a royalty of 16-2/3 percent of the market value of the gas and all products extracted therefrom, less a reasonable allowance for manufacture or processing. If oil lessee supplies casinghead gas produced from one lease for operation and/or development of other leases, either his or others, a royalty of 16-2/3 percent shall be paid on the value of all casinghead gas so used. All casinghead gas not utilized by the oil lessee may, with the approval of the Superintendent, be utilized by the gas lessee, subject to the prescribed royalty of 16-2/3 percent.

E. Development (1) Lessee shall drill and produce all wells necessary to offset or protect the above described land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon, if, in his opinion, a prudent operator would conduct further development.

(2) The Lessee accepts this lease with the understanding that the lands covered hereby are or may be leased to another party who shall have the exclusive right to prospect for and produce gas. If Lessee is notified of indications of possible oil production as the result of drilling by a gas lessee, he shall have the option to take over the well subject to acceptance and payment as provided in the regulations in 25 CFR Part 183.

(3) If the oil lessee drills a gas well he shall immediately without removing from the well any of the casing or other equipment, notify the gas lessee and the Superintendent. If the gas lessee does not, within 15 days after receipt of notice and cost of drilling elect to take over the well, he shall immediately notify the oil lessee, and the disposition of such well and the production therefrom shall be subject to the approval of the Superintendent. Should the gas lessee elect to take over the well, he shall pay the oil lessee the cost of drilling the same, including all damages paid and cost in place of casing and other equipment. If the oil lessee shall drill a gas well upon lands not leased for gas purposes, he shall immediately notify the Superintendent who may, until such time as said lands are leased; permit the lessee to

Section 15. This lease is subject to the regulations now or hereafter prescribed by the Secretary of the Interior, relative to such leases, all of which are made a part of this lease; PROVIDED, that no regulation made after the approval of this lease shall operate to affect the term of the lease, rate of royalty, rental or acreage, unless agreed to by both parties.

Section 16. Violation of any of the terms or conditions of this lease or of the regulations pertaining thereto, shall subject the lease to cancellation by the Superintendent, or the Lessee to a fine of not exceeding Five-Hundred Dollars ($500.00) per day for each and every day the terms of the lease or the regulations are violated, or the orders of the Superintendent in reference thereto are not complied with, or to both such fine and cancellation in the discretion of the Superintendent; PROVIDED, that the Lessee shall be entitled to notice and hearing with respect to the terms of the lease or of the regulations violated, which hearing shall be held by the Superintendent, whose findings shall be conclusive unless an appeal be taken to the Commissioner of Indian Affairs or to the Secretary of the Interior, as provided by the Regulations and the decision of the Commissioner or Secretary on such an appeal shall be conclusive.

Section 17. Before this lease shall be in force and effect, Lessee shall furnish a bond with responsible surety to the satisfaction of the Superintendent, conditioned for the performance of this lease, which bond shall be deposited and remain on file in the Osage Agency.

Section 18. An assignment of this lease or any interest therein covered by operating agreement or otherwise, may be made with the approval

# WEST BURBANK UNIT

## BLANKET OIL MINING LEASE

## OSAGE COUNTY, OKLAHOMA

A. A. CAMERON, OPERATOR

JANUARY 1, 1957

(a) [The sum of sixteen and two-thirds (16 2/3) per cent of the gross proceeds from the sales,] after deducting the oil used for fuel in operating the lease, of all oil produced and saved from the lease premises; provided, if when the quantity of oil produced and saved during any calendar month is sufficient to average 100 or more barrels per well per day, the royalty on such oil shall be twenty (20) per cent.

(b) Payment for the royalty payable hereunder shall be made at the time of sale or removal of the oil from the leased premises, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at [not less than the highest posted market price in the Mid-Continent Field on the day of sale or removal.]

Should the lessor with the approval of the Commissioner of Indian Affairs elect to take the royalty in oil, lessee shall furnish free storage for the royalty oil for not exceeding thirty (30) days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner may impose restrictions as to time or times for the drilling of wells and as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner may take into consideration among other things, Federal laws, State laws, or regulations by competent Federal or St[illegible] authorities or lawful agreements among operators regulating either drilling

1/6

33228

(Must be executed in Triplicate)

FORM B

CONTRACT NUMBER

Inited ..

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in quadruplicate, on this 7th day of September A. D. 19 50, by and between the Osage Tribe of Indians in Oklahoma by JOHN OBERLY Principal Chief, under authority of the Resolution of the Osage Tribal Council dated AUG 16 1950 party of the first part, designated as lessor, and LESTER E. COX of Springfield, Missouri party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906 (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quantities, all the oil deposits in or under land described as follows, to-wit:

66 Tr. NE¼ (Quarter) Sec. 31 Twp 29 North N. Rge. 11 East E

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Secretary of the Interior may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on the land embraced in this lease within twelve months from date of approval of lease, or this may be held for the full five year period without drilling, upon payment of rentals to the Superintendent for the lessor at the rate of $1.00 per acre per annum, or a proportionate part thereof for each three months period the lease is held and a well not drilled, such rental beginning twelve months from date of approval of lease: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homesteads shall have been given. Provided, that the Superintendent of the Osage Agency in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant. Should the lessee elect to surrender this lease before the end of any such yearly period without drilling a well thereon, he shall pay the rental based on one dollar per acre for the fraction part of the year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty five days from expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: Provided, further, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also, the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Upon payment of such location-site money lessee shall be entitled to possession. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tank-site. The sum to be paid for an oil tanksite of larger capacity and occupying greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

If the surface owner of the land covered by this lease obtains a Federal farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortgage on the surface of said land, the lessee shall pay all fees and damages, required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

X

33229

(Must be executed in Triplicate)

FORM B

CONTRACT NUMBER

Lessee ..........

# OIL MINING LEASE

## OSAGE RESERVATION. OKLAHOMA

This lease, made and entered into in quadruplicate, on the 7th day of September A. D. 1950 by and between the Osage Tribe of Indians in Oklahoma by JOHN [illegible] Principal Chief, under authority of the Resolution of the Osage Tribal Council dated AUG 16 1950 party of the first part, designated as lessor, and LESTER E. COX of Springfield, Missouri party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quanities, all the oil deposits in or under land described as follows, to-wit:

67 Tr. SE¼ (Quarter) Sec. 31 Twp 29 North N. Rge. 11 East E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2/3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royality oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Secretary of the Interior may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on the land embraced in this lease within twelve months from date of approval of lease, or this may be held for the full five year period without drilling, upon payment of rentals to the Superintendent for the lessor at the rate of $1.00 per acre per annum, or a proportionate part thereof for each three months period the lease is held and a well not drilled, such rental beginning twelve months from date of approval of lease: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homesteads shall have been given. Provided, that the Superintendent of the Osage Agency in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant. Should the lessee elect to surrender this lease before the end of any such yearly period without drilling a well thereon, he shall pay the rental based on one dollar per acre for the fraction part of the year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty five days from expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: Provided, further, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also, the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Upon payment of such location-site money lessee shall be entitled to possession. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tank-site. The sum to be paid for an oil tanksite of larger capacity and occupying greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

If the surface owner of the land covered by this lease obtains a Federal farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortgage on the surface of said land, the lessee shall pay all fees and damages, required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

FORM B (Revised)
Approved by the Secretary of the Interior September 14, 1968

(Must be executed in duplicate)

CONTRACT NUMBER 14-20-G06 3726

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in duplicate, on this 26th day of April A. D. 19 74 by and between the Osage Tribe of Indians in Oklahoma by Sylvester J. Tinker Principal Chief, under authority of the Resolution of the Osage Tribal Council dated APR 17 1974 party of the first part, designated as lessor, and Ferguson Oil Company, Inc. of 2700 Liberty Tower., Okla. City, Okla. party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906. (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) the Act approved June 24, 1938 (52 Stat. L. 1034), and the Act of October 8, 1964, Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalities, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quantities all the oil deposits in or under land described as follows, to-wit:

107 Tr. SE/4 (Quarter) Sec. 10 Twp. 22N N. Rge. 8E E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

Section three of the Act of June 24, 1938 (52 Stat. 1034) as amended by the Act of October 8, 1964 (78 Stat. 1008) provides in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled "An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes," which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, and thereafter until otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Commissioner of Indian Affairs shall elect to take the royalty in oil; payment to be made at the time of sale or removal of oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Commissioner of Indian Affairs elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner of Indian Affairs may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner of Indian Affairs may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi Lime, unless oil or gas is found in paying quantities at a lesser depth, on the land covered by his lease, within 12 months from the date of approval of the lease, or the lease may be held for the full five-year primary term without drilling, upon payment to the Superintendent for the lessor of rental at the rate of one dollar per acre per annum, payable annually in advance beginning one year after the date of approval of the lease. This lease shall terminate as to both parties unless such advance rental shall be received at the Osage Agency or shall have been mailed as indicated by postmark, on or before the due date: PROVIDED, That the time within which a well shall be drilled shall not begin to run on any restricted homestead selection until the consent of the Superintendent to drilling on such homestead shall have been given, nor shall advance rental become due until the next anniversary date of the lease following the date of such consent: Provided further, That the Superintendent in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant: Provided further, That whenever the Commissioner of Indian Affairs shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

The completion of a well to the Mississippi Lime, or production of oil or gas in paying quantities from a lesser depth than the Mississippi Lime, for such time as such production shall continue, after the lease has entered a rental status, shall relieve the lessee from any further payment of rentals for the balance of the primary term of the lease for which rental has not been paid. Should such production cease, rental shall commence on the next anniversary date of the lease.

Rental shall be paid on the basis of a full year, and no refund will be made of advance rental paid in compliance with the regulations in this part.

4. Lessee shall have the right to use so much of the surface of the land within the Osage Reservation as may be reasonable for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods and other appliances necessary for the operation of the wells; also the right of ingress and egress and the right of way to any point of operations. Before commencing operations for the drilling of any well the lessee shall pay to the surface owner the sum of $200 for each well located on cultivated land (tilled or cultivated within the immediately preceding three years, and including hay meadow land), $150 for open pasture land, and $100 for each location on brush or wooded lands, and other lands not suitable for cultivation. Upon payment of such location site money, lessee shall be entitled to possession. Location site shall be held to the minimum area essential for operations, and in no event shall exceed one and one-half acres in area. Lessee shall also pay tank site fees at the rate of $20 per tank of not exceeding 1,000 barrels capacity: *Provided, however*, That no tank site fee shall be paid for a tank temporarily set on a well location site for testing purposes during the completion of the well. Tank sites shall be held to the minimum area essential to efficient operations, and in no event shall exceed an area of 50 feet square per tank. The sum to be paid for a tank site of larger capacity and occupying a greater area, shall be as agreed upon between the surface owner and the lessee, and on failure to agree, the same shall be fixed by arbitration.

Lessee may with the approval of the Superintendent use water from streams and natural water courses to the extent that same does not diminish the supply below the requirements of the surface owner from whose land the water is taken. When such water supply is located off the lease upon which the water is to be used, the lessee may, lay necessary lines across intervening lands to obtain such water. Any damage resulting from laying such water lines and the setting of pumps and other equipment, that cannot be amicably settled shall be settled by arbitration, as provided in regulations.

If the surface owner of the land covered by this lease obtains a farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortage on the surface of said land, and shall have agreed in writing that damages accruing to him from mineral operations on such land shall be paid to the mortagee, the lessee shall pay all fees and damages required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

CONTRACT NUMBER
14-20-G06 6619

BLANKET OIL MINING LEASE

OSAGE RESERVATION, OKLAHOMA

THIS LEASE, made and entered into in duplicate on this 3rd day of March, 1978, by and between the OSAGE TRIBE OF INDIANS IN OKLAHOMA by Sylvester J. Tinker, Principal Chief, under authority of the resolution of the Osage Tribal Council dated February 15, 1978, and numbered 24-429, Party of the First Part, designated as Lessor, and Charles W. Oliphant, an undivided .469641 interest, Gertrude O. Oliphant, an undivided .115472 interest, Allene O. Mayo, an undivided .182062 interest, Bank of Oklahoma, Trustee, u/t/w A. G. Oliphant, deceased, an undivided .078561 interest, Eric B. Oliphant, an undivided .044456 interest, Nancy B. Oliphant, formerly Nancy B. Wyrick, an undivided .044456 interest, John D. Mayo II, an undivided .009857 interest, Peter O. Mayo, an undivided .009857 interest, J. P. Freeman an undivided .009857 interest, W. J. McAulay, an undivided .009857 interest, Martha R. Gillespie, an undivided .012124 interest, Katherine O. Croteau, an undivided .006900 interest, and Dorothy O. Johnston, an undivided .006900 interest, parties of the second part, designated as Lessee, under and in pursuance of Section 3 of the Act approved June 28, 1906 (34 Stat. L. 539-543); the Act approved March 3, 1921 (41 Stat. L. 1249); the Act of March 2, 1929 (45 Stat. L. 1478); the Act of June 24, 1938 (52 Stat. L. 1034); the Act of June 15, 1950 (Stat. L. 215); and the Act of October 6, 1964 (78 Stat. 1008):

WITNESSETH:

WHEREAS, Lessee is the owner of oil mining leases duly executed by the Principal Chief of the Osage Tribe under authority of resolution of the Osage Tribal Council and thereafter approved by the Secretary of the Interior, or his duly authorized representative, as now shown by the records of the Osage Indian Agency at Pawhuska, Oklahoma, covering lands in Osage County, Oklahoma, more particularly described as follows:

| | | | |
|---|---|---|---|
| NE/4 | 5-T25N-R5E | Contract No. | 14-20-G06-663 |
| SE/4 | 5-T25N-R5E | Contract No. | " |
| NW/4 | 5-T25N-R5E | " | " |

| | | |
|---|---|---|
| SW/4 | 5-T25N-R5E | Contract No. 14-20-GO6-603 |
| NE/4 | 6-T25N-R5E | " " |
| SE/4 | 6-T25N-R5E | " " |
| NW/4 | 6-T25N-R5E | " " |
| SW/4 | 6-T25N-R5E | " " |
| NW/4 | 8-T25N-R5E | " " |
| SE/4 | 31-T26N-R5E | " " |
| SW/4 | 31-T26N-R5E | " " |
| SE/4 | 32-T26N-R5E | " " |
| NW/4 | 31-T26N-R5E | Contract No. 14-20-GO6-933 |
| NE/4 | 31-T26N-R5E | Contract No. I-68 Ind. 26205 |
| NW/4 | 32-T26N-R5E | Contract No. 14-20-GO6-934 |
| NE/4 | 32-T26N-R5E | Contract No. 14-20-GO6-2656 |
| NE/4 | 36-T26N-R4E | Contract No. 14-20-GO6-2777 |
| SE/4 | 36-T26N-R4E | Contract No. 14-20-GO6-2778 |

WHEREAS, Lessee desires to unitize and merge said leases into a sole blanket lease for further development by the water flood process.

1. The lessor, in consideration of a bonus of One Dollar ($1.00), receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee for Five (5) years from the date of approval hereof and as long thereafter as oil is produced in paying quantities all the oil deposits except as hereinafter provided, in or under all the lands above described, containing 2,880 acres, more or less.

As the primary and moving consideration for the granting of this lease, Lessee agrees that in addition to operations now being conducted on the leased premises Lessee will within six months from the effective date hereof commence operations for the development of the Cleveland Sand underlying the leased premises by a secondary recovery process and with due diligence continue the development of the Cleveland Sand and the Mississippi Chat underlying the leased premises by such process as long as development and operation of the leased premises by said process can be conducted profitably.

Lessee shall on or before December 31, 1978, and on or before December 31st of each year thereafter, submit to the Superintendent his plan of development and operation for the unit area for the ensuing year.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operations; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April, 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Casinghead gas" means gas produced from an oil well as a consequence of oil production from the same formation.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

B. Reversion to Form B - Prior to February 1, 1981, all eighteen (18) tracts may be held as part of the Blanket Lease by having a well injecting water into, or producing oil in paying quantities from the Cleveland Sand or Mississippi Chat formations. Failure to comply with the above shall cause the termination of any such tract and it shall no longer be a part of this Blanket Lease; Provided, If there is in existence and operation on such tract a well producing oil in paying quantities from any formation other than the Cleveland Sand or Mississippi Chat as provided in this paragraph for that particular tract, the original Form B. Lease Contract theretofore merged into this or the preceding Blanket Lease shall be restored to its original status and lessee shall be entitled to hold such tract under terms of the original Form B Lease so long as oil is produced on such tract in paying quantities; Provided, further, That any time after February 1, 1981, that any of the eighteen (18) tracts described herein does not have thereon an active well producing oil in paying quantities from the Cleveland Sand or Mississippi Chat formations, this Blanket Lease shall terminate with respect to that tract, and the tract shall no longer be a part of this Blanket Lease, if any of the tracts that cease to produce oil in paying quantities from the Cleveland Sand or Mississippi Chat formation but have thereon an active well injecting water into either of these formations the Lessee or his assigns will be assured of obtaining a SWD easement at the prevailing rate, Provided, If there is in existence and operation on such tract a well producing oil in paying quantities from any formation other than the Cleveland Sand or Mississippi Chat as provided in this paragraph for that particular tract, the original Form B Lease Contract theretofore merged into this or the preceding Blanket Lease shall be restored to its original status and lessee shall be entitled to hold such tract under terms of the original Form B Lease so long as oil is produced on such tract in paying quantities.

C. Royalty - Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2/3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, That when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be

[based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal.]

D. Casinghead Gas - All casinghead gas shall belong to the oil lessee subject to any rights under existing gas leases. All casinghead gas removed from the lease from which it is produced shall be metered unless otherwise approved by the Superintendent and subject to a royalty of 16-2/3 percent of the market value of the gas and all products extracted therefrom, less a reasonable allowance for manufacture or processing. If oil lessee supplies casinghead gas produced from one lease for operation and/or development of other leases, either his or others, a royalty of 16-2/3 percent shall be paid on the value of all casinghead gas so used. All casinghead gas not utilized by the oil lessee may, with the approval of the Superintendent, be utilized by the gas lessee, subject to the prescribed royalty of 16-2/3 percent.

E. Development (1) Lessee shall drill and produce all wells necessary to offset or protect the above described land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon, if, in his opinion, a prudent operator would conduct further development.

(2) The Lessee accepts this lease with the understanding that the lands covered hereby are or may be leased to another party who shall have the exclusive right to prospect for and produce gas. If Lessee is notified of indications of possible oil production as the result of drilling by a gas lessee, he shall have the option to take over the well subject to acceptance and payment as provided in the regulations in 25 CFR Part 183.

(3) If the oil lessee drills a gas well he shall immediately without removing from the well any of the casing or other equipment, notify the gas lessee and the Superintendent. If the gas lessee does not, within 15 days after receipt of notice and cost of drilling elect to take over the well, he shall immediately notify the oil lessee, and the disposition of such well and the production therefrom shall be subject to the approval of the Superintendent. Should the gas lessee elect to take over the well, he shall pay the oil lessee the cost of drilling the same, including all damages paid and cost in place of casing and other equipment. If the oil lessee shall drill a gas well upon lands not leased for gas purposes, he shall immediately notify the Superintendent who may, until such time as said lands are leased; permit the lessee to

(Must be executed in Triplicate)

FORM B

CONTRACT NUMBER

I-68-Ind ..................

