**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| | ) | Electronically Filed: |
| Plaintiff, | ) | June 14, 2005 |
| | ) | |
| v. | ) | No. 00-169 L |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

**APPENDIX TO DEFENDANT'S EXHIBITS IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS (DATED JUNE 14, 2005)**

**Index to Defendant's Exhibits in Support of Defendant's Motion to Dismiss, In Part, Plaintiff's Tranche One Claims (Dated June 14, 2005)**

**Summary of Exhibits:**

Exhibit No. 1 (Pages 1 – 5)
Exhibit No. 2 (Pages 6 – 7)
Exhibit No. 3 (Pages 8 – 10)
Exhibit No. 4 (Pages 11 – 13)
Exhibit No. 5 (Pages 14 – 15)
Exhibit No. 6 (Pages 16 – 17)
Exhibit No. 7 (Pages 18 – 19)
Exhibit No. 8 (Pages 20 – 21)
Exhibit No. 9 (Pages 22 – 41)
Exhibit No. 10 (Pages 42 – 46)
Exhibit No. 11 (Pages 47 – 53)
Exhibit No. 12 (Page 54)
Exhibit No. 13 (Pages 55 – 112)
Exhibit No. 14 (Pages 113 – 120)
Exhibit No. 15 (Pages 121 – 156)
Exhibit No. 16 (Pages 157 – 179)
Exhibit No. 17 (Page 180)
Exhibit No. 18 (Page 181)

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 1 | Letter from George E. Tallchief, Principal Chief of Osage Tribal Council, to Jack Shoemate, Superintendent Osage Indian Agency (Aug. 29, 1984) | 1 |
| 2 | Letter from George Tallchief, Principal Chief, Osage Tribe to Jack Shoemate, Superintendent, Osage Indian Agency (undated) | 6 |
| 3 | Resolution of the Osage Tribal Council, No. 26-624 (Aug. 21, 1985) | 8 |
| 4 | Resolution of the Osage Tribal Council, No. 28-363 (Sept. 18, 1991) | 11 |
| 5 | Resolution of the Osage Tribal Council, No. 26-659 (Oct. 8, 1985) | 14 |

| Exhibit No. | Description | Beginning Page Number in Appendix |
|---|---|---|
| 6 | Memorandum from Jim Littleton, Tribal Auditor, to Mary Lou Drywater, Realty Specialist (April 24, 1987) | 16 |
| 7 | Memorandum from Jim Littleton, Tribal Auditor, to Jack Shoemate, Superintendent Osage Indian Agency, *et. al.* (Aug. 28, 1987) | 18 |
| 8 | Letter to Dark Oil Co. from E.A. Green, Acting Superintendent, Osage Indian Agency (undated) | 20 |
| 9 | Complaint, *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*, No. 99-550L (Fed. Cl. filed Aug. 2, 1999) | 22 |
| 10 | Plaintiff's Motion to Amend and Consolidate and Brief in Support, No. 99-550L (May 1, 2000) | 42 |
| 11 | Defendant's Motion to Reconsider Consolidation Order, No. 99-550L, No. 00-169L (May 26, 2000) | 47 |
| 12 | Order, No. 99-550L (September 14, 2000) | 54 |
| 13 | Third Amended Complaint, No. 99-550L (Oct. 24, 2005) | 55 |
| 14 | Amended Joint Preliminary Status Report, No. 99-550L (Feb. 11, 2005) | 113 |
| 15 | Motion to Dismiss, No. 99-550L (April 15, 2005) | 121 |
| 16 | Memorandum from Superintendent Osage Agency to Joseph C. Johnston, Chief, Division of Energy & Mineral Resources (May 30, 1986) | 157 |
| 17 | Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991 | 180 |
| 18 | Memorandum from Jim W. Littleton to Osage Tribal Council (July 11, 1986) | 181 |

GEORGE E. TALLCHIEF
Principal Chief
Osage Tribe of Indians

ED RED EAGLE, SR.
Assistant Principal Chief

MEMBERS OF COUNCIL

RALPH R. ADKISSON
DON H. BIG ELK
FRANCIS (FRISCO) DREXIL
D. E. (BILL) MARTIN
CAMILLE W. PANGBURN
HARRY RED EAGLE, JR.
JOHN TALLCHIEF
GEORGE ED REVARD

OSAGE TRIBAL COUNCIL
PAWHUSKA, OKLAHOMA
74056

AUG 29 1984

Mr. Jack Shoemate
Superintendent
Osage Indian Agency
Pawhuska, Oklahoma 74056

Dear Mr. Shoemate:

The Osage Tribe of Indians has been furnished a copy of the Summary of Trust Funds and Detail of Trust Funds for the month ending July, 1984, for all Osage Tribal appropriations. It is the policy of the BIA that these reports will be used by all jurisdictions to monitor and manage tribal trust funds. Our staff has reviewed these reports and other financial problems confronting the Osage Agency and we would like to share with you their comments.

In Mr. Pappan's memo to you, under date of August 8, 1984, he outlined the responsibilities of the Osage Agency, Anadarko Area Office and the Branch of Finance and Accounting. The purpose being to reduce the accounting errors to a very minimum and to manage Osage Tribal Funds more effectively and efficiently. The Osage Tribe of Indians has not received any comments regarding the Trust Fund Reports whether they are good, bad, or indifferent. According to our staff, these Trust Fund Financial Reports contain many errors and these errors are not corrected without the urging of the Osage Tribal Council.

<u>Mismanagement of Osage Tribal Funds</u>

Your office has been repeatedly notified that daily deposits are not being made consistently according to the BIA regulations, which results in loss of interest to the Osage Tribe. The loss of interest to the Osage Tribe would be subject to litigation against the U.S. Government (Osage Agency) for mismanagement of Trust Funds. Recently, members of your staff (Mrs. Sloan, Mrs. Hartness, and Miss Nave), informed Mr. Pappan that the cash collection clerk cash box contained several days collections that had not been deposited. Mr. Pappan personally advised you of the contents of the cash box, and you discussed this matter with Mrs. Sloan. During the absence of the cash collection clerk, it is quite obvious

EXHIBIT 1

that no daily deposits are being made, which causes the loss of interest to the Osage Tribe. It appears that your employees do as they please in making deposits. If no improvements are noted in the next review of the daily deposit procedure, then other alternatives will be assessed.

Tribal Appropriation 14X7385

Summary of Trust Funds for tribal appropriation 14X7385 shows "Unallotted Funds - U.S. Treasury" in an overdraft status in the amount of $5,001.21. Overdraft in this appropriation has existed for several months, but again, no action has been taken by the Osage Agency, Anadarko Area Office, nor the Branch of Finance and Accounting.

Tribal Appropriation 14X7386

Osage Agency accounting records for month ending July, 1984, shows total cash available in the amount of $13,259,509.01, whereas, the Summary of Trust Funds shows $13,410,972.31 available or a difference of $151,463.30, which has been identified as:

| | |
|---|---|
| C/D 4514, dated 6-27-84, Encoded into the accounting system as $61,621.60. Correct amount should be $61,661.60. Mr. Sisco's office was informed of this discrepancy, but no action was taken in July, 1984. | $ 40.00 |
| C/D 4573, dated 7-26-84, Encoded into the accounting system as $65,661.01, whereas, correct amount should be $65,660.51. Mr. Sisco's office was informed of this error. | ( .50) |

It is apparent, as indicated by the two discrepancies noted above, that documents encoded in the accounting system are not being verified.

| | |
|---|---|
| C/D 4582, dated 7-31-84, in transit. | 9,961.27 |
| EFT transfer by Osage Oil and Transportation Company in the amount of $161,464.07 was posted into the Bureau's accounting system on C/D 209, and again, on C/D 212. | (161,464.07) |
| TOTAL | $(151,463.30) |

Miscellaneous

During the month of July, 1984, several hundred thousand dollars were collected from the Lease Sale held in June, 1984. Funds were deposited into tribal receipt symbol X7386 and invested to mature on September 13, 1984, the date of the headright payment. July collections are available for distribution to shareholders in December, 1984. Mr. Sisco's office should have notified the Bureau's Investment Office in Albuquerque to that effect.

Appropriation 14X7730

Appropriation 14X7730 shows an Unallotted Balance of $3.16. Please instruct your staff to transfer this amount to X7386 as previous balances were handled. This will close this appropriation balance, which should not be used again for any purpose.

Appropriation 14X7885

Appropriation 14X7885 shows Unallotted Funds in the amount of $147.21, which should be invested at the highest rate available. Please instruct your staff to initiate investment procedures.

Appropriation 14X7886

Appropriation 14X7886 shows Unallotted Funds, in the amount of $22,822.33, were requested to be used in the September, 1984 headright payment. This request was made to John Vale, who in turn, made the request to the Branch of Finance and Accounting. They informed him that this amount was in error and could not be used. Why hasn't the Osage Agency, Anadarko Area or the Branch of Finance and Accounting, said anything about this amount not being available to the Osage Tribe? This is another example of nobody doing anything.

Appropriation 14X9771

Appropriation 14X9771 shows Unallotted Funds in the amount of $2,816.59. If correct, this amount should be invested at the highest rate available. Please have your office make this request.

