Blanco, Caroline

RECEIVED
APR 15 2005
OFFICE OF THE CLERK
U.S. COURT OF FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

By leave of the Judge

| | |
|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, Plaintiff, v. THE UNITED STATES OF AMERICA, Defendant. | No. 99-550L<br>Judge Mary Ellen Coster Williams |

'05 APR 18 A8 :40
DEPT. OF JUSTICE - ENRD
ENVIRONMENT DIVISION

## UNITED STATES' MOTION TO DISMISS

The United States, by and through its undersigned counsel, hereby moves this Court for an order, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), dismissing Plaintiff's Third Amended Complaint. The grounds for the United States' Motion to Dismiss are that:

1. This Court does not have subject matter jurisdiction to hear Plaintiff's claims concerning oil and gas leases entered into prior to August 2, 1993, and Plaintiff's claims concerning non-mineral leases entered into prior to October 20, 1998, because they are time-barred; and

2. Plaintiff has failed to state a cognizable claim under the Tucker Act, 28 U.S.C. § 1491(a)(1), with regard to its claim that the United States breached its fiduciary duty owed to the Tribe for alleged mismanagement of non-fund Osage trust assets.

In support of this Motion, the United States submits the accompanying Memorandum of Points and Authorities in Support of the United States' Motion to Dismiss.

//

6/39



EXHIBIT 15

90-2-20-09634

WHEREFORE, the United States respectfully requests that its Motion to Dismiss be granted, and that Plaintiff's Third Amended Complaint be dismissed.

Dated this 11th day of April, 2005.

Respectfully submitted,

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0248
Fax: (202) 305-0267
E-mail: caroline.blanco@usdoj.gov

Of Counsel:

ALAN WOODCOCK
Regional Solicitor
Office of the Field Solicitor
United States Department of the Interior
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
Tel.: (918) 669-7730, Ext. 225
Fax: (918) 669-7736

STEPHEN L. SIMPSON
Attorney
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240
Tel.: (202) 219-1659
Fax: (202) 208-3490

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | No. 99-550L |
| v. | ) | Judge Mary Ellen Coster Williams |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS**

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

Memorandum of Points and Authorities
In Support of the United States' Motion to Dismiss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Factual and Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The 1906 Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Oil and Gas Leases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

C. The Relationship Between the Leases and the Regulations . . . . . . . . . . . . . . . . . . . . . . . . . 4

D. The Litigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A. Standards for Granting Dismissal of Complaint under Rule 12(b)(1) and 12(b)(6) . . . . . 5

B. Plaintiff's Claims Are Time-Barred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1. The Tribe's Mismanagement Claims Concerning Mineral Leases that Accrued Prior to August 2, 1993, and any Non-Mineral Lease that Accrued Prior to August 16, 1998, Are Time-Barred Under 28 U.S.C. § 2501 . . 8

2. The Tribe Is Barred from Bringing any Claim Against the United States that Accrued Prior to August 13, 1946 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

C. Plaintiff Has Failed to State a Cause of Action for which Relief Can Be Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1. The Tribe Does Not Allege that the United States Failed to Comply with the Governing Law and the United States Is Not Obligated to Maximize the Amount of Royalty Realized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. The Statutes and Regulations, at Best, Can Only Be Fairly Interpreted as Mandating Compensation to a Claimant Headright Owner, and, thus, Do Not Mandate Compensation to the Tribe, aside from a Claim Associated with Its Own Headright Ownership Interest . . . . . . . . . . . . . . . . . . 22

IV. Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### FEDERAL CASES

Andrade v. United States, 202 Ct. Cl. 988 (Ct. Cl. 1973) . . . . . . . . . . 10

Brown v. United States, 195 F.3d 1334 (Fed. Cir. 2000) . . . . . . . . . . 10, 12

Capoeman v. United States, 440 F.2d 1002 (1971) . . . . . . . . . . 10

Catellus Dev. Corp. v. United States, 31 Fed. Cl. 399 (1994) . . . . . . . . . . 9

Cochran v. United States, 19 Cl. Ct. 455 (1990) . . . . . . . . . . 10

Commodity Futures Trading Com'n v. Nahas, 738 F.2d 487 (D.C. Cir. 1984) . . . . . . . . . . 6

Conley v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . 6, 8

Contreras v. United States, 2005 WL 741757 (Fed. Cl. 2005) . . . . . . . . . . 22

Eastport Steamship Corp. v. United States, 178 Ct. Cl. 599 (1967) . . . . . . . . . . 22

Hart v. United States, 910 F.2d 815 (1990) . . . . . . . . . . 9

Hishon, 467 U.S. 69 at 73 (1984) . . . . . . . . . . 7

Japanese War Notes Claimants Assoc. v. United States, 178 Ct. Cl. 630 (1967) . . . . . . . . . . 9

LaMear v. United States, 9 Cl. Ct. 562, 568 (1986) . . . . . . . . . . 9

Laughlin v. United States, 22 Cl. Ct. 85 (1990) . . . . . . . . . . 9

Menominee Tribe of Indians of Wisconsin v. United States, 221 Cl. Ct. 506 (1979) . . . . . . . . . . 22

Menominee Tribe v. United States, 726 F.2d 718 (Fed. Cir. 1984) . . . . . . . . . . 9, 10

Mitchell v. United States, 10 Cl. Ct. 63 (1986) . . . . . . . . . . 9

Mitchell II, 463 U.S. at 217 . . . . . . . . . . 22

Nager Electric Co. v. United States, 177 Ct. Cl. 234 (1966) . . . . . . . . . . 9

Navajo Tribe of Indians v. United States, 9 Cl. Ct. 227 (1985) . . . . . . . . . . 21

Navajo Tribe v. New Mexico, 809 F.2d 1455 (10th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 14

Neitzke v. Williams, 490 U.S. 319 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Oglala Sioux Tribe v. United States, 650 F.2d 140 (8th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . 14

Osage Nation v. United States, 57 Fed. Cl. 392 (2003) . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11, 23

Pawnee v. United States, 830 F.2d 187 (Fed. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 20

Ramming v. U.S., 281 F.3d 158 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Renne v. Geary, 501 U.S. 312 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Sac and Fox Tribe of Indians of Oklahoma v. United States, 159 Ct. Cl. 247 (1962) . . . . . . . . 21

Sankey v. United States, 22 Cl. Ct. 743 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

Sauer v. United States, 173 Ct. Cl. 642 (1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Shoshone Indian Tribe of the Wind River Reservation v. United States
364 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

United Nuclear Corp. v. United States, 12 Cl. Ct. 45 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

United States Department of Energy v. Ohio, 503 U.S. 607 (1992) . . . . . . . . . . . . . . . . . . . . . . 6

United States v. King, 395 U.S. 1 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

United States v. Mottaz, 476 U.S. 834 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

United States v. Navajo Nation, 537 U.S. 488 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 20, 21

United States v. Sherwood, 312 U.S. 584 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Wally Packaging, Inc. v. United States, 578 F. Supp. 1408 (Ct. Int'l Trade 1984) . . . . . . . . . . . . 6

**FEDERAL STATUTES**

25 U.S.C. § 70k . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 2501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11, 13

Act of June 28, 1906, 34 Stat. 539 . . . . . . . . . . 1

Act of October 21, 1978, 92 Stat. 1660 . . . . . . . . . . 2

Community Bank & Trust v. United States, 54 . . . . . . . . . . 6

Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049 . . . . . . . . . . 8

Pub. L. No. 79-726, 60 Stat. 1049-1056 (1946) . . . . . . . . . . 13

Tucker Act, 28 U.S.C. § 1491 . . . . . . . . . . 7

Tucker Act, 28 U.S.C. § 1505 . . . . . . . . . . 7, 22

**FEDERAL REGULATIONS**

25 C.F.R. 226.11(a)(2) . . . . . . . . . . 12

25 C.F.R. Part 183, 30 . . . . . . . . . . 3

25 C.F.R. Part 226 . . . . . . . . . . 3

25 C.F.R. § 226.11 . . . . . . . . . . 21

25 C.F.R. § 226.11(a)(1) . . . . . . . . . . 2

25 C.F.R. § 226.11(a)(2) . . . . . . . . . . 3, 18

25 C.F.R. § 226.11(b)(2) . . . . . . . . . . 3

25 C.F.R. § 226.5 . . . . . . . . . . 4, 19

25 C.F.R. §§ 226.11(a)(2) . . . . . . . . . . 21

Fed. Reg. 22254 (June 21, 1974) . . . . . . . . . . 3

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS

### I. INTRODUCTION

In its Third Amended Complaint, the Osage Tribe of Indians of Oklahoma (hereinafter referred to as "Plaintiff" or the "Tribe") seeks money damages from the United States for alleged mismanagement of oil, gas, and certain non-mineral leases. *See* Third Amended Complaint, ¶1. Plaintiff's Third Amended Complaint follows the filing of three earlier complaints and a verification of claim validity, which was ordered by this Court to be filed after the Tribe had access to tens of thousands of documents concerning lease, mineral production and revenue information. Despite these numerous opportunities to narrow its claims, Plaintiff, after more than five years of litigation, has still failed to articulate a viable claim for money damages against the United States for mismanagement of non-fund trust assets. The claims in Plaintiff's Third Amended Complaint concerning the alleged mismanagement of oil and gas leases accrued prior to August 2, 1993, are time-barred, as are its claims involving alleged mismanagement of non-mineral leases that accrued prior to August 16, 1998. Moreover, Plaintiff's claim that the United States mismanaged its non-fund trust assets fails to state a cause of action for which relief can be granted. For these reasons, which are more fully set forth below, the United States' Motion to Dismiss should be granted and Plaintiff's Third Amended Complaint dismissed.