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in triplicate, on this 5th day of [illegible], A. D., 1952 by and between the Osage Tribe of Indians in Oklahoma by PAUL PITTS Principal Chief, under authority of the Resolution of the Osage Tribal Council dated JAN 16 1952 party of the first part, designated as lessor, and **Lester E. Cox** of **Springfield, Missouri** party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. L. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quantities, all the oil deposits in or under land described as follows, to-wit:

Tr. **SE** (Quarter) Sec. **30** Twp **29** N. Rge. **11** E.

of the Indian Meridian, and containing **160** acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Secretary of the Interior may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on the land embraced in this lease within twelve months from date of approval of lease, or this may be held for the full five year period without drilling, upon payment of rentals to the Superintendent for the lessor at the rate of $1.00 per acre per annum, or a proportionate part thereof for each three months period the lease is held and a well not drilled, such rental beginning twelve months from date of approval of lease: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homesteads shall have been given. Provided, that the Superintendent of the Osage Agency in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant. Should the lessee elect to surrender this lease before the end of any such yearly period without drilling a well thereon, he shall pay the rental based on one dollar per acre for the fraction part of the year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty five days from expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: Provided, further, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also, the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Upon payment of such location-site money lessee shall be entitled to possession. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tank-site. The sum to be paid for an oil tanksite of larger capacity and occupying greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

If the surface owner of the land covered by this lease obtains a Federal farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortgage on the surface of said land, the lessee shall pay all fees and damages, required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

14

(Must be executed in Triplicate)

FORM B

CONTRACT NUMBER

I-65-Ind ............

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in triplicate, on this 5th day of Feb A. D. 1952 by and between the Osage Tribe of Indians in Oklahoma by PAUL PITTS Principal Chief, under authority of the Resolution of the Osage Tribal Council dated JAN 16 1952 party of the first part, designated as lessor, and Lester E. Cox of Springfield, Missouri party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quanities, all the oil deposits in or under land described as follows, to-wit:

5✓ Tr. NE (Quarter) Sec. 30 Twp 29 N. Rge. 11 E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Secretary of the Interior may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on the land embraced in this lease within twelve months from date of approval of lease, or this may be held for the full five year period without drilling, upon payment of rentals to the Superintendent for the lessor at the rate of $1.00 per acre per annum, or a proportionate part thereof for each three months period the lease is held and a well not drilled, such rental beginning twelve months from date of approval of lease: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homesteads shall have been given. Provided, that the Superintendent of the Osage Agency in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant. Should the lessee elect to surrender this lease before the end of any such yearly period without drilling a well thereon, he shall pay the rental based on one dollar per acre for the fraction part of the year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty five days from expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: Provided, further, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also, the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Upon payment of such location-site money lessee shall be entitled to possession. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tank-site. The sum to be paid for an oil tanksite of larger capacity and occupying greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

If the surface owner of the land covered by this lease obtains a Federal farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortgage on the surface of said land, the lessee shall pay all fees and damages, required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

(Must be executed in Triplicate)

FORM II

CONTRACT NUMBER

I-63-Ind ..................

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in triplicate, on this 5th day of March A. D. 1952 by and between the Osage Tribe of Indians in Oklahoma by PAUL PITTS Principal Chief, under authority of the Resolution of the Osage Tribal Council dated MAR 1 5 1952 party of the first part, designated as lessor, and **Lester E. Cox** of **Springfield, Missouri** party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quanities, all the oil deposits in or under land described as follows, to-wit:

24 Tr. NW (Quarter) Sec. 5 Twp 28 N. Rge. 11 E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2/3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Secretary of the Interior may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Secretary may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on the land embraced in this lease within twelve months from date of approval of lease, or this may be held for the full five year period without drilling, upon payment of rentals to the Superintendent for the lessor at the rate of $1.00 per acre per annum, or a proportionate part thereof for each three months period the lease is held and a well not drilled, such rental beginning twelve months from date of approval of lease: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homesteads shall have been given. Provided, that the Superintendent of the Osage Agency in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant. Should the lessee elect to surrender this lease before the end of any such yearly period without drilling a well thereon, he shall pay the rental based on one dollar per acre for the fraction part of the year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty five days from expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: Provided, further, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also, the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Upon payment of such location-site money lessee shall be entitled to possession. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tank-site. The sum to be paid for an oil tanksite of larger capacity and occupying greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

If the surface owner of the land covered by this lease obtains a Federal farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortgage on the surface of said land, the lessee shall pay all fees and damages, required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

Approved by the Secretary of the Interior November 7, 1983

Lease Contract No. 14-20-G06

Lease Contract No. 14-20-G06

CONTRACT NUMBER 14-20-G06-

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 18th day of April, 1980 by and between the Osage Tribe of Indians in Oklahoma, Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 197_ party of the first part, designated as Lessor, and Cussman Oil Company of Tulsa, Oklahoma

party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~for a term of~~ from the date of approval hereof and as long thereafter as oil and or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. NE/4 Sec. 19 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control. The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. ... shall complete and place in production a well producing and selling oil and or natural gas in paying quantities on the land ... within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, ... 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be ... for the remaining primary term of the lease by payment ... rental ...~~

C. Royalty - Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate stratum if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated and are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

17

Combining oil lease and gas lease pursuant to Resolution No. 25-173
l Lease Contract No. 14-20-G( 33
as Lease Contract No. 14-20-G06- 16

approved by the Secretary of the Interior November 7, 1975

CONTRACT NUMBER
14-20-G06-

# OIL & GAS MINING LEASE
## OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 1st day of April, 1980, by and between the Osage Tribe of Indians of Oklahoma, Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1974, party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 5, 1978 (92 Stat. 1008), witnesseth:

1. The Lessor, in consideration of a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SE/4 Sec. 19 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. [illegible] the land [illegible] within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be [illegible] of the lease.~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated and are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions. The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

Comb[illegible] oil lease and gas lease pursuant to Resolution No. 26-173

[illegible] by the Secretary of the Interior November 7, 1975

' Lease Contract No. 14-20-G0[illegible]0

[illegible]s Lease Contract No. 14-20-G06-[illegible]16

CONTRACT NUMBER 14-20-G06-7319

# OIL & GAS MINING LEASE
## OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 18th day of April, 1980 by and between the Osage Tribe of Indians in Oklahoma Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1974 party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SE/4 Sec. 24 Twp. 23 N. Rge. 7 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. [illegible] on the land [illegible] within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, [illegible] 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, [illegible] as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be [illegible] primary term of the lease by payment [illegible].~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon if in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

Form ... oil lease and gas lease pursuant to Resolution No. 25-173
approved by the Secretary of the Interior November 7, 1975

Lease Contract No. 14-20-GO ...5
... Lease Contract No. 14-20-G06-...6

CONTRACT NUMBER 14-20-G06-...

# OIL & GAS MINING LEASE
## OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 15th day of April, 1980, by and between the Osage Tribe of Indians in Oklahoma Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1978 party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma

party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and/or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SW/4 Sec. 19 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and/or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. ... Lessee shall complete and place on production a well producing and selling oil and/or natural gas in paying quantities on the land ... within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, ... 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be ... remainder of the primary term of the lease by payment of advance rental ...~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of

Combining oil lease and gas lease pursuant to Resolution No. 25-173
Approved by the Secretary of the Interior November 7, 1975
Oil Lease Contract No. 14-20-G06-[illegible]3
Gas Lease Contract No. 14-20-G06-[illegible]9

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

CONTRACT NUMBER 14-20-G06-

This lease made and entered into in duplicate, on this 8 day of April, 1980 by and between the Osage Tribe of Indians in Oklahoma by Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1979 party of the first part, designated as Lessor, and Cussman Oil Company of Tulsa, Oklahoma

party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. NE/4 Sec. 30 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and-or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. [illegible] shall complete and place in production a well producing and selling oil and-or natural gas in paying quantities~~ the land [illegible] within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be ~~[illegible]~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate portion if, in his opinion, a prudent operator would conduct further development.

3. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions - The Superintendent may impose restrictions as to time ofdrillingand rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

Comb ing oil lease and gas lease pur nt to Resolution No. 25-173
Approved by the Secretary of the Interior November 7, 1975
l Lease Contract No. 14-20-G06 09
as Lease Contract No. 14-20-G06- 289

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

CONTRACT NUMBER 14-20-G06-

This lease made and entered into in duplicate, on this 15th day of April, 1980 by and between the Osage Tribe of Indians in Oklahoma, Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1976, party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma

party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SW/4 Sec. 30 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right -of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. Drill. Unless lessee shall complete and place on production a well producing and selling oil and or natural gas in paying quantities on the land within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be maintained by paying the remaining primary term of the lease by payment of advance rental ... of the lease.~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate strata if, in his opinion, a prudent operator would conduct further development.

E. Regulations. It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

FORM C — Combining oil lease and gas lease pursuant to Resolution No. 25-173
Approved by the Secretary of the Interior November 7, 1975 — Lease Contract No. 14-20-C0 5 — Gas Lease Contract No. 14-20-C06- 30

CONTRACT NUMBER 7832-1

# OIL & GAS MINING LEASE
# OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 1st day of April, 1930 by and between the Osage Tribe of Indians in Oklahoma Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1979 party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in consideration of a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. NW/4 Sec. 20 Twp. 23 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control. The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. ... shall complete and place on production a well producing and selling oil and-or natural gas in paying quantities on the land embraced within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for as long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be ... for the remaining primary term of the lease by payment of advance rental ...~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands of which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereafter promulgated, are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations

A. Restrictions. - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

Comb[illegible] oil lease and gas lease purs[illegible] to Resolution No. 25-173

[illegible] by the Secretary of the [illegible] November 7, 1975

[illegible] Lease Contract No. 14-20-G0[illegible]2

[illegible] Lease Contract No. 14-20-G06-[illegible]9

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

CONTRACT NUMBER
14-20-G06-[illegible]

[illegible] made and entered into in duplicate, on this 11th day of April, 1930 by and between the Osage Tribe of Indians of Oklahoma [illegible] Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated: June 2, 1978 party of the first part, designated as Lessor, and Gussman Oil Company of Tulsa, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 23, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SE/4 Sec. 25 Twp. 23 N. Rge. 7 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control. The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

[illegible] In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. [illegible] complete and place on production a well producing and selling oil and/or natural gas in paying quantities [illegible] the land [illegible] within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be [illegible].~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate [illegible] if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated [illegible] made a part of this lease and lessee hereby agrees to abide and conform thereto.

F. Operations

1. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

FORM B (Revised)
Approved by the Secretary of Interior September 16, 1958

(Must be executed in duplicate)

CONTRACT NUMBER
14-20-0406-352

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in duplicate, on this Fifth day of May A. D. 19 61 by and between the Osage Tribe of Indians in Oklahoma by PAUL PITTS Principal Chief, under authority of the Resolution of the Osage Tribal Council dated APR 19 1961 party of the first part, designated as lessor, and Oras A. Shaw of 1408 Philtower Building, Tulsa, Oklahoma party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quanities all the oil deposits in or under land described as follows, to-wit:

Tr. 49 NE/4 (Quarter) Sec. 29 Twp. 26 N. Rge. 11 E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Commissioner of Indian Affairs shall elect to take the royalty in oil; payment to be made at the time of sale or removal of oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Commissioner of Indian Affairs elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner of Indian Affairs may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner of Indian Affairs may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi Lime, unless oil or gas is found in paying quantities at a lesser depth, on the land covered by his lease, within 12 months from the date of approval of the lease, or the lease may be held for the full five-year primary term without drilling, upon payment to the Superintendent for the lessor of rental at the rate of one dollar per acre per annum, payable annually in advance beginning one year after the date of approval of the lease. This lease shall terminate as to both parties unless such advance rental shall be received at the Osage Agency or shall have been mailed as indicated by postmark, on or before the due date: PROVIDED, That the time within which a well shall be drilled shall not begin to run on any restricted homestead selection until the consent of the Superintendent to drilling on such homestead shall have been given, nor shall advance rental become due until the next anniversary date of the lease following the date of such consent: Provided further, That the Superintendent in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant: Provided further, That whenever the Commissioner of Indian Affairs shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

The completion of a well to the Mississippi Lime, or production of oil or gas in paying quantities from a lesser depth than the Mississippi Lime, for such time as such production shall continue, after the lease has entered a rental status, shall relieve the lessee from any further payment of rentals for the balance of the primary term of the lease for which rental has not been paid. Should such production cease, rental shall commence on the next anniversary date of the lease.

Rental shall be paid on the basis of a full year, and no refund will be made of advance rental paid in compliance with the regulations in this part.

4. Lessee shall have the right to use so much of the surface of the land as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods and other appliances necessary for the operation of the wells; also the right of ingress and egress and the right of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations for the drilling of any well the lessee shall pay to the surface owner the sum of $200 for each well located on cultivated land (tilled or cultivated within the immediately preceding three years, and including hay meadow land), $150 for open pasture land, and $100 for each location on brush or wooded lands, and other lands not suitable for cultivation. Upon payment of such location site money, lessee shall be entitled to possession. Location site shall be held to the minimum area essential for operations, and in no event shall exceed one and one-half acres in area. Lessee shall also pay tank site fees at the rate of $20 per tank of not exceeding 1,000 barrels capacity: *Provided, however*, That no tank site fee shall be paid for a tank temporarily set on a well location site for testing purposes during the completion of the well. Tank sites shall be held to the minimum area essential to efficient operations, and in no event shall exceed an area of 60 feet square per tank. The sum to be paid for a tank site of larger capacity and occupying a greater area, shall be as agreed upon between the surface owner and the lessee, and on failure to agree, the same shall be fixed by arbitration.

Lessee may use water from streams and natural water courses to the extent that same does not diminish the supply below the requirements of the surface owner from whose land the water is taken. When such water supply is located off the lease upon which the water is to be used, the lessee may, with the approval of the Superintendent, lay necessary lines across intervening lands to obtain such water. Any damage resulting from laying such water lines and the setting of pumps and other equipment, that cannot be amicably settled shall be settled by arbitration, as provided in the regulations.

If the surface owner of the land covered by this lease obtains a farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortage on the surface of said land, and shall have agreed in writing that damages accruing to him from mineral operations on such land shall be paid to the mortagee, the lessee shall pay all fees and damages required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

FORM B (Revised)
Approved by the Secretary of the Interior September 16, 1955

(Must be executed in duplicate)

CONTRACT NUMBER
14-20-0106

# OIL MINING LEASE

## OSAGE RESERVATION, OKLAHOMA

This lease, made and entered into in duplicate, on this Fifth day of May A. D., 19 61, by and between the Osage Tribe of Indians in Oklahoma by PAUL PITTS Principal Chief, under authority of the Resolution of the Osage Tribal Council dated APR 19 1961 party of the first part, designated as lessor, and Oras A. Shaw of 1408 Philtower Building, Tulsa, Oklahoma party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) And the Act approved June 24, 1938 (52 Stat. L. 1034), Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalities, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quanities all the oil deposits in or under land described as follows, to-wit:

Tr. 50 NW/4 (Quarter) Sec. 29 Twp. 26 N. Rge. 11 E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

The act of June 24, 1938 (52 Stat. L. 1034) amended section one of the act of March 2, 1929 (45 Stat. L. 1478) so as provided in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal, or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, unless otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Commissioner of Indian Affairs shall elect to take the royalty in oil; payment to be made at the time of sale or removal of oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Commissioner of Indian Affairs elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner of Indian Affairs may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner of Indian Affairs may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi Lime, unless oil or gas is found in paying quantities at a lesser depth, on the land covered by his lease, within 12 months from the date of approval of the lease, or the lease may be held for the full five-year primary term without drilling, upon payment to the Superintendent for the lessor of rental at the rate of one dollar per acre per annum, payable annually in advance beginning one year after the date of approval of the lease. This lease shall terminate as to both parties unless such advance rental shall be received at the Osage Agency or shall have been mailed as indicated by postmark, on or before the due date: PROVIDED, That the time within which a well shall be drilled shall not begin to run on any restricted homestead selection until the consent of the Superintendent to drilling on such homestead shall have been given, nor shall advance rental become due until the next anniversary date of the lease following the date of such consent: Provided further, That the Superintendent in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant: Provided further, That whenever the Commissioner of Indian Affairs shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

The completion of a well to the Mississippi Lime, or production of oil or gas in paying quantities from a lesser depth than the Mississippi Lime, for such time as such production shall continue, after the lease has entered a rental status, shall relieve the lessee from any further payment of rentals for the balance of the primary term of the lease for which rental has not been paid. Should such production cease, rental shall commence on the next anniversary date of the lease.

Rental shall be paid on the basis of a full year, and no refund will be made of advance rental paid in compliance with the regulations in this part.

4. Lessee shall have the right to use so much of the surface of the land as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods and other appliances necessary for the operation of the wells; also the right of ingress and egress and the right of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations for the drilling of any well the lessee shall pay to the surface owner the sum of $200 for each well located on cultivated land (tilled or cultivated within the immediately preceding three years, and including hay meadow land), $150 for open pasture land, and $100 for each location on brush or wooded lands, and other lands not suitable for cultivation. Upon payment of such location site money, lessee shall be entitled to possession. Location site shall be held to the minimum area essential for operations, and in no event shall exceed one and one-half acres in area. Lessee shall also pay tank site fees at the rate of $20 per tank of not exceeding 1,000 barrels capacity: *Provided, however*, That no tank site fee shall be paid for a tank temporarily set on a well location site for testing purposes during the completion of the well. Tank sites shall be held to the minimum area essential to efficient operations, and in no event shall exceed an area of 50 feet square per tank. The sum to be paid for a tank site of larger capacity and occupying a greater area, shall be as agreed upon between the surface owner and the lessee, and on failure to agree, the same shall be fixed by arbitration.

Lessee may use water from streams and natural water courses to the extent that same does not diminish the supply below the requirements of the surface owner from whose land the water is taken. When such water supply is located off the lease upon which the water is to be used, the lessee may, with the approval of the Superintendent, lay necessary lines across intervening lands to obtain such water. Any damage resulting from laying such water lines and the setting of pumps and other equipment, that cannot be amicably settled shall be settled by arbitration, as provided in the regulations.

If the surface owner of the land covered by this lease obtains a farm loan from any lending agency under the supervision of the Farm Credit Administration, secured by a mortage on the surface of said land, and shall have agreed in writing that damages accruing to him from mineral operations on such land shall be paid to the mortagee, the lessee shall pay all fees and damages required to be paid to the surface owner, to the mortgagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

PROGRAM EGH30170
0001475

FARMLAND INDUSTRIES, INC.
DEPARTMENT # 4
P. O. BOX 7305
KANSAS CITY, MO 64116

CURRENT DATE 12/14/89

STATEMENT OF CRUDE OIL PURCHASES FOR THE MONTH OF 11/89

OPERATOR NUMBER 02177
J M GRAVES

2455 E 51ST STREET
TULSA OK 74105

138

| | |
|---|---|
| LEASE NUMBER | 35-1002008 |
| LEASE NAME | DUFFY |
| OIL TIER | STRIPPER |
| STATE | OKLAHOMA |
| COUNTY | OSAGE |
| SEC-TWNSHP-RANGE | 22 -27 -10 |

| PROD MONTH | LEASE GROSS BBLS | LEASE GROSS VALUE | TRANSPORT CHARGE | LEASE STATE TAX | LEASE WINDFALL TAX | LEASE NET VALUE |
|---|---|---|---|---|---|---|
| 11/89 | 159.13 | 3,063.25 | 0.00 | 180.86 | 0.00 | 2,882.39 |
| LEASE TOTALS | 159.13 | 3,063.25 | 0.00 | 180.86 | 0.00 | 2,882.39 |

LEASE ACTIVITY DETAIL

| RUNTICKET NUMBER | BATCH NUMBER | REMOVAL DATE | TANK NUMBER | GRAVITY | TYPE OF RUN | TRANS. RATE | NET BARRELS | PRICE PER BARREL | GROSS VALUE |
|---|---|---|---|---|---|---|---|---|---|
| 000014 | 00003 | 11/04/89 | 00016312 | 33.2 | REGULAR RUN | | 159.13 | 19.25000 | 3,063.25 |
| LEASE TOTALS | | | | | | | 159.13 | | 3,063.25 |

1/6 $10.54 81-2
$10.62 81-1
$21.16
T

OSAGE AGENCY FILE OIL

Form B.