Again, we request that you inform Mr. Sisco that all financial documents covering the September, 1984 headright payment

carry the same effective date. The June, 1984 headright payment covered by FB349, was not dated the same as the investment maturity date, which costs the Osage Tribe several thousand dollars loss in interest earning.

Minerals

Over the past ten years, at a minimum, the Osage Agency Minerals Branch has not properly reviewed the waterflood lease reports, related purchaser run statements, and collections of royalties due the Osage Tribe. The accounting responsibilities of the lease compliance section, within the Branch of Minerals, reach far beyond the minimal review procedures that were employed. Royalty rates were not properly monitored and enforced. The lessee production information was not emphasized, (even though the lease agreements key on production for the proper royalty rate, and 6-month non-production grace period, before shutdowns are to be enforced), The Production History report, that has been on the Agency computer system since 1980, is not a production history at all, but a sales history. There are many factors which have contributed to the negligent performance of the Minerals Branch over the last few years, such as:

1. Turnover in personnel.
2. Lack of proper accounting procedures.
3. Accounting policy and procedures developed by inexperienced, uneducated personnel.
4. Lack of concern for accountability.
5. Unsupervised on-the-job training of accounting clerks.
6. Lack of Internal controls.
7. Disregard for coordination between IIM and Minerals Sections at the Osage Agency and the Albuquerque BIA Office.

As a result of the problem areas listed above, the Osage Agency is now faced with a total of thirteen companies or individuals, involving (to date) six leases, owing the Osage Tribe $336,003.23 for underpaid royalties and related penalty amounts as of the date of this memo, of which only three companies have paid in $9,910.20, leaving an outstanding balance of $326,093.03. An aged accounts receivable breakdown is as follows:

| Days outstanding | Amount |
|---|---|
| 0 - 30 | $161,121.24 |
| 31 - 60 | 53,429.39 |
| 61 - 90 | 18,605.42 |
| over 90 | 92,936.98 |
| Total A/R Outstanding | $326,093.03 |

One lessee, Mr. Don Cornelius, was notified as long ago as March 1, 1984, concerning his Sand Creek Unit, Contract No. 14-20-G061284, for underpayment of royalties and related penalties totalling $86,332.44 (per Superintendent's letter dated April 25, 1984). This particular claim is nearly six months old with no settlement expected in the near future. Mr. Cornelius was to have notified the Agency no later than August 15, 1984, of his intent to pay the amount due or show reasonable cause why he should not pay the full amount due. No reason has been offered to the Agency for this delay. The Agency has not made an effort to proceed with the collection of the delinquent amount (as of the date of this memo).

May we have your comments at an early date.

Sincerely yours,

OSAGE TRIBAL COUNCIL

By Principal Chief

cc: Mr. Don Moon, Acting Area Director, MAO

GEORGE E. TALLCHIEF
PRINCIPAL CHIEF
OSAGE TRIBE OF INDIANS

ED RED EAGLE, SR.
ASSISTANT PRINCIPAL CHIEF

MEMBERS OF COUNCIL
RALPH R. ADKISSON
DON H. BIG ELK
FRANCIS DREXEL
D. E. (BILL) MARTIN
CAMILLE W. PANGBURN
HARRY RED EAGLE, JR.
GEORGE E. REVARD
JOHN TALLCHIEF

SEAL OF OSAGE NATION

OSAGE TRIBAL COUNCIL
PAWHUSKA, OKLAHOMA
74056

Mr. Jack Shoemate, Superintendent
Osage Indian Agency
Bureau of Indian Affairs
Pawhuska, Oklahoma 74056

Dear Mr. Shoemate:

The attached worksheets were presented to my office by Mr. Bert Pappan, Tribal Auditor. These documents summarize the results of a review of the royalty payments made to the Osage Agency by CRA (Farmland) during the period January 1, 1973 to April 30, 1984, in relation to the Alameda/Damson Lease (SE 13-26-11), Contract No. 14-20-201-9551. Attached to the worksheets are the Lessee Reports and related purchaser's payment summary for the month of underpayment indicated. This review established that a total of $39,891.20 in underpaid royalties and related penalties are due through April 30, 1984.

This lease was selected from a group of 24 waterflood leases that had been chosen by Mr. Charles Hurlburt, Petroleum Engineer, for review. The royalty rate on this particular lease was 16 2/3% for "gross proceeds from sales when the production from the Bartlesville sand amounts to less than four hundred sixty-one (461) barrels during any calendar month" ... per the May 27, 1959 Amendment to Blanket Oil Mining Lease. When the production equals or exceeds 461 barrels per month, the royalty rate is 12 1/2%. The Minerals Branch policy has not emphasized barrels of production, but rather barrels sold per month. Schedule A/3 shows the results of a review of the royalty rates based on barrels sold per month. This review indicated a $23,224.74 total underpayment plus penalties amount due (a difference of $17,237.26 between the two methods).

The underpayments indicated above do not appear to be isolated events. Other leases, not yet fully examined, indicate similar royalty payment errors that were previously undetected by Osage Agency personnel. On the lease mentioned above,1 the review was expanded to January 1, 1973 through April 30, 1984. This review found an additional amount due of $16,666.46 for a total amount of the royalty underpayments and penalties due of $39,891.20. (See Schedule A/2.)

There are approximately 150 waterflood leases that are still active in Osage County.

EXHIBIT 2



0505KAN0040774

I am submitting the documents described above to you so that the Osage Agency can prepare an invoice for collection of the $39,891.20 amount indicated plus any additional penalties due to date. I would also request that any negotiations with the lessees concerning this matter be coordinated with my office.

Thank you for your cooperation in this matter.

Sincerely,

George E. Tallchief

George Tallchief, Principal Chief
Osage Tribe of Indians

Attachments

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL No. 26-624

WHEREAS,

1. During the past several years many Osage oil and/or gas lessees have requested to negotiate new leases on areas where they had mineral leases that were terminated for failure to pay advanced rental in a timely manner as required by their lease terms. Said lessees have negotiated new leases with the Osage Tribal Council as provided for in 25 CFR 226.2(f), and

2. The Osage Tribal Council passed Resolution No. 26-47 on September 15, 1982, authorizing the Principal Chief to execute new leases and authorizing the Superintendent to approve said leases on property that had been terminated for non-payment of advanced rental provided that on all leases the following provisions be included in the lease:

1/6 royalty be increased to 25%, and
3/16 royalty be increased to 27%, and

the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect, and

3. Mineral lessees have informed the Osage Tribal Council that the royalty rates set forth in Osage Tribal Council Resolution No. 26-47 are deemed to be excessive under existing operating conditions. They have advised that it is not economically feasible for them to operate their mineral leases at the higher royalty rate because of recent decreases in the oil prices. They have requested that the Osage Tribal Council consider negotiating new leases at the same royalty rate prescribed in their original lease with the requirement that some monetary bonus be paid for said lease, and

4. It is the consensus of the Osage Tribal Council that it would be in the best interest of the Osage Tribe, in the management of Osage Mineral Estate, that the Principal Chief or in his absence the Acting Principal Chief execute new leases and that the Superintendent be given the authority to approve such leases on properties that have been terminated for non-payment of advanced rental provided that on all new leases that the following provisions be included therein: The new lease will contain the same royalty provisions as those stipulated within the

**EXHIBIT 3**

original lease, and the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease plus an additional $750 bonus for each lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect: Therefore, be it

RESOLVED, That,

1. The Osage Tribal Council hereby rescinds Osage Tribal Council Resolution No. 26-47.

2. The Osage Tribal Council hereby grants the Principal Chief or in his absence the Acting Principal Chief the authority to execute new leases and the Superintendent of the Osage Agency is hereby authorized to approve such leases on properties that had been terminated for non-payment of advanced rental provided that on all new leases that the following provisions be included therein: The new lease will contain the same royalty provisions as those stipulated within the original lease; and the lessees be required to pay a bonus in an equal amount to the rental that they failed to pay on the original lease plus an additional $750 bonus for each lease, with said lease being effective from the date the lessee failed to pay the rental and be for a primary term for the period remaining in the original lease, should it have remained in full force and effect, provided that the lessee submits the proper written request for a new lease within 30 days of the date of the notice of termination.

3. The Principal Chief, or in his absence, the Acting Principal Chief, is authorized to sign this resolution on behalf of the Osage Tribe.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of 5 in favor and 1 against this 21 day of August, 1985.