### II. FACTUAL AND STATUTORY BACKGROUND

#### A. The 1906 Act

The Osage Tribe, at the turn of the last century, occupied a reservation which now constitutes Osage County, Oklahoma. By virtue of the Act of June 28, 1906, 34 Stat. 539, the

surface interests were allotted to individual tribal members. Section 3 of the 1906 Act reserved "... the oil, gas, coal, and other minerals covered by the lands for the selection and division of which provision is herein made are hereby reserved to the Osage tribe for a period of twenty-five years from and after the eighth day of April, nineteen hundred and six . . . ."[1] The ownership of the minerals by the Osage Tribe has been extended from time to time and was last extended in perpetuity by the Act of October 21, 1978, 92 Stat. 1660. The 1906 Act provides that leases are to be made by the Osage Tribal Council and approved by the Bureau of Indian Affairs.

**B. <u>Oil and Gas Leases</u>**

Oil and gas from the Tribe's mineral estate has been extracted pursuant to leases that provide for, among other things, the payment of royalties from production. It is the payment of royalties that is the principal reason a lessor enters into a lease. In general, a royalty under an oil lease is calculated by applying the "royalty rate," which has historically been and is currently stated in the regulations as being not less than 16 2/3 percent,[2] to the gross proceeds obtained from the sale of the oil after subtracting out the oil used by the lessee for development and operational purposes. *See* 25 C.F.R. § 226.11(a)(1).

The "gross proceeds" are the total monies or other consideration received at an established sales price for the oil. The established sales price is the higher of either the actual selling price or the highest posted price in a particular geographical area. *See, e.g.,* Third

---

[1] Plaintiff misquotes this statute, stating that the 1906 Act reserved the sand and gravel for the Osage Tribe. No mention is made in the 1906 Act of such a reservation.

[2] The current regulations provide that the royalty rate shall not be less than 16 2/3 percent. This allows the Tribe to execute leases at other rates as it deems appropriate. For ease of reference, however, the United States refers herein to the royalty rate as being 16 2/3 percent.

Amended Complaint, ¶ 24. Although the "royalty rate" has remained at its historical rate of 16 2/3 percent of the gross proceeds, the geographical area for determining the sales price, has changed over time. This is reflected in some of the leases attached as Exhibit A to the Third Amended Complaint.

In the early part of the 20th century, the sales price was to be based on the highest posted market price in the Mid-Continent oil field. *See, e.g.,* Third Amended Complaint, Exhibit A, p. 28. Then it changed to the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area. *See* 25 C.F.R. Part 183, 30 Fed. Reg. 22254 (June 21, 1974); *see also* Third Amended Complaint, ¶ 24. The current basis for determining the sales price today is the higher of either the actual selling price or the highest posted price by a major purchaser in Osage County, Oklahoma. *See* 25 C.F.R. § 226.11(a)(2). This standard is expressly set forth in the regulations governing the leasing of the Osage Reservation lands for oil and gas mining, 25 C.F.R. Part 226, which were approved by the Tribe through tribal resolution, and have been in effect since at least 1991. *See* Resolution of the Osage Tribal Council, Res. No. 28-393, dated December 18, 1991, attached hereto as "Exhibit A." In sum, the methodology for determining the amount of royalty to be received under an oil lease is the royalty rate of 16 2/3 percent multiplied by the total revenue received from the sale of oil priced at the higher of either the actual sales price or the highest posted price offered in the geographical area applicable at the time, minus the cost of oil used in the development and operation of the lease.

Royalty on gas is determined by multiplying the royalty rate of 16 2/3 percent by the market value of all natural gas and products extracted under the lease that have been produced and sold, less the natural gas used in the operation and development of the lease. *See* 25 C.F.R. §

226.11(b)(2). For purposes of determining royalty on gas production, there is no reference to a particular geographical area upon which the market value is based.

## C. <u>The Relationship Between the Leases and the Regulations</u>

As reflected in many of the leases attached to Plaintiff's Third Amended Complaint, the federal regulations governing Osage oil and gas leasing are expressly applicable to the leases. *See, e.g., Third Amended Complaint*, Exhibit A, p. 18. Some of the leases also state that "[i]t is specifically understood that [the] lease is subject to the current regulations of the Secretary contained at 25 CFR 226 . . . and any amendments to the regulations hereinafter promulgated are made a part of [the] lease and lessee hereby agrees to abide and conform thereto." *See, e.g., id.* at p. 36. This language is consistent with 25 C.F.R. § 226.5, which also provides that any amendment or change to the applicable regulations made after approval of any oil or gas lease applies to that lease, except that no such amendment or change shall "affect the term of the lease, rate of royalty, rental, or acreage unless agreed to by both parties and approved by the Superintendent." *Id.* As set forth above, the royalty rate has historically been and currently remains at 16 2/3 percent and, thus, there has been no need for the parties to agree and the Superintendent to approve a different royalty rate to be applied to a lease. The only aspect of the amendments to the Osage oil and gas regulations relevant to this matter that has affected the amount of royalty to be received is the change in the geographical area upon which to determine the sales price of the oil. Under 25 C.F.R. § 226.5, this factor, however, does not preclude application of the regulations' subsequent amendments to pending leases approved prior to the effective date of those amendments.

**D. The Litigation**

On August 2, 1999, the Tribe filed its original Complaint. After failing to sufficiently articulate its claims, this Court ordered the Tribe to review documents that it viewed germane to its case and then file a Verification of Claim Validity. Pursuant to that order, the Tribe "reviewed hundreds of boxes of material and made copies filling over 50 boxes of lease, production and revenue information." *See* Plaintiff's Response to the Court's Request for Verification of Claim Validity (docket entry #36), at p. 1. The Tribe also claims that it then conducted "extensive research of tens of thousands of documents" and then prepared and filed its Verification of Claim Validity. *See* Plaintiff's Response to the Court's Request for Verification of Claim Validity (docket entry #36), at p. 1. Over the next few years, the Tribe filed three amended complaints, ending with the currently pending Third Amended Complaint, filed on October 20, 2004. The only vestige of the Tribe's original Complaint that arguably is contained in its Third Amended Complaint, is the claim that the United States mismanaged the Tribe's mineral leases by failing to obtain the highest posted price. The claim that the United States mismanaged the Tribe's non-mineral leases appeared for the first time in the Tribe's Second Amended Complaint, filed on August 16, 2004.

## III. ARGUMENT

**A. Standards for Granting Dismissal of Complaint under Rule 12(b)(1) and 12(b)(6)**

Rule 12(b)(6)of the Rules of the Court of Federal Claims, ("RCFC") provides that the defendant may move to dismiss an action for the following reasons: "(1) lack of jurisdiction over the subject matter, . . . [or] (6) failure to state a claim upon which relief can be granted." In resolving the United States' Motion to Dismiss here,

> . . . the court must accept as true the complaint's undisputed *factual* allegations and construe *the facts* in the light most favorable to plaintiff. A plaintiff must make only a prima facie showing of jurisdictional *facts* through the submitted material in order to avoid a defendant's motion to dismiss. If the *undisputed facts* reveal any possible basis on which the non-moving party might prevail, the court must deny the motion.

*Community Bank & Trust v. United States,* 54 Fed. Cl.R. 352, 354 (Ct. Fed. Cl. 2002) (citations omitted) (emphasis added). While a plaintiff is required to make a short and plain statement of the facts constituting its claim, under Rule 8(a)(2), brevity should not rob the complaint of content. The federal courts, in ruling on motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, have held that the complaint must advise the opposing party of the claim against it. As the Fifth Circuit stated:

> Subsumed within the rigorous standard of the *Conley* test [a reference to *Conley v. Gibson,*355 U.S. 41 (1957)] is the requirement that the plaintiff's complaint be stated with enough clarity to enable a court or an opposing party to determine whether a claim is sufficiently alleged.

*Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001).

RCFC 12(b)(1) provides for dismissal of a claim if the court lacks jurisdiction over the subject matter of a claim. A party seeking federal court jurisdiction bears the burden of demonstrating that it is so entitled. *Commodity Futures Trading Com'n v. Nahas*, 738 F.2d 487 (D.C. Cir. 1984). The Supreme Court presumes that federal courts lack jurisdiction unless the contrary appears affirmatively from the record. *United States Department of Energy v. Ohio*, 503 U.S. 607, 614 (1992); *Renne v. Geary*, 501 U.S. 312, 315 (1991). A plaintiff must also provide and support a jurisdictional basis for judicial review. *Wally Packaging, Inc. v. United States*, 578 F. Supp. 1408, 1410 (Ct. Int'l Trade 1984). Plaintiff's claims here are time-barred and, thus, there is no jurisdictional basis for review of the Tribe's claims concerning mismanagement of

mineral leases that accrued prior to August 2, 1993, and mismanagement claims concerning non-mineral leases that accrued prior to August 16, 1998.

Moreover, it is a basic tenet that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued . . ., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tribe's Third Amended Complaint asserts that this Court has jurisdiction over its claims under the Tucker Act, 28 U.S.C. § 1491, and the so-called "Indian Tucker Act," 28 U.S.C. § 1505 (*see* Third Amended Complaint, ¶ 4). As set forth below, however, the Tribe's claims are time-barred and, thus, neither of the Tucker Acts can serve as a proper waiver of sovereign immunity to sue the United States. Accordingly, the Tribe's Third Amended Complaint should be dismissed under RCFC 12(b)(1).