# OIL MINING LEASE.

## OSAGE RESERVATION, OKLAHOMA.

This lease, made and entered into in quadruplicate, on this 10 day of January, A. D., 1916, by and between the Osage Tribe of Indians in Oklahoma by A-she-gah-hre, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 17, 1915, party of the first part, designated as lessor, and Almeda Oil Company, of Bartlesville, Oklahoma, party of the second part, designated as lessee, under and in pursuance of section 3 of the Act approved June 28, 1906 (34 Stat. L., 539-543), witnesseth:

168 and 3279

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease, and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is found in paying quantities, provided that the term of this lease shall not extend beyond the date the title to the minerals remains in the Osage Tribe, all the oil deposits in or under lands described as follows, to wit:

South West Quarter of Sec. 21, T. 26, N., R. 12, E.,
Sec. ...... T. ...... N., R. ...... E.,
Sec. ...... T. ...... N., R. ...... E.,
Sec. ...... T. ...... N., R. ...... E.,
Sec. ...... T. ...... N., R. ...... E.,

OFFICE OF INDIAN AFFAIRS RECEIVED MAY 29 1916

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor, as royalty, the sum of 16⅔ per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of sale or removal: *Provided*, That when the quantity of oil taken from all the producing wells on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent.

Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease.

3. Lessees shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on each and every quarter-section or fractional quarter-section of land covered by this lease which is not producing oil on March 16, 1916, within one year from the date of approval hereof, or shall pay to the Superintendent, for the lessor, a rental of one dollar per acre, payable annually, for each year or fractional part of a year the land is held by the lessee and a well is not drilled: *Provided*, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homestead shall have been given. Should the lessee elect to surrender any such quarter-section or fractional quarter-section before the end of any such yearly period without drilling a well thereon, he shall pay the rental of one dollar per acre for the fractional part of a year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty-five days from the expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: *Provided*, That the lessee may surrender this lease and have the same canceled at any time as to any homestead selection should the Secretary of the Interior refuse to give his consent to drilling thereon: *Provided further*, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on all producing lands.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tanksite. The sum to be paid for an oil tanksite of larger capacity and occupying a greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

During operations the lessee shall pay all damages for the use of the surface other than that included in the location and tanksites, all damages to any growing crops or to any improvements on the lands and all other damages as may be occasioned by reason of operations. Such damages shall be apportioned among the parties interested in the surface, whether as owner, lessee, or otherwise, as the parties may mutually agree or as their interests may appear. If the parties are unable to agree concerning damages, the same shall be determined by arbitration.

RECEIVED
JUL 17 1963
OSAGE AGENCY

CONTRACT NUMBER
14-20-0406-1361

BLANKET OIL MINING LEASE
OSAGE RESERVATION, OKLAHOMA

THIS LEASE, made and entered into in quadruplicate as of August 1 A.D., 1963, by and between OSAGE TRIBE OF INDIANS in Oklahoma, by Paul Pitts, Principal Chief, under authority of a Resolution of the Osage Tribal Council dated July 17, 1963 and numbered 21-75, party of the first part, designated as LESSOR, and THE PURE OIL COMPANY, a corporation, party of the second part, designated as LESSEE under and in pursuance of Section 3 of the Act approved June 28, 1906 (34 Stat. L., 539-543), the Act approved March 3, 1921 (41 Stat.L., 1249), the Act of March 2, 1929 (45 Stat. L., 1478), the Act of June 24, 1938 (52 Stat. L., 1034), and the Act of June 15, 1950 (64 Stat. L., 215).

WITNESSETH:

The Lessee, in full interest, is the owner of oil leases duly executed by the Principal Chief of the Osage Tribe of Indians under authority of resolutions of the Osage Tribal Council, and thereafter approved by the Secretary of the Interior, or his duly authorized representative, as now shown by the records of the Osage Indian Agency at Pawhuska, Oklahoma, and Exhibit "A" attached hereto and made a part hereof, covering lands in Osage County, Oklahoma, and more particularly described as follows:

In Township 27 North, Range 10 East, Osage County, Oklahoma:

| | |
|---|---|
| S½ of Sec. 2 | (Contract No. 14-20-0406-1271) |
| All of Sec. 11 | (Contract No. 14-20-0406-1271) |
| All of Sec. 14 | (Contract No. 14-20-0406-1271) |
| ~~SE¼ of Sec. 3~~ | ~~(Contract No. 14-20-0406-1271)~~ out |
| NE¼ of Sec. 15 | (Contract No. 14-20-0406-1271) |
| SE¼ of Sec. 15 | (Contract No. 14-20-0406-1271) |
| SW¼ of Sec. 12 | (Contract No. 14-20-0406-1271) |
| SW¼ of Sec. 13 | (Contract No. 14-20-0406-1271) |
| NW¼ of Sec. 13 | (Contract No. I-68-Ind.-3499) |

WHEREAS, Lessee, the present owner and holder of said oil mining leases as hereinabove described and set forth, is desirous of developing and operating

the lands described in said oil mining leases for oil mining purposes as a unit for the common benefit of Lessor and the present owner and holder of said leases.

Section 1. The Lessor, in consideration of One Dollar ($1.00), the receipt whereof is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained and hereby agreed to be paid, observed and performed by the Lessee, does hereby demise, grant, lease and let unto the Lessee for five (5) years from the date of approval hereof, and as long thereafter as oil is produced in paying quantities, all of the oil deposits in or under all of the lands above described, containing two thousand five hundred and sixty (2,560) acres, more or less, with the exclusive right to extract, pipe, store and remove oil.

The Act of June 24, 1938 (52 Stat. L., 1034) amended Section One of the Act of March 2, 1929 (45 Stat. L., 1478) so as provided in part as follows:

"That all that part of the Act of June 28, 1906 (34 Stat. L., 539-543) entitled 'An Act for the division of lands and funds of the Osage Indians in Oklahoma' and for other purposes; which reserves to the Osage Tribe the oil, gas, coal or other minerals, covered by the lands for the selection and division of which provision is made in that Act, is hereby amended so that the oil, gas, coal or other minerals, covered by said lands, are reserved to the Osage Tribe until the 8th. day of April, 1983, unless otherwise provided by Act of Congress."

Section 2. The Lessee agrees to pay, or cause to be paid, to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the Lessor, as Royalty on oil produced and saved from the lease premises, after deducting the oil used in operating the lease:

(a) The sum of twelve and one-half ($12\frac{1}{2}$) per cent of the gross proceeds from the sales of crude oil produced and saved from the Wayside Sand on the one thousand eight hundred and ninety five (1,895) acres described in Exhibit "B" attached hereto and made a part hereof after the effective date of this blanket oil mining lease.

(b) The sum of twelve and one-half ($12\frac{1}{2}$) per cent of the gross proceeds from the sales of crude oil produced and saved from the Mississippi Chat on the

six hundred eighty (680) acres described in Exhibit "C" attached hereto and made a part hereof after the effective date of this blanket oil mining lease.

(c) The sum of sixteen and two-thirds (16-2/3) per cent of the gross proceeds from sale of all crude oil produced and saved from all formations, other than from the Wayside Sand on the one thousand eight hundred and ninety five (1,895) acres described in (a) above and the Mississippi Chat on the six hundred and eighty (680) acres described in (b) above; Provided, That when the quantity of oil produced from formations other than the Wayside Sand on such 1,895 acres and Mississippi Chat on such 680 acres during any calendar month is sufficient to average one hundred (100) or more barrels per well per day, the royalty on such oil from formations other than the Wayside Sand and the Mississippi Chat shall be twenty (20) per cent.

Payment for the royalty hereunder shall be made at the time of sale or removal of the oil from the leased premises, except where payments are made on division orders, and settlement shall be based on the actual selling price, but [ at not less than the highest posted market price in the Mid-Continent Oil Field on the day of sale or removal. ]

Should the Lessor, with the approval of the Commissioner of Indian Affairs, elect to take the royalty in oil, Lessee shall furnish free storage for the royalty oil for not exceeding thirty (30) days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any of the oil produced under this lease. The Commissioner may impose restrictions as to time or times for the drilling of wells and as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities

CONTRACT NUMBER
756

# BLANKET OIL MINING LEASE
## OSAGE RESERVATION, OKLAHOMA
## NORTH DRUMCREEK UNIT

This lease, made and entered into in triplicate, on this 26th day of May, A.D., 1966, by and between the Osage Tribe of Indians in Oklahoma by Paul Pitts under authority of Resolution No. 21-219 of the Osage Tribal Countil dated May 26 1966, party of the first part, designated as lessor, and Charles W. Oliphant, an undivided 28.9038% interest, ~~A. G. Oliphant, an undivided 30.0156% interest~~, Allene O. Mayo, an undivided 5.0400% interest, Lowell Wadmond, an undivided 12.5000% interest, Faye Rasmussen, an undivided 9.7081% interest, Katherine O. Detrick, an undivided .020% of 13.8325% interest, Gayle G. Frazier, an undivided .018 of 13.8325% interest, Daniel D. Gridley, an undivided .022 of 13.8325% interest, ~~Josie Hair, an undivided .006 of 13.8325%~~ interest, Mary E. Hitzman, an undivided .005 of 13.8325% interest, Faith N. Jansen, an undivided .005 of 13.8325% interest, Carl R. Kauffman, an undivided .016 of 13.8325% interest, Allene O. Mayo, an undivided .100 of 13.8325% interest, The First National Bank & Trust Company of Tulsa, Guardian of the Estate of John D. Mayo, II, a Minor, an undivided .020 of 13.8325% interest, A. G. Oliphant, an undivided .168 of 13.8325% interest, A. G. Oliphant, Guardian of the Estate of A. G. Oliphant, Jr., a Minor, an undivided .200 of 13.8325% interest, The First National Bank & Trust Company of Tulsa, Executor of the Estate of Carol E. Oliphant, Deceased, an undivided .150 of 13.8325% interest, Charles W. Oliphant, an undivided .100 of 13.8325% interest, Charles W. Oliphant, Guardian of the Estate of Eric B. Oliphant, a Minor, an undivided .020 of 13.8325% interest, Gertrude O. Oliphant, an undivided .008 of 13.8325% interest, Mary E. Oliphant, an undivided .002 of 13.8325% interest, Charles W. Oliphant, Guardian of the Estate of Nancy B. Oliphant, a Minor, an undivided .010 of 13.8325% interest, Faye Rasmussen, an undivided .020 of 13.8325% interest, Claire E. Stevens, an undivided .010 of 13.8325% interest, Nancy O. Thompson, an undivided .004 of 13.8325% interest, Cecil Ezelle Whitwell, an undivided .030 of 13.8325% interest, Thomas A. Harrell, administrator with will annexed, of the Estate of Earl V. Whitwell, deceased, an undivided .060 of 13.8325% interest, ~~and~~ Lewis L. Young, an undivided .006 of 13.8325% interest, parties of the second part designated as lessees, under and in pursuance of Section 3, of the Act approved June 28, 1906 (34 Stat. L 539-543), the Act approved March 3, 1921 (41 Stat. L. 1249), the Act. of March 2, 1929 (45 Stat. L. 1478) and the Act approved June 24, 1938 (52 Stat. L. 1034), the Act of June 15, 1950 (64 Stat. L. 215), and the Act of October 6, 1964 (78 Stat. 1008); witnesseth:

| | |
|---|---|
| Clara Hair Clement | .0166 % |
| Glen F. Hair | .0166 % |
| Melton D. Hair | .0166 % |
| Charles A. Hair | .0166 % |
| Lawrence Hair | .0166 % |

| | |
|---|---|
| Charles W. Oliphant | 6.6702 |
| Allene O. Mayo | 6.6702 |
| Nat'l Bk [illegible] Trustee u/w A. G. Oliphant Dec. | 6.6702 |
| Gertrude O. Oliphant | 10.0058 |

32

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessees, does hereby demise, grant, lease and let unto the lessees, for five years from the effective date hereof, and as long thereafter as oil is produced in paying quantities, all the oil deposits in or under land described as follows, to-wit:

| | | | |
|---|---|---|---|
| NE/4 | 3-25N-4E | Contract No. 14-20-0406-1245 | |
| ~~SE/4~~ | ~~3-25N-4E~~ | ~~Contract No. 14-20-0406-1247~~ | Terminated 3-1-68 |
| NW/4 | 3-25N-4E | Contract No. 14-20-0406-1246 | |
| SW/4 | 3-25N-4E | Contract No. I-68-Ind-27504, | |
| NE/4 | 4-25N-4E | Contract No. 14-20-0406-419 | |
| SE/4 | 4-25N-4E | Contract No. I-68-Ind-26538 | |
| NW/4 | 4-25N-4E | Contract No. 14-20-0406-420 | |
| SW/4 | 4-25N-4E | Contract No. I-68-Ind-26539 | |
| ~~NE/4~~ | ~~5-25N-4E~~ | ~~Contract No. 14-20-0406-1248~~ | Terminated 3-1-68 |
| SE/4 | 5-25N-4E | Contract No. I-68-Ind-26542 | |
| ~~NW/4~~ | ~~5-25N-4E~~ | ~~Contract No. 14-20-0406-1353~~ | Terminated 6-1-68 |
| SW/4 | 5-25N-4E | Contract No. I-68-Ind-26543 | |
| NW/4 | 9-25N-4E | Contract No. I-68-Ind-26548 | |
| NE/4 | 10-25N-4E | Contract No. 14-20-0406-1143 | |
| NW/4 | 10-25N-4E | Contract No. I-68-Ind-27506 | |

of the Indian Meridian, and containing ~~2400~~ 1,920 6/2/68 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

Section Three of the Act of June 24, 1938 (52 Stat. L 1034) as amended by the Act of October 6, 1964 (78 Stat. 1008) provides in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543) entitled 'An Act for the division of lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, and thereafter until otherwise provided by Act of Congress.

2. The lessees agree to pay, or cause to be paid to the Superintendent of the Osage Agency, Pawhuska, Oklahoma, for the lessor, as royalty on oil, or other hydrocarbon substances, produced and saved from the leased premises after deducting the oil used in operating the lease:

(a) The sum of sixteen and two-thirds percent (16-2/3%) of the gross proceeds from sales of oil produced and saved from the leased premises: Provided, If when the quantity of oil produced during any calendar month is sufficient to average one hundred (100) or more barrels per well per day, the royalty on such oil shall be 20%.

Payment of the royalty payable hereunder shall be made at the time of sale or removal of the oil from the leased premises, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent Field on the day of sale or removal.

Should the lessor, with the approval of the Commissioner of Indian Affairs, elect to take the royalty in oil, the lessees shall furnish free storage for the royalty oil for not exceeding thirty (30) days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner may impose restrictions as to time or times for the drilling of wells and as to the production from any well or wells drilled when in his judgement such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner may take into consideration, among other things, federal laws, state laws, or regulations by competent federal or state authorities or lawful agreements among operators regulating either drilling or production, or both.

1/9/18/82

515

(FORM B.)

# OIL MINING LEASE.

## Osage Reservation, Oklahoma

This lease, made and entered into in quadruplicate, on this .................... day of .................. ............A. D., 19......, by and between the Osage Tribe of Indians in Oklahoma by ..........A-she-gah-hre.......... Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 17, 1915, party of the first part, designated as lessor, and The Skelton-Moore Oil Company of Bartlesville, Okla. party of the second part, designated as lessee, under and in pursuance of section 3 of the Act approved June 28, 1906, (34 Stat. L., 539-543), witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease, and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is found in paying quantities, provided that the term of this lease shall not extend beyond the date the title to the minerals remains in the Osage Tribe, all the oil deposits in or under lands described as follows, to-wit:

Southwest Quarter of ..........Sec. 32 T. 26 N., R. 12 E.

RECEIVED MAY 20 1916

..........Sec. .......... T. .......... N., R. .......... E.

..........Sec. .......... T. .......... N., R. .......... E. 55044

..........Sec. .......... T. .......... N., R. .......... E.

..........Sec. .......... T. .......... N., R. .......... E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor, as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Secretary of the Interior, shall elect to take the royalty in oil; payment to be made at time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of sale or removal: PROVIDED, That when the quantity of oil taken from all the producing wells on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent.

Should the lessor, with the approval of the Secretary of the Interior, elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 20 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease

3. Lessees shall drill at least one well to the Mississippi lime, unless oil or gas is found in commercial quantities at a lesser depth, on each and every quarter-section or fractional quarter-section of land covered by this lease which is not producing oil on March 16, 1916, within one year from the date of approval hereof, or shall pay to the Superintendent, for the lessor, a rental of one dollar per acre, payable annually, for each year or fractional part of a year the land is held by the lessee and a well is not drilled: PROVIDED, That the time within which a well shall be drilled or rental paid in lieu of drilling shall not begin to run on any homestead selection until the consent of the Secretary of the Interior to drilling on such homestead shall have been given. Should the lessee elect to surrender any such quarter-section or fractional quarter-section before the end of any such yearly period without drilling a well thereon, he shall pay the rental of one dollar per acre for the fractional part of a year the land is held and a well is not drilled, and failure of the lessee to pay such rental within twenty-five days from the expiration of any yearly period during which such well is not drilled shall be cause for cancellation of this lease by the Secretary of the Interior, but such cancellation shall not release the lessee and his sureties from the obligation to pay such rental: PROVIDED, That the lessee may surrender this lease and have the same canceled at any time as to any homestead selection should the Secretary of the Interior refuse to give his consent to drilling thereon: PROVIDED FURTHER, That whenever the Secretary of the Interior shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on all producing lands.

4. Lessee shall have the right to use so much of the surface of the land and such water on the premises as may be necessary for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods, and other appliances necessary for the operation of the wells; also the right of ingress and egress and the rights of way to any point of operations under condition of least injury and inconvenience to the owner and occupant of the surface. Before commencing operations the lessee shall pay to the surface owner the sum of one hundred dollars for each well located on cultivated land or land suitable for cultivation and thirty-five dollars for each location on land not susceptible to cultivation. Location sites shall not exceed one and one-half acres in area. Lessee shall also pay ten dollars for each site outside of the well location used for oil tank of not exceeding 1,600 barrels capacity, allowing 50 feet square for each tanksite. The sum to be paid for an oil tanksite of larger capacity and occupying a greater area shall be as agreed upon between the surface owner and the lessee, and on failure to agree the same shall be fixed by arbitration.

During operations the lessee shall pay all damages for the use of the surface other than that included in the location and tanksites, all damages to any growing crops or to any improvements on the lands and all other damages as may be occasioned by reason of operations. Such damages shall be apportioned among the parties interested in the surface, whether as owner, lessee, or otherwise, as the parties may mutually agree or as their interests may appear. If the parties are unable to agree concerning damages, the same shall be determined by arbitration.