[signature]
Acting PRINCIPAL CHIEF

ATTEST:

[signature]
SECRETARY

DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
OSAGE INDIAN AGENCY
PAWHUSKA, OKLAHOMA

DATE: AUG 29 [illegible]

APPROVED: [signature]
ACTING Superintendent
Osage Indian Agency
Pawhuska, Oklahoma

Copy

FILE COPY
SURNAME
Brown
NBanks
Dugwater

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

No. 28-363

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, acknowledges that WHR Corporation is the successor to Ajax Gas Corporation for Gas Lease I-68-Ind-3751 containing 1280 acres, more or less, and Gas Leases 14-20-201-0406-171 and 14-20-201-6917 containing 1280 acres, more or less, located in Osage County, Oklahoma;

2. Osage Tribal Council Resolution No. 27-267 sets forth the terms and conditions by which the subject gas mining leases were modified on August 1, 1988;

3. Specifically, Osage Tribal Council Resolution No. 27-267 Part 2C requires that lessee will, 30 days prior to August 1st of each year, arrange for discussion of the gas resale price negotiations with the Osage Tribe;

4. WHR Corporation has proposed that the price to be paid for gas should be based on the posting price contained in the first posted issue for the month in which gas is purchased under the heading: Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually;

5. The Osage Tribal Council and the Gas Lessee have agreed that the price to be paid for gas should be based on the posting price contained in the first posted issue for the month in which gas is purchased under the heading: Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually. Therefore, be it

RESOLVED,

1. That the Osage Tribal Council is agreeable to renegotiate the price to be paid for gas based on the posting price contained in the first posting issue for the month in which gas is purchased under the heading Williams Natural Gas Company - Texas, Oklahoma and Kansas, appearing in the publication entitled Inside FERC Gas Market Report, or any new contract entered into with provisions for a higher gas price for the period August 1, 1991, to August 1, 1992, and that the minimum resale price will be renegotiated annually. Further, WHR Corporation will meet with the Osage Tribal Council 30 days prior to August 1 of each year to determine the base price for gas that will be utilized for royalty calculations for the ensuing year;

2. The basis of value on which royalty shall be paid for gas produced from acreages which are part of said gas lease contracts shall be equal to 70% of the price WHR Corporation receives for resale of the gas, but no less than the minimum resale price set forth in paragraph 1 above;

3. The basis of value on which royalty shall be paid for gas produced from acreages which are not a part of said gas mining contracts but delivered into the WHR Corporation Gas Gathering System shall be equal to 58% of the price WHR Corporation receives for resale of the gas, but no less than the minimum resale price set forth in paragraph 1 above;

4. Royalty paid based on the WHR Corporation resale price will be adjusted by multiplying the fraction, the numerator of which shall be the BTU content per cubic foot of the gas produced and the denominator of which shall be one thousand (1000) times the basis of value of the price for each lease;

5. For gas produced by WHR Corporation, or its assigns, or gas delivered by other gas producers to WHR Corporation, or its assigns, shall be measured at prevailing meter pressures and the volumes thereof shall be computed on a pressure base of 14.65 psi and on a temperature of sixty (60) degrees Fahrenheit;

6. If any of the quarter sections remaining in Gas Mining Leases I-68-Ind-3751, 14-20-201-6917, and 14-20-0406-171 fail to produce gas, a six-month period of time shall be allowed, from cessation of production to properly evaluate and re-establish gas production. Upon failure to establish gas production within the six-month period, such quarter section shall be deleted from the Gas Mining Leases except that the Superintendent may, with the consent of the Osage Tribal Council, grant an extension of time not to exceed ninety days;

7. This resolution shall be of no force or effect until accepted by WHR, or its assigns, and approved by the Secretary of the Interior or his authorized representative. A copy, when approved, shall be attached to and made a part of the Gas Mining Contracts;

8. The Principal Chief, or in his absence the Acting Principal Chief, is authorized to sign this resolution; and,

9. We respectfully recommend that the Superintendent approve the resale price as above described.

**CERTIFICATION**

I hereby certify that the foregoing resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of September 1991.

PRINCIPAL CHIEF

ATTEST:

SECRETARY

Kent

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

No. 26-659

WHEREAS,

1. On Monday, September 23, 1985, a meeting between the Minerals Committee and Consultant, Mr. George Daly, was held in Tulsa, Oklahoma, to discuss the current $0.31/MCF service charge now being deducted by CEJA Corporation. This charge covers the cost of pipeline construction and operation;

2. This charge had existed since 1977 when the pipeline was built and completed;

3. The leases involved are in T24N, R4E; T25N, R3E; T25N, R4E; T25N, R5E; and T26N, R5E. Gas is being sold to Oklahoma Natural Gas Company. A cost analysis of the pipeline investment led to a service charge of $0.31/MCF sold. At the time when the $0.31 charge was agreed to, CEJA had a choice of selling to ONG or selling to Phillips Petroleum Company. Selling to ONG got approximately $0.80 more per MCF than selling to Phillips; however, this required that CEJA build a pipeline to the ONG selling point. The Osage Agency felt that it was in the best interest of the Osage Tribe to accept the higher price, even though it included a $0.31 transportation fee. At this point in time it is still advantageous to the Osage Tribe to have CEJA continue selling to ONG;

4. Mr. George Daly brought forth a method of calculating the service charge. This method is published by the USGS and is widely accepted throughout the oil industry. The method calculates the maximum allowable deduction on an <u>annual</u> basis. The formula is presented below:

$$\text{Maximum Allowable Service Charge } (\$/\text{MCF}) = \frac{D + I + E}{F}$$

D = Depreciation rate in dollars per year over a 20-year period

I = Return (in dollars) on undepreciated investment

E = Annual operating cost or ten percent (10%) of the initial investment; whichever is less

F = Total volume of gas sold (in MCF) annually;

5. It was determined that this method is appropriate for the current situation involving the gas pipeline; and,

6. The Osage Agency calculations indicate that an overcharge has occurred. To recover this overcharge, CEJA has agreed to discontinue the service charge as of September 1, 1985. No deductions will be withheld through 1986. In January 1987, the overcharge will have been recovered and the correct service charge will be assessed based on the USGS Guidelines outlined above. Therefore, be it

**EXHIBIT 5**



**G06PLF0001536**

RESOLVED, That

1. The Osage Tribal Council and CEJA Corporation agree to use the USGS Guidelines (Geological Survey Conservation Manual, Chapter 5A, Part 647.5A.1). To calculate maximum allowable annual service charge per MCF gas produced from the CEJA Corporation pipeline system in western Osage County;

2. CEJA will cease deduction of the service charge from September 1, 1985, to December 31, 1986, to recover the current overcharge;

3. Beginning January 1, 1987, CEJA can begin deducting the service charge using the guidelines presented above

4. The Principal Chief, or in his absence the Acting Principal Chief, is authorized to sign this resolution on behalf of the Osage Tribe; and,

5. We respectfully recommend that the Superintendent of the Osage Agency approve this resolution as described above.

CERTIFICATION

I hereby certify that the foregoing resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this eighth day of October 1985.

[signature]
PRINCIPAL CHIEF

ATTEST:

[signature]
SECRETARY

UNITED STATES GOVERNMENT

# memorandum

Held for MLD's response

DATE: April 24, 1987

REPLY TO ATTN. OF: Jim Littleton, Tribal Auditor.

SUBJECT: Posting of Oil Runs Statements for the Additional Royalty Calculation.

TO: Mary Lou Drywater, Realty Specialist.

I keypunched Union Oil Company of California's Oil Run Statements for December 1986 into the Additional Royalty program on the computer. This task was performed in the exact manner that I had performed it for the months of October and November 1986. The information entered into the computer was taken from the Oil Run Statements verbatim. While performing this duty, I noticed that Union had paid a higher amount of royalty than the oil run statements displayed, so I attached a note to the file so other personnel would be sure to post the amount of Additional Royalty paid.

When all of the December data had been entered, and the checking of this data by two of the Oil Accounting Sections personnel (Reta Carnegy and Larraine Wilcox), and myself for errors had been completed, an edit run was made.

It was at this point that Reta Carnegy came across the notes I had left on the file to remind her to post what I assumed to be Additional Royalty payments. Reta then informed me that Union Oil had a work sheet attached to the oil run statements which refigured the oil sales at the highest posted price. Therefore, the amounts I thought were Additional Royalty payments were, in reality, included in the recalculation based on the Highest Posted Price and need not be posted separately to the Ledger.

The posting of the Union Oil of California's oil run statements for the month of December 1986, amounted to a $415.27 difference from the worksheets. These postings were corrected by changing the price on the individual entries in the Additional Royalty program prior to the final run being made. The correction could also have been made by the posting of these amounts in the Ledger. The Ledger posting are what I

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114

☆U.S. Government Printing Office: 1980—311-153/6017

had anticipated, assuming that they had been payment of Additional Royalty. Either handling of the situation is acceptable and would result in the correct monies recorded, but the changing of the prices to the amounts on Union's worksheet best reflects the payment of royalties to the Osage Tribe.

This problem did not arise in the other months I had punched into the computer because there was just one price for the each month. With no price changes, the oil run statements and the work sheets are in agreement. Union's oil run statements use an average monthly price to allocate oil to different leases in the unit, and when price changes occur, create an Additional Royalty amount due. Union then creates a worksheet which recalculates the oil sales based on the Highest Posted Price negating the Additional Royalty due.

The problem was created because I was unaware that this worksheet was a correction to the Highest Posted Price. Reta Carnegy, with the most seniority in the Oil Accounting Section, was aware of this, and we were then able to make the changes which best reflected the oil sales. A procedures manual for the calculation of Additional Royalty and the handling of the various purchaser information would be of great benefit to the employee who is not familiar with this process. For that matter, each desk in the Oil and Gas Accounting Section, Branch of Minerals, could utilise a procedures manual to ease the strain caused by absenteeism and vacations.

cc. Jack Shoemate, Superintendent.