RCFC 12(b)(6) also forms a basis for dismissal of Plaintiff's claims. Dismissal of a claim is authorized on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989) (citing *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) and *Conley v. Gibson*, 355 U.S. 41 (1957)). "[I]f as a matter of law 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations,' a claim must be dismissed, without regard to whether it is based on an outlandish legal theory or on a close but ultimately unavailing one." *Id.* (quoting *Hishon*, 467 U.S. at 73). Thus, a claim should be dismissed under RCFC 12(b)(6) where, as here, "it appears beyond doubt that the plaintiff can

prove no set of facts in support of his legal claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41 (1957).

**B. <u>Plaintiff's Claims Are Time-Barred.</u>**

According to Plaintiff's characterization, this lawsuit is one in which the Tribe seeks money damages "for *mismanagement* of certain Osage trust assets committed by the United States as trustee." Third Amended Complaint, ¶ 1. As a precursor to judicial review, however, Plaintiff must demonstrate that its claims are not time-barred. Because any claim for mismanagement against the United States must be brought within six years after the claim first accrues, 28 U.S.C. § 2501, most, and possibly all, of the Tribe's claims here are time-barred. Moreover, any claim that the Tribe may have had prior to August 13, 1946, is likewise time-barred under the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1049, codified at 25 U.S.C. §§ 70, *et seq.* (now repealed), which provided that any Indian claim against the United States that accrued before August 13, 1946, but which had not been filed with the Indian Claims Commission within five years thereafter, was time-barred.

**1. The Tribe's Mismanagement Claims Concerning Mineral Leases that Accrued Prior to August 2, 1993, and any Non-Mineral Lease that Accrued Prior to August 16, 1998, Are Time-Barred Under 28 U.S.C. § 2501.**

Although the Tribe has not specifically identified which leases have allegedly been mismanaged by the United States, one can assume from the attachments to the Third Amended Complaint that the leases cover, at a minimum, the years 1916 through 1995. *See, e.g.,* Third Amended Complaint, ¶¶ 27, 28; Exhibit A, pp. 28 and 35; Exhibit C, pp. 42-43. The governing statute of limitations for Plaintiff's claims here is 28 U.S.C. § 2501 (1992),

which provides:

> Every claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.

The Federal Circuit has held that § 2501 "is jurisdictional in nature and, as an express limitation of the waiver of sovereign immunity, may not be waived." *Hart v. United States*, 910 F.2d 815, 818-19 (1990); *Laughlin v. United States*, 22 Cl. Ct. 85, 99 (1990), *aff'd*, 975 F.2d 869 (Fed. Cir.1992); and *Catellus Dev. Corp. v. United States*, 31 Fed. Cl. 399, 404 (1994). This Circuit also held that "[t]he 6-year statute of limitations on actions against the United States is a jurisdictional requirement attached by Congress as a condition of the government's waiver of sovereign immunity and, as such, must be strictly construed." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988). The limitation language is "a dispositive jurisdictional inquiry for this court." *LaMear v. United States*, 9 Cl. Ct. 562, 568, *aff'd* 809 F.2d. 789 (Fed. Cir. 1986).

A claim against the United States accrues "when all events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." *Japanese War Notes Claimants Assoc. v. United States*, 178 Ct. Cl. 630, 632, 373 F.2d 356, 358 (1967), *cert. denied*, 389 U.S. 971; *Nager Electric Co. v. United States*, 177 Ct. Cl. 234, 240, 368 F.2d 847, 851 (1966); *Mitchell v. United States*, 10 Cl. Ct. 63, 66-67 (1986); *United Nuclear Corp. v. United States*, 12 Cl. Ct. 45, 49 (1987) (*citing Sauer v. United States*, 173 Ct. Cl. 642, 647, 354 F.2d 302, 304 (1965). The statute of limitations will not be tolled unless the facts underlying the claim are either fraudulently concealed or inherently unknowable. *See Menominee Tribe v. United States*, 726 F.2d 718, 721-22 (Fed. Cir. 1984), *cert. denied*, 469

U.S. 826 (1984); *Hopland Band of Pomo Indians v. United States*, 855 F.2d at 1577. In such an event, the burden of proof rests upon the plaintiff to justify and prove that the facts are so concealed or unknowable so as to delay or toll the running of the limitations period against each respective claim. *Brown v. United States*, 195 F.3d 1334 (Fed. Cir. 2000); *Cochran v. United States*, 19 Cl. Ct. 455, 458 (1990).

The fact that the Plaintiff here is an Indian tribe and that issues of a trust relationship between the United States and the Tribe are involved in the claims does not toll the running of the claims bar established by 28 U.S.C. § 2501. *Menominee Tribe v. United States*, *supra*, 726 F.2d at 721. Statutes of limitations are to be applied against the claims of Indian tribes in the same manner as against any other litigant seeking legal redress or relief from the government. *See United States v. Mottaz*, 476 U.S. 834 (1986); *Andrade v. United States*, 202 Ct. Cl. 988, 991, 996, 485 F.2d 660, 661, 664 (Ct. Cl. 1973), *cert. denied*, 419 U.S. 831 (1974); *Capoeman v. United States*, 440 F.2d 1002, 1007-08, 194 Ct. Cl. 664 (1971).

Moreover, this Circuit recently concluded, in *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d. 1339, 1349-51 (Fed. Cir. 2004), that 28 U.S.C. § 2501 applies to claims alleging the United States' mismanagement of trust assets. The Federal Circuit held that the tolling provision applicable to 28 U.S.C. § 2501 at issue in that case (the Department of the Interior and Related Agencies Appropriations Act, Public Law No. 108-7), only applies to "claims that allege the Government mismanaged *funds* after they were collected, as well as any claims that allege the Government failed to timely collect amounts due and owing to the Tribes under its sand and gravel contracts." *Shoshone Indian Tribe of*

*the Wind River Reservation v. United States*, 364 F.3d at 1351 (emphasis added).[3] Any attempt by the Tribe here to argue that the tolling provision is applicable to its claims because they involve the Government's failure "to timely collect amounts due and owing to the Tribe[]," is misplaced. Plaintiff has not alleged in its Third Amended Complaint that the only issue is whether the United States failed to "timely collect amounts due and owing;" rather by Plaintiff's own admission, this case alleges that the United States mismanaged the Tribe's trust assets by failing to determine the correct income through calculating royalties based on the highest posted price in the wrong geographical area. *See, e.g.,* Third Amended Complaint, ¶¶ 1 and 25. This characterization clearly puts the basis for determining the amount "due and owing" in dispute and, thus, is more akin to an allegation that the United States failed to *maximize* the return from the Tribe's mineral and non-mineral leases. Such a claim falls outside of the application of the tolling provision as set forth in the *Shoshone* case. Accordingly, Plaintiff's claims fail to state a claim for which relief can be granted. *See United States v. Navajo Nation*, 537 U.S. 488, 507 (2003); and *Shoshone Indian Tribe of the Wind River Reservation v. United States*, 364 F.3d at 1349-51.

Likewise, Plaintiff cannot prevent application of 28 U.S.C. § 2501 by claiming it was ignorant of how the United States calculated the royalty amount. There can be no doubt that the Tribe was aware that, since at least 1991, Osage County, Oklahoma – not the Kansas-

---

[3] Over one year prior to the Federal Circuit's ruling in the *Shoshone* matter, this Court issued an order concerning the application of 28 U.S.C. § 2501 to the United States' management of Osage tribal trust funds in the matter of *Osage Nation v. United States*, No. 00-169L. *See Osage Nation v. United States*, 57 Fed. Cl. 392, 395-97 (2003). The instant case, however, involves a dispute concerning the United States' management of Osage trust *assets* and, thus, this Court's ruling in the other *Osage* matter does not apply here.

Oklahoma area – had been the geographical area upon which the sales price was based. *See* Resolution of the Osage Tribal Council (Res. No. 28-393), dated December 18, 1991, attached hereto as "Exhibit A." In Resolution No. 28-393, the Tribe proposes an amendment to the then existing regulation, which expressly states that Osage County, Oklahoma is the relevant geographical area for determining the highest posted selling price. The Tribe's proposed amendment to 25 C.F.R. 226.11(a)(2) is attached to the Resolution, and provides suggested language to make clear that bonuses or premium pay to producers in Osage County shall not be considered in the calculation of the highest posted selling price. *See* Exhibit A, p. 2. Given this clear evidence of the Tribe's awareness that the selling price was being determined on the basis of the highest posted price in Osage County as of 1991, it knew or should have known at that time — at the very latest — that it had a claim for mismanagement of its mineral leases. When a Tribe is aware of its claim, has not demonstrated that it was excusably ignorant of the problem, and yet failed to bring its claim in a timely manner, this Circuit has held that such a claim is time-barred:

> Because the plaintiffs-appellants knew or should have known of the underreporting and underpayment as of 1979 and have failed to show that, collectively, they were excusably ignorant of the breach by the lessee, we hold that the statute of limitations has expired with respect to their claim that the United States breached a fiduciary duty by failing to discover that [the lessee] was underreporting its gross receipts.