 CONTRACT NUMBER
pproved by the Secretary of the ...ease Contract No. 163-IND-34
..terior. (Revised June 1, 1983) ..a. Lease Contract No. 14-20-G06-... 14-20-G06-

# OIL & GAS MINING LEASE
# OSAGE RESERVATION, OKLAHOMA

Larry Chinn
Acct #

This lease made and entered into in duplicate, on this 31st. day of January, 1985, by and between the Osage Tribe Indians of Oklahoma by George E. Tallchief, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1979 party of the first part, designated as Lessor, and Larry Chinn Box 717 of Bowring, Oklahoma 74009 party of the second part, signated as Lessee, under and pursuant to Section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), ection 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), the Act of October 6, 1964 (78 Stat. 1008), and the Act of October 21, 1978 (92 Stat. 1660), witnesseth:

1. The Lessor, in consideration of a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, id of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by e lessee, does hereby grant and lease to the lessee ~~for xxxxxxxxxx years~~ from the date of approval hereof and as long thereafter as oil and-or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SW/4 Sec. 36 Twp. 27 N. Rge. 11 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; id the right to use water for lease operations as set out in 25 CFR 226. Lessee shall conduct his operations in a workmanlike manner, ommit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land in perpetuity.

2. Definitions - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 226, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and-or 'drocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of drocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety ':erefor, conditioned upon compliance with the terms of this lease and the regulations.

~~B. Rental - Unless Lessee shall complete and place on production a well producing and selling oil and-or natural gas in paying quantities~~ on the land embraced ~~within the~~ lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the ~~Superintendent~~ consents to drilling on any restricted homestead selection, this lease shall terminate unless :ntal at the rate of Two Dollars ($2) per acre shall be ~~paid before the~~ end of the first year of the lease. The lease may also be held without :illing for the remainder of its primary term upon payment of the specified ~~rental annually~~ in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities ~~shall, for so long~~ as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary ~~term the lease~~ may be ~~ontinued only during the remaining primary term of the lease by payment of advance rental which shall commence on the next nniversary date of the lease~~.

C. Royalty - Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 1/6 of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of il taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month ; sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on ıe day of sale or removal, and Lessee shall pay a royalty of 3-16 of the value of all natural gas and products extracted, produced and sold ·om this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on djoining lands on which Lessor is not the owner of the minerals, or in lieu, thereof, to compensate the Lessor in full each month for the stimated loss of royalty through drainage: Provided, that during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate iorizon if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 226, "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter romulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations.

A. Restrictions - The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

RECEIVED
[illegible] 3 - 1976
OSAGE AGENCY

FORM C
Approved by the Secretary of the
Interior November 7, 1975

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

CONTRACT NUMBER
14-20-G06- [illegible]

This lease made and entered into in duplicate, on this 1st day of November 1976 by and between the Osage Tribe of Indians in Oklahoma by Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated OCT 20 1976 party of the first part, designated as Lessor, and Ben Helmer and Euzene Sell, d/b/a Helmer & Sell Well Servicing Company and [illegible] Carman of P.O. Box 1139, Pawhuska, Oklahoma [illegible]

party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ 3,100.00, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee for 3 years from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. 19 NE/4 Sec. 15 Twp. 26 N. Rge. 5 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right -of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

B. Rental - Unless Lessee shall complete and place on production a well producing and selling oil and-or natural gas in paying quantities on the land embraced within the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be continued only during the remaining primary term of the lease by payment of advance rental which shall commence on the next anniversary date of the lease.

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made atthe time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands on which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the estimated loss of royalty through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate horizon if, in his opinion, a prudent operator would conduct further development.

E. Regulations - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter promulgated are made a part of this lease and lessee hereby agrees to abide and conform thereto.

4. Operations.

A. Restrictions- The Superintendent may impose restrictions as to time ofdrillingand rate of production from any well or wells when, in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

RECEIVED Com. oil lease and gas lease pursuant to Resolution No. 25-173
Approved by the Secretary of the Interior November 7, 1973
Oil Lease Contract No. 14-20-G06-
Gas Lease Contract No. 14-20-G06-3883

OSAGE AGENCY

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

CONTRACT NUMBER 14-20-G06-

This lease made and entered into in duplicate, on this 19th day of Oct., 1979, by and between the Osage Tribe of Indians in Oklahoma by Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 197 party of the first part, designated as Lessor, and W. C. Carman, 1/2 and Helmer & Sell Well Servicing Company of Pawhuska, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in considerationof a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee [struck] from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. SW/4 Sec. 11 Twp. 26 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543) as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. - When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" refers to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and-or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond. - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor, conditioned upon compliance with the terms of this lease and the regulations.

~~[illegible] on the land [illegible] the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms or 12 months from the date the Superintendent consents to drilling on any restricted homestead selection, this lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, for so long as such production continues relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be [illegible]~~

C. Royalty -Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sale after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlements shall be based on the actual selling price or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal, and Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, and sold from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development. - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands of which Lessor is not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the [illegible] through drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate [illegible] a prudent operator would conduct further development.

E. Regulations. - It is specifically understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter [illegible] a part of this lease and lessee hereby agrees to abide and conform thereto.

4. [illegible]

A. [illegible] The Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in [illegible] action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

38

RECEIVED

Combining oil lease and gas lease pursuant to Resolution No. 25-173
Oil Lease Contract No. 14-20-G06-399
Gas Lease Contract No. 14-20-G06-388

OSAGE AGENCY

CONTRACT NUMBER

OIL & GAS MINING LEASE
OSAGE RESERVATION, OKLAHOMA

This lease made and entered into in duplicate, on this 22nd day of Dec., 1979, by and between the Osage Tribe of Indians of Oklahoma, by Sylvester J. Tinker, Principal Chief, under authority of the Resolution of the Osage Tribal Council dated June 1, 1978 party of the first part, designated as Lessor, and Helmer and Sell Well Servicing Company, 1/2; W. C. Carman, 1/2 of Pawhuska, Oklahoma party of the second part, designated as Lessee, under and pursuant to section 3 of the Act of June 28, 1906 (34 Stat. 539), the Act of March 3, 1921 (41 Stat. 1249), section 1 of the Act of March 2, 1929 (45 Stat. 1478), the Act of June 24, 1938 (52 Stat. 1034), and the Act of October 6, 1964 (78 Stat. 1008), witnesseth:

1. The Lessor, in consideration of a bonus of $ None, paid to the Superintendent, receipt of which is hereby acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby grant and lease to the lessee ~~xxxxxxxxxxxx~~ from the date of approval hereof and as long thereafter as oil and -or natural gas is produced in paying quantities all the oil and natural gas deposits except as hereinafter provided, in or under land described as follows:

Tr. NW/4 Sec. 14 Twp. 26 N. Rge. 8 E. containing 160 acres, more or less.

Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain pipelines, electric lines, pull rods, and other appliances necessary for operations and marketing; the right-of-way for ingress and egress to any point of operation; and the right to use water for lease operations as set out in 25 CFR 183. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any nuisance to be maintained on the premises under his control.

The Act of June 28, 1906 (34 Stat. 539-543), as amended reserves to the Osage Tribe the oil, gas, coal or other minerals covered by said land until the 8th day of April 1983, and thereafter until otherwise provided by Act of Congress.

2. Definitions. When used herein the following terms shall be defined as:

(A) "Secretary" refers to the Secretary of the Interior or his authorized representative.

(B) "Osage Tribal Council" means the duly elected governing body of the Osage Nation or Tribe of Indians of Oklahoma vested with the authority to lease or take other actions on oil and gas mining pertaining to the Osage Mineral Estate.

(C) "Superintendent" refers to the Superintendent of the Osage Indian Agency or his authorized representative.

(D) "Regulations" shall refer to the regulations in 25 CFR Part 183, promulgated by the Secretary of the Interior and applicable to this lease.

(E) "Natural gas" means any fluid, either combustible or noncombustible, recovered at the surface in the gaseous phase and -or hydrocarbons recovered at the surface as liquids which are the result of condensation caused by reduction of pressure and temperature of hydrocarbons originally existing in a reservoir in the gaseous phase.

3. In consideration of the foregoing, the Lessee hereby agrees:

A. Bond - To furnish such bond as may be required by the Superintendent, with acceptable surety, or United States bonds as surety therefor conditioned upon compliance with the terms of this lease and the regulations.

~~B. ... [illegible] ... the lease, or as otherwise provided in the lease terms, ... the lease within 12 months from the date of approval of the lease, or as otherwise provided in the lease terms, or ... months from the date the Superintendent consents to drilling on any restricted homestead-selection. This lease shall terminate unless rental at the rate of Two Dollars ($2) per acre shall be paid before the end of the first year of the lease. The lease may also be held without drilling for the remainder of its primary term upon payment of the specified rental annually in advance, commencing with the second lease year, unless otherwise provided. The completion of a well producing in paying quantities shall, so long as such production continues, relieve lessee from any further payment of rental, except that should such production cease during the primary term the lease may be ... [illegible]~~

C. Royalty - Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, the sum of 16-2-3 percent of the gross proceeds from sale after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area whichever is higher on the day of sale or removal. And Lessee shall pay a royalty of 16-2-3 percent of the value of all natural gas and products extracted, produced, or saved from this lease. Natural gas used in the reasonable and prudent operation and development of said lease shall be exempted from royalty payment. In no event shall the royalty paid from this lease during any year be less than an amount equal to the annual rental specified above.

D. Development - Lessee shall drill and produce all wells necessary to offset or protect the leased land from drainage by wells on adjoining lands ... [illegible] ... not the owner of the minerals, or in lieu thereof, to compensate the Lessor in full each month for the ... [illegible] ... drainage; Provided, That during the period of supervision by the Secretary, the necessity for offset wells shall be determined by the Superintendent and payment in lieu of drilling and production shall be with the consent of, and in amount determined by the Superintendent. The Superintendent in his discretion may order further development of any leased acreage or separate ... [illegible] ... his opinion a prudent operator would conduct further development.

E. Regulations - It is expressly understood this lease is subject to the current regulations of the Secretary contained in 25 CFR 183 "LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING," and any amendments to the regulations hereinafter ... [illegible] ... part of this lease and lessee hereby agrees to abide and conform thereto.

... [illegible] ... Superintendent may impose restrictions as to time of drilling and rate of production from any well or wells when, in ... [illegible] ... may be necessary or proper for the protection of the natural resources of the leased land and the interests of the

Osage o (Revised)
... ved by the Secretary of the
... ...ember .o, 1968

(Must be executed in duplicate)

CONTRACT NUMBER
14-20-G06 ...

# OIL MINING LEASE
## OSAGE RESERVATION, OKLAHOMA.

This lease, made and entered into in duplicate, on this 17th day of January A. D., 19 73 by and between the Osage Tribe of Indians in Oklahoma by Sylvester J. Tinker Principal Chief, under authority of the Resolution of the Osage Tribal Council dated JAN 17 1973 party of the first part, designated as lessor, and Ceja Corporation of Tulsa, Oklahoma party of the second part, designated as lessee, under and in pursuant of section 3, of the Act approved June 28, 1906, (34 Stat. L. 539-543), the Act approved March 3, 1921 (41 Stat. 1249) The Act of March 2, 1929 (45 Stat. L. 1478) the Act approved June 24, 1938 (52 Stat. L. 1034), and the Act of October 6, 1964, Witnesseth:

1. The lessor, in consideration of one dollar, the receipt whereof is acknowledged, and of the royalties, covenants, stipulations, and conditions herein contained, and hereby agreed to be paid, observed, and performed by the lessee, does hereby demise, grant, lease and let unto the lessee, for five years from the date of approval hereof, and as long thereafter as oil is produced in paying quantities all the oil deposits in or under land described as follows, to-wit:

Tr. 59 SE¼ (Quarter) Sec. 3 Twp. 25 N. Rge. 4 E.

of the Indian Meridian, and containing 160 acres, more or less, with the exclusive right to extract, pipe, store, and remove oil.

Section three of the Act of June 24, 1938 (52 Stat. 1034) as amended by the Act of October 6, 1964 (78 Stat. 1008) provides in part as follows:

That all that part of the Act of June 28, 1906 (34 Stat. L. 539-543), entitled 'An Act for the division of the lands and funds of the Osage Indians in Oklahoma, and for other purposes,' which reserves to the Osage Tribe the oil, gas, coal, or other minerals covered by the lands for the selection and division of which provision is made in that Act is hereby amended so that the oil, gas, coal or other minerals, covered by said lands are reserved to the Osage Tribe, until the 8th day of April, 1983, and thereafter until otherwise provided by Act of Congress.

2. The lessee agrees to pay or cause to be paid to the Superintendent of the Osage Indian Agency, at Pawhuska, Oklahoma, for the lessor as royalty, the sum of 16 2-3 per cent of the gross proceeds from sales after deducting the oil used for fuel in operating the lease, unless the Osage Tribal Council, with the approval of the Commissioner of Indian Affairs shall elect to take the royalty in oil; payments to be made at the time of sale or removal of oil, except where payments are made on division orders, and settlement shall be based on the actual selling price, but at not less than the highest posted market price in the Mid-Continent oil field on the day of the sale or removal: Provided, That when the quantity of oil taken from all producing wells, on any quarter-section according to the public survey, or fractional part of a quarter-section if the land covered by this lease does not include the full quarter-section, during any calendar month, is sufficient to average one hundred or more barrels per well per day, the royalty on such oil shall be 20 per cent. Should the lessor, with the approval of the Commissioner of Indian Affairs elect to take the royalty in oil, the lessee shall furnish free storage for the royalty oil for not exceeding 30 days.

Any of the Executive Departments of the United States Government shall have the option to purchase at the highest posted market price on the day of sale all or any part of the oil produced under this lease. The Commissioner of Indian Affairs may impose restrictions as to time or times for the drilling of wells as to the production from any well or wells drilled when in his judgment such action may be necessary or proper for the protection of the natural resources of the leased land and the interests of the Osage Tribe of Indians, and in the exercise of his judgment the Commissioner of Indian Affairs may take into consideration, among other things, Federal laws, State laws, or regulations by competent Federal or State authorities or lawful agreements among operators regulating either drilling or production, or both.

3. Lessee shall drill at least one well to the Mississippi Lime, unless oil or gas is found in paying quantities at a lesser depth, on the land covered by this lease, within 12 months from the date of approval of the lease, or the lease may be held for the full five-year primary term without drilling, upon payment to the Superintendent for the lessor of rental at the rate of one dollar per acre per annum, payable annually in advance beginning one year after the date of approval of the lease. This lease shall terminate as to both parties unless such advance rental shall be received at the Osage Agency or shall have been mailed as indicated by postmark, on or before the due date: PROVIDED, That the time within which a well shall be drilled shall not begin to run on any restricted homestead selection until the consent of the Superintendent to drilling on such homestead shall have been given, nor shall advance rental become due until the next anniversary date of the lease following the date of such consent: Provided further, That the Superintendent in his discretion may direct the drilling of any undrilled lease, if in his opinion the interests of the Osage Tribe warrant: Provided further, That whenever the Commissioner of Indian Affairs shall consider the marketing facilities inadequate to take care of the production he may direct the suspension of drilling operations on this lease.

The completion of a well to the Mississippi Lime, or production of oil or gas in paying quantities from a lesser depth than the Mississippi Lime, for such time as such production shall continue, after the lease has entered a rental status, shall relieve the lessee from any further payment of rentals for the balance of the primary term of the lease for which rental has not been paid. Should such production cease, rental shall commence on the next anniversary date of the lease.

Rental shall be paid on the basis of a full year, and no refund will be made of advance rental paid in compliance with the regulations in this part.

4. Lessee shall have the right to use so much of the surface of the land within the Osage Reservation as may be reasonable for operations, including the right to lay and maintain pipe lines, telephone and telegraph lines, pull rods and other appliances necessary for the operation of the wells; also the right of ingress and egress and the right of way to any point of operations. Before commencing operations for the drilling of any well the lessee shall pay to the surface owner the sum of $200 for each well located on cultivated land (tilled or cultivated within the immediately preceding three years, and including hay meadow land), $150 for open pasture land, and $100 for each location on brush or wooded lands, and other lands not suitable for cultivation. Upon payment of such location site money, lessee shall be entitled to possession. Location site shall be held to the minimum area essential for operations, and in no event shall exceed one and one-half acres in area. Lessee shall also pay tank site fees at the rate of $20 per tank of not exceeding 1,000 barrels capacity: *Provided, however,* That no tank site fee shall be paid for a tank temporarily set on a well location site for testing purposes during the completion of the well. Tank sites shall be held to the minimum area essential to efficient operations, and in no event shall exceed an area of 60 feet square per tank. The sum to be paid for a tank site of larger capacity and occupying a greater area, shall be as agreed upon between the surface owner and the lessee, and on failure to agree, the same shall be fixed by arbitration.

Lessee may with the approval of the Superintendent use water from streams and natural water courses to the extent that same does diminish the supply below the requirements of the surface owner from whose land the water is taken. When such water supply is located lease upon which the water is to be used, the lessee may, lay necessary lines across intervening lands to obtain such water. Any damage from laying such water lines and the setting of pumps and other equipment, that cannot be amicably settled shall be settled by provided in regulations.

If the surface owner of the land covered by this lease obtains a farm loan from any lending agency under the supervi Administration, secured by a mortage on the surface of said land, and shall have agreed in writing that damages accruing to tions on such land shall be paid to the mortagee, the lessee shall pay all fees and damages required to be paid to the surfac gagee, through the Superintendent of the Osage Indian Agency, to be credited on the loan.

40

# EXHIBIT B

1995 PRICES
JAN - MAR



# EXHIBIT C

JAN - MAR 1995
OSAGE vs CUSHING



# JAN 1995 OSAGE PRODUCTION

13,845 BOPD $1.42 Shortfall

Daily Underpayment to Osage

**$3,686 per Day**

Monthly Underpayment to Osage

**$112,054 per Month**

Yearly Underpayment to Osage

**$1,344,648 per Year**

8-2

**CERTIFICATE OF SERVICE**

I, Wilson K. Pipestem, hereby certify that on October 20, 2004, I mailed by first class mail a copy of Plaintiff Osage Tribe's Third Amended Complaint to the following Counsel of Record for Defendant:

Edward J. Passarelli
Senior Counsel
General Litigation Section
U.S. Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: (202) 305-0468
Fax: (202) 305-0506

Wilson K. Pipestem

Blanca Garcia

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>Defendant. | ) | No. 99-550L<br><br>Judge Mary Ellen Coster Williams |

'05 FEB 11 P2:47

DEPT. OF JUSTICE - ENRD ENVIRONMENT DIVISION

## AMENDED JOINT PRELIMINARY STATUS REPORT

Pursuant to Appendix G of the Rules of the United States Court of Federal Claims, the parties hereby submit the following Amended Joint Preliminary status Report:

**A. Does the Court have jurisdiction over the action?**

Plaintiff Osage Nation believes that this Court has jurisdiction over the Nation's claims for federal mismanagement of Osage tribal trust assets. In an ongoing case before Judge Emily C. Hewitt involving Osage claims for federal mismanagement of tribal trust funds (another Osage trust asset), the Court of Federal Claims denied similar contentions to those made by Defendant below.[1]

Defendant believes that this Court only has limited, if any, jurisdiction over this action. Defendant contends that Plaintiff has standing only to prosecute claims relating to damages for trust asset mismanagement that it has allegedly sustained, and not those allegedly sustained by its individual members or non-Indian headright owners. Defendant believes this Court has no jurisdiction over trust asset mismanagement claims brought by the Tribe on behalf of individual Osage headright owners who received "individual allotments" of the headrights, or on behalf of the Osage individual members or non-Indian owners of headrights who acquired those headrights

[1] *See Osage Nation v. United States*, 57 Fed.Cl. 392 (July 28, 2003).