UNITED STATES GOVERNMENT

# memorandum

DATE: August 28, 1987

REPLY TO
ATTN. OF: Jim Littleton, Tribal Auditor

SUBJECT: Biweekly Status Report

TO: Mr. Jack Shoemate; Superintendent, Osage Indian Agency.
Mrs. Camille Pangburn, Chairman, Finance Committee, Osage Tribal Council.
Mr. George Tallchief, Principal Chief, Osage Indian Nation.
Mr. Newell Barker, Chief, Branch of Minerals.

Minerals personnel have began to calculate Additional Royalty again. It appears that the amount due will be considerably less than previous billings.

Investigation of the information which was received from Chevron Petroleum is nearly complete. At this point, given the information we now have that the amount of royalty due from Chevron will be several thousands of dollars. Further investigation and communication with purchasers will reveal the correct amount due.

The examination of waterfloods which have both 1/6 and 1/8 royalty oil is continuing. Correspondence with the various lessees have corrected some of the problems which we feared might exist.

An example of one such correspondence was a letter received from Lamamco Drilling Company. Lamamco is paying 1/6 royalty on all the oil which is produced on a lease which has both 1/6 & 1/8 royalty agreements. Lamamco determined that this method of royalty payment would be more economical than setting a tank battery for the 1/8 royalty oil. A letter was requested, detailing this agreement. This letter was requested to protect the Tribe from a claim, in the future, for repayment of the overpayment of royalty. This letter was presented to the Field Solicitor's office for approval. Mr Woods directed that the letter would become binding upon the approved by the Superintendent.

The waterflood reports and production reports for other waterflood units are also being examined and a full report will be issued when a conclusion can be reached.

OPTIONAL FORM NO. 10
(REV. 1-80)
GSA FPMR (41 CFR) 101-11.6
5010-114
★ U.S.G.P.O.: 1986-491-248/40011

0505KAN0038935

EXHIBIT 7

I have also participated in numerous discussions with Kent Sanborn, Charlene Cozad, & Reta Carnegy concerning problems with the gas accounting system. Several changes have been initiated, with a few more discussed. There seems to be some corrections that have to be made in prior gas reports. Initial estimations show that some royalty payments were not correct. An audit of the total gas accounting picture could benefit the Tribe.

ADDRESS: SUPERINTENDENT ONLY

UNITED STATES
DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS

OSAGE AGENCY
PAWHUSKA, OKLAHOMA
74056

CERTIFIED MAIL - RETURN RECEIPT REQUESTED

Dark Oil Co.
P.O. Box 1139
Pawhuska, OK 74056

Gentlemen:

Mr. Dwayne Carnes of Osage Oil and Transportation, Inc., (Osage) has advised the Principal Chief, George E. Tallchief, and the Superintendent that the May 1984 oil royalty payment due June 25, 1984, to the Osage Tribe of Indians could not be timely made and proposed that said payments be made over the next three (3) months. He further advised that funds would be available to pay the June 1984 royalty payment.

The oil royalty payment due the Tribe is governed by 25 CFR 226.13(a), (c), and .14(a) (1983), which provide as follows:

> Royalty payments due may be paid by either purchaser or Lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the preceding month. Failure to make such payments shall subject Lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 1/2 percent for each month or fraction thereof until paid.
>
> Failure to remit payments or reports shall subject Lessee to further penalties as provided in §§ 226.42 and 226.43 and shall subject the division order to cancellation.
>
> Lessee may enter into division orders or contracts with the purchasers of oil, gas, or derivatives therefrom which will provide for the purchaser to make payment of royalty in accordance with his lease: Provided, That such division orders or contracts shall not relieve Lessee from responsibility for the payment of the royalty should the purchaser fail to pay. . . . (emphasis added)

The Osage Tribal Council met with Mr. Carl Carnes concerning the delinquent payment and declined to accept the proposal made by Osage. The Council invoked 25 CFR 226.14(a), which requires oil lessees to pay oil royalty payments to the Tribe, should the purchaser fail to make such payments. However, the Council waived all late charges and penalties, provided the payments are received by this office on or before the close of business __ days from the date of this letter. The Superintendent has approved the decision made by the Council.

0505KAN0040739



EXHIBIT 8

Enclosed are copies of the run statements furnished by Osage, which indicate the amount of the oil royalty which you owe the Tribe for May 1984. You are responsible to ascertain whether these amounts are correct. Checks should be made payable to the Bureau of Indian Affairs.

Please advise if you have any questions concerning this matter.

Sincerely yours,

E.A. Green

Acting Superintendent

Enclosures

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 99-550 L |
| UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS, | ) | FILED AUG 2 1999 |
| Defendant. | ) | |

## COMPLAINT

### Jurisdiction

1. This action is filed pursuant to 28 U.S.C. § 1491 and 28 U.S.C. § 1505, the due process clause of the Fifth Amendment and equal protection clause of the Fourteenth Amendment to the United States Constitution.

### Parties

2. The Plaintiff, the Osage Nation, or Tribe of Indians of the State of Oklahoma ("Osage"), is a federally recognized Indian tribe.

3. The Defendant is the United States of America ("United States").

### Nature of the Action

4. This is an action for money damages for underpayment of oil royalties, an accounting, and for declaratory and/or injunctive relief, related to the loss of trust funds and property rights owned by the Plaintiff that were and are being lost by the United States by failing to collect and account for revenues from the production of oil on Osage land, including failing to obtain or assist the Plaintiff in obtaining the highest price that could have been and could be obtained from the sale



EXHIBIT 9

of oil produced from the Osage mineral estate located in Osage County, Oklahoma, which mineral(s) are held in trust by the United States for the benefit of the Osage.

**Contractual Basis for Damages**

5. Article 1 and 10 of the United States Treaty with the Osage dated November 10, 1808, states:

> Art. 1. The United States being anxious to promote peace, friendship and intercourse with the Osage tribes, to afford them every assistance in their power, . . .
>
> Art. 10. The United States receive the Great and Little Osage nations into their friendship and under their protection; and the said nations, on their part, declare that they will consider themselves under the protection of no other power whatsoever, disclaiming all right to cede, sell or in any manner transfer their lands to any foreign power, or to citizens of the United States or inhabitants of Louisiana, unless duly authorised by the President of the United States to make the said purchase or accept the said cession on behalf of the government.

and Article X of the United States Treaty with the Osage Indians dated September 29, 1865, states:

> The Osages acknowledge their dependence on the government of the United States, and invoke its protection and care; they desire peace, and promise to abstain from war, and commit no depredations on either citizens or Indians; . . .

**Statutory Basis for Damages**

6. By Act of June 28, 1906, Chapter 3572, 34 Stat. 539; Act of March 31, 1921, Chapter 120, 41 Stat. 1249; Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034; Act of July 25, 1947, Chapter 334, 61 Stat. 459; Act of October 6, 1964, 78 Stat. 1008; and Act of October 21, 1978, 92 Stat. 1660, title and or control and the rights and responsibilities appurtenant to ownership to the Osage mineral estate in Oklahoma have been continuously, at all times relevant to this case, and is currently vested in the United States in trust for the benefit of the Osage Tribe:

(a) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 542, Sec. 2, seventh paragraph: . . . *And provided further*, That nothing herein shall authorize the sale of the oil, gas, coal, or other minerals covered by said lands, said minerals being reserved to the use of the tribe for a period of twenty-five years, and the royalty to be paid to said tribe as hereinafter provided; . . .

(b) Act of June 28, 1906, Ch. 3572, 34 Stat. 539 at 543, Sec. 3. That the oil, gas, coal or other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six; . . .

(c) Act of June 28, 1906, Ch. 3572, 34 St. 539 at 544, Sec. 4. That all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, shall be held in trust by the United States for the period of twenty-five years from and after the first day of January, nineteen hundred and seven, except as herein provided:

(d) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1250, Sec. 3. That all members of the Osage Tribe of Indians are hereby declared to be citizens of the United States, but this shall not affect their interest in tribal property or the control of the United States over such property as is now or may hereafter be provided by law; . . .

(e) Act of March 31, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trust and supervision until January 1, 1959, unless otherwise provided by Act of Congress.

(f) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035, Sec. 3. . . . The lands, moneys, and other properties now or hereafter held in trust or under the supervision of the United States for the Osage Tribe of Indians, the members thereof, or their heirs and assigns, shall continue subject to such trusts and supervision until January 1, 1984, unless otherwise provided by Act of Congress. . . .

> (g) Act of October 21, 1978, 92 Stat. 1606 at 1606, Sec. 2(a). The first paragraph of section 3 of the Act of June 24, 1938 (52 Stat. 1034, 1035), as amended, extending the mineral estate reserved to the Osage Tribe by the Act of June 26, 1906 (34 Stat. 539), is further amended by striking the phrase "until the eighth day of April, 1983, and thereafter until otherwise provided by Act of Congress" and substituting, in lieu thereof, the phrase "in perpetuity".

7. The above statutes also provide for the management of the Osage mineral estate by the Secretary of the Interior ("Secretary") for the United States:

> (a) Act of June 28, 1906, Cha. 3572, 34 Stat. 539 at 543, Sec. 3. . . . leases for all oil, gas, and other minerals, covered by selections and division of land herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: *Provided*, That the royalties to be paid to the Osage tribe under any mineral lease so made shall be determined by the President of the United States. . . .