*Brown v. United States*, 195 F.3d 1334, 1338 (Fed. Cir. 2000). In fact, this Court has previously held that, in a situation similar to this one, the statute of limitations began to run upon receipt of the very first royalty payment. *See Sankey v. United States*, 22 Cl. Ct. 743 (1991). Specifically, the Court concluded that receipt of the first royalty payment constituted

constructive notice of the issue:

> Plaintiffs offer no evidence that the original lessors did not review the leases prior to execution, and once plaintiffs began to receive royalty payments a simple phone call and/or visit to BIA would have secured answers to any questions that might have arisen. There plainly was no concealment by defendant such that would toll the statute of limitations. Nor were the facts of a potential claim 'inherently unknowable' at the ordinary accrual date of 1962.

*See Sankey v. United States*, 22 Cl. Ct. at 746. Accordingly, because the Tribe cannot reasonably claim, and indeed has failed to proffer a colorable allegation, that, as of August 2, 1993 -- six years prior to the filing of its original Complaint -- it was unaware that it had potential claims for mismanagement of its mineral leases, those claims are now time-barred under 28 U.S.C. § 2501. Likewise, any claims for mismanagement of the Tribe's non-mineral leases that accrued six years prior to the filing of its Third Amended Complaint, August 16, 1998, are time-barred.

**2. The Tribe Is Barred from Bringing any Claim Against the United States that Accrued Prior to August 13, 1946.**

The Tribe has clearly not been deprived of an opportunity to litigate any claim accruing prior to August 13, 1946, that the United States mismanaged its mineral and non-mineral leases. The Tribe had the opportunity to litigate any claims it might have had against the United States pursuant to the Indian Claims Commission Act. Pub. L. No. 79-726, 60 Stat. 1049-1056 (1946) (formerly codified as amended at 25 U.S.C. §§ 70-70v2 and omitted from the current code because the Indian Claims Commission terminated on September 30, 1978) (hereinafter "ICCA"), and, in fact, the Tribe did, indeed, take advantage of this opportunity to litigate certain claims. *See, e.g., Osage Nation v. United States*, 23 Ind. Cl. Comm. 447 (1970) (compromise settlement resolving docket numbers 105, 106, 107, and

108). Accordingly, if the Tribe desired judicial relief from the United States on its mismanagement claims that accrued prior to August 13, 1946, it was obligated by Section 12 of the ICCA to have filed a timely claim with the Indian Claims Commission or have such claims forever barred. Section 12 of the ICCA established that:

> The Commission shall receive claims for a period of five years after the date of the approval of this Act [August 13, 1946] and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

(formerly at) 25 U.S.C. § 70k.

Regardless of whether or not the Tribe did pursue its claims before the Claims Commission, the Tribe's claims today are barred because the Tribe's exclusive remedy for those claims was under the ICCA and before the Indian Claims Commission. *Oglala Sioux Tribe v. United States*, 650 F.2d 140 (8th Cir. 1981), *cert. denied* 455 U.S. 907 (1982) (Congress, by enacting the ICCA, established the exclusive remedy for the Oglala's claim under the Fifth Amendment of an unconstitutional taking of land by the United States, and the court lacked jurisdiction to entertain suit). By operation of section 12 of the ICCA, then, this Court does not have the subject matter jurisdiction to consider the Tribe's mismanagement claims against the United States that accrued prior to August 13, 1946. *See Navajo Tribe v. New Mexico*, 809 F.2d 1455 (10th Cir. 1987).

In *Navajo Tribe,* the Tenth Circuit laid to rest any argument about the scope of remedies open to an Indian Tribe after enactment of the ICCA by holding that the ICCA was the sole judicial remedy open to any tribe for a claim against the government arising before 1946. *Navajo Tribe*, 809 F.2d at 1463; *see also* Wright & Miller, *Federal Practice &*

*Procedure* § 3660, n. 22 (collecting cases finding the ICCA to be a Tribes' exclusive remedy). The ICCA and case law interpreting it gave the term "claim" its broadest possible reading based upon Congress's intent to provide a forum for the resolution of all possible accrued claims. *Id.* at 1464. Given that the leases at pages 28 and 35 of Exhibit A to the Third Amended Complaint are dated from the year 1916, it is highly likely that at least some of Plaintiff's mismanagement claims accrued prior to 1946, and, thus, should have been presented to the Indian Claims Commission, if at all.

Moreover, the Tribe, in the Stipulation for Entry of Final Judgment, which was incorporated into the Final Judgment in the matter of *Osage Nation v. United States*, 23 Ind. Cl. Comm. 447 (1970), waived any claims it could have brought that accrued prior to August 13, 1946. This waiver is contained in the very broad language of the Stipulation:

> 3. The judgment shall finally dispose of all claims or demands which petitioner has asserted or could have asserted in the above-entitled cases (Docket Nos. 105, 106, 107 and 108) against defendant, and petitioner shall be barred from asserting all such claims or demands in any future action.
>
> 4. The judgment shall finally dispose of all offsets, claims or demands, which defendant has asserted or could have asserted against petitioner in this or in any other case from and after November 10, 1868, to and including the date of final judgment entered herein, under the provisions of Section 2 of the Indian Claims Commission Act, or any other act authorizing the assertion of offset claims against petitioner.

*Id.* at 455. It cannot be disputed that the Tribe was well-aware of its ability to bring a mismanagement claim against the United States, yet it chose not to do so. Therefore, in light of the very broad waiver that it stipulated to, and pursuant to the plain language of the ICCA, the Tribe is now barred from bringing any claim against the United States for mismanagement of its mineral and non-mineral leases that accrued prior to August 13, 1946.

C. **<u>Plaintiff Has Failed to State a Cause of Action for which Relief Can Be Granted.</u>**

In its Third Amended Complaint, Plaintiff has failed to allege facts sufficient to state a cause of action against the United States for a breach of its trust responsibility to the Tribe. As stated earlier, Plaintiff is a tribe that has been integrally involved in oil and gas leasing activities for decades, and passed tribal resolutions reflecting its approval of the very Osage oil and gas royalty regulations it now claims the United States should have ignored. The Tribe does not assert in Count One of its Third Amended Complaint that the United States failed to comply with its responsibilities under those tribally-sanctioned regulations; rather, without further support, it asserts that the United States should have revised its regulations and used a different method of calculating royalties that would have resulted in the Tribe receiving more money. Third Amended Complaint, ¶¶ 25-30. Because the United States followed the governing regulations and because it was not obligated by any applicable provision of law to maximize the royalty received under the mineral leases, Plaintiff has failed to state a claim for which relief can be granted.

In Count Two of the Third Amended Complaint, the Tribe alleges that the United States failed to collect additional royalty associated with non-mineral leases. As was the case with Count One, Plaintiff does not argue in Count Two that the United States has breached any provision of the applicable statutes and regulations. Rather, despite claiming earlier that it has filled over 50 boxes with copies of lease, production and revenue information, the Tribe claims it "cannot identify each and every non-oil and gas lease where the United States, as trustee, has made a payment to the Tribe that is less than the payment required by the lease," however, it believes that such underpayments were made. Third Amended Complaint, ¶ 33,

34. The Tribe's allegations concerning the United States' management of non-mineral leases offer nothing more; they fail to identify any particular lease at issue or challenge the United States' methodology for calculating royalties. The allegations are simply too vague to put the United States on notice of any claim and, thus, the Tribe has failed to state a claim upon which relief can be granted.

### 1. The Tribe Does Not Allege that the United States Failed to Comply with the Governing Law and the United States Is Not Obligated to Maximize the Amount of Royalty Realized.

The allegations of Count One reveal that Plaintiff is simply dissatisfied with the end result of applying the regulations' terms to the Osage mineral leases. Count One alleges that the United States should have applied the royalty rate to the highest posted price in Cushing, Oklahoma and, thus, more royalty would have been realized. Third Amended Complaint, ¶ 25. The United States' obligation, however, is limited to compliance with the applicable regulations. Where, as here, its legal obligation is limited to the approval of the leases and the timely collection of the lease proceeds, the United States owes no fiduciary duty to the Tribe to maximize the amount of royalty to be paid.

In an analogous case, *Pawnee v. United States,* 830 F.2d 187, 191-92 (Fed. Cir. 1987), the plaintiffs claimed that the Government had beached its trust responsibility because "the Government did not pay them, as royalties, on the basis of the highest market value for the particular type of gas produced by the leases." After noting that "the difficulty with this claim is that it runs counter to the governing regulations and the terms of the lease," the court held that "the scope and extent of the fiduciary relationship, with respect to this particular matter is established by the regulation and leases. . . . Interior is not required to go beyond directives

and leases which are consistent with the statutes and regulations." *Id.* at 191-92.

As made clear in *Pawnee,* the United States' liability, if any, is for violations of any applicable statutes and regulations, which define the government's trust responsibility. So long as the United States acts in accordance with those authorities, the United States has satisfied its trust responsibility. Plaintiff does not allege that the United States failed to comply with the regulations and lease terms; rather, it claims that the United States should have used a different method of calculating the royalty. Even assuming *arguendo* the existence of a general fiduciary relationship, such a relationship, however, "does not mean that each and every claim by the Indian lessor necessarily states a proper claim for breach of trust." *Pawnee, supra,* at 191.

The Tribe's argument that the United States should have calculated the oil and gas royalty payment by applying the royalty rate against the higher of either the actual selling price or the highest posted price in Cushing, Oklahoma (*see* Third Amended Complaint, ¶ 25) appears to be based upon a misunderstanding of the factual background. Plaintiff cites to certain leases for the proposition that royalty payment is based upon:

> The actual selling price or highest posted price or offered price by a major purchaser in the Kansas/Oklahoma area, whichever is higher on the day of sale or removal.