Pleg



#90-2

EXHIBIT 14

from individual Osage members; the Tribe has no standing to assert such claims on behalf of these individuals, as they are not parties to this litigation. The claim that the United States has not been achieving enough revenue because it calculates royalties in accordance with the applicable statutes and regulations is barred by the statute of limitations; those statutes and regulations were enacted and promulgated more than six years before the filing of this action. In addition, because the allegations are so vague, it does not appear that this Court has jurisdiction over Plaintiff's second cause of action, claiming that Defendant breached its trust duties to the Tribe with respect to managing leases covering the Osage surface and/or mineral estates other than oil and gas leases. Defendant also contends that this Court does not have jurisdiction over this matter because the statutes and regulations cited by Plaintiff cannot be fairly interpreted to mandate compensation to Plaintiff for alleged royalty mismanagement when such authorities dictate that the separate headright owners are the parties entitled to receive such royalties.

**B. Should the case be consolidated with any other case and the reason therefor?**

The parties are not aware of any other case with which this action should be consolidated.

**C. Should trial of liability and damages be bifurcated and the reasons therefor?**

Plaintiff believes that bifurcation of liability and damages is appropriate for this case. The interest of judicial economy dictates that the Court first determine the extent of Defendant's liability before examining the damages evidence and determining the amount of damages.

Defendant believes that it is premature to determine whether bifurcation is appropriate. Defendant believes that a ruling on its anticipated motion on the pleadings will leave very little, if anything, of the Complaint to be resolved; if a claim remains, it is likely to be isolated and narrow enough that bifurcation, while often appropriate, would not be in the interests of judicial economy.

**D. Should further proceedings in this case be deferred pending consideration of another case before this court or any other tribunal and the reasons therefor?**

Plaintiff believes that this case should move expeditiously forward, with the next step being Defendant filing a dispositive motion on the issues it describes in Section A above, including the issue of statute of limitations. It should not be deferred pending the many cases on federal mismanagement of tribal trust assets that are pending.

Defendant believes that further proceedings in this case need not be deferred, however, the Court may wish to defer briefing on the statute of limitations issue until after the United States' petition for a *writ of certiorari*, in the matter of *United States v. Shoshone Indian Tribe of the Wind River Reservation*, No. 04-929 (filed in January of 2005), is resolved by the United States Supreme Court. The application of the relevant statute of limitations, 25 U.S.C. § 2501, to the government's alleged mismanagement of tribal trust assets is at issue in that matter as well.

**E. In cases other than tax refund actions, will a remand or suspension be sought and the reasons therefor and the proposed duration?**

The parties agree that there is no reason to anticipate that a remand or suspension will be sought in this action.

**F. Will additional parties be joined and, if so, a statement describing such parties, their relationship to the case, and the efforts to effect joinder and the schedule proposed to effect joinder?**

Plaintiff does not anticipate that additional parties will be joined. This case seeks redress from the federal government for its breach of trust duties.

Defendant anticipates that certain oil lessees may seek permissive joinder because any liability on the part of the United States will require the United States to seek contribution from

the oil lessees. Defendant also anticipates that gas lessees and the non-mineral asset lessees may eventually seek permissive joinder because the Osage Nation has now argued that the price calculated for royalties on those assets is incorrect. Until such time, however, as Plaintiff states how it believes royalties on those assets should be calculated, Defendant is unable to determine how likely it is that the gas and non-mineral asset lessees will seek permissive joinder.

**G. Does either party intend to file a motion pursuant to RCFC 12(b), 12(c) or 56 and, if so, a schedule for the intended filing?**

Plaintiff agrees that the next step is for Defendant to file a dispositive motion under Rule 12 but believes that 30 days is a more reasonable time period to file the motion, not 60 days. After the Court rules on Defendant's Rule 12 motion, Plaintiff may move for summary judgment on liability issues under Rule 56 after a reasonable amount of discovery.

Defendant intends to file a motion under RCFC 12 (b) and/or 12(c) within 60 days of the preliminary status conference addressing the jurisdictional issues mentioned above and the failure of Plaintiff to state a breach of trust claim for which relief can be granted. If any claims remain after a ruling on Defendant's anticipated motion, Defendant will then be better able to assess the timing of any appropriate motions for summary judgment. Defendant believes that discovery should be deferred until after a ruling on the dispositive issues presented by its Rule 12 motion.

**H. What are the relevant issues?**

Plaintiff believes the relevant issues are as follows:

1. To what extent has the United States, as trustee, damaged the Osage Nation by failing to collect payments under oil and gas mining leases that the United States issued for the benefit of the Osage Nation?

2. To what extent has the United States, as trustee, damaged the Osage Nation by failing to collect payments under other non-oil and gas mining leases that the United States issued for the benefit of the Osage Nation?

3. To what extent has the United States damaged the Osage Nation by causing the Nation to lose interest or other investment income on the funds the United States, as trustee, should have but failed to collect?

Defendant believes the relevant issues are as follows:

1. Does Plaintiff have standing to assert an asset mismanagement claim for money damages on behalf of over 2,000 individual headright owners, many of whom are neither Osage nor Indian?

2. Whether Plaintiff's claims are barred by the six-year statute of limitations?

3. Whether Plaintiff's claims for damages resulting from Defendant's alleged mismanagement of trust assets arising prior to 1946 are barred by the Indian Claims Commission Act?

4. Whether Plaintiff's claims for damages resulting from Defendant's alleged mismanagement of trust assets arising prior to 1946 are barred by the doctrine of *res judicata* because they were previously brought before and resolved by the Indian Claims Commission?

5. What is the nature of any fiduciary duties arising from federal statutes and regulations that could fairly be interpreted as mandating compensation to Plaintiff?

6. Does Defendant's compliance with validly enacted statutes and regulations constitute a breach of any fiduciary duties that could be fairly construed as mandating compensation to Plaintiff?

7. To what extent has Plaintiff had advance knowledge of, and consented to, the actions complained of?

**I. What is the likelihood of settlement?**

Plaintiff believes that settlement of this case is unlikely before the Court decides Defendant's dispositive motion under Rule 12.

Given the nature of the dispositive threshold defenses and the threshold merits defenses presented by Plaintiff's Complaint, Defendant believes that settlement is unlikely. Defendant is, however, open to consider any reasonable offer of settlement.

**J. Do the parties anticipate proceeding to trial? Does any party or do the parties jointly, request expedited trial scheduling, and, if so, the reasons why the case is appropriate therefor?**

Plaintiff agrees with Defendant that cross motions for summary judgment would likely resolve this action without a trial.

Defendant anticipates that this action will be resolved by its initial dispositive motion and that the matter will not proceed to trial. Assuming, *arguendo*, that any portion of the Complaint survives Defendant's anticipated Rule 12 motion, cross-motions for summary judgment would likely resolve this action without a trial. The scheduling of such cross-motions for summary judgment is, however, premature at this time given the nature of the dispositive issues that will likely dispose of the entire matter.

**K. Is there any other information of which the court should be aware at this time?**

At this time, the parties are not aware of any additional information that may assist this Court with regard to this matter.

Dated this 8th day of February, 2005.

Respectfully Submitted,

for CAROLINE M. BLANCO

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0248
Fax: (202) 305-0267
E-mail: caroline.blanco@usdoj.gov

Of Counsel:

Alan Woodcock, Attorney
Office of the Field Solicitor
United States Department of the Interior
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
(918) 669-7730, Ext. 225

Stephen L. Simpson, Attorney
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240
(202) 219-1659

Attorneys for Defendant

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036
Tel.: (202) 419-3526
Fax: (202) 659-4931
E-mail: wkpipestem@pipestemlaw.com

Attorney for Plaintiff

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,** | ) | |
| **Plaintiff,** | ) | **No. 99-550L** |
| **v.** | ) | **Judge Mary Ellen Coster Williams** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of February, 2005, a true and correct copy of the foregoing **AMENDED JOINT PRELIMINARY STATUS REPORT** was served, via first-class mail, postage prepaid, to the following counsel of record at the following address:

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663

WILSON K. PIPESTEM

Blanco, Caroline

RECEIVED
APR 15 2005
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

By leave of the Judge

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, Plaintiff, | ) | No. 99-550L |
| v. | ) | Judge Mary Ellen Coster Williams |
| THE UNITED STATES OF AMERICA, Defendant. | ) | |

'05 APR 18 A8 :40
DEPT. OF JUSTICE - ENRD
ENVIRONMENT DIVISION

## UNITED STATES' MOTION TO DISMISS

The United States, by and through its undersigned counsel, hereby moves this Court for an order, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), dismissing Plaintiff's Third Amended Complaint. The grounds for the United States' Motion to Dismiss are that:

1. This Court does not have subject matter jurisdiction to hear Plaintiff's claims concerning oil and gas leases entered into prior to August 2, 1993, and Plaintiff's claims concerning non-mineral leases entered into prior to October 20, 1998, because they are time-barred; and

2. Plaintiff has failed to state a cognizable claim under the Tucker Act, 28 U.S.C. § 1491(a)(1), with regard to its claim that the United States breached its fiduciary duty owed to the Tribe for alleged mismanagement of non-fund Osage trust assets.

In support of this Motion, the United States submits the accompanying Memorandum of Points and Authorities in Support of the United States' Motion to Dismiss.

//

6/39



EXHIBIT 15

90-2-20-09634

WHEREFORE, the United States respectfully requests that its Motion to Dismiss be granted, and that Plaintiff's Third Amended Complaint be dismissed.

Dated this 11th day of April, 2005.

Respectfully submitted,

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0248
Fax: (202) 305-0267
E-mail: caroline.blanco@usdoj.gov

Of Counsel:

ALAN WOODCOCK
Regional Solicitor
Office of the Field Solicitor
United States Department of the Interior
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
Tel.: (918) 669-7730, Ext. 225
Fax: (918) 669-7736

STEPHEN L. SIMPSON
Attorney
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240
Tel.: (202) 219-1659
Fax: (202) 208-3490

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | No. 99-550L |
| v. | ) | Judge Mary Ellen Coster Williams |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**<u>IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS</u>**

## TABLE OF CONTENTS


Table of Authorities . . . iii

Memorandum of Points and Authorities
In Support of the United States' Motion to Dismiss . . . 1

I. Introduction . . . 1

II. Factual and Statutory Background . . . 1

A. The 1906 Act . . . 1

B. Oil and Gas Leases . . . 2

C. The Relationship Between the Leases and the Regulations . . . 4

D. The Litigation . . . 5

III. Argument . . . 5

A. Standards for Granting Dismissal of Complaint under Rule 12(b)(1) and 12(b)(6) . . . 5

B. Plaintiff's Claims Are Time-Barred . . . 8

1. The Tribe's Mismanagement Claims Concerning Mineral Leases that Accrued Prior to August 2, 1993, and any Non-Mineral Lease that Accrued Prior to August 16, 1998, Are Time-Barred Under 28 U.S.C. § 2501 . . 8

2. The Tribe Is Barred from Bringing any Claim Against the United States that Accrued Prior to August 13, 1946 . . . 13

C. Plaintiff Has Failed to State a Cause of Action for which Relief Can Be Granted . . . 16

1. The Tribe Does Not Allege that the United States Failed to Comply with the Governing Law and the United States Is Not Obligated to Maximize the Amount of Royalty Realized . . . 17

2. The Statutes and Regulations, at Best, Can Only Be Fairly Interpreted as Mandating Compensation to a Claimant Headright Owner, and, thus, Do Not Mandate Compensation to the Tribe, aside from a Claim Associated with Its Own Headright Ownership Interest . . . . . . . . . . . . . . . . . . . 22

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

Andrade v. United States, 202 Ct. Cl. 988 (Ct. Cl. 1973) . . . . . . . . . . 10

Brown v. United States, 195 F.3d 1334 (Fed. Cir. 2000) . . . . . . . . . . 10, 12

Capoeman v. United States, 440 F.2d 1002 (1971) . . . . . . . . . . 10

Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399 (1994) . . . . . . . . . . 9

Cochran v. United States, 19 Cl. Ct. 455 (1990) . . . . . . . . . . 10

Commodity Futures Trading Com'n v. Nahas, 738 F.2d 487 (D.C. Cir. 1984) . . . . . . . . . . 6

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . 6, 8

Contreras v. United States, 2005 WL 741757 (Fed. Cl. 2005) . . . . . . . . . . 22

Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599 (1967) . . . . . . . . . . 22

Hart v. United States, 910 F.2d 815 (1990) . . . . . . . . . . 9

Hishon, 467 U.S. 69 at 73 (1984) . . . . . . . . . . 7

Japanese War Notes Claimants Assoc. v. United States, 178 Ct. Cl. 630 (1967) . . . . . . . . . . 9

LaMear v. United States, 9 Cl. Ct. 562, 568 (1986) . . . . . . . . . . 9

Laughlin v. United States, 22 Cl. Ct. 85 (1990) . . . . . . . . . . 9

Menominee Tribe of Indians of Wisconsin v. United States, 221 Cl. Ct. 506 (1979) . . . . . . . . . . 22

Menominee Tribe v. United States, 726 F.2d 718 (Fed. Cir. 1984) . . . . . . . . . . 9, 10

Mitchell v. United States, 10 Cl. Ct. 63 (1986) . . . . . . . . . . 9

Mitchell II, 463 U.S. at 217 . . . . . . . . . . 22

Nager Electric Co. v. United States, 177 Ct. Cl. 234 (1966) . . . . . . . . . . 9

Navajo Tribe of Indians v. United States, 9 Cl. Ct. 227 (1985) . . . . . . . . . . 21

Navajo Tribe v. New Mexico, 809 F.2d 1455 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 14

Neitzke v. Williams, 490 U.S. 319 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Oglala Sioux Tribe v. United States, 650 F.2d 140 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . 14

Osage Nation v. United States, 57 Fed. Cl. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 23

Pawnee v. United States, 830 F.2d 187 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

Ramming v. U.S., 281 F.3d 158 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sac and Fox Tribe of Indians of Oklahoma v. United States, 159 Ct. Cl. 247 (1962) . . . . . . . . 21

Sankey v. United States, 22 Cl. Ct. 743 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Sauer v. United States, 173 Ct. Cl. 642 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Shoshone Indian Tribe of the Wind River Reservation v. United States
364 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

United Nuclear Corp. v. United States, 12 Cl. Ct. 45 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States Department of Energy v. Ohio, 503 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . 6

United States v. King, 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Mottaz, 476 U.S. 834 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Navajo Nation, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20, 21

United States v. Sherwood, 312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wally Packaging, Inc. v. United States, 578 F. Supp. 1408 (Ct. Int'l Trade 1984) . . . . . . . . . . . . 6

**FEDERAL STATUTES**

25 U.S.C. § 70k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

Act of June 28, 1906, 34 Stat. 539 . . . . . . . . . . 1

Act of October 21, 1978, 92 Stat. 1660 . . . . . . . . . . 2

Community Bank & Trust v. United States, 54 . . . . . . . . . . 6

Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049 . . . . . . . . . . 8

Pub. L. No. 79-726, 60 Stat. 1049-1056 (1946) . . . . . . . . . . 13

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . 7

Tucker Act, 28 U.S.C. § 1505 . . . . . . . . . . 7, 22

**FEDERAL REGULATIONS**

25 C.F.R. 226.11(a)(2) . . . . . . . . . . 12

25 C.F.R. Part 183, 30 . . . . . . . . . . 3

25 C.F.R. Part 226 . . . . . . . . . . 3

25 C.F.R. § 226.11 . . . . . . . . . . 21

25 C.F.R. § 226.11(a)(1) . . . . . . . . . . 2

25 C.F.R. § 226.11(a)(2) . . . . . . . . . . 3, 18

25 C.F.R. § 226.11(b)(2) . . . . . . . . . . 3

25 C.F.R. § 226.5 . . . . . . . . . . 4, 19

25 C.F.R. §§ 226.11(a)(2) . . . . . . . . . . 21

Fed. Reg. 22254 (June 21, 1974) . . . . . . . . . . 3

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS

## I. INTRODUCTION

In its Third Amended Complaint, the Osage Tribe of Indians of Oklahoma (hereinafter referred to as "Plaintiff" or the "Tribe") seeks money damages from the United States for alleged mismanagement of oil, gas, and certain non-mineral leases. *See* Third Amended Complaint, ¶1. Plaintiff's Third Amended Complaint follows the filing of three earlier complaints and a verification of claim validity, which was ordered by this Court to be filed after the Tribe had access to tens of thousands of documents concerning lease, mineral production and revenue information. Despite these numerous opportunities to narrow its claims, Plaintiff, after more than five years of litigation, has still failed to articulate a viable claim for money damages against the United States for mismanagement of non-fund trust assets. The claims in Plaintiff's Third Amended Complaint concerning the alleged mismanagement of oil and gas leases accrued prior to August 2, 1993, are time-barred, as are its claims involving alleged mismanagement of non-mineral leases that accrued prior to August 16, 1998. Moreover, Plaintiff's claim that the United States mismanaged its non-fund trust assets fails to state a cause of action for which relief can be granted. For these reasons, which are more fully set forth below, the United States' Motion to Dismiss should be granted and Plaintiff's Third Amended Complaint dismissed.

## II. FACTUAL AND STATUTORY BACKGROUND

### A. The 1906 Act

The Osage Tribe, at the turn of the last century, occupied a reservation which now constitutes Osage County, Oklahoma. By virtue of the Act of June 28, 1906, 34 Stat. 539, the

surface interests were allotted to individual tribal members. Section 3 of the 1906 Act reserved "... the oil, gas, coal, and other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six ...."[1] The ownership of the minerals by the Osage Tribe has been extended from time to time and was last extended in perpetuity by the Act of October 21, 1978, 92 Stat. 1660. The 1906 Act provides that leases are to be made by the Osage Tribal Council and approved by the Bureau of Indian Affairs.

## B. Oil and Gas Leases

Oil and gas from the Tribe's mineral estate has been extracted pursuant to leases that provide for, among other things, the payment of royalties from production. It is the payment of royalties that is the principal reason a lessor enters into a lease. In general, a royalty under an oil lease is calculated by applying the "royalty rate," which has historically been and is currently stated in the regulations as being not less than 16 2/3 percent,[2] to the gross proceeds obtained from the sale of the oil after subtracting out the oil used by the lessee for development and operational purposes. *See* 25 C.F.R. § 226.11(a)(1).

The "gross proceeds" are the total monies or other consideration received at an established sales price for the oil. The established sales price is the higher of either the actual selling price or the highest posted price in a particular geographical area. *See, e.g.,* Third

---

1/ Plaintiff misquotes this statute, stating that the 1906 Act reserved the sand and gravel for the Osage Tribe. No mention is made in the 1906 Act of such a reservation.

2/ The current regulations provide that the royalty rate shall not be less than 16 2/3 percent. This allows the Tribe to execute leases at other rates as it deems appropriate. For ease of reference, however, the United States refers herein to the royalty rate as being 16 2/3 percent.