> (b) Act of March 31, 1921, Ch. 120, 41 Stat. 1249 at 1249. . . .the Secretary of the Interior and the Osage Council are hereby authorized and directed to offer for lease for oil and gas purposes all of the remaining portion of the unleased Osage land prior to April 8, 1931, offering the same annually at the rate of not less than one-tenth of the unleased area.

> (c) Act of March 2, 1929, Ch. 493, 45 Stat. 1478 at 1479. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas, and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil and gas mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(d) Act of June 24, 1938, Ch. 645, 52 Stat. 1034 at 1035. . . . The Secretary of the Interior and the Osage tribal council are hereby authorized and directed to offer for lease for oil, gas and other mining purposes any unleased portion of said land in such quantities and at such times as may be deemed for the best interest of the Osage Tribe of Indians: *Provided*, That not less than twenty-five thousand acres shall be offered for lease for oil- and gas-mining purposes during any one year: *Provided further*, That as to all lands hereafter leased, the regulations governing same and the leases issued thereon shall contain appropriate provisions for the conservation of the natural gas for its economic use, to the end that the highest percentage of ultimate recovery of both oil and gas may be secured. . . .

(e) Act of October 21, 1978, 92 Stat. 1660 at 1661. Sec. 4. In order to conserve natural resources and provide for the greatest ultimate recovery of oil and gas underlying the Osage mineral estate, the Secretary of the Interior is authorized to establish rules and regulations under which oil and gas leases producing from a common source of supply may be unitized.

**Regulatory Basis for Damages**

8. 25 C.F.R. Part 226 contains the current regulations for leasing the Osage mineral estate by the United States:

a. § 226.2 establishes oil and gas lease "sale" procedures.

b. § 226.3 describes the procedure to surrender an oil and or gas lease.

c. § 226.4 requires payment of oil and gas lease obligations to the Bureau of Indian Affairs ("BIA").

d. § 226.5 makes oil and gas leases subject to the regulations of the Secretary.

e. § 226.6 requires certain bonds of lessee.

f. § 226.7 requires oil and gas leases to be on forms prescribed by the Secretary.

g. § 226.8 sets forth information required of corporate lessees.

h. § 226.9 describes delay rental and drilling obligations to keep an oil and/or gas lease in effect.

i. § 226.10 governs the primary term of an oil and/or gas lease.

9. Regulations also govern the marketing/royalty revenue for production attributable to the Osage and the payment of royalties.

a. § 226.11 provides for payment of royalties based on "gross proceeds", except where payments are made on division orders in which case settlement is based on "actual selling Price" but not less than the "highest posted price" and provides for taking royalty oil in kind.

b. § 226.12 allows the United States to purchase Osage oil at the highest posted price.

c. § 226.13 sets forth the time when payment is due and requires certain operational information.

d. § 226.14 provides for the lessee to contract for the sale of oil and the effect of division orders.

e. § 226.15 contains rules governing unitization of oil and/or gas leases and assignments of leases and overriding royalty interests.

10. § 226.16 through § 226.27 govern operations; § 226.28 and § 226.29 govern cessation of operations; § 226.30 through § 226.41 set forth the requirements on lessees, including record keeping, prevention of waste, measurement of oil and other matters; § 226.42 and § 226.43 describe penalties for violations of the regulations and § 226.44 through § 226.46 govern appeals and notices.

## STATEMENT OF FACTS

11. Under the commerce powers of the Constitution, the above-described treaties, statutes and regulations and the decisions of this Court, and other applicable Federal decisions and the United

States Supreme Court, the United States has a fiduciary duty to the Osage requiring the exercise of "the most exacting fiduciary standards" in managing Plaintiff's minerals and trust funds. Navajo Tribe of Indians v. United States, 176 Ct. Cl. 502, at 507 (1966); Seminole Nation v. United States, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942); United States v. Mitchell, 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

12. The United States has historically allowed the sale of the oil produced from Osage lands for "the highest posted price" and not for the highest price that could be and/or was obtained for said oil.

13. Pursuant to 25 C.F.R. § 226.11, the United States is also authorized to sell oil produced from Osage lands at values described as "gross proceeds" and "actual selling price"; however, said regulations do not define either term nor do they define "highest posted price."

14. The price obtained by the United States for oil produced from Osage lands is at least $1 to $2 less than its value and or market price or prices readily available from the sale of said oil to the detriment of Plaintiff.

15. The United States, by and through its legislative arm, enacted The Indian Mineral Leasing Act of 1938, 25 U.S.C. § 396 through § 396.g which specifically excludes the Osage. The United States failed to enact similar legislation for the benefit of the Osage, which failure resulted in detriment to the Osage.

16. In 1994, The United States, through its Department of Interior Minerals Management Service ("MMS") began an investigation into royalty underpayments based on "posted prices" which culminated in a 1996 demand on various major oil companies for hundreds of millions of dollars dating back to 1980. The United States failed to do the same for the Osage.

17. As a result of the above investigation in 1996, the United States changed its regulations governing payment of royalties on Indian Oil (30 C.F.R. § 206.51 and § 206.52) and on oil produced from federal lands (30 C.F.R. § 206.101 and § 206.102) to require payment based on market value; however, the United States failed to change and/or improve regulations governing the sale of oil from Osage lands.

18. The United States has failed to judiciously collect the highest price available and account to the Osage for revenues from the sale of oil production form Osage lands in breach of the United State's solemn duty.

19. The United States has failed and refused to allow the Osage to review records in the custody of the United States, including those involving oil production, revenues received from oil purchasers, revenue statements from oil producers, prices paid for the production of oil, and production records, gross volumes of oil produced, and costs of storing, transporting, or selling same.

20. Due to the failure and refusal of the United States to allow review of the records as alleged above, the Osage cannot state with exact specificity, but based upon information and belief, the Osage hereby allege that the United States has continued to allow the sale of Osage oil for less than the value of the oil produced from the Osage land for a period of years, the exact time period is currently unknown to the Osage.

21. Further that the United States has knowingly and continually allowed the sale of Osage oil for less than its full value for a period of years, the exact time period of which is currently unknown to the Osage.

22. The actions and or inaction of the United States in failing to obtain the highest value for Osage oil, and its failure to account to the Osage for revenues due the Osage under the terms of

various oil and gas leases for the production of oil from Osage lands, including, without limitation, all allegations of fact herein, and as may be proven at trial in the instant proceeding, constitute a continuing claim from the date of the first such action or inaction, to the present.

23. The actions of the United States in failing to properly and judiciously administer its assumed and statutory obligations and duties over the mineral estate of the Osage are of such a nature and in such reckless disregard of the property rights and interest of the Osage that the trust relationship between the Osage and the United States has been, in effect and result, repudiated by the United States.

## FIRST CAUSE OF ACTION

**Breach of Fiduciary Duty in Failing to Make Demand on Purchasers of Osage Oil For Past Underpayments of Royalty**

The Osage incorporate all factual allegations hereinabove stated, including paragraphs 1 through 23 herein, and further allege as follows:

24. The United States, through the MMS, determined that the "highest posted price" is less than the price that the United States should receive for the sale of oil from federal lands and has made demand on the purchasers of said oil for royalty underpayments. The United States has not made a similar demand on behalf of the Osage.

25. The United States knew and or has knowledge that similar underpayments have occurred on payment of royalty for the sale of oil from Osage lands and has taken no action to correct or remedy this problem.

26. Defendant has breached its fiduciary duty to Plaintiff by failing to make demand on and collect from the purchasers of Osage oil for similar royalty underpayments as the MMS has collected for the United States under the same circumstances.

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duty in Failing to Market Osage Oil at Market Price to the Detriment of Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and hereby further state as follows:

27. Located at Cushing, Oklahoma, a short distance from the Osage mineral estate, is a public oil market readily accessible to the United States at which the United States could have marketed and or caused the oil produced from Osage Lands to be marketed to the credit of the Osage at a higher price than received.

28. The United States knew that federal regulations provided for storage of Osage oil at no cost, at or near the Cushing distribution center, to facilitate the marketing of said oil.

29. The United States knew that a higher price was available.

30. The United States breached their fiduciary duty to the Osage by failing to either market, facilitate the marketing or cause the Osage oil to be marketed at the highest price readily available and/or by failing to comply with its own regulations in the sale of Osage oil to the detriment of the Osage.

## THIRD CAUSE OF ACTION

**Breach of Fiduciary Duty by Failing to Pass Legislation and/or Promulgate Regulations which Would Maximize the Benefit of the Osage Mineral Estate to Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and further state as follows:

31. The United States has enacted legislation (supra) and the Secretary issued regulations (supra) governing the sale of Osage oil, but said legislation and regulations were not promulgated to maximize the value of the Osage mineral estate.

32. The United States breached its fiduciary duty to the Osage by failing to enact legislation and/or draft regulations governing the sale of Osage oil so that the Osage would receive the maximum benefit from the minerals produced from their lands.

## FOURTH CAUSE OF ACTION

**Breach of Fiduciary Duty by Failing to Promulgate Oil Lease Forms Which Would Maximize the Benefit of the Osage Mineral Estate to Plaintiff**

The Osage incorporate all factual allegations hereinabove stated, and further state as follows:

33. The United States has assumed responsibility for and made a mandatory form of oil lease which must be has been used by persons leasing Osage minerals.