*See* Third Amended Complaint, ¶ 24; and Exhibit A attached thereto. Plaintiff then argues that 25 C.F.R. § 226.11(a)(2), being later in time than the leases, cannot change the royalty calculation unless agreed to by the Plaintiff. That regulation, prior to 1991, stated as follows:

> Unless the Osage Tribal council, with approval of the Secretary, shall elect to take the royalty in kind, payment shall be made at the time of sale or removal of the oil, except where payments are made on division orders, and settlement

> shall be based on the actual selling price, or the highest posted or offered price by a major purchaser in the Kansas-Oklahoma area which ever is higher on the day of sale or removal. Where different prices are paid simultaneously for oil from a lease and the highest such price exceeds the higher of the aforementioned prices, then that price shall be the basis of royalty on all oil from said lease.

In 1991, the regulation was modified to state as follows:

> Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in § 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage Oil leases.

The current regulation was promulgated in 1993, and also provides that the applicable geographic area to be used in determining the sales price, is the highest posted price in Osage County, not the Kansas-Oklahoma region. Based on these regulations, the United States was not obligated to consider the highest posted price for crude oil in Cushing, Oklahoma. Rather, the regulations specify that the proper geographical area upon which to apply the royalty rate of 16 2/3 percent is Osage County, Oklahoma, not Pawnee County, Oklahoma, which is where Cushing, Oklahoma is located. *See* 25 C.F.R. § 226.5. The Tribe does not allege that the United States has failed to act in accordance with these regulations; nor does the Tribe specifically claim that the United States failed to carry out its obligations to approve mineral leases and timely collect the proceeds from those leases. Fulfilling those obligations is all that the United States is required to do. As articulated by the *Pawnee* court:

> There is no obligation that Interior failed to comply with the regulations or the leases in valuing the oil for royalty purposes. There is no statutory provision on that subject and no assertion that any statute has been violated. There is no claim that the leases were imprudently or illegally consummated. There is no suggestion that Interior failed to base royalty payments on all the gas sold by the lessees and the sums paid over by

> them. Thus, the claim is simply that the Interior Department is compelled to go contrary to and beyond the regulations and the leases in order to fulfill its alleged fiduciary obligation to appellants.
>
> That is a proposition we cannot accept. . . . [T]he fiduciary relationship springs from the statutes and regulations which 'define the contours of the United States' fiduciary responsibilities.' Where, as in this case, the regulations and the leases deal directly with the problem and are not challenged, the Indians cannot demand that the United States ignore those provisions or act contrary to them. The scope and extent of the fiduciary relationship, . . . is established by the regulation and leases. Appellants cannot create a viable fiduciary claim purely by insisting that this court (or the Claims Court) establish different or higher standards.

*Pawnee v. United States,* 830 F.2d at 191-92 (citations omitted).

The Supreme Court's ruling in *United States v. Navajo Nation,* 537 U.S. 488 (2003), likewise supports dismissal of the Tribe's Third Amended Complaint for failure to state a claim upon which relief can be granted. In *Navajo*, the tribe sought money damages for allegedly agreeing to a royalty rate for a coal lease that was less than a theoretically higher rate. In dismissing the tribe's breach of trust claim, the Supreme Court pointed out that the coal leasing provisions of the IMLA required the Secretary only to approve coal leases and to promulgate regulations. Likewise, here, the Secretary has analogous obligations. Specifically, the 1906 Act and later acts, which Plaintiff cites as the authority creating the United States' trust obligation (*see* Third Amended Complaint, ¶ 22), simply require Secretarial approval and provide for the promulgation of regulations. As was the situation in *Navajo*, there are no specific statutory obligations imposed upon the Secretary here. Thus, this Court should follow the Supreme Court's decision in *Navajo,* wherein the Supreme Court stated:

> In sum, neither the IMLA nor any of its regulations establishes anything more than a bare minimum royalty. Hence, there is no textual basis for concluding

> that the Secretary's approval function includes a duty, enforceable in an action for money damages, to ensure a higher rate of return for the Tribe concerned.

537 U.S. at 511. In the present case, the regulations only require that the lease provide for a minimum royalty rate of 16 2/3 percent. *See* 25 C.F.R. § 226.11. The regulations do not require the United States to obtain a theoretical higher rate. The regulations also specify the method of calculation of the price of oil or gas on which the royalty is based. *See* 25 C.F.R. §§ 226.11(a)(2) and 226.11(b). Thus, to the extent that the Third Amended Complaint alleges the United States should have obtained a higher royalty rate or calculated the amounts differently, it fails to state a cause of action upon which relief can be granted.

Moreover, as discussed earlier, the regulations at issue here are the very regulations that Plaintiff expressly approved by tribal resolution in 1991, and the ones with which the Tribe requested that the United States act in accordance. Such conformity with the Tribe's wishes support a finding that the United States has committed no breach of its fiduciary duty. *See, e.g., Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 227, 248-54 (1985) (holding primarily that, because the Tribe had asked the BIA to do an inventory of mineral resources in the late 1930s, and because the Tribe passed a resolution in 1941 supporting the war effort, there was no breach of the very broad "fair and honorable dealings" clause when the United States failed to pay the Navajo Tribe a prospecting fee after it explored the Navajo Reservation for uranium in the 1940's). *See also Sac and Fox Tribe of Indians of Oklahoma v. United States*, 159 Ct. Cl. 247 (1962) (rejecting claim for breach of "fair and honorable dealings" clause concerning the United States' reservation of certain ceded tribal lands for the use of certain members of the tribe when the tribe had previously asked the United States to

set aside a tract from the ceded lands for the use of those members). Accordingly, where, as here, the United States has acted in conformity with the wishes of the Tribe, there should be no cognizable claim under 28 U.S.C. § 1505.[4]

**2. The Statutes and Regulations, at Best, Can Only Be Fairly Interpreted as Mandating Compensation to a Claimant Headright Owner, and, thus, Do Not Mandate Compensation to the Tribe, aside from a Claim Associated with Its Own Headright Ownership Interest.**

The 1906 Act provides the authority for royalties to be paid to the individual annuitants. *See* Sections 3 and 4 (Second), 1906 Act. To the extent that the Osage Nation seeks to bring its asset mismanagement claims, it can only do so as a headright holder; it cannot be permitted to claim a judgment for monies related to other headright holders when those other headright holders could seek a judgment themselves. The statutes and regulations *must* be fairly interpreted to mandate compensation to the *claimant*, and it is only the headright owner that can argue that the statutes and regulations mandate compensation to them. For statutes that place certain duties on the government:

> even if the promise to pay money damages is not expressly in the statute, these damages may nevertheless be *implied* by the statute as a necessary remedy for the government's breach of its duties. *See Mitchell II*, 463 U.S. at 217 n. 16 ("the substantive source of law may grant the *claimant* a right to recover damages either 'expressly or by implication'" (quoting *Eastport Steamship Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967)).

*Contreras v. United States*, 2005 WL 741757, *7 (Fed. Cl. 2005) (emphasis added).

In *Osage Nation v. United States*, No. 00-169L, this Court entered an order, dated July

---

[4] The scope of 28 U.S.C. § 1505 is much narrower than that of the "fair and honorable dealings" clause (*see Menominee Tribe of Indians of Wisconsin v. United States*, 221 Cl. Ct. 506 (1979), and, thus, if this Court found that acting in conformity with a tribe's wishes precluded a claim for a breach of the "fair and honorable dealings" clause, then the same conclusion should be reached here.

28, 2003, concluding that the Osage Nation was authorized to bring a claim for alleged mismanagement of trust funds paid into the tribal account on behalf of the other Osage headright holders. *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003). Osage headright holders are comprised of individual members of the Osage Tribe, individual members of other Indian tribes, and non-Indians who have a right to receive a disbursement of funds generated by the Osage mineral estate. *See* Third Amended Complaint, ¶ 19.

That *Osage* case, however, differs from the present one in that there, the court held that the funds mismanagement allegedly took place once the funds were within the tribal trust account established by the 1906 Act. *Osage Nation v. United States*, 57 Fed. 2d at 395. In this case, the Tribe is not pursuing a claim for loss of funds that were already in the trust account held by the United States. Rather, the Plaintiff here is arguing that it should recoup funds that had never entered into the Tribe's trust account in the first instance. Because this case challenges the methodology used to value royalties on mineral and non-mineral leases, a ruling on the merits of the Tribe's claims – if the Third Amended Complaint survives the United States' Motion to Dismiss – would not bind headright holders not before this Court. This is because the statute and regulations can be fairly interpreted to mandate compensation to them as headright owners for claims in their own right. Moreover, if a headright holder brings an action in the future that raises the same claims that are now pending before this Court, it is theoretically possible that different outcomes on the same claims could result.

The Supreme Court in *Navajo* held that there must be a money mandating statute such that the breach of which requires the United States to pay money damages. The statutes creating the Osage arrangement indicate that any responsibility is owed, not to the Osage

Tribe, but, rather, to the individual members. Section 3 of the 1906 Act reads in part:

> . . . and lease for all oil, gas, and other minerals, covered by the selections and division of lands herein provided for, may be made by the Osage tribe of Indians through its tribal council, and with the approval of the Secretary of the Interior, and under such rules and regulations as he may prescribe: Provided, that the royalties to be paid to *the Osage tribe* under any mineral lease so made shall be determined by the President of the United States . . .