Amended Complaint, ¶ 24. Although the "royalty rate" has remained at its historical rate of 16 2/3 percent of the gross proceeds, the geographical area for determining the sales price, has changed over time. This is reflected in some of the leases attached as Exhibit A to the Third Amended Complaint.

In the early part of the 20th century, the sales price was to be based on the highest posted market price in the Mid-Continent oil field. *See, e.g.,* Third Amended Complaint, Exhibit A, p. 28. Then it changed to the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area. *See* 25 C.F.R. Part 183, 30 Fed. Reg. 22254 (June 21, 1974); *see also* Third Amended Complaint, ¶ 24. The current basis for determining the sales price today is the higher of either the actual selling price or the highest posted price by a major purchaser in Osage County, Oklahoma. *See* 25 C.F.R. § 226.11(a)(2). This standard is expressly set forth in the regulations governing the leasing of the Osage Reservation lands for oil and gas mining, 25 C.F.R. Part 226, which were approved by the Tribe through tribal resolution, and have been in effect since at least 1991. *See* Resolution of the Osage Tribal Council, Res. No. 28-393, dated December 18, 1991, attached hereto as "Exhibit A." In sum, the methodology for determining the amount of royalty to be received under an oil lease is the royalty rate of 16 2/3 percent multiplied by the total revenue received from the sale of oil priced at the higher of either the actual sales price or the highest posted price offered in the geographical area applicable at the time, minus the cost of oil used in the development and operation of the lease.

Royalty on gas is determined by multiplying the royalty rate of 16 2/3 percent by the market value of all natural gas and products extracted under the lease that have been produced and sold, less the natural gas used in the operation and development of the lease. *See* 25 C.F.R. §

226.11(b)(2). For purposes of determining royalty on gas production, there is no reference to a particular geographical area upon which the market value is based.

## C. The Relationship Between the Leases and the Regulations

As reflected in many of the leases attached to Plaintiff's Third Amended Complaint, the federal regulations governing Osage oil and gas leasing are expressly applicable to the leases. *See, e.g., Third Amended Complaint*, Exhibit A, p. 18. Some of the leases also state that "[i]t is specifically understood that [the] lease is subject to the current regulations of the Secretary contained at 25 CFR 226 . . . and any amendments to the regulations hereinafter promulgated are made a part of [the] lease and lessee hereby agrees to abide and conform thereto." *See, e.g., id.* at p. 36. This language is consistent with 25 C.F.R. § 226.5, which also provides that any amendment or change to the applicable regulations made after approval of any oil or gas lease applies to that lease, except that no such amendment or change shall "affect the term of the lease, rate of royalty, rental, or acreage unless agreed to by both parties and approved by the Superintendent." *Id.* As set forth above, the royalty rate has historically been and currently remains at 16 2/3 percent and, thus, there has been no need for the parties to agree and the Superintendent to approve a different royalty rate to be applied to a lease. The only aspect of the amendments to the Osage oil and gas regulations relevant to this matter that has affected the amount of royalty to be received is the change in the geographical area upon which to determine the sales price of the oil. Under 25 C.F.R. § 226.5, this factor, however, does not preclude application of the regulations' subsequent amendments to pending leases approved prior to the effective date of those amendments.

**D. The Litigation**

On August 2, 1999, the Tribe filed its original Complaint. After failing to sufficiently articulate its claims, this Court ordered the Tribe to review documents that it viewed germane to its case and then file a Verification of Claim Validity. Pursuant to that order, the Tribe "reviewed hundreds of boxes of material and made copies filling over 50 boxes of lease, production and revenue information." *See* Plaintiff's Response to the Court's Request for Verification of Claim Validity (docket entry #36), at p. 1. The Tribe also claims that it then conducted "extensive research of tens of thousands of documents" and then prepared and filed its Verification of Claim Validity. *See* Plaintiff's Response to the Court's Request for Verification of Claim Validity (docket entry #36), at p. 1. Over the next few years, the Tribe filed three amended complaints, ending with the currently pending Third Amended Complaint, filed on October 20, 2004. The only vestige of the Tribe's original Complaint that arguably is contained in its Third Amended Complaint, is the claim that the United States mismanaged the Tribe's mineral leases by failing to obtain the highest posted price. The claim that the United States mismanaged the Tribe's non-mineral leases appeared for the first time in the Tribe's Second Amended Complaint, filed on August 16, 2004.

## III. ARGUMENT

**A. Standards for Granting Dismissal of Complaint under Rule 12(b)(1) and 12(b)(6)**

Rule 12(b)(6)of the Rules of the Court of Federal Claims, ("RCFC") provides that the defendant may move to dismiss an action for the following reasons: "(1) lack of jurisdiction over the subject matter, . . . [or] (6) failure to state a claim upon which relief can be granted." In resolving the United States' Motion to Dismiss here,

> . . . the court must accept as true the complaint's undisputed *factual* allegations and construe *the facts* in the light most favorable to plaintiff. A plaintiff must make only a prima facie showing of jurisdictional *facts* through the submitted material in order to avoid a defendant's motion to dismiss. If the *undisputed facts* reveal any possible basis on which the non-moving party might prevail, the court must deny the motion.

*Community Bank & Trust v. United States,* 54 Fed. Cl.R. 352, 354 (Ct. Fed. Cl. 2002) (citations omitted) (emphasis added). While a plaintiff is required to make a short and plain statement of the facts constituting its claim, under Rule 8(a)(2), brevity should not rob the complaint of content. The federal courts, in ruling on motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, have held that the complaint must advise the opposing party of the claim against it. As the Fifth Circuit stated:

> Subsumed within the rigorous standard of the *Conley* test [a reference to *Conley v. Gibson,*355 U.S. 41 (1957)] is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged.

*Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).

RCFC 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. A party seeking federal court jurisdiction bears the burden of demonstrating that it is so entitled. *Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984). The Supreme Court presumes that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *United States Department of Energy v. Ohio*, 503 U.S. 607, 614 (1992); *Renne v. Geary*, 501 U.S. 312, 315 (1991). A plaintiff must also provide and support a jurisdictional basis for judicial review. *Wally Packaging, Inc. v. United States*, 578 F. Supp. 1408, 1410 (Ct. Int'l Trade 1984). Plaintiff's claims here are time-barred and, thus, there is no jurisdictional basis for review of the Tribe's claims concerning mismanagement of

mineral leases that accrued prior to August 2, 1993, and mismanagement claims concerning non-mineral leases that accrued prior to August 16, 1998.

Moreover, it is a basic tenet that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tribe's Third Amended Complaint asserts that this Court has jurisdiction over its claims under the Tucker Act, 28 U.S.C. § 1491, and the so-called "Indian Tucker Act," 28 U.S.C. § 1505 (*see* Third Amended Complaint, ¶ 4). As set forth below, however, the Tribe's claims are time-barred and, thus, neither of the Tucker Acts can serve as a proper waiver of sovereign immunity to sue the United States. Accordingly, the Tribe's Third Amended Complaint should be dismissed under RCFC 12(b)(1).

RCFC 12(b)(6) also forms a basis for dismissal of Plaintiff's claims. Dismissal of a claim is authorized on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) and *Conley v. Gibson*, 355 U.S. 41 (1957)). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* (quoting *Hishon*, 467 U.S. at 73). Thus, a claim should be dismissed under RCFC 12(b)(6) where, as here, "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his legal claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41 (1957).

B. **Plaintiff's Claims Are Time-Barred.**

According to Plaintiff's characterization, this lawsuit is one in which the Tribe seeks money damages "for *mismanagement* of certain Osage trust assets committed by the United States as trustee." Third Amended Complaint, ¶ 1. As a precursor to judicial review, however, Plaintiff must demonstrate that its claims are not time-barred. Because any claim for mismanagement against the United States must be brought within six years after the claim first accrues, 28 U.S.C. § 2501, most, and possibly all, of the Tribe's claims here are time-barred. Moreover, any claim that the Tribe may have had prior to August 13, 1946, is likewise time-barred under the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049, codified at 25 U.S.C. §§ 70, *et seq.* (now repealed), which provided that any Indian claim against the United States that accrued before August 13, 1946, but which had not been filed with the Indian Claims Commission within five years thereafter, was time-barred.

1. **The Tribe's Mismanagement Claims Concerning Mineral Leases that Accrued Prior to August 2, 1993, and any Non-Mineral Lease that Accrued Prior to August 16, 1998, Are Time-Barred Under 28 U.S.C. § 2501.**

Although the Tribe has not specifically identified which leases have allegedly been mismanaged by the United States, one can assume from the attachments to the Third Amended Complaint that the leases cover, at a minimum, the years 1916 through 1995. *See, e.g.,* Third Amended Complaint, ¶¶ 27, 28; Exhibit A, pp. 28 and 35; Exhibit C, pp. 42-43. The governing statute of limitations for Plaintiff's claims here is 28 U.S.C. § 2501 (1992),

which provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

The Federal Circuit has held that § 2501 "is jurisdictional in nature and, as an express limitation of the waiver of sovereign immunity, may not be waived." *Hart v. United States*, 910 F.2d 815, 818-19 (1990); *Laughlin v. United States*, 22 Cl. Ct. 85, 99 (1990), *aff'd*, 975 F.2d 869 (Fed. Cir.1992); and *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). This Circuit also held that "[t]he 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). The limitation language is "a dispositive jurisdictional inquiry for this court." *LaMear v. United States*, 9 Cl. Ct. 562, 568, *aff'd* 809 F.2d. 789 (Fed. Cir. 1986).

A claim against the United States accrues "when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Assoc. v. United States*, 178 Ct. Cl. 630, 632, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971; *Nager Electric Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966); *Mitchell v. United States*, 10 Cl. Ct. 63, 66-67 (1986); *United Nuclear Corp. v. United States*, 12 Cl. Ct. 45, 49 (1987) (*citing Sauer v. United States*, 173 Ct. Cl. 642, 647, 354 F.2d 302, 304 (1965). The statute of limitations will not be tolled unless the facts underlying the claim are either fraudulently concealed or inherently unknowable. *See Menominee Tribe v. United States*, 726 F.2d 718, 721-22 (Fed. Cir. 1984), *cert. denied*, 469

U.S. 826 (1984); *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577. In such an event, the burden of proof rests upon the plaintiff to justify and prove that the facts are so concealed or unknowable so as to delay or toll the running of the limitations period against each respective claim. *Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 2000); *Cochran v. United States*, 19 Cl. Ct. 455, 458 (1990).

The fact that the Plaintiff here is an Indian tribe and that issues of a trust relationship between the United States and the Tribe are involved in the claims does not toll the running of the claims bar established by 28 U.S.C. § 2501. *Menominee Tribe v. United States*, *supra*, 726 F.2d at 721. Statutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government. *See United States v. Mottaz*, 476 U.S. 834 (1986); *Andrade v. United States*, 202 Ct. Cl. 988, 991, 996, 485 F.2d 660, 661, 664 (Ct. Cl. 1973), *cert. denied*, 419 U.S. 831 (1974); *Capoeman v. United States*, 440 F.2d 1002, 1007-08, 194 Ct. Cl. 664 (1971).

Moreover, this Circuit recently concluded, in *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d. 1339, 1349-51 (Fed. Cir. 2004), that 28 U.S.C. § 2501 applies to claims alleging the United States' mismanagement of trust assets. The Federal Circuit held that the tolling provision applicable to 28 U.S.C. § 2501 at issue in that case (the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108-7), only applies to "claims that allege the Government mismanaged *funds* after they were collected, as well as any claims that allege the Government failed to timely collect amounts due and owing to the Tribes under its sand and gravel contracts." *Shoshone Indian Tribe of*

*the Wind River Reservation v. United States*, 364 F.3d at 1351 (emphasis added).[3] Any attempt by the Tribe here to argue that the tolling provision is applicable to its claims because they involve the Government's failure "to timely collect amounts due and owing to the Tribe[]," is misplaced. Plaintiff has not alleged in its Third Amended Complaint that the only issue is whether the United States failed to "timely collect amounts due and owing;" rather by Plaintiff's own admission, this case alleges that the United States mismanaged the Tribe's trust assets by failing to determine the correct income through calculating royalties based on the highest posted price in the wrong geographical area. *See, e.g.*, Third Amended Complaint, ¶¶ 1 and 25. This characterization clearly puts the basis for determining the amount "due and owing" in dispute and, thus, is more akin to an allegation that the United States failed to *maximize* the return from the Tribe's mineral and non-mineral leases. Such a claim falls outside of the application of the tolling provision as set forth in the *Shoshone* case. Accordingly, Plaintiff's claims fail to state a claim for which relief can be granted. *See United States v. Navajo Nation*, 537 U.S. 488, 507 (2003); and *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d at 1349-51.

Likewise, Plaintiff cannot prevent application of 28 U.S.C. § 2501 by claiming it was ignorant of how the United States calculated the royalty amount. There can be no doubt that the Tribe was aware that, since at least 1991, Osage County, Oklahoma – not the Kansas-

---

[3] Over one year prior to the Federal Circuit's ruling in the *Shoshone* matter, this Court issued an order concerning the application of 28 U.S.C. § 2501 to the United States' management of Osage tribal trust funds in the matter of *Osage Nation v. United States*, No. 00-169L. *See Osage Nation v. United States*, 57 Fed. Cl. 392, 395-97 (2003). The instant case, however, involves a dispute concerning the United States' management of Osage trust *assets* and, thus, this Court's ruling in the other *Osage* matter does not apply here.

Oklahoma area – had been the geographical area upon which the sales price was based. *See* Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991, attached hereto as "Exhibit A." In Resolution No. 28-393, the Tribe proposes an amendment to the then existing regulation, which expressly states that Osage County, Oklahoma is the relevant geographical area for determining the highest posted selling price. The Tribe's proposed amendment to 25 C.F.R. 226.11(a)(2) is attached to the Resolution, and provides suggested language to make clear that bonuses or premium pay to producers in Osage County shall not be considered in the calculation of the highest posted selling price. *See* Exhibit A, p. 2. Given this clear evidence of the Tribe's awareness that the selling price was being determined on the basis of the highest posted price in Osage County as of 1991, it knew or should have known at that time — at the very latest — that it had a claim for mismanagement of its mineral leases. When a Tribe is aware of its claim, has not demonstrated that it was excusably ignorant of the problem, and yet failed to bring its claim in a timely manner, this Circuit has held that such a claim is time-barred:

> Because the plaintiffs-appellants knew or should have known of the underreporting and underpayment as of 1979 and have failed to show that, collectively, they were excusably ignorant of the breach by the lessee, we hold that the statute of limitations has expired with respect to their claim that the United States breached a fiduciary duty by failing to discover that [the lessee] was underreporting its gross receipts.

*Brown v. United States*, 195 F.3d 1334, 1338 (Fed. Cir. 2000). In fact, this Court has previously held that, in a situation similar to this one, the statute of limitations began to run upon receipt of the very first royalty payment. *See Sankey v. United States*, 22 Cl. Ct. 743 (1991). Specifically, the Court concluded that receipt of the first royalty payment constituted

constructive notice of the issue:

> Plaintiffs offer no evidence that the original lessors did not review the leases prior to execution, and once plaintiffs began to receive royalty payments a simple phone call and/or visit to BIA would have secured answers to any questions that might have arisen. There plainly was no concealment by defendant such that would toll the statute of limitations. Nor were the facts of a potential claim 'inherently unknowable' at the ordinary accrual date of 1962.

*See Sankey v. United States*, 22 Cl. Ct. at 746. Accordingly, because the Tribe cannot reasonably claim, and indeed has failed to proffer a colorable allegation, that, as of August 2, 1993 -- six years prior to the filing of its original Complaint -- it was unaware that it had potential claims for mismanagement of its mineral leases, those claims are now time-barred under 28 U.S.C. § 2501. Likewise, any claims for mismanagement of the Tribe's non-mineral leases that accrued six years prior to the filing of its Third Amended Complaint, August 16, 1998, are time-barred.

**2. The Tribe Is Barred from Bringing any Claim Against the United States that Accrued Prior to August 13, 1946.**

The Tribe has clearly not been deprived of an opportunity to litigate any claim accruing prior to August 13, 1946, that the United States mismanaged its mineral and non-mineral leases. The Tribe had the opportunity to litigate any claims it might have had against the United States pursuant to the Indian Claims Commission Act. Pub. L. No. 79-726, 60 Stat. 1049-1056 (1946) (formerly codified as amended at 25 U.S.C. §§ 70-70v2 and omitted from the current code because the Indian Claims Commission terminated on September 30, 1978) (hereinafter "ICCA"), and, in fact, the Tribe did, indeed, take advantage of this opportunity to litigate certain claims. *See, e.g., Osage Nation v. United States*, 23 Ind. Cl. Comm. 447 (1970) (compromise settlement resolving docket numbers 105, 106, 107, and

108). Accordingly, if the Tribe desired judicial relief from the United States on its mismanagement claims that accrued prior to August 13, 1946, it was obligated by Section 12 of the ICCA to have filed a timely claim with the Indian Claims Commission or have such claims forever barred. Section 12 of the ICCA established that:

> The Commission shall receive claims for a period of five years after the date of the approval of this Act [August 13, 1946] and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

(formerly at) 25 U.S.C. § 70k.

Regardless of whether or not the Tribe did pursue its claims before the Claims Commission, the Tribe's claims today are barred because the Tribe's exclusive remedy for those claims was under the ICCA and before the Indian Claims Commission. *Oglala Sioux Tribe v. United States*, 650 F.2d 140 (8th Cir. 1981), *cert. denied* 455 U.S. 907 (1982) (Congress, by enacting the ICCA, established the exclusive remedy for the Oglala's claim under the Fifth Amendment of an unconstitutional taking of land by the United States, and the court lacked jurisdiction to entertain suit). By operation of section 12 of the ICCA, then, this Court does not have the subject matter jurisdiction to consider the Tribe's mismanagement claims against the United States that accrued prior to August 13, 1946. *See Navajo Tribe v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987).

In *Navajo Tribe,* the Tenth Circuit laid to rest any argument about the scope of remedies open to an Indian Tribe after enactment of the ICCA by holding that the ICCA was the sole judicial remedy open to any tribe for a claim against the government arising before 1946. *Navajo Tribe*, 809 F.2d at 1463; *see also* Wright & Miller, *Federal Practice &*

*Procedure* § 3660, n. 22 (collecting cases finding the ICCA to be a Tribes' exclusive remedy). The ICCA and case law interpreting it gave the term "claim" its broadest possible reading based upon Congress's intent to provide a forum for the resolution of all possible accrued claims. *Id.* at 1464. Given that the leases at pages 28 and 35 of Exhibit A to the Third Amended Complaint are dated from the year 1916, it is highly likely that at least some of Plaintiff's mismanagement claims accrued prior to 1946, and, thus, should have been presented to the Indian Claims Commission, if at all.

Moreover, the Tribe, in the Stipulation for Entry of Final Judgment, which was incorporated into the Final Judgment in the matter of *Osage Nation v. United States*, 23 Ind. Cl. Comm. 447 (1970), waived any claims it could have brought that accrued prior to August 13, 1946. This waiver is contained in the very broad language of the Stipulation:

> 3. The judgment shall finally dispose of all claims or demands which petitioner has asserted or could have asserted in the above-entitled cases (Docket Nos. 105, 106, 107 and 108) against defendant, and petitioner shall be barred from asserting all such claims or demands in any future action.
>
> 4. The judgment shall finally dispose of all offsets, claims or demands, which defendant has asserted or could have asserted against petitioner in this or in any other case from and after November 10, 1868, to and including the date of final judgment entered herein, under the provisions of Section 2 of the Indian Claims Commission Act, or any other act authorizing the assertion of offset claims against petitioner.