34. The lease form promulgated by the United States to lease Osage minerals for oil exploration fails to contain safeguards to maximize the value of oil production to the Osage.

35. The failure of the United States to promulgate an oil lease form containing additional provisions to maximize the royalty revenue received by the Osage is a breach of its fiduciary duty to the Osage.

## FIFTH CAUSE OF ACTION

**Request for Declaratory Relief**

The Osage incorporate the factual allegations hereinabove stated, and further state as follows:

36. Pursuant to the applicable lease terms and federal laws, the Osage are entitled to be paid royalties (pursuant to the terms of oil and gas leases administered by the United States on its lands), based upon the highest value of the oil, not limited by a "posted price" designation.

37. The United States has failed to obtain said value for the Osage, despite their duty to do so under Federal law.

## SIXTH CAUSE OF ACTION

**Request for an Accounting**

The Osage hereby incorporate the above paragraphs herein, and further state as follows:

38. Based upon the treaties, statutes, regulations, and oil and gas leases cited herein, the Osage are entitled to an accounting for the royalty share of all proceeds of oil production from Osage land, as administered by the United States in its capacity as trustee and fiduciary for the Osage. That upon information and belief, the Osage hereby allege that the United States has failed to account to the Osage for its rightful share of revenues for oil production under the terms of various oil and gas leases and laws governing the drilling, development, and production of oil from Osage lands despite the duties assumed by and delegated to the United States to so account.

39. In fact, the United States has wholly failed to account to the Osage for the highest value of the oil produced, and has further failed to obtain and account to the Osage for amounts in excess of the "posted price", despite the United States' knowledge that the "posted price" was not

the actual highest value of the oil in and at the wellhead location of said production within Osage County.

40. The United States has failed to take any steps necessary in order to render such an accounting or account to the Osage for the proceeds of oil revenues produced from the Osage lands during the tenure of the United States' position as trustee and fiduciary over such matters.

## SEVENTH CAUSE OF ACTION

**Breach of the Constitutional Rights of the Osage**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

41. The United States has undertaken, and in fact, effectively promulgated various regulations, otherwise known as the Code of Federal Regulations, which purport to govern the activities and interpretation of both the Statutes of the United States and various oil and gas leases affecting the mineral interest of the Osage.

42. Pursuant to said regulations, the United States has promulgated rules which are constitutionally infirm and constitute a taking of the Osage property and property rights without due process and or equal protection, as guaranteed by the United States Constitution..

## EIGHTH CAUSE OF ACTION

**Request for Injunctive Relief**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

43. The Osage, upon information and belief hereby allege that the United States has, within the scope of its assumed responsibility and obligations pursuant to the above cited statutes and regulations, the ability to take action, both now and in the future, to obtain, secure, and otherwise reduce to possession, the royalty for the Osage based upon the actual value of said oil, both for production in the past and in the future, based upon the geographic location of production and the time of said production, rather than a "posted price" nomination.

44. Based upon information and belief, the Osage allege that the United States has failed to take action necessary to recover the full value of oil royalties based upon said production from the Osage lands for the past, the present and for production in the future.

## NINTH CAUSE OF ACTION

**Breach of Fiduciary Duty by Preventing the Osage from Marketing Oil Production in Kind**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

45. The Osage have in the past pursued, planned and have attempted to take such action as the Osage deemed proper to market oil production "in kind" from the wells located on Osage lands in order to obtain a higher price for its royalty share.

46. The United States intended, attempted, and in fact did, impede the Osage in their attempts to lawfully obtain and sell royalty production in kind, under the terms of the various oil and gas leases covering oil producing wells on Osage lands. Such action by the United States, impeding the Osage attempts to market oil production in kind, caused damage to the Osage.

## TENTH CAUSE OF ACTION

**Rights to Documents and Information**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

47. The United States is in possession of various records, receipts, revenue check stubs, and numerous other documents indicating the various locations, times, amounts, and type of production and revenue payments that relate to the proceeds of revenues from oil production from Osage lands. All of said documents, pursuant to the above cited statutes, regulations, and assumed duties of the United States, are obtained, held, and used strictly for the benefit of the Osage.

48. The Osage have ownership rights and are the legal owner of said documents above described. Despite the Osage interest in and request for said records, the United States has failed and refused to allow the Osage full access to said records, including to copy or inquire into the complete nature, scope, and organization of said records, except for a very limited number of documents acquired through a Freedom of Information Act request.

49. The United States has taken such action with the direct intent and effect of impeding the Osage in its pursuit to verify the United States' breach of its fiduciary duties, including the issues alleged in all causes of action stated herein, including but not limited to accounting and or valuation verification.

**ELEVENTH CAUSE OF ACTION**

**Fraud and/or Constructive Fraud Committed by the United States**

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

50. That based upon information and belief, the Osage allege that the United States has knowingly participated in a deception to the detriment of the Osage, i.e., that the "posted price" was the actual value and/or highest available price of the oil being produced from Osage lands. That the United States specifically had knowledge that the "posted price" was less than the true value of the oil, but failed to reveal this information to the Osage, or take any action thereon, resulting in damage to the Osage. These actions by the United States constitute fraudulent conduct.

51. That pursuant to the United States' fiduciary and trustee duties to the Osage, the above actions constitute constructive fraud, based upon such relationship between the Osage and the United States.

52. The United States knew or should have known that the Osage were not being paid the highest royalty proceeds available under the terms of its oil and gas leases according to the terms thereof, upon both the true volume and value of the oil, as produced at the wellhead.

(a) Despite such knowledge, the United States participated in deceiving the Osage and perpetuating the falsehood that the "posted price" was the highest available price or the true value of the oil at the wellhead. This deception has effectively resulted in a great disadvantage to the Osage, causing the Osage damages.

(b) The Osage further allege that the United States knowingly failed to report the full amount of royalty revenues, based upon both production volumes and value. That the United

States had a duty to fully report and account to the Osage for all production and corresponding royalty revenues. The United States represented that it had fully reported, when in fact it had not.

53. The above described fraudulent acts of the United States caused the Osage damages.

## TWELFTH CAUSE OF ACTION

### Repudiation of Trust Relationship

The Osage hereby incorporate the above referenced paragraphs, and further allege and state as follows:

54. Based upon the acts of the United States as alleged herein as may be proven at trial, the United States has failed and refused to perform its fiduciary or even ordinary duties to the Osage regarding the production and preservation of their mineral estate, including their duty to obtain the highest value for oil production from said mineral estate for the benefit of the Osage.

55. That the United States has, by its actions as herein alleged, repudiated the trust relationship by its careless and reckless disregard for the Osage in continuously failing to judiciously account for revenues for the volumes of oil production from Osage lands for an extended period of time, the exact length and or period of which is currently unknown to the Osage, but known to the United States.

56. That the United States' actions are of such nature as to call for the exercise of this Court's power and jurisdiction to find that the trust relationship between the Osage and the United States has been breached by the United States and that the Osage are entitled to relief by way of judicial decree and judgment in order to ensure that the mineral estate of the Osage Nation be preserved and protected from this point forward.

## PRAYER FOR RELIEF

**WHEREFORE,** in consideration of the above premises and each of them, the Osage hereby pray they recover judgment from the United States, including their costs and attorney's fees as may be allowed by law, and such relief as the Court may deem appropriate, compensable, just and equitable, including, but not limited to the following:

(a) **Compensatory damages** against the United States in an amount necessary to compensate the Osage for the actions/inactions of the United States as above alleged, in a sum in excess of $100,000,000.00, or as may be proven at trial;

(b) A **finding, order and judgment**, that the Osage are entitled to royalties on the production of oil under oil and gas leases covering mineral interests of the Osage Nation, based upon the highest value of said hydrocarbon production at the time and location of said production, as a continuing claim, without any limitation, including the limitation of a "posted price";

(c) **An accounting** by the United States to the Osage for the full percentage share of revenues due under the terms of its various oil and gas leases for the full volume of production of oil from Osage lands, inclusive of the highest value of oil production, based upon the time and location of the production at the well site, rather than the highest "posted price", as a continuing claim from the date to be established as the first failure of the United States to accurately account, including the accounting and payment for the full value of the oil produced, up to the present;

(d) **Order** the United States to pursue such action as may be necessary to obtain oil royalties for the Osage based upon full value of the oil produced at the wellhead, rather than the highest posted price for past, current and future production;

(e) **Order** the United States to promulgate legislation and regulations to maximize the benefit of the Osage mineral estate and oil production therefrom to the Osage;

(f) **Order** all provisions of the Code of Federal Regulations, as may be determined to limit the Osage in their ability to receive the proceeds of oil production based on the full value of the oil at the well site location, to be invalid, unconstitutional, void, and unenforceable. This request is inclusive of, but not limited to 25 C.F.R. Sections 226.11 and 226.15, et seq.;

(g) **An order, judgment and decree** determining the interest and ownership of the Osage in all documents and records of any nature that either address or pertain to oil revenues, oil production, oil leasing activities of any kind and/or other records of any kind relating to the past and present mineral estate of the Osage; **further,** that the Osage be allowed full, complete and unfettered access to said records at any time, and in such a manner as not to disturb the normal business activities of the United States;

(h) **Order** the United States to cease and desist all efforts and attempts to impede the Osage from marketing oil production in kind; and,

(i) **A determination, by judicial decree,** that the United States has breached its fiduciary duties as alleged herein and has done so in a continuing manner; **and to order** the United States to take any and all actions as may be necessary to prevent further breach of their duties, fiduciary and otherwise to the Osage, which actions, as may be determined by the Court herein, would include any and all direction necessary to protect the value of the Osage mineral estate and the rights of the Osage in and to said mineral estate. **Further,** that a finding be entered that the United States has in fact repudiated the trust relationship between the Osage and the United States by its actions as hereinabove alleged, and that this Court take such action as within its jurisdiction and power to modify and amend the powers and duties of the United States and their right to supervise, administer, oversee, and manage

the mineral estate of the Osage in order that the same may be preserved to the benefit of the Osage from this time forward, and for such other and further relief as the Court deems just.