*Id.* (emphasis added). Section 4, (Second) of the 1906 Act provides as follows:

> That the royalty received from oil, gas, coal and other mineral leases upon the lands for which selection and division are herein provided. . . shall be placed in the Treasury of the United States to the credit of the *members of the Osage Tribe of Indians* as other moneys of said tribe are to be deposited under the provisions of this act, and the same shall be distributed to the individual members of said Osage tribe according to the roll provided for herein. . .

*Id.* (emphasis added).

Moreover, the statute makes it clear that the royalty received is to be paid to the members of the Tribe, not to the Tribe itself. While Section 3 of the 1906 Act provides that royalties to be paid to the Tribe shall be determined by the Secretary, Section 4 makes it clear that all such payments are to go to the members, and not to the Tribe itself. Thus, even if the 1906 Act and implementing regulations could somehow be deemed to be money-mandating, they can only be fairly interpreted to mandate compensation for a breach to the headright owners; the Tribe would have an interest only to the extent that it owns a portion of a headright interest, and could not receive a monetary judgment in its name for claims of individual Osage tribal members, non-Osage Indians, and non-Indian headright owners, who are not before this Court. For this reason, too, the Tribe's Complaint should be dismissed to the extent that it seeks recovery for claims outside of its headright ownership. Accordingly, the Tribe's Third Amended Complaint should be dismissed for failure to state a claim upon

which relief can be granted.

## IV. CONCLUSION

WHEREFORE, for the reasons set forth above, the United States respectfully requests that its Motion to Dismiss be granted, that Plaintiff's Third Amended Complaint be dismissed, and that each party be directed to pay its own fees and costs.

Dated this 11th day of April, 2005.

Respectfully submitted,

Caroline M. Blanco

CAROLINE M. BLANCO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
General Litigation Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel.: (202) 305-0248
Fax: (202) 305-0267
E-mail: caroline.blanco@usdoj.gov

Of Counsel:

ALAN WOODCOCK
Regional Solicitor
Office of the Field Solicitor
United States Department of the Interior
7906 East 33rd Street, Suite 100
Tulsa, OK 74145
Tel.: (918) 669-7730, Ext. 225
Fax: (918) 669-7736

STEPHEN L. SIMPSON
Attorney
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW, MS 6456-MIB
Washington, D.C. 20240
Tel.: (202) 219-1659
Fax: (202) 208-3490

Attorneys for Defendant

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **THE OSAGE TRIBE OF INDIANS OF OKLAHOMA,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **No. 99-550L** |
| | ) | **Judge Mary Ellen Coster Williams** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 11th day of April, 2005, true and correct copies of the foregoing UNITED STATES' MOTION TO DISMISS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE UNITED STATES' MOTION TO DISMISS and EXHIBIT A attached thereto, were served, via first-class mail, postage prepaid, to the following counsel of record at the following address:

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, NW
Washington, D.C. 20036

Caroline M. Blanco
CAROLINE M. BLANCO

REC'D IN BRANCH OF MINERALS 1/17/92. NB

Jewell Barker Copy

FILE COPY
SURNAME
Brown

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

Res. No. 28-393

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, is of the opinion that the mineral estate is losing royalty income, when oil and gas purchasers cannot offer bonus or premium pay to producers in Osage County without effecting the highest paid price provision in 25 CFR 226.11; and,

2. The Osage Tribal Council together with the Superintendent, Osage Agency, Bureau of Indian Affairs, and the Office of the Field Solicitor, Pawhuska, participated in drafting the attached proposed amendment to the Regulations, 25 CFR 226.11(a)(2). Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary of the Interior approve the proposed amendment to 25 CFR 226.11(a)(2); and,

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to sign this resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of December 1991.

[signature]
PRINCIPAL CHIEF

ATTEST:

June E. Cole
SECRETARY



Exhibit A

PROPOSED AMENDMENT TO 25 CFR 226

LEASING OF OSAGE RESERVATION LANDS
FOR OIL AND GAS MINING

PRESENT REGULATIONS

Sec. 226.11(a)(2)

(2) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the highest of the bona fide selling price, posted or offered price by a major purchaser (as defined in Sec. 226.1(h)) in Osage County, Oklahoma, who purchases production from Osage oil leases.

PROPOSED REGULATIONS

(a)(2) add after the period following, Osage oil leases, this sentence: Provided, that premium, bonus, or other like payments, shall not be considered in the calculation of highest posted, offered, or selling price; except, that royalty will be due for all such payments. Provided further, that all contracts, for said payments, shall first receive approval from the Osage Tribal Council and the Superintendent.

File Copy

Thuel

Harris Wood

MAY 3 0 1986

Blue envelope

MEMORANDUM

TO: Joseph C. Johnston, Chief, Division of Energy & Mineral Resources

FROM: Superintendent, Osage Agency

SUBJECT: Proposed Revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining

Pursuant to your instructions, there are enclosed the original of the proposed revisions of 25 CFR 226 and copy of Osage Tribal Council Resolution NO. 26-734.

It is requested that these proposed revisions be published, as written, as proposed rulemaking as soon as possible.

If you have any questions, please call Cecil O. Wood, Jr., Field Solicitor, Pawhuska, Phone 918-287-2495, Extension 246.

Superintendent

Enclosure

cc w/o enclosure:
Solicitor's Reading File

COWood:clh 5/30/86

Superintendent's chrony copy
Mailroom copy

cc w/enclosures:
Area Director, Muskogee

Principal Chief, Osage Tribe



EXHIBIT 16

RESOLUTION
of the
OSAGE TRIBAL COUNCIL No. 26-754

WHEREAS,

1. The Osage Tribal Council has reviewed the draft of the proposed revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining, and

2. It is the consensus of the Council that said revision, as written, would be in the best interest of the Osage Tribe of Indians and the Osage oil lessees: Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary - Indian Affairs approve, as written, and publish as proposed rule making at the earliest practical date the proposed revision of 25 CFR 226 - Leasing of Osage Reservation Lands for Oil and Gas Mining, and

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to execute this Resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of Eight (8) in favor, and None (0) against, this 28th day of May, 1986.

[signature]
Principal Chief

ATTEST:

[signature]
Secretary

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 CFR Part 226

LEASING OF OSAGE RESERVATION LANDS FOR OIL AND GAS MINING.

AGENCY: Bureau of Indian Affairs.

ACTION: Proposed rule.

SUMMARY: The Bureau of Indian Affairs is publishing a proposed rule to amend the regulations relative to the leasing of the mineral estate of the Osage Tribe of Indians for oil and gas mining. The management of the Osage mineral estate needs to be strengthened and the Osage oil lessees need relief from basing the payment of royalty to the Osage Tribe on the offered or posted price of a major purchaser in the Kansas-Oklahoma area. The promulgation of these amendments to the regulations will improve the management of the Osage mineral estate and will alleviate the economic hardship placed on the oil lessees.

DATE: Comments must be received on or before (30 days after date of publication of this proposed rule in the FEDERAL REGISTER).

ADDRESS: Send written comments to Joseph C. Johnston, Chief, Division of Energy and Mineral Resources, Code 240, Bureau of Indian Affairs, Department of the Interior, 1951 Constitution Avenue, N.W., Washington, D. C. 20245.

FOR FURTHER INFORMATION CONTACT: George E. Tallchief, Osage Tribal Council, Grandview Avenue, Pawhuska, OK 74056, (918) 287-4622 or 4623; Jack Shoemate, Superintendent, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2481; Cecil O. Wood, Jr., Field Solicitor, Pawhuska, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2495; Newell Barker, Chief, Branch of Minerals, Osage Agency, Grandview Avenue, Pawhuska, OK 74056, (918) 287-2471.

SUPPLEMENTARY INFORMATION: This proposed rule is published in exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary - Indian Affairs by 209 DM 8.

The Department of the Interior has determined that this document is not a major rule under E. O. 12291 and certifies that this document will not have a significant economic effect on a substantial number of small businesses under the Regulatory Flexibity Act, 5 U.S.C. §§ 601 et seq. (1982).

The information collection requirements contained in Sections 226.6, 226.14, 226.23, 226.25, 226.28, 226.29, 226.33 and 226.44 are those necessary to comply with the requirements of the Office of Management and Budget (OMB) Circular No. A-102. The Standard Form 424 and attachments prescribed by such circular are approved by OMB under 44 U.S.C. 3501 et seq. (1982) and assigned approval number 0348-0006. These sections describe the types of information that would satisfy the requirements of Circular A-102.

The primary author of this document is the Osage Tribal Council, Telephone number (918) 287-4622 or 4623.

Since this document does not constitute a major Federal action under the National Environmental Policy Act of 1969, 42 U.S.C §§ 4321 et seq. (1982), no environmental impact statements or environmental assessments were made.

List of subjects in 25 CFR Part 226: Leasing of Osage Reservation Lands For Oil and Gas Mining.

Accordingly, it is proposed to amend 25 CFR Part 226 as shown.

1. The authority citation for Part 226 would be revised to read as follows:

Authority: Sec. 3, 34 Stat. 543. Sec. 1, 2, 45 Stat. 1478, 1479. Sec. 3, 52 Stat. 1034, 1035. Sec. 2(a), 92 Stat. 1660.

2. Section 226.1 would be amended by revising paraagraph (h) to read as follows:

§ 226.1 Definitions.