*Id.* at 455. It cannot be disputed that the Tribe was well-aware of its ability to bring a mismanagement claim against the United States, yet it chose not to do so. Therefore, in light of the very broad waiver that it stipulated to, and pursuant to the plain language of the ICCA, the Tribe is now barred from bringing any claim against the United States for mismanagement of its mineral and non-mineral leases that accrued prior to August 13, 1946.

C. **Plaintiff Has Failed to State a Cause of Action for which Relief Can Be Granted.**

In its Third Amended Complaint, Plaintiff has failed to allege facts sufficient to state a cause of action against the United States for a breach of its trust responsibility to the Tribe. As stated earlier, Plaintiff is a tribe that has been integrally involved in oil and gas leasing activities for decades, and passed tribal resolutions reflecting its approval of the very Osage oil and gas royalty regulations it now claims the United States should have ignored. The Tribe does not assert in Count One of its Third Amended Complaint that the United States failed to comply with its responsibilities under those tribally-sanctioned regulations; rather, without further support, it asserts that the United States should have revised its regulations and used a different method of calculating royalties that would have resulted in the Tribe receiving more money. Third Amended Complaint, ¶¶ 25-30. Because the United States followed the governing regulations and because it was not obligated by any applicable provision of law to maximize the royalty received under the mineral leases, Plaintiff has failed to state a claim for which relief can be granted.

In Count Two of the Third Amended Complaint, the Tribe alleges that the United States failed to collect additional royalty associated with non-mineral leases. As was the case with Count One, Plaintiff does not argue in Count Two that the United States has breached any provision of the applicable statutes and regulations. Rather, despite claiming earlier that it has filled over 50 boxes with copies of lease, production and revenue information, the Tribe claims it "cannot identify each and every non-oil and gas lease where the United States, as trustee, has made a payment to the Tribe that is less than the payment required by the lease," however, it believes that such underpayments were made. Third Amended Complaint, ¶ 33,

34. The Tribe's allegations concerning the United States' management of non-mineral leases offer nothing more; they fail to identify any particular lease at issue or challenge the United States' methodology for calculating royalties. The allegations are simply too vague to put the United States on notice of any claim and, thus, the Tribe has failed to state a claim upon which relief can be granted.

### 1. The Tribe Does Not Allege that the United States Failed to Comply with the Governing Law and the United States Is Not Obligated to Maximize the Amount of Royalty Realized.

The allegations of Count One reveal that Plaintiff is simply dissatisfied with the end result of applying the regulations' terms to the Osage mineral leases. Count One alleges that the United States should have applied the royalty rate to the highest posted price in Cushing, Oklahoma and, thus, more royalty would have been realized. Third Amended Complaint, ¶ 25. The United States' obligation, however, is limited to compliance with the applicable regulations. Where, as here, its legal obligation is limited to the approval of the leases and the timely collection of the lease proceeds, the United States owes no fiduciary duty to the Tribe to maximize the amount of royalty to be paid.

In an analogous case, *Pawnee v. United States,* 830 F.2d 187, 191-92 (Fed. Cir. 1987), the plaintiffs claimed that the Government had beached its trust responsibility because "the Government did not pay them, as royalties, on the basis of the highest market value for the particular type of gas produced by the leases." After noting that "the difficulty with this claim is that it runs counter to the governing regulations and the terms of the lease," the court held that "the scope and extent of the fiduciary relationship, with respect to this particular matter is established by the regulation and leases. . . . Interior is not required to go beyond directives

and leases which are consistent with the statutes and regulations." *Id.* at 191-92.

As made clear in *Pawnee,* the United States' liability, if any, is for violations of any applicable statutes and regulations, which define the government's trust responsibility. So long as the United States acts in accordance with those authorities, the United States has satisfied its trust responsibility. Plaintiff does not allege that the United States failed to comply with the regulations and lease terms; rather, it claims that the United States should have used a different method of calculating the royalty. Even assuming *arguendo* the existence of a general fiduciary relationship, such a relationship, however, "does not mean that each and every claim by the Indian lessor necessarily states a proper claim for breach of trust." *Pawnee, supra,* at 191.

The Tribe's argument that the United States should have calculated the oil and gas royalty payment by applying the royalty rate against the higher of either the actual selling price or the highest posted price in Cushing, Oklahoma (*see* Third Amended Complaint, ¶ 25) appears to be based upon a misunderstanding of the factual background. Plaintiff cites to certain leases for the proposition that royalty payment is based upon:

> The actual selling price or highest posted price or offered price by a major purchaser in the Kansas/Oklahoma area, whichever is higher on the day of sale or removal.

*See* Third Amended Complaint, ¶ 24; and Exhibit A attached thereto. Plaintiff then argues that 25 C.F.R. § 226.11(a)(2), being later in time than the leases, cannot change the royalty calculation unless agreed to by the Plaintiff. That regulation, prior to 1991, stated as follows:

> Unless the Osage Tribal council, with approval of the Secretary, shall elect to take the royalty in kind, payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement

> shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area which ever is higher on the day of sale or removal. Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

In 1991, the regulation was modified to state as follows:

> Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage Oil leases.

The current regulation was promulgated in 1993, and also provides that the applicable geographic area to be used in determining the sales price, is the highest posted price in Osage County, not the Kansas-Oklahoma region. Based on these regulations, the United States was not obligated to consider the highest posted price for crude oil in Cushing, Oklahoma. Rather, the regulations specify that the proper geographical area upon which to apply the royalty rate of 16 2/3 percent is Osage County, Oklahoma, not Pawnee County, Oklahoma, which is where Cushing, Oklahoma is located. *See* 25 C.F.R. § 226.5. The Tribe does not allege that the United States has failed to act in accordance with these regulations; nor does the Tribe specifically claim that the United States failed to carry out its obligations to approve mineral leases and timely collect the proceeds from those leases. Fulfilling those obligations is all that the United States is required to do. As articulated by the *Pawnee* court:

> There is no obligation that Interior failed to comply with the regulations or the leases in valuing the oil for royalty purposes. There is no statutory provision on that subject and no assertion that any statute has been violated. There is no claim that the leases were imprudently or illegally consummated. There is no suggestion that Interior failed to base royalty payments on all the gas sold by the lessees and the sums paid over by

> them. Thus, the claim is simply that the Interior Department is compelled to go contrary to and beyond the regulations and the leases in order to fulfill its alleged fiduciary obligation to appellants.
>
> That is a proposition we cannot accept. . . . [T]he fiduciary relationship springs from the statutes and regulations which 'define the contours of the United States' fiduciary responsibilities.' Where, as in this case, the regulations and the leases deal directly with the problem and are not challenged, the Indians cannot demand that the United States ignore those provisions or act contrary to them. The scope and extent of the fiduciary relationship, . . . is established by the regulation and leases. Appellants cannot create a viable fiduciary claim purely by insisting that this court (or the Claims Court) establish different or higher standards.

*Pawnee v. United States,* 830 F.2d at 191-92 (citations omitted).

The Supreme Court's ruling in *United States v. Navajo Nation,* 537 U.S. 488 (2003), likewise supports dismissal of the Tribe's Third Amended Complaint for failure to state a claim upon which relief can be granted. In *Navajo*, the tribe sought money damages for allegedly agreeing to a royalty rate for a coal lease that was less than a theoretically higher rate. In dismissing the tribe's breach of trust claim, the Supreme Court pointed out that the coal leasing provisions of the IMLA required the Secretary only to approve coal leases and to promulgate regulations. Likewise, here, the Secretary has analogous obligations. Specifically, the 1906 Act and later acts, which Plaintiff cites as the authority creating the United States' trust obligation (*see* Third Amended Complaint, ¶ 22), simply require Secretarial approval and provide for the promulgation of regulations. As was the situation in *Navajo*, there are no specific statutory obligations imposed upon the Secretary here. Thus, this Court should follow the Supreme Court's decision in *Navajo,* wherein the Supreme Court stated:

> In sum, neither the IMLA nor any of its regulations establishes anything more than a bare minimum royalty. Hence, there is no textual basis for concluding

> that the Secretary's approval function includes a duty, enforceable in an action for money damages, to ensure a higher rate of return for the Tribe concerned.

537 U.S. at 511. In the present case, the regulations only require that the lease provide for a minimum royalty rate of 16 2/3 percent. *See* 25 C.F.R. § 226.11. The regulations do not require the United States to obtain a theoretical higher rate. The regulations also specify the method of calculation of the price of oil or gas on which the royalty is based. *See* 25 C.F.R. §§ 226.11(a)(2) and 226.11(b). Thus, to the extent that the Third Amended Complaint alleges the United States should have obtained a higher royalty rate or calculated the amounts differently, it fails to state a cause of action upon which relief can be granted.

Moreover, as discussed earlier, the regulations at issue here are the very regulations that Plaintiff expressly approved by tribal resolution in 1991, and the ones with which the Tribe requested that the United States act in accordance. Such conformity with the Tribe's wishes support a finding that the United States has committed no breach of its fiduciary duty. *See, e.g., Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 227, 248-54 (1985) (holding primarily that, because the Tribe had asked the BIA to do an inventory of mineral resources in the late 1930s, and because the Tribe passed a resolution in 1941 supporting the war effort, there was no breach of the very broad "fair and honorable dealings" clause when the United States failed to pay the Navajo Tribe a prospecting fee after it explored the Navajo Reservation for uranium in the 1940's). *See also Sac and Fox Tribe of Indians of Oklahoma v. United States*, 159 Ct. Cl. 247 (1962) (rejecting claim for breach of "fair and honorable dealings" clause concerning the United States' reservation of certain ceded tribal lands for the use of certain members of the tribe when the tribe had previously asked the United States to

set aside a tract from the ceded lands for the use of those members). Accordingly, where, as here, the United States has acted in conformity with the wishes of the Tribe, there should be no cognizable claim under 28 U.S.C. § 1505.[4]

**2. The Statutes and Regulations, at Best, Can Only Be Fairly Interpreted as Mandating Compensation to a Claimant Headright Owner, and, thus, Do Not Mandate Compensation to the Tribe, aside from a Claim Associated with Its Own Headright Ownership Interest.**

The 1906 Act provides the authority for royalties to be paid to the individual annuitants. *See* Sections 3 and 4 (Second), 1906 Act. To the extent that the Osage Nation seeks to bring its asset mismanagement claims, it can only do so as a headright holder; it cannot be permitted to claim a judgment for monies related to other headright holders when those other headright holders could seek a judgment themselves. The statutes and regulations *must* be fairly interpreted to mandate compensation to the *claimant*, and it is only the headright owner that can argue that the statutes and regulations mandate compensation to them. For statutes that place certain duties on the government:

> even if the promise to pay money damages is not expressly in the statute, these damages may nevertheless be *implied* by the statute as a necessary remedy for the government's breach of its duties. *See Mitchell II*, 463 U.S. at 217 n. 16 ("the substantive source of law may grant the *claimant* a right to recover damages either 'expressly or by implication'" (quoting *Eastport Steamship Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967)).

*Contreras v. United States*, 2005 WL 741757, *7 (Fed. Cl. 2005) (emphasis added).

In *Osage Nation v. United States*, No. 00-169L, this Court entered an order, dated July

---

[4] The scope of 28 U.S.C. § 1505 is much narrower than that of the "fair and honorable dealings" clause (*see Menominee Tribe of Indians of Wisconsin v. United States*, 221 Cl. Ct. 506 (1979), and, thus, if this Court found that acting in conformity with a tribe's wishes precluded a claim for a breach of the "fair and honorable dealings" clause, then the same conclusion should be reached here.

28, 2003, concluding that the Osage Nation was authorized to bring a claim for alleged mismanagement of trust funds paid into the tribal account on behalf of the other Osage headright holders. *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003). Osage headright holders are comprised of individual members of the Osage Tribe, individual members of other Indian tribes, and non-Indians who have a right to receive a disbursement of funds generated by the Osage mineral estate. *See* Third Amended Complaint, ¶ 19.

That *Osage* case, however, differs from the present one in that there, the court held that the funds mismanagement allegedly took place once the funds were within the tribal trust account established by the 1906 Act. *Osage Nation v. United States*, 57 Fed. 2d at 395. In this case, the Tribe is not pursuing a claim for loss of funds that were already in the trust account held by the United States. Rather, the Plaintiff here is arguing that it should recoup funds that had never entered into the Tribe's trust account in the first instance. Because this case challenges the methodology used to value royalties on mineral and non-mineral leases, a ruling on the merits of the Tribe's claims – if the Third Amended Complaint survives the United States' Motion to Dismiss – would not bind headright holders not before this Court. This is because the statute and regulations can be fairly interpreted to mandate compensation to them as headright owners for claims in their own right. Moreover, if a headright holder brings an action in the future that raises the same claims that are now pending before this Court, it is theoretically possible that different outcomes on the same claims could result.

The Supreme Court in *Navajo* held that there must be a money mandating statute such that the breach of which requires the United States to pay money damages. The statutes creating the Osage arrangement indicate that any responsibility is owed, not to the Osage

Tribe, but, rather, to the individual members. Section 3 of the 1906 Act reads in part:

> . . . and lease for all oil, gas, and other minerals, covered by the selections and division of lands herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: Provided, that the royalties to be paid to *the Osage tribe* under any mineral lease so made shall be determined by the President of the United States . . .

*Id.* (emphasis added). Section 4, (Second) of the 1906 Act provides as follows:

> That the royalty received from oil, gas, coal and other mineral leases upon the lands for which selection and division are herein provided. . . shall be placed in the Treasury of the United States to the credit of the *members of the Osage Tribe of Indians* as other moneys of said tribe are to be deposited under the provisions of this act, and the same shall be distributed to the individual members of said Osage tribe according to the roll provided for herein. . .

*Id.* (emphasis added).

Moreover, the statute makes it clear that the royalty received is to be paid to the members of the Tribe, not to the Tribe itself. While Section 3 of the 1906 Act provides that royalties to be paid to the Tribe shall be determined by the Secretary, Section 4 makes it clear that all such payments are to go to the members, and not to the Tribe itself. Thus, even if the 1906 Act and implementing regulations could somehow be deemed to be money-mandating, they can only be fairly interpreted to mandate compensation for a breach to the headright owners; the Tribe would have an interest only to the extent that it owns a portion of a headright interest, and could not receive a monetary judgment in its name for claims of individual Osage tribal members, non-Osage Indians, and non-Indian headright owners, who are not before this Court. For this reason, too, the Tribe's Complaint should be dismissed to the extent that it seeks recovery for claims outside of its headright ownership. Accordingly, the Tribe's Third Amended Complaint should be dismissed for failure to state a claim upon

which relief can be granted.

## IV. CONCLUSION

WHEREFORE, for the reasons set forth above, the United States respectfully requests that its Motion to Dismiss be granted, that Plaintiff's Third Amended Complaint be dismissed, and that each party be directed to pay its own fees and costs.

Dated this 11th day of April, 2005.

Respectfully submitted,

Caroline M. Blanco

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0248
Fax: (202) 305-0267
E-mail: caroline.blanco@usdoj.gov

Of Counsel:

ALAN WOODCOCK
Regional Solicitor
Office of the Field Solicitor
United States Department of the Interior
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
Tel.: (918) 669-7730, Ext. 225
Fax: (918) 669-7736

STEPHEN L. SIMPSON
Attorney
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240
Tel.: (202) 219-1659
Fax: (202) 208-3490

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 99-550L** |
| | ) | **Judge Mary Ellen Coster Williams** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April, 2005, true and correct copies of the foregoing UNITED STATES' MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS and EXHIBIT A attached thereto, were served, via first-class mail, postage prepaid, to the following counsel of record at the following address:

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Caroline M. Blanco
CAROLINE M. BLANCO

REC'D IN BRANCH OF MINERALS 1/17/92. NB

Tamelle Barker Copy

FILE COPY
SURNAME
Brown

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

Res. No. 28-393

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, is of the opinion that the mineral estate is losing royalty income, when oil and gas purchasers cannot offer bonus or premium pay to producers in Osage County without effecting the highest paid price provision in 25 CFR 226.11; and,

2. The Osage Tribal Council together with the Superintendent, Osage Agency, Bureau of Indian Affairs, and the Office of the Field Solicitor, Pawhuska, participated in drafting the attached proposed amendment to the Regulations, 25 CFR 226.11(a)(2). Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary of the Interior approve the proposed amendment to 25 CFR 226.11(a)(2); and,

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to sign this resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of December 1991.

[signature]
PRINCIPAL CHIEF

ATTEST:

June E. Cole
SECRETARY



Exhibit A

PROPOSED AMENDMENT TO 25 CFR 226

LEASING OF OSAGE RESERVATION LANDS
FOR OIL AND GAS MINING

PRESENT REGULATIONS

Sec. 226.11(a)(2)

(2) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in Sec. 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases.

PROPOSED REGULATIONS

(a)(2) add after the period following, Osage oil leases, this sentence: Provided, that premium, bonus, or other like payments, shall not be considered in the calculation of highest posted, offered, or selling price; except, that royalty will be due for all such payments. Provided further, that all contracts, for said payments, shall first receive approval from the Osage Tribal Council and the Superintendent.

Tluel

File Copy

Harris
Wood

MAY 30 1986

Blue envelope

MEMORANDUM

TO: Joseph C. Johnston, Chief, Division of Energy & Mineral Resources

FROM: Superintendent, Osage Agency

SUBJECT: Proposed Revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining

Pursuant to your instructions, there are enclosed the original of the proposed revisions of 25 CFR 226 and copy of Osage Tribal Council Resolution NO. 26-734.

It is requested that these proposed revisions be published, as written, as proposed rulemaking as soon as possible.

If you have any questions, please call Cecil O. Wood, Jr., Field Solicitor, Pawhuska, Phone 918-287-2495, Extension 246.

Superintendent

Enclosure

cc w/o enclosure:
Solicitor's Reading File

COWood:clh 5/30/86

Superintendent's chrony copy
Mailroom copy

cc w/enclosures:
Area Director, Muskogee

Principal Chief, Osage Tribe



EXHIBIT 16

RESOLUTION
of the
OSAGE TRIBAL COUNCIL

No. 26-754

WHEREAS,

1. The Osage Tribal Council has reviewed the draft of the proposed revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining, and

2. It is the consensus of the Council that said revision, as written, would be in the best interest of the Osage Tribe of Indians and the Osage oil lessees: Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary - Indian Affairs approve, as written, and publish as proposed rule making at the earliest practical date the proposed revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining, and

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to execute this Resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of Eight (8) in favor, and None (0) against, this 28th day of May, 1986.

Principal Chief

ATTEST:

Secretary

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 CFR Part 226

LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING.

AGENCY: Bureau of Indian Affairs.

ACTION: Proposed rule.

SUMMARY: The Bureau of Indian Affairs is publishing a proposed rule to amend the regulations relative to the leasing of the mineral estate of the Osage Tribe of Indians for oil and gas mining. The management of the Osage mineral estate needs to be strengthened and the Osage oil lessees need relief from basing the payment of royalty to the Osage Tribe on the offered or posted price of a major purchaser in the Kansas-Oklahoma area. The promulgation of these amendments to the regulations will improve the management of the Osage mineral estate and will alleviate the economic hardship placed on the oil lessees.

DATE: Comments must be received on or before (30 days after date of publication of this proposed rule in the FEDERAL REGISTER).