Respectfully submitted,

**MAHAFFEY & GORE, P.C.**

By: ______________________________

BRADLEY D. BRICKELL, OBA #1117
RICHARD J. GORE, OBA # 3479
R. BRUCE KERR, OBA # 4990
Two Leadership Square, Suite 1100
211 North Robinson
Oklahoma City, Oklahoma 73102
Telephone: (405) 236-0478
Facsimile: (405) 236-1520
ATTORNEYS FOR PLAINTIFF

Passarelli

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND THE SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS,<br><br>Defendant, | ) | No. 99-550 L<br>Judge John P. Wiese |
| and | ) | |
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,<br><br>Plaintiff,<br><br>vs.<br><br>UNITED STATES OF AMERICA, by and through THE DEPARTMENT AND THE SECRETARY OF THE INTERIOR and BUREAU OF INDIAN AFFAIRS,<br><br>Defendant. | ) | No. 00-169 L<br>Judge James T. Turner |

DEPARTMENT OF JUSTICE GENERAL LITIGATION SECTION

00 MAY -5 AM 9: 34

**MOTION TO AMEND AND CONSOLIDATE**
**AND BRIEF IN SUPPORT**

COMES NOW the Plaintiff, pursuant to Rules 7 and 42(a) of the Rules of the United States Court of Federal Claims and moves the Court to consolidate Case No. 00-169 L, styled *The Osage Nation and/or Tribe of Indians of Oklahoma v. United States of America, by and through The Department and Secretary of the Interior and Bureau of Indian Affairs* and filed in this Court on March 31, 2000, with this case.

90-2-20-09634



**EXHIBIT 10**

In support of said Motion, Plaintiff represents to the Court that:

1. Pending before this Court is Plaintiff's claim that the Defendant breached its fiduciary duty to Plaintiff and mismanaged Plaintiff's trust by not collecting the proper royalty amount on oil produced and sold from lands held in trust by the Defendant for the benefit of Plaintiff. This issue includes both the amount of production and price obtained. (*See* Complaint, Exhibit "A")

2. Case No. 00-169 L will combine herewith the claim(s) that the Defendant has, to the detriment of Plaintiff, further mismanaged Plaintiff's trust money assets, composed primarily of oil royalties, by not prudently and properly accounting for the money paid into the U.S. Treasury and investing the same (as required by federal law) for the benefit of Plaintiff. (*See* new Complaint, Exhibit "B")

3. As can be seen, the original Complaint directly relates to Defendant's failure to properly collect royalty for oil and Case No. 00-169 L relates to Defendant's mismanagement of the oil royalty money that was collected, as well as other assets of the Osage.

4. Consequently, the two cases are extremely interrelated and it would be highly efficient for one judge to hear both causes of action, to eliminate duplication of discovery, the possibility of inconsistent rulings, and judicial efficiency. *See* F.R.C.P. 18 and reasoning express in *Glendale Joint Venture v. U.S.*, 13 Cl.Ct. 325 (1987). The basis for consolidation stated by this Court in *Navajo Tribe v. United States*, 222 Cl.Ct. 584 (Opinion January 25, 1980), i.e., judicial economy, etc. applies, even though the request for consolidation was overruled therein on the basis that the two (2) cases were far apart in preparation time, i.e., one had been open for twenty-seven (27) years. In the instant proceeding, should the cases not be consolidated, there could be a potential for "double recovery" of overlapping claims in the two cases as argued in *Navajo*, at 588.

5. The consolidation of Case No. 00-169 L with this case will not prejudice the Defendant or its ability to defend on the merits since this new Complaint is filed close in time with the original action and is unquestionably intertwined with the original Complaint and the facts and circumstances alleging mispayment, underpayment and accounting for oil production, as set forth in the original Complaint. The consolidation, in fact, will conserve the legal resources of the Defendant.

6. Granting of the Motion to Consolidate will not cause undue delay because discovery is in the initial stages and neither case is set for trial.

7. Plaintiff has consulted with Defendant, who opposed amending the original Complaint to add the causes of action in Case No. 00-169 L. Defendant's counsel suggested a Motion to Consolidate would be more appropriate and the Plaintiff is complying with Defendant's request by the filing of this motion.

8. Plaintiff further states it will amend (in the newly consolidated Complaint if this relief is granted) to more specifically set forth facts and issues related to the failure to require royalty be paid pursuant to the oil and gas lease terms, as indicated to this Court in the initial scheduling conference, wherein this Court did grant Plaintiff such leave to amend.

WHEREFORE, Plaintiff requests this Court(s) to grant its Motion to Consolidate Case No. 00169L within the original and surviving Case No. 99-550L, before the Honorable John P. Wiese and for leave to file such amended, consolidated Complaint, in accordance with Judge Wiese's ruling at the scheduling conference relating to amended allegations on royalty pricing. For purposes of

ease of administration, this Motion has been filed in both cases and it is believed that either Judge has jurisdiction to grant the relief requested.

Respectfully submitted,

MAHAFFEY & GORE, P.C.

Bradley D. Brickell, OBA #1117
Richard J. Gore, OBA 3479
Two Leadership Square, Suite 1100
211 North Robinson
Oklahoma City, Oklahoma 73102
(405) 236-0478
(405) 236-1520 (facsimile)
and

Nancy Skancke
Grammar Kissel Robbins Skancke & Edwards
1225 Eye Street, N.W., Suite 1225
Washington, D.C. 20005
(202) 408-5400
(202) 408-5406 (facsimile)
ATTORNEYS FOR PLAINTIFF

**CERTIFICATE OF MAILING**

This is to certify that on the 28 day of April, 2000, a true and correct copy of the above and foregoing document was mailed, postage prepaid, to the following:

Edward J. Passarelli
Environment and Natural Resources Division
Department of Justice
P.O. Box 663
Washington, D.C. 20044-0663

Alan Woodcock
Office of the Field Solicitor
United States Department of the Interior
7906 E. 33rd Street, Suite 100
Tulsa, Oklahoma 74145

Stephen L. Simpson
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240

Bradley D. Brickell

ORIGINAL

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
MAY 26 2000
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 99-550 L<br>No. 00-169 L<br>Judge John P. Wiese |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION TO RECONSIDER CONSOLIDATION ORDER

Defendant respectfully moves the Court to reconsider its Order, dated May 5, 2000, consolidating the two captioned cases. In support of this motion, defendant states the following:

## STATEMENT OF THE TWO CONSOLIDATED CASES

***Docket No. 99-550 L.***

In Docket No. 99-550 L, filed on August 2, 1999, the Osage Nation ("the Osage" or "the Nation") is seeking money damages related to the collection by the Bureau of Indian Affairs of allegedly undervalued royalties on oil and gas income from plaintiff's mineral properties. The Osage also seek equitable and declaratory relief to challenge the validity and require the amendment of both federal statute and regulation governing defendant's royalty collection for plaintiff, as well as to reform other related administrative practices and procedures, and to mandate that defendant perform an accounting of Osage oil and gas revenues. Complaint ¶¶ 15, 17, and 27-44. The Nations' complaint and their attorney's explanation at the March 2, 2000 status conference with the Court both emphasize that the central issue is defendant's claimed

RECEIVED



**EXHIBIT 11**

failure to collect royalty income based upon the highest possible price. Complaint, ¶¶ 12-14, 18, and 21-23; Transcript of Status Conference, March 2, 2000 ("Tr."), pp. 8-9.

Plaintiff's requested relief in Docket 99-550 L for monetary, declaratory, injunctive and accounting remedies is focused exclusively on *collection of oil and gas royalties*, that is, defendant's asserted *failure to bring into the Nation's trust fund accounts in the first place* the full value for tribal income-generating properties or interests

***Docket No. 00-169 L.***

The Osage Nation in this docket asks first and foremost for an accounting of *all moneys already received into its trust fund accounts*. Filed on March 31, 2000, following the March 2 status conference in Docket No. 99-550 L, this case alleges defendant mismanaged tribal trust funds *after they had been received* into plaintiff's accounts.[1]

**LEGAL STANDARDS REGARDING CONSOLIDATION**

A trial court has broad discretion in ordering consolidation of cases for trial, where there is a common question of law or fact. *Gillette Motor Transport v. Northern Oklahoma Butane Co.*, 179 F.2d 711 (10th Cir. 1950); *Rando v. Luckenbach Steamship Co.*, 155 F.Supp. 220 (E.D.N.Y.1957). Existence of common questions of law and fact, however, is *prerequisite* for any consolidation. *Magnavox Co. v. APF Electronics, Inc.*, 496 F.Supp. 29, 209 U.S.P.Q. 1094 (N.D. Ill. 1980).