* * * * *

(h) "Major purchaser" means any one of the minimum number

of purchasers taking 95 percent of the oil in Osage County, Oklahoma. Any oil purchased by a purchaser from itself, its subsidiaries, partnerships, associations, or other corporations in which it has a financial or management interest shall be excluded from the determination of a major purchaser.

* * * * *

3. Section 226.6 would be amended by revising paragraphs (a) and (c) to read as follows:

§ 226.6 Bonds.

* * * * *

(a) A bond on Form D shall be filed with each lease submitted for approval. Such bond shall be in an amount of not less than $5,000 for each quarter section or fractional quarter section covered by said lease: Provided, however, That one bond in the sum of not less than $50,000 may be filed on Form G covering all leases on the Osage Mineral Estate not in excess of 10,240 acres to which lessee is or may become a party.

* * * * *

(c) A bond on Form H shall be filed in an amount of not less than $5,000 covering a lease acquired through assignment where the assignee does not have a collective bond on Form G or nationwide bond, or the corporate surety does not execute

its consent to remain bound under the original bond given to secure the faithful performance of the terms and conditions of the lease.

* * * * *

4. Section 226.11 would be amended by revising paragraphs (a)(2) and (b)(1) to read as follows:

§ 226.11 Royalty payments.

(a) * * *

(2) Unless the Osage Tribal Council, with approval of the Secretary, shall elect to take the royalty in kind, payment is owing at the time of sale or removal of the oil, except where payments are made on division orders, and settlement shall be based on the bona fide selling price, posted or offered price by a major purchaser in Osage County, Oklahoma, who purchases production from Osage oil leases as defined in § 226.1(h).

* * * * *

(b) * * *

(1) Oil Lease. All casinghead gas shall belong to the oil lessee subject to any rights under existing gas leases. All casinghead gas removed from the lease from which it is produced shall be metered unless otherwise approved by the Superintendent and be subject to a royalty of not less than 16 2/3 percent of the market value of the gas and all products extracted therefrom,

less a reasonable allowance for manufacture or processing. If oil lessee supplies casinghead gas produced from one lease for operation and/or development of other leases, either his or others, a royalty of not less than 16 2/3 percent shall be paid on the market value of all casinghead gas so used. All casinghead gas not utilized or sold by the oil lessee may, with the approval of the Superintendent, be utilized or sold by the gas lessee, subject to the prescribed royalty of not less than 16 2/3 percent of the market value.

* * * * *

5. Section 226.13 would be amended by revising paragraph (a) to read as follows:

§ 226.13 Time of royalty payments and reports.

(a) Royalty payments due may be paid by either purchaser or lessee. Unless otherwise provided by the Osage Tribal Council and approved by the Superintendent, all payments shall be due by the 25th day of each month and shall cover the sales of the preceding month. Failure to make such payments shall subject lessee or purchaser, whoever is responsible for royalty payment, to a late charge at the rate of not less than 1 1/2 percent for each month or fraction thereof until paid. The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charge.

* * * * *

6. Section 226.14 would be amended by revising paragraph (b) to read as follows:

§ 226.14 Contracts and division orders.

* * * * *

(b) Lessee shall require the purchaser of oil and/or gas from his lease or leases to furnish the Superintendent with a monthly statement of the gross barrels of oil and/or gross Mcf of gas sold not later than the 25th day of each month, unless an extension of time not to exceed 10 days is authorized by the Superintendent, and shall cover the preceding month.

7. Section 226.15 would be amended by adding a new paragraph (e) to read as follows:

§ 226.15 Unit leases, assignments and related instruments.

* * * * *

(e) Combining Leases. The lessee owning both an oil lease and gas lease covering the same acreage is authorized to convert such leases to a combination oil and gas lease.

8. Paragraph (e) of Section 226.18 would be deleted and the introductory paragraph and paragraph (d) thereof would be revised to read as follows:

§ 226.18 Information to be given surface owners prior to commencement of drilling operations.

Except for the surveying and staking of a well, no operations of any kind shall commence until the lessee or his authorized representative shall meet with the surface owner or his representative, if a resident of and present in Osage County, Oklahoma. Unless waived by the Superintendent, such meeting shall be held at least ten (10) days prior to the commencement of any operations, except for the surveying and staking of the well. At such meeting lessee or his authorized representative shall comply with the following requirements:

* * * * *

(d) When the surface owner or his representative is not a resident of or is not physically present in Osage County, Oklahoma, or cannot be contacted at the last known address, the Superintendent may authorize lessee to proceed with operations.

9. Section 226.19 would be amended by revising paragraphs (a), (b) and (d) read as follows:

§ 226.19 Use of surface land.

(a) Lessee or his authorized representative shall have the right to use so much of the surface of the land within the Osage Mineral Estate as may be reasonable for operations and marketing. This includes but is not limited to the right to lay and maintain

pipelines, electric lines, pull rods, other appliances necessary for operations and marketing, and the right-of-way for ingress and egress to any point of operations. If lessee and surface owner are unable to agree as to the route of pipelines, electric lines, etc., said route shall be set by the Superintendent. The right to use water for lease operations is established by § 226.24. Lessee shall conduct his operations in a workmanlike manner, commit no waste and allow none to be committed upon the land, nor permit any avoidable nuisance to be maintained on the premises under his control.

(b) Before commencing a drilling operation, lessee shall pay or tender to the surface owner commencement money in the amount of $25 per seismic shot hole and commencement money in the amount of $300 for each well, after which lessee shall be entitled to immediate possession of the drilling site. Commencement money will not be required for the redrilling of a well which was originally drilled under the current lease. A drilling site shall be held to the minimum area essential for operations and shall not exceed one and one-half acres in area unless authorized by the Superintendent. Commencement money shall be a credit toward the settlement of the total damages. Acceptance of commencement money by the surface owner does not affect his right to compensation for damages as described in § 226.20, occasioned by the drilling and completion of the well for which

it was paid. Since actual damage to the surface from operations cannot necessarily be ascertained prior to the completion of a well as a serviceable well or dry hole, a damage settlement covering the drilling operation need not be made until after completion of drilling operations.

* * * * *

(d) Lessee shall also pay fees for tank sites not exceeding 50 feet square at the rate of $100 per tank site or other vessel: Provided, That no payment shall be due for a tank temporarily set on a well location site for drilling, completing, or testing. The sum to be paid for a tank occupying more than 50 feet square shall be agreed upon between the surface owner and lessee or, on failure to agree, the same shall be determined by arbitration as provided by § 226.21.

10. Section 226.21 would be amended by revising paragraph (f) to read as follows:

§ 226.21 Procedure for settlement of damages claimed.

* * * * *

(f) Any two of the arbitrators may make a decision as to the amount of damage due. The decision shall be in writing and shall be served forthwith upon the parties in interest. Each party shall have 90 days from the date the decision is served in which to file an action in a court of competent jurisdiction.

If no such action is filed within said time and the award is against lessee or his authorized representative, he shall pay the same together with interest at an annual rate established for the Internal Revenue Service from date of award, within 10 days after the expiration of said period for filing an action.

* * * * *

11. Section 226.22 would be amended by revising paragraph (b) and (e) to read as follows:

s 226.22 Prohibition of pollution.

* * * * *

(b) Pits for drilling mud or deleterious substances used in the drilling, completion, recompletion, or workover of any well shall be constructed and maintained to prevent pollution of surface and subsurface fresh water. These pits shall be enclosed with a fence of at least four strands of barbed wire, or an approved substitute, stretched taut to adequately braced corner posts, unless the surface owner, user, or the Superintendent gives consent to the contrary. Immediately after completion of operations, pits shall be emptied and leveled unless otherwise requested by surface owner or user.

* * * * *

(e) Deleterious fluids other than fresh water drilling fluids used in drilling or workover operations, which are displaced or produced in well completion or stimulation procedures including but not limited to fracturing, acidizing, swabbing, and drill stem tests, shall be collected into a pit lined with plastic of at least 30 mil or a metal tank and maintained separately from above-mentioned drilling fluids to allow for separate disposal.

12. Section 226.23 would be revised to read as follows:

§ 226.23 Easements for wells off leased premises.

The Superintendent, with the consent of the Osage Tribal Council, may grant commercial and non-commercial easements for wells off the leased premises to be used for purposes associated with oil and gas production. Rental payable to the Osage Tribe for such easements shall be an amount agreed to by Grantee and the Osage Tribal Council subject to the approval of the Superintendent. Grantee shall be responsible for all damages resulting from the use of such wells and settlement therefor shall be made as provided in § 226.21.

13. Section 226.25 would be revised to read as follows:

§ 226.25 Gas well drilled by oil lessees and vice versa.

Prior to drilling, the oil or gas lessee shall notify the other lessee of his intent to drill. When an oil lessee in drilling a well encounters a formation or zone having indications of possible gas production, or the gas lessee in drilling a well encounters a formation or zone having indication of possible oil production, he shall immediately notify the other lessee and the Superintendent. Lessee drilling the well shall obtain all information which a prudent operator utilizes to evaluate the productive capability of such formation or zone.