ADDRESS: Send written comments to Joseph C. Johnston, Chief, Division of Energy and Mineral Resources, Code 240, Bureau of Indian Affairs, Department of the Interior, 1951 Constitution Avenue, N.W., Washington, D. C. 20245.

FOR FURTHER INFORMATION CONTACT: George E. Tallchief, Osage Tribal Council, Grandview Avenue, Pawhuska, OK 74056, (918) 287-4622 or 4623; Jack Shoemate, Superintendent, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2481; Cecil O. Wood, Jr., Field Solicitor, Pawhuska, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2495; Newell Barker, Chief, Branch of Minerals, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2471.

SUPPLEMENTARY INFORMATION: This proposed rule is published in exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary - Indian Affairs by 209 DM 8.

The Department of the Interior has determined that this document is not a major rule under E. O. 12291 and certifies that this document will not have a significant economic effect on a substantial number of small businesses under the Regulatory Flexibity Act, 5 U.S.C. §§ 601 et seq. (1982).

The information collection requirements contained in Sections 226.6, 226.14, 226.23, 226.25, 226.28, 226.29, 226.33 and 226.44 are those necessary to comply with the requirements of the Office of Management and Budget (OMB) Circular No. A-102. The Standard Form 424 and attachments prescribed by such circular are approved by OMB under 44 U.S.C. 3501 et seq. (1982) and assigned approval number 0348-0006. These sections describe the types of information that would satisfy the requirements of Circular A-102.

The primary author of this document is the Osage Tribal Council, Telephone number (918) 287-4622 or 4623.

Since this document does not constitute a major Federal action under the National Environmental Policy Act of 1969, 42 U.S.C §§ 4321 et seq. (1982), no environmental impact statements or environmental assessments were made.

List of subjects in 25 CFR Part 226: Leasing of Osage Reservation Lands For Oil and Gas Mining.

Accordingly, it is proposed to amend 25 CFR Part 226 as shown.

1. The authority citation for Part 226 would be revised to read as follows:

Authority: Sec. 3, 34 Stat. 543. Sec. 1, 2, 45 Stat. 1478, 1479. Sec. 3, 52 Stat. 1034, 1035. Sec. 2(a), 92 Stat. 1660.

2. Section 226.1 would be amended by revising paraagraph (h) to read as follows:

§ 226.1 Definitions.

* * * * *

(h) "Major purchaser" means any one of the minimum number

of purchasers taking 95 percent of the oil in Osage County, Oklahoma. Any oil purchased by a purchaser from itself, its subsidiaries, partnerships, associations, or other corporations in which it has a financial or management interest shall be excluded from the determination of a major purchaser.

* * * * *

3. Section 226.6 would be amended by revising paragraphs (a) and (c) to read as follows:

§ 226.6 Bonds.

* * * * *

(a) A bond on Form D shall be filed with each lease submitted for approval. Such bond shall be in an amount of not less than $5,000 for each quarter section or fractional quarter section covered by said lease: Provided, however, That one bond in the sum of not less than $50,000 may be filed on Form G covering all leases on the Osage Mineral Estate not in excess of 10,240 acres to which lessee is or may become a party.

* * * * *

(c) A bond on Form H shall be filed in an amount of not less than $5,000 covering a lease acquired through assignment where the assignee does not have a collective bond on Form G or nationwide bond, or the corporate surety does not execute

its consent to remain bound under the original bond given to secure the faithful performance of the terms and conditions of the lease.

* * * * *

4. Section 226.11 would be amended by revising paragraphs (a)(2) and (b)(1) to read as follows:

§ 226.11 Royalty payments.

(a) * * *

(2) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the bona fide selling price, posted or offered price by a major purchaser in Osage County, Oklahoma, who purchases production from Osage oil leases as defined in § 226.1(h).

* * * * *

(b) * * *

(1) Oil Lease. All casinghead gas shall belong to the oil lessee subject to any rights under existing gas leases. All casinghead gas removed from the lease from which it is produced shall be metered unless otherwise approved by the Superintendent and be subject to a royalty of not less than 16 2/3 percent of the market value of the gas and all products extracted therefrom,

less a reasonable allowance for manufacture or processing. If oil lessee supplies casinghead gas produced from one lease for operation and/or development of other leases, either his or others, a royalty of not less than 16 2/3 percent shall be paid on the market value of all casinghead gas so used. All casinghead gas not utilized or sold by the oil lessee may, with the approval of the Superintendent, be utilized or sold by the gas lessee, subject to the prescribed royalty of not less than 16 2/3 percent of the market value.

* * * * *

5. Section 226.13 would be amended by revising paragraph (a) to read as follows:

§ 226.13 Time of royalty payments and reports.

(a) Royalty payments due may be paid by either purchaser or lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the sales of the preceding month. Failure to make such payments shall subject lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 1/2 percent for each month or fraction thereof until paid. The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charge.

* * * * *

6. Section 226.14 would be amended by revising paragraph (b) to read as follows:

§ 226.14 Contracts and division orders.

* * * * *

(b) Lessee shall require the purchaser of oil and/or gas from his lease or leases to furnish the Superintendent with a monthly statement of the gross barrels of oil and/or gross Mcf of gas sold not later than the 25th day of each month, unless an extension of time not to exceed 10 days is authorized by the Superintendent, and shall cover the preceding month.

7. Section 226.15 would be amended by adding a new paragraph (e) to read as follows:

§ 226.15 Unit leases, assignments and related instruments.

* * * * *

(e) Combining Leases. The lessee owning both an oil lease and gas lease covering the same acreage is authorized to convert such leases to a combination oil and gas lease.

8. Paragraph (e) of Section 226.18 would be deleted and the introductory paragraph and paragraph (d) thereof would be revised to read as follows:

§ 226.18 Information to be given surface owners prior to commencement of drilling operations.

Except for the surveying and staking of a well, no operations of any kind shall commence until the lessee or his authorized representative shall meet with the surface owner or his representative, if a resident of and present in Osage County, Oklahoma. Unless waived by the Superintendent, such meeting shall be held at least ten (10) days prior to the commencement of any operations, except for the surveying and staking of the well. At such meeting lessee or his authorized representative shall comply with the following requirements:

* * * * *

(d) When the surface owner or his representative is not a resident of or is not physically present in Osage County, Oklahoma, or cannot be contacted at the last known address, the Superintendent may authorize lessee to proceed with operations.

9. Section 226.19 would be amended by revising paragraphs (a), (b) and (d) read as follows:

§ 226.19 Use of surface land.

(a) Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain

pipelines, electric lines, pull rods, other appliances necessary for operations and marketing, and the right-of-way for ingress and egress to any point of operations. If lessee and surface owner are unable to agree as to the route of pipelines, electric lines, etc., said route shall be set by the Superintendent. The right to use water for lease operations is established by § 226.24. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any avoidable nuisance to be maintained on the premises under his control.

(b) Before commencing a drilling operation, lessee shall pay or tender to the surface owner commencement money in the amount of $25 per seismic shot hole and commencement money in the amount of $300 for each well, after which lessee shall be entitled to immediate possession of the drilling site. Commencement money will not be required for the redrilling of a well which was originally drilled under the current lease. A drilling site shall be held to the minimum area essential for operations and shall not exceed one and one-half acres in area unless authorized by the Superintendent. Commencement money shall be a credit toward the settlement of the total damages. Acceptance of commencement money by the surface owner does not affect his right to compensation for damages as described in § 226.20, occasioned by the drilling and completion of the well for which

it was paid. Since actual damage to the surface from operations cannot necessarily be ascertained prior to the completion of a well as a serviceable well or dry hole, a damage settlement covering the drilling operation need not be made until after completion of drilling operations.

* * * * *

(d) Lessee shall also pay fees for tank sites not exceeding 50 feet square at the rate of $100 per tank site or other vessel: Provided, That no payment shall be due for a tank temporarily set on a well location site for drilling, completing, or testing. The sum to be paid for a tank occupying more than 50 feet square shall be agreed upon between the surface owner and lessee or, on failure to agree, the same shall be determined by arbitration as provided by § 226.21.

10. Section 226.21 would be amended by revising paragraph (f) to read as follows:

§ 226.21 Procedure for settlement of damages claimed.

* * * * *

(f) Any two of the arbitrators may make a decision as to the amount of damage due. The decision shall be in writing and shall be served forthwith upon the parties in interest. Each party shall have 90 days from the date the decision is served in which to file an action in a court of competent jurisdiction.

If no such action is filed within said time and the award is against lessee or his authorized representative, he shall pay the same together with interest at an annual rate established for the Internal Revenue Service from date of award, within 10 days after the expiration of said period for filing an action.

* * * * *

11. Section 226.22 would be amended by revising paragraph (b) and (e) to read as follows:

s 226.22 Prohibition of pollution.

* * * * *

(b) Pits for drilling mud or deleterious substances used in the drilling, completion, recompletion, or workover of any well shall be constructed and maintained to prevent pollution of surface and subsurface fresh water. These pits shall be enclosed with a fence of at least four strands of barbed wire, or an approved substitute, stretched taut to adequately braced corner posts, unless the surface owner, user, or the Superintendent gives consent to the contrary. Immediately after completion of operations, pits shall be emptied and leveled unless otherwise requested by surface owner or user.

* * * * *

(e) Deleterious fluids other than fresh water drilling fluids used in drilling or workover operations, which are displaced or produced in well completion or stimulation procedures including but not limited to fracturing, acidizing, swabbing, and drill stem tests, shall be collected into a pit lined with plastic of at least 30 mil or a metal tank and maintained separately from above-mentioned drilling fluids to allow for separate disposal.

12. Section 226.23 would be revised to read as follows:

§ 226.23 Easements for wells off leased premises.

The Superintendent, with the consent of the Osage Tribal Council, may grant commercial and non-commercial easements for wells off the leased premises to be used for purposes associated with oil and gas production. Rental payable to the Osage Tribe for such easements shall be an amount agreed to by Grantee and the Osage Tribal Council subject to the approval of the Superintendent. Grantee shall be responsible for all damages resulting from the use of such wells and settlement therefor shall be made as provided in § 226.21.

13. Section 226.25 would be revised to read as follows:

§ 226.25 Gas well drilled by oil lessees and vice versa.

Prior to drilling, the oil or gas lessee shall notify the other lessee of his intent to drill. When an oil lessee in drilling a well encounters a formation or zone having indications of possible gas production, or the gas lessee in drilling a well encounters a formation or zone having indication of possible oil production, he shall immediately notify the other lessee and the Superintendent. Lessee drilling the well shall obtain all information which a prudent operator utilizes to evaluate the productive capability of such formation or zone.

(a) Gas well to be turned over to gas lessee. If the oil lessee drills a gas well, he shall, without removing from the well any of the casing or other equipment, immediately shut the well in and notify the Superintendent. If the gas lessee does not, within 45 days after receiving notice and cost of drilling, elect to take over such well and reimburse the oil lessee for the cost of drilling, including all damages paid and the cost in-place of casing, tubing, and other equipment, the oil lessee shall immediately confine the gas to the original stratum. The disposition of such well and the production therefrom shall then be subject to the approval of the Superintendent. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas

lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

(b) Oil well to be turned over to oil lessee. If the gas lessee drills an oil well, he shall immediately, without removing from the well any of the casing or other equipment, notify the oil lessee and the Superintendent. If the oil lessee does not, within 45 days after the receipt and cost of drilling, elect to take over the well, he shall immediately notify the gas lessee, and the disposition of such well and the production therefrom shall be subject to the approval of the Superintendent. Should the oil lessee elect to take over the well, he shall pay the gas lessee for the cost of drilling, including all damages paid and cost in-place of casing, tubing, and other equipment. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

(c) Lands not leased. If the gas lessee shall drill an oil well upon lands not leased for oil purposes or vice versa, the Superintendent may, until such time as said lands are leased, permit the lessee who drilled the well to operate and market the production therefrom. When said lands are leased, the lessee who

drilled and completed the well shall be reimbursed by the oil or gas lessee for the cost of drilling said well, including all damages paid and the cost in-place of casing, tubing, and other equipment. If the lessee does not elect to take over said well as provided above, the disposition of such well and the production therefrom shall be determined by the Superintendent. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

14. Section 226.28 would be amended by revising the introductory paragraph and paragraphs (a) and (c) to read as follows:

§ 226.28 Shutdown, abandonment, and plugging of wells.

No productive well shall be abandoned until its lack of further profitable production of oil and/or gas has been demonstrated to the satisfaction of the Superintendent. Lessee shall not shut down, abandon, or otherwise discontinue the operation or use of any well for any purpose without the written approval of the Superintendent. All applications for such approval shall be submitted to the Superintendent on forms furnished by him.

(a) Application for authority to permanently shut down or discontinue use or operation of a well shall set forth justification, probable duration, the means by which the well bore is to be protected, and the contemplated eventual disposition of the well. The method of conditioning such well shall be subject to the approval of the Superintendent.

* * * * *

(c) The Superintendent is authorized to shut in a lease when the lessee fails to comply with the terms of the lease, the regulations, and/or orders of the Superintendent.

15. Section 226.29 would be amended by revising paragraph (a) to read as follows:

§ 226.29 Disposition of casings and other improvements.

(a) Upon termination of lease, permanent improvements, unless otherwise provided by written agreement with the surface owner and filed with the Superintendent, shall remain a part of said land and become the property of the surface owner upon termination of the lease, other than by cancellation. Exceptions include personal property not limited to tools, tanks, pipelines, pumping and drilling equipment, derricks, engines, machinery, tubing, and the casings of all wells: Provided, That when any

lease terminates, all such personal property shall be removed within 90 days or such reasonable extension of time as may be granted by the Superintendent. Otherwise, the ownership of all casings shall revert to lessor and all other personal property and permanent improvements to the surface owner. Nothing herein shall be construed to relieve lessee of responsiblility for removing any such personal property or permanent improvements from the premises if required by the Superintendent and restoring the premises as near as practicable to its original state.
* * * * *

16. Section 226.33 would be revised to read as follows:

§ 226.33 Line drilling.

Lessee shall not drill within 300 feet of boundary line of leased lands, nor locate any well or tank within 200 feet of any public highway, any established watering place, or any building used as a dwelling, granary, or barn, except with the written permission of the Superintendent. Failure to obtain advance written permission from the Superintendent shall subject lessee to cancellation of his lease and/or plugging of the well.

17. Section 226.34 would be revised to read as follows:

§ 226.34 Wells and tank batteries to be marked.

Lessee shall clearly and permanently mark all wells and tank batteries in a conspicuous place with number, legal description, operator, and telephone number, and shall take all necessary precautions to preserve these markings.

18. Section 226.36 would be revised to read as follows:

§ 226.36 Control devices.

In drilling operations in fields where high pressures, lost circulation, or other conditions which could result in blowouts, lessee shall install an approved gate valve or other controlling device which is in proper working condition for use until the well is completed. At all times preventative measures must be taken in all well operations to maintain proper control of subsurface strata.

19. Section 226.42 would be revised to read as follows:

Violation of any of the terms or conditions of any lease or of the regulations in this part shall subject the lease to cancellation by the Superintendent, or lessee to a fine of not more than $500 per day for each day of such violation or non-compliance with the orders of the Superintendent, or to both such fine and cancellation. Payment of penalties not received within 10 days after notice of the decision shall be subject to late charges at the rate of not less than 1 1/2 percent per month

for each month or fraction thereof until paid. The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charge.

20. Section 226.43 would be amended by adding a new paragraph (j) and revising paragraphs (a), (b), (d), (e), (g) and (h) to read as follows:

§ 226.43 Penalties for violation of certain operating regulations.

* * * * *

(a) For failure to obtain permission to start operations required by § 226.16(b), $50 per day until permission is obtained.

(b) For failure to file records required by § 226.32, $50 per day until compliance is met.

* * * * *

(d) For failure to construct and maintain pits as required by § 226.22, $50 for each day after operations are commenced on any well until compliance is met.

(e) For failure to comply with § 226.36 regarding valve or other approved controlling device, $500.

* * * * *

(g) For failure to properly care for and dispose of deleterious fluids as provided in § 226.22, $500 per day until compliance is met.

(h) For failure to file plugging reports as required by § 226.29 and for failure to file reports as required by § 226.13, $50 per day for each violation until compliance is met.

* * * * *

(j) Lessee or his authorized representative is hereby notified that criminal penalties are provided by 18 USC § 1001 for knowingly filing fraudulent reports and information.

21. Section 226.44 would be revised to read as follows:

§ 226.44 Hearings and appeals.

Any person, firm, or corporation aggrieved by any decision or order issued by or under the authority of the Superintendent, pursuant to the regulations in this part, may appeal pursuant to 25 CFR Part 2.

22. Section 226.45 would be revised to read as follows:

§ 226.45 Notices.

Notices and orders issued by the Superintendent to the representative and/or operator shall be binding on the lessee. The Superintendent may in his discretion increase the time allowed in his orders and notices.

Assistant Secretary - Indian Affairs

REC'D IN BRANCH of MINERALS 1/17/92. NB

Jewell Barker Copy

| FILE COPY |
| --- |
| SURNAME |
| Brown |

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

Res. No. 28-393

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, is of the opinion that the mineral estate is losing royalty income, when oil and gas purchasers cannot offer bonus or premium pay to producers in Osage County without effecting the highest paid price provision in 25 CFR 226.11; and,

2. The Osage Tribal Council together with the Superintendent, Osage Agency, Bureau of Indian Affairs, and the Office of the Field Solicitor, Pawhuska, participated in drafting the attached proposed amendment to the Regulations, 25 CFR 226.11(a)(2). Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary of the Interior approve the proposed amendment to 25 CFR 226.11(a)(2); and,

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to sign this resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of December 1991.

[signature]
PRINCIPAL CHIEF

ATTEST:

[signature: June E. Cole]
SECRETARY



EXHIBIT 17

RECEIVED
JUL 11 1986
OSAGE AGENCY

July 10, 1986

To: Osage Tribal Council

Status Report: Jim W. Littleton

January 6, 1986:

Reported to work under the direction of Mr. Bert Pappan. I was assigned the task of closing out various estates which had undistributed Lake Fund monies. Working with Mr. Bill Haney of the Field Solicitor's office, each estate was researched and a determination was then made as to the correct individual to receive the distribution of the Lake Fund monies and the interest which had been accrued. The balances were calculated and, under the direction of Mr. Pappan, a Journal Voucher was prepared for approximately 80% of the unsettled estates. These vouchers were left in the custody of Mr. Pappan for final processing.

February 20, 1986:

Reassigned to the Branch of Minerals to help with the backlog of Additional Royalty calculations. Upon arrival in the Branch of Minerals I found that the Additional Royalty calculations had been completed and billed through March 1985. Additional Royalty for April 1985 through December 1985 was then calculated and posted to the individual ledger sheets for each lease owner. Late charges on unpaid or untimely paid Additional Royalty were also calculated and posted to each ledger sheet to record charges through June 1986.

July 1, 1986:

The Branch of Minerals mailed out 210 letters of collection to various lease owners which amounted to over $116,000 of Additional Royalty and late charges. Collection of $3,700 of the amount has been received as of this date.

Present:

Continuing to calculate Additional Royalty for 1986 until it can be brought to a current status. Following completion of this, I feel a full audit of selected lease owners Royalty payments would be in the best interest of the tribe.

Jim W. Littleton
Tribal Auditor

cc: Jack Shoemate, Superintendent

0305G060009652



EXHIBIT 18

G06G06-0114086