The Court of Federal Claims has its own rule respecting related cases for the purpose of

---

[1] To the extent that a limited portion of the Complaint in Docket No. 00-169 L can be read to allege federal failure to collect full value for tribal income-generating properties or interests, *e.g.*, ¶ 21, the charges appear to be duplicative of issues raised in the Nation's Docket No. 99-550 L Complaint.

contemplating the appropriateness of consolidating actions or not in the interests of judicial economy or other factors. RCFC 77(f), as amended in 1994 by General Order 36, deems cases related if they "(A) involve the same parties *and* are based on the same or similar claims; or (B) involve the same contract, property or patent." (Emphasis added.)

Although defendant is mindful that this Court has initially determined, based upon plaintiff's motion to amend or consolidate, to grant that request, the government respectfully suggests that this case does not involve common questions of law or of fact.[2] We further suggest that, while the two consolidated actions involve the same parties, they do not involve the same or even similar claims. Finally, defendant suggests that the two cases do not even ultimately involve the same property of plaintiff, even though both cases involve plaintiff's money. The property in Docket No. 99-550 L is oil and gas royalty income; the property in Docket No. 00-169 L is moneys received not only from oil and gas production but from other sources, as well.

**THE DIFFERENCES BETWEEN THE TWO CONSOLIDATED CASES**

Docket No. 99-550 L, being a royalty-collection case, and docket no. 00-169 L, being a trust fund management action, will necessarily and almost entirely involve different aspects of federal operations, different documents, different potential witnesses and, of special importance,

---

[2]It should be stressed that it was plaintiff's decision to file separately these two distinct actions, involving separate statutory and factual predicates. Defendants's attorney of record in Docket 99-550 L never consented to consolidation, nor does plaintiff's motion reflect that defense counsel agreed that consolidation had merit or that any motion to consolidate would not be opposed. When consulted on whether defendant would agree to an amended Docket 99-550 L Complaint, defendant's counsel indicated his opposition. He informed plaintiff's attorney that amendment would be inappropriate because the actions were separate claims involving separate factual and legal predicates. That is precisely the same basis on which defendant now opposes consolidation.

different statutory and regulatory authority. In essence, except for involving the same plaintiff and the same defendant, the two suits have nothing in common. This essential distinction is specifically acknowledged in plaintiff's own Motion to Amend and Consolidate and Brief in Support, filed herein on or about May 1, 2000, ¶¶ 1 and 2.[3]

***Differences in Controlling Statute and Regulation.***

Taking first the difference deemed the most significant, at least in defendant's view, the Court should consider the two separate statutory-regulatory schemes involved in a royalty-collection suit and in a trust funds management suit.

On their faces, the two Complaints in these cases make clear the two operative sets of laws at issue in each. In the royalty-collection suit, the Osage refer to and focus the issues on the Indian Mineral Leasing Act of 1938, 25 U.S.C. §§ 396-396g, as well as cite various oil and gas laws (Complaint, ¶¶ 6-7) and to federal oil and gas leasing regulations contained in 25 C.F.R. Part 226 (Complaint ¶¶ 8-9 and 13) and 30 C.F.R. Part 206 (Complaint, ¶ 17) because they are the legal structure governing Indian oil and gas issues generally or Osage oil and gas issues specifically.

In the new trust funds accounting suit, the Osage refer to and focus the issues on the Indian Trust Funds Management Act of 1994, 25 U.S.C. § 4011 and, more generally, 25 U.S.C. § 162a(d) (Complaint, ¶ 8).

---

[3]The points at issue concerning consolidation will, of course, be discussed herein, *infra*. Of immediate and central disagreement, however, are plaintiff's assertion in its Motion that "the two cases are extremely interrelated" (¶ 4) and that "consolidation, in fact, will conserve the judicial resources of Defendant" (¶ 5) and that "Defendant's counsel suggested a Motion to Consolidate would be. . . appropriate" (¶ 7).

The two statutory-regulatory structures deal with different Secretarial responsibilities, obviously quite distinct from one another. So distinct in fact that by Congressional decision, the responsibilities are carried out by two separate offices of the Department of the Interior – the Superintendent, Osage Agency, Bureau of Indian Affairs, for minerals and minerals royalty matters (25 C.F.R. Part 226) and the Office of Trust Funds Management, Office of the Special Trustee for American Indians ("OST/OTFM") for handling moneys already received into tribal accounts (U.S. Department of the Interior Manual,110 DM 28 (copy attached hereto is located at http://elips.doi.gov/ELIPS/toc/ACT_MAN.htm); *see also, e.g.*, 25 C.F.R. Part 1200).

***Differences in Management of the Presently Consolidated Cases.***

For purposes of this litigation, these two sets of separate federal responsibilities translate directly into two distinct case management tasks for both parties and for the Court itself. Arising under two different structures, the royalty-accounting case and the trust funds management case will quickly and permanently involve two different sets of documents and exhibits. Those papers produced by the Superintendent, Osage Agency, will not relate at all to the papers produced by the OST/OTFM. Thus, whatever discovery takes place and whatever exhibits are prepared will proceed as they would with two different cases. For the same reasons, the personnel knowledgeable in the two areas will be entirely different groups of people. Thus, the witnesses that may be deposed or eventually called will not be the same people in each case.

Given this condition, there is no reason to think that the cases will necessarily proceed on the same schedule, unless the progress on one is artificially halted awaiting completion of the other. Defendant submits that consolidation is wholly adverse to the general interests of judicial economy and may be prejudicial to the efficient resolution of the separate actions that have

separate attorneys of record for the defendant. Docket No. 99-550 L is already in the discovery stage, while the defendant has yet to receive a litigation report, yet alone file an answer in Docket No. 00-169 L. Indeed, defendant foresees on the not-too-distant horizon the further complicating specter of plaintiff moving to amend the two complaints in an attempt to fuse together distinct claims that the Osage initially chose to keep separate. Even if such an effort does not materialize, the consolidation itself forces into one proceeding two stand-alone actions that were not pled together originally and that involve varying jurisdictional issues, such as different statute of limitations periods.

Defendant reminds the Court that during the May 9, 2000, telephone status conference among the parties to both cases and the Court, plaintiff's counsel stated that when he filed Docket No. 99-550 L, he had not then been authorized by the Osage Nation to file the claims now present in Docket No. 00-169 L. Clearly, plaintiff itself viewed the cases as entirely different ones to such a degree that it first withheld approval of proceeding on the more recent filing.

Finally, and of great significance, given the two different areas of trust responsibility law in play here and the two different factual situations that certainly exist between royalty supervision by BIA over third-party oil and gas companies, on the one hand and OST/OTFM management of funds directly and solely within that agency's own responsibility, it is almost impossible to conceive that the Court would be making findings of fact or rulings of law that would overlap. Therefore, the chance of two different judges reaching conflicting findings or rulings is virtually non-existent.

**CONCLUSION**

For the foregoing reasons, the Court should vacate its Order of March 5, 2000, and separate Docket Nos. 99-550 L and 00-169 L into two individual cases.

Dated this 26th day of May, 2000.

Respectfully submitted,

EDWARD J. PASSARELLI
Attorney of Record for Defendant in Docket No. 99-550 L
Telephone: (202) 305-0468

R. ANTHONY ROGERS
Attorney of Record for Defendant in Docket No. 00-169 L
RENITA Y. FORD

General Litigation Section
Environment and Natural Resources Division
United States Department of Justice
P. O. Box 663
Washington, D. C. 20044-0663
Telephone: (202) 305-0483
Fax: (202) 305-8273/0506

Of Counsel:

Stephen Simpson
Attorney
Office of the Solicitor
Division of Indian Affairs
U.S. Department of the Interior
Washington, D. C. 20240
Telephone: (202) 219-1659
Fax: (202) 208-3490

# In the United States Court of Federal Claims

No. 99-550 L
No. 00-169 L

Filed: September 14, 2000

FILED
SEP 14 2000
U.S. COURT OF FEDERAL CLAIMS

SEP 18 PM 3:52
DEPARTMENT OF JUSTICE
GENERAL LITIGATION SECTION

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, )
Plaintiff, )
v. )
THE UNITED STATES, )
Defendant

---

ORDER

VACATING CONSOLIDATION ORDER

---

On May 26, 2000, defendant filed a motion asking the court to reconsider its Order of May 5, 2000, directing the consolidation of Case Nos. 99-550L and 00-169L. Based on the reasons set forth in defendant's motion, and the supplementary views expressed by counsel during the hearing on this matter held on September 12, 2000, the Order allowing consolidation of the referenced cases is hereby vacated.

The Clerk is instructed to return Case No. 00-169 L to the originally-assigned judge.

John P. Wiese
Judge



EXHIBIT 12