(a) Gas well to be turned over to gas lessee. If the oil lessee drills a gas well, he shall, without removing from the well any of the casing or other equipment, immediately shut the well in and notify the Superintendent. If the gas lessee does not, within 45 days after receiving notice and cost of drilling, elect to take over such well and reimburse the oil lessee for the cost of drilling, including all damages paid and the cost in-place of casing, tubing, and other equipment, the oil lessee shall immediately confine the gas to the original stratum. The disposition of such well and the production therefrom shall then be subject to the approval of the Superintendent. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas

lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

(b) Oil well to be turned over to oil lessee. If the gas lessee drills an oil well, he shall immediately, without removing from the well any of the casing or other equipment, notify the oil lessee and the Superintendent. If the oil lessee does not, within 45 days after the receipt and cost of drilling, elect to take over the well, he shall immediately notify the gas lessee, and the disposition of such well and the production therefrom shall be subject to the approval of the Superintendent. Should the oil lessee elect to take over the well, he shall pay the gas lessee for the cost of drilling, including all damages paid and cost in-place of casing, tubing, and other equipment. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

(c) Lands not leased. If the gas lessee shall drill an oil well upon lands not leased for oil purposes or vice versa, the Superintendent may, until such time as said lands are leased, permit the lessee who drilled the well to operate and market the production therefrom. When said lands are leased, the lessee who

drilled and completed the well shall be reimbursed by the oil or gas lessee for the cost of drilling said well, including all damages paid and the cost in-place of casing, tubing, and other equipment. If the lessee does not elect to take over said well as provided above, the disposition of such well and the production therefrom shall be determined by the Superintendent. In the event the oil lessee and gas lessee cannot agree on the cost of the well, such cost will be apportioned between the oil and gas lessee by the Superintendent. If such apportionment is not accepted, the well shall be plugged by the oil or gas lessee who drilled the well.

14. Section 226.28 would be amended by revising the introductory paragraph and paragraphs (a) and (c) to read as follows:

§ 226.28 Shutdown, abandonment, and plugging of wells.

No productive well shall be abandoned until its lack of further profitable production of oil and/or gas has been demonstrated to the satisfaction of the Superintendent. Lessee shall not shut down, abandon, or otherwise discontinue the operation or use of any well for any purpose without the written approval of the Superintendent. All applications for such approval shall be submitted to the Superintendent on forms furnished by him.

(a) Application for authority to permanently shut down or discontinue use or operation of a well shall set forth justification, probable duration, the means by which the well bore is to be protected, and the contemplated eventual disposition of the well. The method of conditioning such well shall be subject to the approval of the Superintendent.

* * * * *

(c) The Superintendent is authorized to shut in a lease when the lessee fails to comply with the terms of the lease, the regulations, and/or orders of the Superintendent.

15. Section 226.29 would be amended by revising paragraph (a) to read as follows:

§ 226.29 Disposition of casings and other improvements.

(a) Upon termination of lease, permanent improvements, unless otherwise provided by written agreement with the surface owner and filed with the Superintendent, shall remain a part of said land and become the property of the surface owner upon termination of the lease, other than by cancellation. Exceptions include personal property not limited to tools, tanks, pipelines, pumping and drilling equipment, derricks, engines, machinery, tubing, and the casings of all wells: Provided, That when any

lease terminates, all such personal property shall be removed within 90 days or such reasonable extension of time as may be granted by the Superintendent. Otherwise, the ownership of all casings shall revert to lessor and all other personal property and permanent improvements to the surface owner. Nothing herein shall be construed to relieve lessee of responsiblility for removing any such personal property or permanent improvements from the premises if required by the Superintendent and restoring the premises as near as practicable to its original state.
* * * * *

16. Section 226.33 would be revised to read as follows:

§ 226.33 Line drilling.

Lessee shall not drill within 300 feet of boundary line of leased lands, nor locate any well or tank within 200 feet of any public highway, any established watering place, or any building used as a dwelling, granary, or barn, except with the written permission of the Superintendent. Failure to obtain advance written permission from the Superintendent shall subject lessee to cancellation of his lease and/or plugging of the well.

17. Section 226.34 would be revised to read as follows:

§ 226.34 Wells and tank batteries to be marked.

Lessee shall clearly and permanently mark all wells and tank batteries in a conspicuous place with number, legal description, operator, and telephone number, and shall take all necessary precautions to preserve these markings.

18. Section 226.36 would be revised to read as follows:

§ 226.36 Control devices.

In drilling operations in fields where high pressures, lost circulation, or other conditions which could result in blowouts, lessee shall install an approved gate valve or other controlling device which is in proper working condition for use until the well is completed. At all times preventative measures must be taken in all well operations to maintain proper control of subsurface strata.

19. Section 226.42 would be revised to read as follows:

Violation of any of the terms or conditions of any lease or of the regulations in this part shall subject the lease to cancellation by the Superintendent, or lessee to a fine of not more than $500 per day for each day of such violation or non-compliance with the orders of the Superintendent, or to both such fine and cancellation. Payment of penalties not received within 10 days after notice of the decision shall be subject to late charges at the rate of not less than 1 1/2 percent per month

for each month or fraction thereof until paid. The Osage Tribal Council, subject to the approval of the Superintendent, may waive the late charge.

20. Section 226.43 would be amended by adding a new paragraph (j) and revising paragraphs (a), (b), (d), (e), (g) and (h) to read as follows:

§ 226.43 Penalties for violation of certain operating regulations.

* * * * *

(a) For failure to obtain permission to start operations required by § 226.16(b), $50 per day until permission is obtained.

(b) For failure to file records required by § 226.32, $50 per day until compliance is met.

* * * * *

(d) For failure to construct and maintain pits as required by § 226.22, $50 for each day after operations are commenced on any well until compliance is met.

(e) For failure to comply with § 226.36 regarding valve or other approved controlling device, $500.

* * * * *

(g) For failure to properly care for and dispose of deleterious fluids as provided in § 226.22, $500 per day until compliance is met.

(h) For failure to file plugging reports as required by § 226.29 and for failure to file reports as required by § 226.13, $50 per day for each violation until compliance is met.

* * * * *

(j) Lessee or his authorized representative is hereby notified that criminal penalties are provided by 18 USC § 1001 for knowingly filing fraudulent reports and information.

21. Section 226.44 would be revised to read as follows:

§ 226.44 Hearings and appeals.

Any person, firm, or corporation aggrieved by any decision or order issued by or under the authority of the Superintendent, pursuant to the regulations in this part, may appeal pursuant to 25 CFR Part 2.

22. Section 226.45 would be revised to read as follows:

§ 226.45 Notices.

Notices and orders issued by the Superintendent to the representative and/or operator shall be binding on the lessee. The Superintendent may in his discretion increase the time allowed in his orders and notices.

Assistant Secretary - Indian Affairs

REC'D IN BRANCH of MINERALS 1/17/92. NB

Jewell Barker Copy

FILE COPY
SURNAME
Brown

RESOLUTION
OF THE
OSAGE TRIBAL COUNCIL

Res. No. 28-393

WHEREAS,

1. The Osage Tribal Council, the elected governing body of the Osage Tribe, is of the opinion that the mineral estate is losing royalty income, when oil and gas purchasers cannot offer bonus or premium pay to producers in Osage County without effecting the highest paid price provision in 25 CFR 226.11; and,

2. The Osage Tribal Council together with the Superintendent, Osage Agency, Bureau of Indian Affairs, and the Office of the Field Solicitor, Pawhuska, participated in drafting the attached proposed amendment to the Regulations, 25 CFR 226.11(a)(2). Therefore, be it

RESOLVED,

1. That the Osage Tribal Council respectfully requests that the Assistant Secretary of the Interior approve the proposed amendment to 25 CFR 226.11(a)(2); and,

2. That the Principal Chief, or in his absence the Acting Principal Chief, is hereby authorized to sign this resolution.

CERTIFICATION

I hereby certify that the foregoing Resolution was considered by the Osage Tribal Council at a duly called meeting at Pawhuska, Oklahoma, at which a quorum was present and that the same was adopted by a vote of eight (8) in favor and none (0) opposed, this 18th day of December 1991.

[signature]
PRINCIPAL CHIEF

ATTEST:

[signature] June E. Cole
SECRETARY



EXHIBIT 17

RECEIVED
JUL 11 1986
OSAGE AGENCY

July 10, 1986

To: Osage Tribal Council

Status Report: Jim W. Littleton

January 6, 1986:

Reported to work under the direction of Mr. Bert Pappan. I was assigned the task of closing out various estates which had undistributed Lake Fund monies. Working with Mr. Bill Haney of the Field Solicitor's office, each estate was researched and a determination was then made as to the correct individual to receive the distribution of the Lake Fund monies and the interest which had been accrued. The balances were calculated and, under the direction of Mr. Pappan, a Journal Voucher was prepared for approximately 80% of the unsettled estates. These vouchers were left in the custody of Mr. Pappan for final processing.

February 20, 1986:

Reassigned to the Branch of Minerals to help with the backlog of Additional Royalty calculations. Upon arrival in the Branch of Minerals I found that the Additional Royalty calculations had been completed and billed through March 1985. Additional Royalty for April 1985 through December 1985 was then calculated and posted to the individual ledger sheets for each lease owner. Late charges on unpaid or untimely paid Additional Royalty were also calculated and posted to each ledger sheet to record charges through June 1986.

July 1, 1986:

The Branch of Minerals mailed out 210 letters of collection to various lease owners which amounted to over $116,000 of Additional Royalty and late charges. Collection of $3,700 of the amount has been received as of this date.

Present:

Continuing to calculate Additional Royalty for 1986 until it can be brought to a current status. Following completion of this, I feel a full audit of selected lease owners Royalty payments would be in the best interest of the tribe.

Jim W. Littleton

Jim W. Littleton
Tribal Auditor

cc: Jack Shoemate, Superintendent