**ORAL ARGUMENT REQUESTED**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | Electronically Filed July 11, 2005 |
| v. | ) | No. 00-169 L<br>Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**PLAINTIFF OSAGE NATION'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS**

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

# TABLE OF CONTENTS


Table of Authorities ........ i

I. INTRODUCTION ........ 1

II. STATEMENT OF THE CASE ........ 3

A. The 1906 Act ........ 3

B. Applicable Regulations ........ 6

C. The Tranche One Leases ........ 8

D. The Government's Day-to-Day Control of Osage Oil and Gas Leases ........ 9

III. ARGUMENT ........ 12

A. Standard Of Review On A Motion To Dismiss For Lack Of Jurisdiction Under The Indian Tucker Act ........ 12

B. The Osage Nation's Tranche One Royalty Claims Are Within This Court's Jurisdiction ........ 15

C. The Government's Arguments That It Has No Duty To Collect Royalties Owed The Osage Trust Are Unavailing ........ 19

1. The Osage Trust is Not a "Bare" or "Limited" Trust Because the 1906 Act and Osage Regulations Impose Enforceable Duties Regarding the Calculation and Collection of Royalties ........ 20

a. The Government Improperly Relies On An Unduly Narrow Construction Of *Navajo Nation* And *White Mountain Apache* That The Supreme Court Has Rejected ........ 20

2. Under Supreme Court and Federal Circuit Precedent, The Osage Trust is Not a "Bare" or "Limited" Trust ........ 22

3. The Government's Attempts to Characterize Its Duties as Passive are Unavailing ........ 24

4. The Fact the Lessees Owe the Royalty Does not Relieve the Government of its Duty to Collect the Royalty ........ 26

5. The Government Cannot Avoid Liability for Its Failure to Execute its Fiduciary Obligations by Arguing that It Acted as a Volunteer ........ 28

6. The Government Cannot Rely on the Limited Role the Osage Nation Plays in the Leasing Process to Avoid Liability for its Own Conduct.................................................................... 29

7. The Government Misconstrues the *Shoshone* Decisions in an Attempt to Evade its Fiduciary Duties to the Osage Nation ......... 31

8. The Court Should Reject the Government's Eleventh Hour Attempt to Redefine Tranche One of this Case............................ 33

D. The Osage Nation's Claims Are Not Time Barred And The Government's Arguments Have Already Been Rejected By This Court And The Federal Circuit in *Shoshone* ............................................ 35

E. The Osage Nation Has Sufficiently Plead That The Government Breached Its Investment-Related Duties To Survive A Motion To Dismiss ......................................................................................... 38

IV. CONCLUSION AND REQUEST FOR ORAL ARGUMENT ............................. 40

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Army and Air Force Exchange Serv. v. Sheehan*, 456 U.S. 728 (1982) .......... 20

*Brown v. United States*, 42 Fed. Cl. 538 (1998) .......... 14

*Brown v. United States*, 86 F.3d 1554 (Fed. Cir. 1996) .......... *passim*

*Coast Indian Cmty. v. United States*, 550 F.2d 639 (Ct. Cl. 1977) .......... 40

*Minnesota Chippewa Tribe v. United States*, 14 Ct. Cl. 116 (1987) .......... 39

*Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171 (1980) .......... 13, 29

*Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336 (1986) .......... 40

*Osage Nation v. United States*, 57 Fed. Cl. 392 (2003) .......... 35

*Pawnee v. United States*, 830 F.2d 187 (Fed. Cir. 1987) .......... 27

*Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365 (1968) .......... 30

*Shoshone Indian Tribe v. United States*, 52 Fed. Cl. 614 (2002) .......... *passim*

*Shoshone Indian Tribe v. United States*, 56 Fed. Cl. 639 (2003) .......... *passim*

*Shoshone Indian Tribe v. United States*, 58 Fed. Cl. 77 (2003) .......... *passim*

*Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) .......... *passim*

*United States v. Koch Indus.*, 57 F. Supp. 2d 1122 ( N.D. Okla. 1999) .......... 12, 17, 26

*United States v. Mitchell*, 445 U.S. 535 (1980) .......... 12, 20, 22

*United States v. Mitchell*, 463 U.S. 206 (1983) .......... *passim*

*United States v. Navajo Nation*, 537 U.S. 488 (2003) .......... *passim*

*United States v. Testan*, 424 U.S. 392 (1976) .......... 20

*United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003) .......... *passim*

*Wright v. United States*, 32 Fed. Cl. 54 (1994) .......... 20, 21

*Yankton Sioux Tribe v. United States*, 623 F.2d 159 (Ct. Cl. 1980) .......... 40

## DOCKETED CASES

*United States v. Plains Res., Inc.*, Case No 02-CV-976-E (M) .......... 12, 17, 25, 26

## STATUTES AND REGULATIONS

Act of June 28, 1906, 34 Stat. 539 .......... *passim*

25 U.S.C. §§ 155 (2000) .......... *passim*

25 U.S.C. §§ 161a (2000) .......... *passim*

25 U.S.C. §§ 161b (2000) .......... *passim*

25 U.S.C. § 162a (2000) ........ *passim*
Act of October 6, 1964, 78 Stat. 1008 ........ 5
Act of October 21, 1978, 92 Stat. 1660 ........ 5
Act of March 3, 1921, Chapter 120, 41 Stat. 1249 ........ 5
Act of March 2, 1929, Chapter 493, 45 Stat. 1478 ........ 5
Act of June 24, 1938, Chapter 645, 52 Stat. 1034 ........ 5
Act of July 25, 1947, Chapter 334, 61 Stat. 459 ........ 5
Act of June 15, 1950, Chapter 248, 64 Stat. 215 ........ 5
Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809 ........ 35, 36
Federal Oil and Gas Royalty Management Act of 1982, 30 U.S.C §§ 1707-57 (1994) ........ 32
25 U.S.C. § 155 (2000) ........ *passim*
25 U.S.C. § 161a (2000) ........ *passim*
25 U.S.C. § 161b (2000) ........ *passim*
25 U.S.C. § 162a (2000) ........ *passim*
25 C.F.R. § 211.40 (2003) ........ 32
25 C.F.R. § 226.2 (2003) ........ 6
25 C.F.R. § 226.4 (2003) ........ 8, 16, 23
25 C.F.R. § 226.5 (2003) ........ 6
25 C.F.R. § 226.7 (2003) ........ 6, 23
25 C.F.R. § 226.10 (2003) ........ 6
25 C.F.R. § 226.11 (2003) ........ *passim*
25 C.F.R. §§ 226.14-15 (2003) ........ 6
25 C.F.R. §§ 226.16-41 (2003) ........ 7
25 C.F.R. §§ 226.42-46 (2003) ........ 7

## LEGISLATIVE HISTORY

Federal Oil and Gas Royalty Management Act of 1982, H.R. Rep. No. 97-859 at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268 ........ 33

## OTHER AUTHORITIES

Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 177 (4th Ed. 1987)16, 25, 28, 40
Restatement (Second) of Trusts § 174, cmt. a (1959) ........ 16, 25, 28

**PLAINTIFF OSAGE NATION'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS**

## I. INTRODUCTION

For nearly a century the United States of America (the "Government"), acting under the authority of the 1906 Act, 34 Stat. 539, and other federal laws and regulations, has exercised plenary control over all aspects of the mineral estate underlying the Osage Reservation (the "Osage mineral estate"). The Government holds the entire 1.475 million acre Osage mineral estate, and all proceeds therefrom, in trust for the use and benefit of the Osage Nation. In order to fulfill its trust duties, including the duty to collect all royalties due under the oil and gas leases that it issues, the Government employs almost 50 people, including petroleum engineers and accountants, at the Osage Agency, a subagency of the Department of the Interior, Bureau of Indian Affairs ("BIA"), located in Pawhuska, Oklahoma on the Osage Reservation. In addition, the Government employs numerous other professional employees at the Department of the Interior and the Department of the Treasury to invest the funds it collects before they are distributed to the Osage Nation and individual headright owners, in accordance with the 1906 Act.

In this case, the Osage Nation is seeking money damages from the Government because the Government has breached its fiduciary duties to the Osage Nation with respect to the Osage mineral estate and other Osage Trust assets. While these breaches involve literally thousands of leases and extend back many years, the Court has limited this phase of the litigation ("tranche one") to the Osage Nation's damage claims involving five oil and gas leases (the "tranche one leases") and six months (the "tranche one months"). With respect to this more limited scope, the Osage Nation claims that the Government, as trustee, has failed to collect all payments due under the tranche one leases for the tranche one months and, in addition, failed to properly invest and distribute funds collected from those leases as required by law.

Notwithstanding its plenary control over the Osage mineral estate, the Government has filed a motion to dismiss arguing it is not liable to the Osage Nation for any payments, including royalty payments, due to the Osage Nation under the tranche one leases that the Government failed to collect. In essence, the Government argues that its trust duties under the 1906 Act and the network of federal laws and regulations defining the Trust do not require it to collect or properly distribute any payments due to the Osage Nation under those leases for any time period. The Government states that its trust duties are limited to investing only those trust funds that, by whatever means, happen fall into its hands. The Government further contends that it is not liable for any damages for mismanaging those trust funds unless the Osage Nation can demonstrate that the Government has "abused" its discretion.

As discussed below, however, under well-established authority of the Supreme Court, the Federal Circuit, and this Court, the Government is liable to the Osage Nation for any damages the Government caused the Osage Nation by failing to collect payments due under the tranche one leases and improperly distributing them. The 1906 Act contains express language requiring the Government, as trustee, to hold in trust "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due said Osage tribe…" For almost 100 years, the Government itself has consistently interpreted this statutory language as creating a fiduciary duty to collect all payments due the Osage Nation under mineral leases that the Government, as trustee, issues with respect to the Osage mineral estate. This Court should not permit the Government to abandon its own long-standing interpretation of these statutory provisions simply because the Osage Nation now seeks damages based on the Government's failure to collect payments that are due the Osage Nation under the mineral leases that Government, as trustee, solicited, drafted, approved, and managed. Indeed, in the absence of

a damage remedy, there is simply no way the Osage Nation (or this Court) can force the Government to fulfill its admitted trust duties to the Osage Nation under the 1906 Act.

The Government also presents an overly narrow view of federal law pertaining to tribal trust claims by arguing that the 1906 Act and regulations must specifically create an express duty for the Government to perform the precise task the Osage Nation contends the Government failed to do. As detailed below, the law imposes no such requirement. The Federal Circuit and this Court in *Shoshone Indian Tribe v. United States*[1] have consistently ruled that claims regarding the Government's failure to collect royalties owed Indian tribes are within this Court's jurisdiction. Moreover, because the Government does not dispute that it acts as trustee for the Osage Nation, the Government cannot evade its duty as a trustee to collect debts owed the Osage Nation, including royalty payments due and owing. Beyond the plain meaning of the provisions of the 1906 Act requiring it to place all payments due the Osage Nation in trust, moreover, the Government cannot escape liability when it erroneously applies its own regulations and lease forms pertaining to the Osage mineral estate. Having assumed the responsibility of collecting and managing Osage Trust funds, the Government is answerable in damages for failing to fulfill that responsibility, and the Government's erroneous presentation of the facts and law cannot change that conclusion.

## II. STATEMENT OF THE CASE

### A. The 1906 Act

For over 120 years, the Government has been the trustee of the Osage mineral estate. *See Deed from the Cherokee Nation to the United States in Trust for the Use and Benefit of the Osage*

---

[1] *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed. Cir. 2004) ; *Shoshone Indian Tribe v. United States*, 58 Fed. Cl. 77, 82 (2003); *Shoshone Indian Tribe v. United States*, 56 Fed. Cl. 639, 646-48 (2003); *Shoshone Indian Tribe v. United States*, 52 Fed. Cl. 614, 620-21 (2002).

*and Kansas Tribe*, as reprinted in *The Constitutions and Laws of the American Indians, Volume 4.* (Nov. 26, 1890).[2] This particular trust relationship began in 1883 when the United States, as trustee for the Osage Nation and its funds, purchased land from the Cherokee Nation in Oklahoma for the "use and benefit of the Osage and Kansas Indians." Appendix of Exhibits in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, in part, Plaintiff's Tranche One Claims ("App."), Exhibit 1 at 2.

In 1906, Congress enacted a statute setting forth specific duties for the Government, as trustee, with respect to the Osage mineral estate. Act of June 28, 1906, Chapter 3572, 34 Stat. 539 (the "1906 Act").[3] The 1906 Act provided that "all funds belonging to the Osage tribe, and all moneys due, and all moneys that may become due, or may hereafter be found to be due the said Osage tribe of Indians, *shall* be held in trust by the United States . . . ." *Id.* at § 4 (emphasis added). Congress further specified that "the royalty received from oil, gas, coal, and other mineral leases . . . shall be placed in the Treasury of the United States to the credit of the individual members of the Osage tribe" and such money "*shall* be distributed to the members of said Osage tribe according to the roll provided for herein, in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States, except as herein provided." *Id.* at § 4(2) (emphasis added). The 1906 Act acknowledges that claims could be made against the Government for recovery of money due the Osage Nation. *Id.* at § 4(2). Moreover, Congress provided that only the Government, as trustee, can issue a lease for the Osage

[2] Once the briefing on the Government's motion to dismiss is complete, the parties will jointly submit a Joint Appendix containing copies of all relevant statutes, regulations, and other authorities.

[3] The 1906 Act also allotted a portion of the Osage Reservation surface lands to individual members of the Osage Nation. The Government, as trustee, also has trust duties with respect to those lands. Those trust duties, however, are outside the scope of tranche one. Accordingly, we do not address those assets in this memorandum.

mineral estate. *Id.* at § 3. In short, under the 1906 Act, the Government, as trustee, exercises complete and plenary control over every aspect of the management and operation of the Osage mineral estate as well as all the funds derived from that mineral estate.

Since its enactment, the 1906 Act has been amended by Congress on several occasions.[4] In those amendments, Congress made clear that the Government was to lease the Osage Nation's mineral estate "as may be deemed for the best interest of the Osage Nation." Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034. Under those amendments, the Government further exercised its control over the Osage mineral estate by mandating that the Government and the Osage Nation must lease at least 25,000 acres of the Osage Reservation for mining. *Id.* Ultimately, Congress made the trust containing the Osage mineral estate permanent. Act of October 21, 1978, 92 Stat. 1660. None of these amendments, however, changed in any material way the Government's trust duties described above, including the duty to hold in trust all payments due or that may become due to the Osage Nation.

In addition to the 1906 Act, which is applicable only to the Osage Nation, other statutes apply generally to the Government's conduct as trustee. For example, Congress has imposed specific duties regarding the protection of Indian and tribal trust funds, including the collection of money owed such trusts:

> The Secretary [of the Interior's] proper discharge of the trust responsibilities of the United States shall include (but are not limited to) the following:
>
> (1) Providing adequate systems for accounting for and reporting trust fund balances.

[4] The 1906 Act was amended and modified by: Act of March 3, 1921, Chapter 120, 41 Stat. 1249; Act of March 2, 1929, Chapter 493, 45 Stat. 1478; Act of June 24, 1938, Chapter 645, 52 Stat. 1034; Act of July 25, 1947, Chapter 334, 61 Stat. 459; Act of June 15, 1950, Chapter 248, 64 Stat. 215; Act of October 6, 1964, 78 Stat. 1008; and Act of October 21, 1978, 92 Stat. 1660. As used herein, the term "1906 Act" refers to the 1906 Act as amended, unless specified otherwise.

> (2) Providing adequate controls over receipts and disbursements.
>
> (3) Providing periodic, timely reconciliations to assure the accuracy of accounts.
>
> (4) Determining accurate cash balances.
>
> (5) Preparing and supplying account holders with periodic statements of their account performance and with balances of their account which shall be available on a daily basis.
>
> (6) Establishing consistent, written policies and procedures for trust fund management and accounting.
>
> (7) Providing adequate staffing, supervision, and training for trust fund management and accounting.
>
> (8) Appropriately managing the natural resources located within the boundaries of Indian reservations and trust lands.

25 U.S.C. § 162a(d) (2000). Other statutes regulate the manner in which the Government must manage and invest funds received into trust. 25 U.S.C. §§ 155, 161a, 161b and 162a (2000).

**B. Applicable Regulations**

In order to carry out the duties required by the 1906 Act, the Department of Interior, through the BIA, has promulgated comprehensive regulations governing almost every aspect of the leasing of Osage Nation oil and gas resources. The current version of the regulations is found at 25 C.F.R. § 226 (2003) (the "Osage Regulations"). The Government controls the mineral lease bidding and review process through the Osage Regulations. *Id.* at § 226.2. Each lease must be "in the form prescribed by the Secretary," *id.* at § 226.7, and the Government must approve the term of each lease, *id.* at 226.10. Each lease is also subject to the current Osage Regulations and future amendments to the regulations, except for changes affecting the term, royalty rate, rental or acreage unless all parties and the Government agree. *Id.* at § 226.5. As provided by the 1906 Act itself, no lease is effective unless it is approved by the Government. *Id.* at § 226.2(b). Furthermore, the Government must approve any amendments, division orders, assignments, unitization agreements, or similar instruments. *Id.* at §§226.14, .15.

The Osage Regulations also determine and control lessees' conduct and operations under any oil and gas lease, including when and where a well can be drilled, produced, or worked over. *Id.* at §§ 226.16-.41. The Government, as trustee, also enforces all provisions of the oil and gas leases, including the royalty provisions. *Id.* at §§ 226.42-.46. For example, the Osage Regulations establish a late payment charge with respect to any royalty payment (or portion thereof) that is paid late. *Id.* at § 226.42. Further, the Government can issue orders and instructions to the lessee and compliance with those instructions and orders is mandatory. *Id.* at § 226.30. In addition, the Government, as trustee, has the right to enter the lessee's premises and to inspect the lessee's books and records. *Id.* Further, as trustee, the Government can impose penalties for non-compliance with the terms of the lessee and, in appropriate cases, terminate the lease for non-compliance with or without the consent of the Osage Nation. *Id.* at § 226.42. The Osage Regulations also provide that penalties and other enforcement actions are subject to the Government's administrative appeal process. *Id.* at §§ 226.43-.46. Neither the Osage Regulations nor the Government's form lease provide any enforcement role for the Osage Nation, other than the right to waive late fees, and even that is subject to Government approval. *Id.* at § 226.42.

The Osage Regulations also establish a detailed process for the calculation and collection of royalties on oil and natural gas from the Osage mineral estate. The Osage Regulations establish a minimum royalty rate of 16-2/3 percent of gross proceeds, less certain deductions, and the Osage Nation may only negotiate a different rate "upon presentation of justifiable economic evidence by Lessee [and] subject to approval by the Superintendent." *Id.* at § 226.11(a). The Osage Regulations further specify how the value of oil and gas is to be determined for purposes of determining the amount of royalty due. *Id.* at§ 226.11(a)(2). Consistent with the Government's collection duties mandated by the 1906 Act, the Osage Regulations require that all royalties and

other payments due under the leases be made to the Government as trustee of the Osage mineral estate. *Id.* at §§ 226.4, 226.11(a)(1).

**C. The Tranche One Leases**

In form, each of the five leases in tranche one is an oil and/or gas lease between the Osage Nation, as lessor, and an oil and/or gas company, as lessee.[5] In substance, however, these leases were dictated and controlled in every respect by the Government pursuant to the 1906 Act and the Osage Regulations, as described above. For example, each lease requires that royalties be made directly to the Government, and a fixed royalty rate is established. Lease at ¶¶ 3(C) & 5(D). Furthermore, the then-applicable version of the Osage Regulations required each of the tranche one leases to include a formula for determining the value of oil and gas for purposes of calculating the royalty due. The formula requires the lessee to pay the higher of the actual selling price, the highest posted price, or the highest offered price in the Oklahoma-Kansas area:

> Lessee shall pay or cause to be paid to the Superintendent, as royalty on oil, 3/16 of the gross proceeds from sales after deducting the oil used by lessee for development and operation purposes on the lease: Provided, that when the quantity of oil taken from all the producing wells on any quarter-section or fraction thereof, according to the public survey, during any calendar month is sufficient to average one hundred or more barrels per active producing well per day the royalty on such oil shall be 20 percent; payment shall be made at the time of sale or removal of the oil, except were payments are made on division orders, and *settlement shall be based on the actual selling price, or the highest posted or offered price by a major producer in the Kansas-Oklahoma area whichever is higher on the day of sale or removal.*

Lease ¶ 3(C) (emphasis added). The tranche one leases further reaffirm that the leases may not be assigned or transferred without the Government's approval. *Id.* at ¶ 5(A). Enforcement of the each lease is placed in the hands of the Government (*id.* at ¶ 5(C)) and the Osage Nation is

---

[5] The five tranche one leases in tranche one were identified in the Osage Nation's Statement of Claims filed on May 13, 2005. Copies of those leases will be included in the Joint Appendix.

afforded no role in enforcing these leases. In addition, each of the leases expressly provides that it incorporates not only all Osage Regulations existing at the time the lease was executed but all future amendments to those regulations. *Id.* at ¶ 3(F).

**D. The Government's Day-to-Day Control of Osage Oil and Gas Leases**

In order to execute its trust and other duties to the Osage Nation, the Government established the Osage Agency. The Government describes the purpose of the Osage Agency as follows:

> The Osage Agency will uphold and strive to accomplish the Bureau of Indian Affairs mission within the boundaries of the Osage Nation Reservation in Oklahoma. Through the Branch of Minerals, we are to serve and promote the daily operations of the Osage Mineral Estate and the welfare of the Osage Tribe.
> The Branch of Minerals will prudently uphold the Bureau and Osage Agency mission by managing the Osage Minerals Estate for the Osage Tribe, which includes, but is not limited to, verifying volume and value of royalties of the Minerals Estate. Insuring that all monies are received in compliance with the Code of Federal Regulations and properly recorded in accordance with generally accepted accounting principles and generally accepted auditing standards.

Deposition of Carole Revard, Ex. 7, App. Ex. 2 at 7. In order to carry out that purpose, the Osage Agency currently employs approximately 50 people. Deposition of Judy Hill (June 22, 2005) at 357:24-358:12, App. Ex. 3. Based on the testimony of several employees of the Osage Agency and Government manuals describing the Osage Agency's duties, there is little doubt that the Government exercises plenary control over Osage oil and gas leasing operations, including in particular the calculation and collection of royalties, precisely in order to fulfill its trust obligations to the Osage Nation.

As described above, under the 1906 Act and the Osage Regulations, Government exercises control of every material aspect of the oil and gas leasing process. While the Osage Agency may − and sometimes does − consider the Osage Nation's wishes and may consult with the Osage Nation, the Osage Agency makes all decisions regarding Osage oil and gas leases based on the Government's determination of the proper course of action, even if that means disagreeing with

the Osage Nation. Deposition of Newell Barker (June 10, 2005) at 233:20-236:14, App. Ex. 4; Deposition of Charles Hurlburt (June 3, 2005) at 65:6-66:8, App. Ex. 5. In fact, the Government understands that it must exercise this independent "high fiduciary responsibility" duty precisely in order to discharge its fiduciary obligations, even if that means denying certain requests by the Osage Nation to manage oil and gas leasing in a different manner:

> We agreed with your line of thinking that a high fiduciary responsibility does exist as defined in the 1906 Osage Allotment Act which offers specific guidance in the management of oil and gas trust resources. We place considerable weight in protecting the interests of the Osage mineral owners or annuitants as provided in the 1906 Act as amended.

Letter from Gordon Jackson, Superintendent, Osage Agency, to Principal Chief Charles O. Tillman, Jr., Osage Tribal Council 2 (October 18, 1996) (denying request for a division order), App. Ex. 6 at 30.

Employees' duties include collecting all revenue from the Osage mineral estate for the benefit of the Osage Nation. Deposition of Newell Barker (June 8, 2005) at 92:8-93:15, App. Ex. 7; Hill Deposition Ex. 14, App. Ex. 8; Revard Depo. Ex. 7, App. Ex. 2. With respect to the calculation and collection of royalty payments, the Government recognizes that the fact that it receives royalty payments imposes a duty to correctly calculate the amount of royalty due: "As the Osage Agency is the representative royalty collector, all royalties due the Osage Tribe of Indians are accounted for by the oil and gas accounting sections within the Branch of Minerals." Bureau of Indian Affairs, Osage Agency, *Policies and Procedures Guide*, (May 2004) ("Osage Policy Guide"), App. Ex. 9 at 46. To carry out this duty, the Government employs several people whose job duties include verifying the volume and value of oil in order to determine the amount of royalty due. Deposition of Carole Revard (June 20, 2005) at 55:10-55:4, 150:2-16, App. Ex. 10; Barker Depo. (June 8, 2005) at 93:23-94:5, App. Ex. 7; Barker Depo. (June 10, 2005) at 229:18:-231:13, App. Ex. 4; Deposition of Mary Lou Drywater (June 24, 2005) at 25:11-27:9, App. Ex. 11.

The Osage Policy Guide requires that "Accounting records [be] verified and re-verified by the Branch of Minerals Accounting Section before data is posted to computer." App. Ex. 9 at 47.

The Government, in the Osage Policy Guide has established a detailed, multi-step procedure to calculate and verify royalty payments from lessees. App. Ex. 9 at 85, 86. These procedures include consideration of highest posted prices and specify that "[r]oyalty and volume information from the Lessee Reports are compared to the Dbase for concurrence with each other." *Id.* at. 85. The procedures also include steps to "contact producer and report discrepancy," "call to the purchaser regarding the discrepancy," and issuing "a bill for collection for the additional amount." *Id. See also* Drywater Depo. (June 24, 2005) at 17:21-18:13, 26:15-27:9, App. Ex. 11.

Moreover, the Osage Policy Guide expressly recognizes that the Government has duties to calculate the royalty under the terms of 25 C.F.R. § 226.11(a)(2) by setting out detailed procedures for applying the valuation formula set out in Section 226.11(a)(2). App. Ex. 9 at 102. In addition, the Osage Agency mails out its Highest Posted Price letter to lessees in order to assist them in making correct royalty payments. *Id.* at 100. Further, "Lessees/Operators within Osage County are required to send in monthly lessee reports, which are verified against the purchaser's run statements. (Reference C.F.R. 226.13)." *Id.* at 46**.** As part of that collection process, the Osage Agency attempts to collect any underpayment of a royalty of which it is aware. Deposition of Charles Hurlburt (June 1, 2005) at 143:7-144:, App. Ex. 12; Drywater Depo. (June 24, 2005) at 25:11-27:9, App. Ex. 11; Revard Depo. (June 20, 2005) at 36:12-37:4, App. Ex. 10; Barker Depo. (June 10, 2005) at 231:21-232:8, App. Ex. 4.

Furthermore, the Government controls the means by which oil and gas royalties are calculated and collected. The Osage Nation does not have access to the database the Government created to manage mineral royalty payments. Hill Depo. (June 22, 2005) at 360:6-14, App. Ex. 3. Indeed, so tightly does the Osage Agency control the royalty collection process that the Osage

Nation cannot even issue a bill to a lessee for the collection of any royalty, even assuming it has the authority, as beneficiary of the trust, to do so. *Id.* at 360:15-22. Further, although the Government has specified in great detail how the Osage Agency is to discharge its trust duties, the Osage Policy Guide does not establish any procedure for notifying the Osage Nation of any issue regarding royalty payments, nor does it provide a much role for the Osage Nation in that process.

In addition to these administrative duties, the Government has initiated and participated in litigation to collect royalty payments due the Osage Nation, expressly recognizing that such collection efforts were part of its fiduciary duties to the Osage Nation. *United States v. Plains Res., Inc.*, Case No 02-CV-976-E(M) (N.D. Okl.) Complaint at ¶¶ 1, 4, 8 (filed Dec. 30, 2002) (App. Ex. 13) (seeking to collect royalty payments due the Osage Nation "pursuant to its trust responsibilities to the Osage Nation," in reliance on, *inter alia*, the 1906 Act and 25 C.F.R. § 226.11(a)(1)). *See also United States v. Koch Indus.*, 57 F. Supp. 2d 1122, 1123-24 ( N.D. Okla. 1999) (summary judgment for Government in *qui tam* action to collect royalty payments due the Osage Nation).

## III. ARGUMENT

### A. Standard Of Review On A Motion To Dismiss For Lack Of Jurisdiction Under The Indian Tucker Act

In four cases, *United States v. Mitchell*, 445 U.S. 535 (1980) ("*Mitchell I*"), *United States v. Mitchell*, 463 U.S. 206 (1983) ("*Mitchell II*"), *United States v. White Mountain Apache Tribe*, 537 U.S. 465 (2003), and *United States v. Navajo Nation*, 537 U.S. 488 (2003), the Supreme Court has established a test to determine whether this Court has jurisdiction over a claim that the Government has breached its trust duties. This Court recently summarized that test as follows:

> [A] Tribe must identify a substantive source of law that establishes specific fiduciary or other duties, and allege that the Government has failed faithfully to perform those duties. If that threshold is passed, the court must then determine whether the relevant source of substantive law "can fairly be interpreted as mandating compensation for damages sustained as a result of a breach of the

> duties [the governing law] imposes." Although "the undisputed existence of a general trust relationship between the United States and the Indian people" can "reinforce" the conclusion that the relevant statute or regulation imposes fiduciary duties, . . . that relationship alone is insufficient to support jurisdiction under the Indian Tucker Act. Instead, the analysis must train on specific rights-creating or duty-imposing statutory or regulatory prescriptions. Those prescriptions need not, however, expressly provide for money damages; the availability of such damages may be inferred.'

*Shoshone*, 56 Fed. Cl. at 645 (quoting *Navajo Nation*, 537 U.S. at 506 and *Mitchell II*, 463 U.S. at 219). *See also Shoshone*, 58 Fed. Cl. at 81 (same).

The key factor in applying this test is whether the Government exercises control or supervision over the assets in issue, regardless of whether there is specific language imposing fiduciary obligations. The Supreme Court explained that

> where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Mitchell II*, 463 U.S. at 225 (quoting *Navajo Tribe of Indians v. United States*, 224 Ct. Cl. 171, 183 (1980)). The Federal Circuit has held that such control or supervision over a leasing process is established when the Government is authorized to exercise veto power over the major aspects of leases, including who to lease to and the terms and forms of the lease. *Brown v. United States*, 86 F.3d 1554, 1562 (Fed. Cir. 1996) ("Such control over the entry into, terms of, and exit from leasing as the Secretary retains by virtue of [applicable statutes and regulations] is all that is required to create enforceable fiduciary duties under the 'control' portion of the test established by *Mitchell II*"). "[B]y virtue of the control they place in the hands of the Secretary, [the applicable statutes and regulations] impose upon the government a fiduciary duty in the commercial leasing context. 'Given the existence of a trust relationship, it naturally follows that the government

should be liable in damages for breach of its fiduciary duties.'" *Id.* at 1563 (quoting *Mitchell II*, 463 U.S. at 226).[6]

Thus, when a nominal trust imposes no authority to control or supervise a particular asset, no fiduciary obligation arises regarding that asset. (*Navajo Nation*; *Mitchell I*). On the other hand, however, where the Government does exercise such control and supervisory authority over an asset, a fiduciary obligation arises from which a damage remedy for breach of duty may be reasonably inferred. (*White Mountain Apache*; *Mitchell II*).

Once the existence of a fiduciary relationship has been established, it must also be shown that the Government breached the duties established by the statutes and regulations that define the fiduciary relationship. *Mitchell II*, 463 U.S. at 224. The Supreme Court has made clear that those prescriptions include common law duties of trustees, in addition to statutory requirements. For example, in *White Mountain Apache* the Government was subject to this Court's jurisdiction because the Government had failed to abide by its common law obligation to preserve and maintain trust assets the Government controlled even though the applicable statutes and regulations were silent regarding a specific duty to maintain the asset. 537 U.S. at 475.

Thus, the controlling Supreme Court precedent has established at least three ways for a plaintiff to establish that the Government owes the plaintiff a fiduciary duty of sufficient specificity to make the Government answerable in damages for breaching that duty. First, under *White Mountain Apache*, the plaintiff can show that an enforceable fiduciary duty arose as a

---

[6] The Government may point out the court in *Brown*, following remand, dismissed a claim that the Government had failed to determine that the lessees were underreporting gross receipts, *Brown v. United States*, 42 Fed. Cl. 538, 555-56 (1998), arguing that this Court should dismiss this case. *Brown* is distinguishable on this point, however, because the court did not consider any statute requiring that royalties be paid to the Government nor did it appear that the Government had, as here, in fact assumed the duty of calculating and verifying royalty amounts, and of enforcing royalty payment obligations. Accordingly, *Brown* does not support dismissal of the Tribe's royalty claims.

necessary incident of the trust, in light of both the terms of the trust and the common law obligations of a trustee. Second, under *Mitchell II*, the plaintiff can show that the Government was given pervasive authority over the resource or asset in question that it is answerable in damages for failing to exercise that authority in accordance with its fiduciary obligations. Third, under *Mitchell II*, the plaintiff can establish that the Government in fact exercises such complete control over the asset in question control that it is answerable in damages for failing to exercise that authority in accordance with its fiduciary obligations.

Applying these tests, this Court and the Federal Circuit have consistently held that claims relating to the Government's failure to collect royalties due an Indian trust managed by the Government and claims that the Government failed to properly calculate the value of oil for royalty purposes are subject to this Court's jurisdiction. *Shoshone Indian Tribe v. United States*, 364 F.3d 1339, 1350 (Fed. Cir. 2004) ("*Navajo Nation* . . . does not foreclose liability for failing to manage or collect the *proceeds* for the approved mining contracts from the approved mining contracts . . . "); *Shoshone Indian Tribe v. United States*, 56 Fed. Cl. 639, 646-48 (2003) (dispute regarding "the setting of 'value' upon which the rate of royalty was to be paid" was subject to this Court's jurisdiction); *Shoshone Indian Tribe v. United States*, 58 Fed. Cl. 77, 82 (2003) (finding that the Court had jurisdiction over claims relating to Government's failure to collect certain royalties owed "on the take-or-pay portion of the ARCO settlement").

**B. The Osage Nation's Tranche One Royalty Claims Are Within This Court's Jurisdiction**

Under the governing precedents of the Supreme Court , the Federal Circuit, and this Court, there are three independent reasons that mandate finding that the Osage Nation's tranche one royalty claims are within the jurisdiction of this Court.

First, there can be no dispute that under the 1906 Act, the Government has an express fiduciary duty to collect all payments due the Osage Nation under the mineral leases that the

Government, as trustee, issues for the benefit of the Osage Nation. The 1906 Act expressly places in trust, with the Government acting as trustee, "all" funds then due the Osage Nation as well as "all" funds that may become due to the Osage Nation at a later time. 1906 Act at § 4. In addition, the 1906 Act expressly provides that, as trustee, the Government "shall" place in the United States Treasury "the royalties received from oil, gas, coal, and other mineral leases…" *Id.* at § 3. The royalty and other payments that are the subject of tranche one are undeniably payments of this type. Finally, the Osage Regulations require that royalty payments be made directly to the Government. 25 C.F.R. § 226.4.

As trustee, the Government has an affirmative duty to collect amounts due the trust. Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 177 (4th Ed. 1987); Restatement (Second) of Trusts § 174, cmt. a (1959) (Duty to Enforce Claims, noting that "If the trustee hold in trust a contract claim against a third person, it is his duty to take reasonable steps to enforce such claim"). Because the corpus of the Osage trust consists not only of royalty payments actually received, but of royalty payments due, that may become due and that may be found to be due, 1906 Act at § 4, the Government is under a clear, specific fiduciary duty to collect the full royalty due. The Osage Regulations and tranche one leases, therefore, have defined responsibilities regarding the collection of royalties based on a specific formula that the Government, as trustee, must carry out. Moreover, the duty must be understood as "money mandating" because the duty relates specifically to the collection of money for the Osage Nation. Without a damages remedy, the Osage Tribe would have no remedy at all.

Pursuant to *White Mountain Apache*, the Government is answerable in damages for breaching its trust obligation to collect money due the trust. Indeed, this Court found a very similar regulatory structure established that this Court had jurisdiction over a tribe's claim that the Government had failed to collect royalty payments due the tribe. *Shoshone,* 364 F.3d at 1350

(noting that a regulation requiring that royalties be paid to the Government created a duty to collect the correct royalty payment). *See also Shoshone*, 56 Fed. Cl. at 646-48 (dispute regarding "the setting of 'value' upon which the rate of royalty was to be paid" was subject to this Court's jurisdiction); *Shoshone*, 58 Fed. Cl. at 82 (finding that the Court had jurisdiction over claims relating to Government's failure to collect certain royalties owed "on the take-or-pay portion of the ARCO settlement").

In fact, in cases where the Government is not trying to avoid liability, the Government freely admits that the 1906 Act imposes a fiduciary duty on the Government to collect all payments due the Osage Nation under the mineral leases that the Government issues for the benefit of the Osage Nation. For example, at the same time it was telling this Court that it had no duty at all to collect royalty payments, the Government was prosecuting an action under the False Claims Act seeking unpaid royalties from an oil company "pursuant to its trust responsibilities to the Osage Nation," in reliance on, *inter alia*, the 1906 Act and 25 C.F.R. § 226.11(a)(1)). *Plains Res.*, Complaint at ¶¶ 1,4,8. *See also Koch Indus.*, 57 F. Supp. 2d at 1123-24 (summary judgment for Government in *qui tam* action to collect royalty payments due the Osage Nation).

Second, even if the 1906 Act and Osage Regulations were not so precise regarding the duty to collect royalty payments, it is clear that those laws and regulations establish such pervasive control over the Osage Mineral Estate and leases that the Government is subject to a fiduciary duty with respect to those assets under *Mitchell II*. As detailed above, the 1906 Act and Osage Regulations give the Government pervasive control over all aspects of oil and gas leasing making it liable damages for a breach of its duties. As described above, the Government exercises complete control over all aspects of the leasing process, from the decision of whether to enter into a specific lease, the form and terms of the lease, the manner in which the lessee may operate, enforcement of the lease to the collection of payments under the lease. Pursuant to this control,

the Government in fact established by regulation the oil valuation formula that the Osage nation claims the Government failed to correctly apply. *Supra* at 3-12. This pervasive control over the oils and gas leasing process, including the collection of royalty payments, is sufficient under *Mitchell II* to create a fiduciary duty for which the Government is answerable in damages in this Court if it breaches those duties. Indeed, as in *Brown*, the fact that the Government must approve every aspect of the leasing process such that the Osage Nation cannot do a single thing with respect to leasing or using its mineral resources without Government approval establishes the pervasive control necessary to establish that a claim for damages is properly within this Court's jurisdiction.

Third, even apart from the terms of the 1906 Act and Osage Regulations, the Osage Nation's royalty claims are subject to this Court's jurisdiction because the Government has actually assumed complete control over the oil and gas leasing process in general, and the royalty calculation and collection process in particular, thereby making claims that it exercised that authority improperly subject to this Court's jurisdiction under *Mitchell II* and *Brown*. The Government, through the Osage Agency, exercises actual control over the entire oil and gas leasing process. *Supra* at 3-12. With respect to the calculation and collection of royalties, Government employees calculate the royalty, verify the payments made by lessees, correspond with lessees about the correct payment and take enforcement action when necessary. *Supra.* at 10-12. Moreover, the Government has put in place an elaborate bureaucracy, with detailed procedures, to help its employees carry out these duties. *Id.* These tasks are carried out without the control or direction of the Osage Nation, and indeed the Government exercises its authority to overrule the Osage Nation. *Id.*

In this case, the Osage Nation alleges, quite simply, that the Government failed to perform the royalty collection task correctly by, *inter alia*, failing to apply correctly the oil and gas

valuation formula the Government created and applied, thereby failing to collect the full amount of royalty actually due under the Osage Regulations and Tranche One Leases. As the *Shoshone* cases and *Brown* make clear, a claim that the Government failed to correctly apply a statute or regulation clearly states a claim for damages within this Court's jurisdiction. Further, the fact that the Government has assumed control and in fact exercises complete control over the royalty calculation and collection process creates an enforceable fiduciary duty to perform that task correctly. *Brown*, 86 F.3d at 1561-62;[7] *Shoshone*, 52 Fed. Cl. at 621. Accordingly, for each of the above independent reasons, the Osage Nation has stated a claim for damages within this Court's jurisdiction.

### C. The Government's Arguments That It Has No Duty To Collect Royalties Owed The Osage Trust Are Unavailing

Instead of confronting directly this overwhelming body of law and facts, including its own admissions, demonstrating the existence of a fiduciary duty to accurately calculate and collect royalty payments, the Government simply turns its back on it all and constructs an argument based what the Government wishes were the law and facts. Accordingly, the Government's arguments ignore key holdings in applicable cases and indeed seek to reverse prior decisions of this Court. Moreover, the Government relies on a myopic view of the facts that simply ignores the words and deeds of its own employees in an attempt to somehow avoid liability for its own conduct. When subject to scrutiny based on the law and facts as they really exist, however, it is clear that none of the Government's arguments have any merit.

[7] The Government argues that *Navajo Nation* undermines the Federal Circuit's decision in *Brown*. Gov't Br. at 13. But *Navajo Nation* does not address that aspect of *Brown*. Furthermore, the degree of Government approval and regulatory authority in *Brown* and this case is far more extensive than in *Navajo Nation*.

### 1. The Osage Trust is Not a "Bare" or "Limited" Trust Because the 1906 Act and Osage Regulations Impose Enforceable Duties Regarding the Calculation and Collection of Royalties

#### a. The Government Improperly Relies On An Unduly Narrow Construction Of *Navajo Nation* And *White Mountain Apache* That The Supreme Court Has Rejected

In an effort to make it appear that this case falls in the *Mitchell I* and *Navajo Nation* category of cases, the Government attempts to rewrite the law to demand that that the Osage Nation must point to some "controlling provision directing the United States to undertake any duty[] with respect to the calculation or collection of royalties." Memorandum in Support of Defendant's Motion to Dismiss, in Part, Plaintiff's Tranche One Claims ("Gov't Br.") at 19. For support, the Government quotes *Wright v. United States*, 32 Fed. Cl. 54, 56 (1994) (quoting *Mitchell I*, 445 U.S. at 542) for the proposition that "the relevant statutes and regulations must 'unambiguously provide that the United States has undertaken full fiduciary responsibilities' as the particular aspect of the relationship complained of." *Id.* at 19-20. Because the Government claims the Osage Nation cannot point to such specific language, the Government argues that the Osage Trust is a "limited trust" within the meaning of *Mitchell I* and will not support a claim for damages under the Indian Tucker Act. *Id.* at 20. The Government attempts to bolster this argument by citing to, and quoting from two non-Indian Tucker Act cases, *United States v. Testan*, 424 U.S. 392, 398 (1976), and *Army and Air Force Exchange Serv. v. Sheehan*, 456 U.S. 728, 739 (1982). *Id*. at 19-21.

This attempt to narrow the scope of *White Mountain Apache* is unavailing, however, and is undercut even by the cases the Government cites. First, the Supreme Court has specifically rejected the application of *Sheehan* and *Testan* to tribal trust cases. *White Mountain Apache,* 537 U.S. at 476-79. Second, nothing in *Mitchell I*, *Mitchell II*, *Navajo Nation,* or *White Mountain Apache* require that the trust enumerate the specific duties allegedly breached in order for this

court to have jurisdiction over the case. Indeed, as this Court clarified in *Wright*, "What is required under *Mitchell II* is that the statues and regulations defining the activity in question must show congressional intent to assume a trust relationship with specific contours. . . . The statutes and regulations at issue must be fairly susceptible to a construction that imposes particular fiduciary duties, the violation of which were contemplated go result in financial accountability. Something comparable to the 'pervasive' management role present in *Mitchell II* must be alleged." 32 Fed. Cl. at 57. Clearly, not even the authority cited by the Government supports its argument that the statutes and regulations do not specifically set forth a duty to calculate and collect royalties. As the Government's own statements and policies discussed above reveal, the Government has long understood that the 1906 Act and the Osage Regulations create a fiduciary obligation with specific contours regarding the calculation and collection of royalties.

Moreover, as the Supreme Court made clear in *White Mountain Apache*, the statutes and regulations do not need to specify the duty, if such a duty is implicit in the Government's trust duties. In *White Mountain Apache*, there was no express duty of the Government to preserve and maintain the Fort Apache site and facilities. That obligation was implied from the fact that the Government actively managed Fort Apache in trust for the White Mountain Apache tribe and was subject to an inherent trust obligation to preserve and maintain the trust corpus. 537 U.S. at 475. Similarly, in *Shoshone*, the Federal Circuit held that the government was subject to an enforceable fiduciary duty to collect royalty payments due based on the fact that royalty payments were required to be made to the Government and that the Government actively managed the trust containing those royalties. 364 F.3d at 1350.

Finally, the fact that the Government exercises actual control over every aspect of Osage oil and gas leases, is the designated recipient of royalty payments, imposed the specific formula by with royalty payments are determined, actively calculates and verifies royalty payments plainly

creates an enforceable fiduciary duty to correctly calculate and collect royalty payments. *Brown*, 86 F.3d at 1561-62; *Shoshone*, 52 Fed. Cl. at 621.

**2. Under Supreme Court and Federal Circuit Precedent, The Osage Trust is Not a "Bare" or "Limited" Trust**

The Government also argues that the Osage Trust is a "bare" or "limited" trust because "it does not create functional obligations to calculate or collect the moneys due." Gov't Br. at 20. However, even apart from the unduly narrow reading of the case law, there is simply no way to understand the Osage Trust as a "bare trust."

The trust in *Mitchell I* was found to be a "limited trust" because the government was not given, and did not exercise any management or control over the resources in question. As the Supreme Court explained, the trust served the limited purpose of restricting the right of alienation, and of providing immunity from state taxation by vesting legal title in the United States while leaving actual control of the land in the hands of the tribes. *Mitchell I*, 445 U.S. at 543-44. *Navajo Nation* did not involve even a limited trust, and the underlying statute was intended to leave control of the land in the hands of the tribes. 537 U.S. at 508.[8]

Unlike *Mitchell I* or *Navajo Nation*, the 1906 Act and the Osage Regulations create a real trust that gives the Government extensive control over all aspects of the oil and gas leasing process, including the calculation and collection of royalties. 1906 Act at §§ 3&4. By regulation, the Government has established the methodology by which the value of the oil or gas is to be

[8] The Government cites *Navajo Nation* to suggest that the statutory goal of tribal self-reliance militates in favor of not finding any fiduciary duty to the Osage Nation. Gov't Br. at 14. However, unlike the statute in question in *Navajo Nation*, there is no evidence that either the 1906 Act or the Osage Regulations were intended to increase the ability of the Osage Nation to manage its own mineral resources. Moreover, any such intent is rendered moot by the fact that the Government in fact exercises control over the lease process, even if it means making decisions contrary to the Tribe's wishes. In any event, it would not promote tribal self-determination to allow the Government to escape liability for its failure to correctly apply its own regulations.

established for royalty purposes. 25 C.F.R. § 226.11. The Government drafted and mandated the use of the form lease to be used by the Osage Nation. *Id.* at §226.7. Government exercises approval authority over all aspects of oil and gas leases, from the decision to let a particular lease through termination, including such routine matters as division orders. *Supra* at 3-12. The Government has further directed by regulation that royalty payments are to be made directly to the Government by check payable to the Government. 25 C.F.R.§ 226.4. Under *Mitchell II* and *Brown*, this authority creates a real trust that is enforceable in this Court.

Moreover, there is simply no way to understand these regulations as *not* creating enforceable duties. The requirement that lessees make royalty payments to the Government creates a duty on the part of the Government to collect the royalty. *Shoshone*, 364 F.3d at 1350. Similarly, the creation of a specific formula to determine the amount of royalty creates an expectation that that formula will be applied and enforced. As trustee, and particularly as the trustee who actually performs those calculations and collects those payments, the Government cannot escape liability for failing to adhere to its own regulations even if the regulations did not expressly state that the Government must do those things. As trustee, the Government must follow the terms of the trust, and is answerable in damages if it fails to do so.

Moreover, the Government has fully assumed management and operation of the Osage Trust with respect to the calculation and collection of royalties. Government employees calculate the amount of royalties owed. The Government publishes and circulates to its employees listings of posted-prices for oil and gas to assist its employees in calculating royalties and Government employees review royalty payments and are charged with communicating with lessees or purchasers regarding the accuracy of royalty payments. The Government actually collects the royalty payments and prohibits the Osage Nation from participating in the royalty billing process.

Critically, at all times, all royalty payments received are in the complete and exclusive control of the government. *Supra* at 9-12.

As this Court has recognized, *Mitchell II*

> contemplates an inquiry into the level of control that the United States exercises over the Indian resources in question. Defendant's characterization of the *Mitchell II* control or supervision test overlooks the point that actual control or supervision by the government with respect to the Indians' resources may provide an independent basis for fiduciary responsibility in the absence of a clear statutory or regulatory directive prohibiting such a conclusion.

*Shoshone*, 52 Fed. Cl. at 620-21. *See also Brown*, 86 F.3d at 1561-62. Here, there is nothing in the 1906 Act or Osage Regulations that forecloses finding a fiduciary relationship, and the Government's actual exercise of control over the Osage Trust and the calculation and collection of royalties means that the Government has assumed trustee duties, and is answerable in damages when it breaches those duties.

**3. The Government's Attempts to Characterize Its Duties as Passive are Unavailing**

The Government attempts to make the trust look bare by describing its role in the management of the trust in minimalist terms. Gov't Br. at 20-23. The Government describes its duties as entirely passive, to simply receive royalty checks and deposit them into the trust account, with no obligation to determine whether those payments were in the correct amount. Under the Government's theory, if a lessee who was obligated to pay to the Government a royalty of $500 in one month paid only 1¢, the Government would not be in breach of any trust obligation if it blithely deposited that penny into the Treasury, duly noted that the Osage Nation's account had grown by one penny but made no attempt to collect the other $499.99. Indeed, under this theory, the Government would not be in breach of its trust obligation if ***no*** royalty payment were made and the Government made ***no*** effort to collect the delinquent payment. Under the Government's conception of its responsibilities, it is a passive depository, who asks no questions about what is

given to it or not given to it, but blindly, unquestioningly deposits whatever payments happen to be made into the Osage Trust.

Regardless of the facial implausibility of this claim, it is factually baseless. As described above, the Government in fact exercises complete control over the Osage Trust. In particular, the Government actively calculates royalties, verifies royalty payments and takes action to collect unpaid royalties without any assistance or involvement of the Osage Nation. *Supra* at 9-12. In sharp contrast to the description of its lawyers, the Osage Agency employees describe an Osage Agency that actively manages and controls the leasing process, including specifically the calculation and collection of royalty payments.

Moreover, the Government's position mocks the very concept of a trust by asserting that a trustee has no obligation to ensure that it actually collects the full amount of money owed the trust. It is hornbook law, however, that a trustee has an obligation to collect all moneys owed the trust. Austin Wakeman Scott & William Franklin Fratcher, *The Law of Trusts* § 177 (4th Ed. 1987); Restatement (Second) of Trusts § 174, cmt. a (1959) (Duty to Enforce Claims, noting that "If the trustee hold in trust a contract claim against a third person, it is his duty to take reasonable steps to enforce such claim"). As the Supreme Court made clear in *White Mountain Apache*, the Government is subject to this Court's jurisdiction for violating common law trust duties, even where the statute is silent regarding those duties.

Finally, the Government's position is contrary to the position it routinely takes in other courts, where it affirmatively asserts that it has a fiduciary duty to collect royalties owed the Osage Nation. In *Plains Resources*, the United States sued Plains Resources Inc. "on [the Government's] own behalf and pursuant to its trust responsibilities to the Osage Nation," to collect royalty payments Plains owed the Osage Nation. Complaint at ¶¶ 1, 4, App. Ex. 13. The Government based its claim on the 1906 Act and the requirement at 25 C.F.R. § 226.11(a)(1) that royalty

payments be made directly to the Government. *Id.* at ¶ 8. As the Government itself succinctly described the case:

> the United States on behalf of the Bureau of Indian Affairs in its fiduciary capacity for the Osage Nation filed the instant suit under the False Claims Act, 31 U.S.C. § 3730, and the common law theories of breach of contract and unjust enrichment. The thrust of the complaint is that the Defendant failed to properly pay royalty oil to the BIA on behalf of the Osage Nation under an oil purchasing and marketing agreement dated October 27, 1995.

Plaintiff's Mem. in Support of Motion to Strike Affirmative Defenses at 1, App. Ex. 14 at 154.

Other Courts too have recognized that the Government has a duty to collect oil and gas royalty payments due the Osage. In *Koch Indus.*, 57 F. Supp. 2d at 1123-24, plaintiffs in a *qui tam* action sued Koch Industries on behalf of the United States in order to collect royalty payments due the United States and the Osage Nation. In granting summary judgment in favor of the United States the court found that

> The Osage Agency is an agency within the Bureau of Indian Affairs ("BIA"), and the BIA itself is an agency within the DOI. The Osage Agency is responsible for collecting royalty payments on the Osage Indian leases at issue in this lawsuit.

*Id.* at 1124. The Government simply cannot have it both ways. By admitting it has a judicially enforceable duty to collect royalties owed the Osage Nations, it also must admit that it is answerable in damages if it fails to perform that duty.

**4. The Fact the Lessees Owe the Royalty Does not Relieve the Government of its Duty to Collect the Royalty**

Desperate to find some textual ground on which to base its argument, the Government resorts to linguistic hair-splitting to argue that the duty to calculate and collect royalties falls not on the Government, but on each lessee, because the lessee is obligated to pay the royalty and any late fees or penalties. Gov't Br. 20-22. Based on this premise, the Government argues that the Osage Nation is seeking to impose duties on the Government that are contrary to the language of

the statute and regulations, warranting dismissal under *Pawnee v. United States*, 830 F.2d 187, 191 (Fed. Cir. 1987). Gov't Br. at 22.

First, the Federal Circuit and this Court have already held that the requirement that royalties be paid to the Government when the Governments is acting as a trustee creates a fiduciary duty to collect the correct amount of royalties. *Shoshone*, 364 F.3d at 1350; *Shoshone*, 56 Fed. Cl. at 646-48. *See infra* 32-33. Thus, the Government's attempt to draw a distinction between receiving payment and collecting complete payments is legally baseless.

Moreover, *Pawnee* is distinguishable from this case, and this Court has already considered and rejected the Government's application of *Pawnee* to royalty collection cases. *Pawnee* involved a claim that the Government should have calculated royalty payments using a formula different than the formula provided in the regulations. *Shoshone*, 56 Fed. Cl. at 648-49. But in *Shoshone*, the claim was whether the Government had applied correctly its own method of determining the value of oil and gas. *Id.* In that context, this Court found *Pawnee* inapplicable:

> However, the Tribes also claim that "the Government failed to collect royalties based on the proper value of oil and gas." Pls.' Issues Brief at 12-13. This proper value can be determined by application of the regulations above. Unlike the plaintiffs in Pawnee, in this statement of their claim the Tribes are not asking the Secretary to go "contrary to and beyond the regulations and the leases in order to fulfill its alleged fiduciary obligation to appellants," *Pawnee, 830 F.2d at 191*; rather, plaintiffs are merely asking that the Secretary comply with her own regulations. This is a cognizable claim, and therefore Pawnee does not bar the Tribes' claim.

*Id.* As detailed above, the Osage Nation seeks royalties based on precise value formula set forth in the Osage Regulations and the Tranche One leases. As in *Shoshone*, and unlike *Pawnee*, the Osage Nation seeks to enforce the requirements of existing regulations, not expand the trust obligations further.

Second, a trustee cannot rely on a debtor to the trust – in this case lessees and producers – to calculate accurate royalty payments. The mere fact that a debtor is obligated to pay his debt

does not mean that he will pay the debt in full, and certainly does mean that the trustee, as payee, has no obligation to verify the accuracy of the payment. Indeed, the Government's position violates the central duty of loyalty a trustee owes to the trust beneficiaries by accepting at face value and without challenge the position of a trust debtor with regard to the amount of a debt owed to the trust. *See* Scott on Trusts at § 170 ("The most fundamental duty of owed by the trustee to the beneficiaries is the duty of loyalty."); Restatement of Trusts (2d) at § 170 (same). Moreover, it is surely a breach of a trustee's basic duty to exercise reasonable care to accept without question a lessee's calculation of the royalty owed. Simply stated, would a person of ordinary prudence assume, when collecting debts owed to him, accept without question the accuracy of a payment based on a complex formula by a person who has every incentive to pay as little as possible. *See* Restatement of Trusts (2d) at § 174 (setting forth a trustee's duty to exercise reasonable skill and care). By the Government's logic, it would have no duties to take any action whatsoever if every lessee unilaterally declared that it owed no royalty. There is simply no understanding of a trustee's duties that would permit such an abjectly passive and disloyal role.

**5. The Government Cannot Avoid Liability for Its Failure to Execute its Fiduciary Obligations by Arguing that It Acted as a Volunteer**

The Government attempts to minimize the significance of its actual control over the Osage Trust by arguing that "the fact that the Osage Agency may have taken on activities related to calculating or collecting royalties that are not required by the 1906 Act or its implementing regulations should not transform those activities into fiduciary duties, the violation of which would require compensation." Gov't Br. at 23. This argument is legally without merit, and factually unbelievable.

First, as detailed above, the Government is not a "volunteer." Congress has specifically and expressly charged the Government with the duty to carry out trust obligations to collect

royalty payments due the Osage Nation. The Government has repeatedly admitted that it has those obligations, completely undermining its argument here that it is a mere volunteer.

Second, in any event, the Government's argument cannot succeed because even if it is a volunteer, the Supreme Court in *Mitchell II* has made clear that the Government may be answerable in damage for breaches of fiduciary duties it takes on voluntarily:

> Where the Federal Government *takes on* or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

463 U.S. at 225 (quoting *Navajo Tribe*, 224 Ct. Cl. at 183) (emphasis added). Because the Supreme Court was careful to separate the words "takes on" and "has" with the disjunctive "or," it is clear that the Supreme Court understood that the Government can assume fiduciary duties by its actions, even if does not "have" those duties by law. Applying this language, the Federal Circuit in *Brown* stated that "the assumption by Congress and/or the Secretary, its delegate, of control of allottee money or property beyond the limited trust embodied in the General Allotment Act imposes on the government a fiduciary duty to the allottees." 86 F.3d at 1560. *See also*, *Shoshone*, 52 Fed. Cl. at 620-21. Even where the Government exercises its discretion to take on or assume duties not required of it, the Government exposes itself to liability if it breaches the trust obligations thereby assumed. Thus the Government's attempt to escape liability because it contends it is a mere volunteer is legally without merit.

**6. The Government Cannot Rely on the Limited Role the Osage Nation Plays in the Leasing Process to Avoid Liability for its Own Conduct**

The Government again attempts to minimize its role by pointing out that the Osage Nation can make a number of decisions itself, such as whether to enter into a lease, what royalty rate to charge or whether to waive certain late fees and penalties. Gov't Br. at 23-25. But each of those

Tribal decisions are expressly subject to the Government's approval, giving the Government final say on such decisions. *Supra* at 4-7. The fact that the Government posses extensive veto power over lease issues establishes the kind of control that will support a claim for money damages in this Court. *Brown*, 86 F.3d at 1562-63. More fundamentally, however, even if there is a discrete role for the Osage Nation, the Government is not stripped of its duties as trustee.

Desperate to find some basis to escape responsibility for its failure to correctly apply its own regulations, the Government argues that the Osage Nation has standing to enforce violations of leases, thereby demonstrating that the Government does not exercise plenary control over the leases. Gov't Br. at 24-25. This is a false argument, however, because the neither the Osage Regulations nor the tranche one leases provide any role for the Osage Nation to enforce the leases. More fundamentally, even assuming that the Osage Nation could enforce the leases on its own, that power does not absolve the Government of its trust duties. As the Supreme Court acknowledged in the case cited by the Government, *Poafpybitty v. Skelly Oil Co.*, 390 U.S. 365, 369 (1968), even where a tribe has standing to enforce a lease, the Government has a trust obligation to enforce lease violations. *Id.* at 373-74. Here, the Osage Nation is seeking damages for the Government's failure to correctly calculate and collect royalties over a period of many years. Accordingly, the Osage Nation has little choice but to seek damages against the trustee for failing to collect royalties due in a correct and timely manner.

Moreover, the mere fact that the Osage Nation may have standing to enforce a lease directly is meaningless if it lacks the facts necessary to even articulate a specific claim against a specific lessee. As detailed above, the Government controlled all information regarding the calculation and collection of royalties, including in particular the Osage Agency's database, to which information the Osage Nation did not have access. *Supra* at 11.

Indeed, the correspondence and documents the Government relies upon in fact demonstrate that the Government controlled the royalty collection process. Gov't Br. at 26-27. First, the Osage Nation raised issues apparent from information the Government provided about the Government's performance of its duties. If this demonstrates anything, it is that the Government controls the collection and verification of royalty payments, and Osage Nation's role is secondary and limited by the information the Government provides. Moreover, the Osage Nation complained to the Government about the Government's failure to collect royalties, not to the lessee. There is no evidence that the Government directed the Osage Nation to take action against the lessee if the Osage Nation felt there was an underpayment. To the contrary, the indication is that the Government itself took remedial action. Again, the Government's exhibits demonstrate the pervasive and controlling role the Government had in collecting royalty payments.

Finally, the Government points to the Osage Nation's active involvement in its oil and gas resources, including attempts to audit the Government's management of the trust, as evidence that the Government does not possess or exercise full trust power. Gov't Br. at 25-27. First, this correspondence does not appear to relate to any of the tranche one leases or periods, so this argument is simply irrelevant. Second, in any event, it cannot be the case, and the Government cites no authority for the proposition, that the efforts of a beneficiary to protect his interests prove that the trustee had no duties or absolve the trustee of responsibility for its breaches. Indeed, the Government's argument reduces to the position that the fact that the Osage Nation was able to uncover prior breaches of the Government's trust duty somehow proves that the Government had no trust duties. Obviously, such a position is absurd.

**7. The Government Misconstrues the *Shoshone* Decisions in an Attempt to Evade its Fiduciary Duties to the Osage Nation**

The Government argues that the holdings in the *Shoshone* decisions support its Motion to Dismiss. Gov't Br. at 27-30. The Government argues, in essence, that because some of the

statutory provisions discussed in the *Shoshone* litigation were more precise in imposing a duty on the Government to calculate royalties than the 1906 Act and Osage Regulations, the *Shoshon*e decisions support dismissal of this case. Specifically, the Government points to language in the Federal Oil and Gas Management Act of 1982, 30 U.S.C. §§ 1701-1757 (1994) ("FOGRMA") that explicitly requires the Government to calculate royalty payments.

First, nothing in any of the *Shoshone* decisions establishes the language in FOGRMA or the IMLA as *necessary* to establish a claim for breach of fiduciary duty. To the contrary, this Court was clear that the provisions of FOGRMA, were "'duty imposing' [] in that they impose an obligation on defendant to collect moneys on behalf of Indian tribes." 58 Fed. Cl. at 82. The Federal Circuit affirmed this reasoning, concluding that claims for failing to collect royalties were valid because the applicable regulations required the Government to collect royalties, and manage those royalties under the terms of the trust. *Shoshone*, 364 Fed.3d at 1350. Specifically, the Court found that 25 C.F.R. § 211.40 imposed a duty to collect amounts due under sand and gravel leases. *Id.* That regulation provides:

> Unless otherwise specifically provided for in a lease, once production has been established, all payments shall be made to the MMS or such other party as may be designated, and shall be made at such time as provided in 30 C.F.R. chapter II, subchapters A and C. Prior to production, all bonus and rental payments, shall be made to the superintendent or area director.

Other provisions of the Shoshone statute and 25 U.S.C. §§ 155, 161a, 161b and 162a require the Government to hold those sums in trust, manage those sums in a particular manner and distribute the sums in a particular manner. Taken together, these statutes and regulations created an enforceable obligation of the Government to correctly calculate and collect royalty payments due the Shoshone Tribe.

In this case, the 1906 Act and the Osage Regulations create a regulatory framework virtually identical framework that in *Shoshone*. The Osage Regulations and the tranche one leases

require that the lessee "shall pay or cause to be paid to the Superintendent, [the royalties from oil and gas leases]." 25 C.F.R. § 226.11(a)(1). As in *Shoshone*, other terms of the 1906 Act, the Osage Regulations and 25 U.S.C. §§ 155, 161a, 161b and 162a require the Government to hold those sums in trust, manage those sums in a particular manner and distribute the sums in a particular manner. Moreover, the 1906 Act includes in the Osage Trust not just royalties received by the Government, but also royalties that are, and that will become, due. Under *Shoshone*, therefore, the Osage Nation has stated a claim for money damages subject to this Court's jurisdiction based on the Government's failure to collect money due the Osage trust.

Finally, it should be noted that the purpose of FOGRMA was to "fulfill the trust responsibility of the United States for the administration of Indian oil and gas resources . . . ." Federal Oil and Gas Royalty Management Act of 1982, H.R. Rep. No. 97-859 at 15 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4268. Thus, FOGRMA is not to be understood as enlarging the scope of the Government's fiduciary duties, or as creating new duties, but as confirming the scope of preexisting duties by specifying them. The fact that the 1906 Act is not as specific as FOGRMA does not mean that the 1906 Act does not include duties enumerated in FOGRMA. To the contrary, the fact that Congress specified those duties in FOGRMA confirms that those duties were already implicit in the Government's fiduciary obligations to the Osage Nation and other Indian Tribes.

**8. The Court Should Reject the Government's Eleventh Hour Attempt to Redefine Tranche One of this Case**

Tacitly acknowledging that its legal arguments lack merit, the Government attempts to create procedural confusion by arguing that the Osage Nation's royalty claims are not actually part of this case. Gov't Br. at 30-33. To make this argument, the Government strings together a number of isolated statements from a variety of pleadings in this case and in a related case the Osage Nation has filed against the United States in this Court, Case No. 550L, currently pending

before Judge Williams. The essence of the Government's argument is that the Court should dismiss the royalty claims in this case because those claims are not actually in this case, but are in Case No. 550. *Id.* This argument is factually erroneous and legally without merit.

There is no question that the Osage Nation's royalty claims are in this case. Paragraph 21 of the Complaint alleges that the Government, *inter alia*,

> has further damaged the Osage and violated its duty under the above laws, more specifically, as follows: . . .
>
> b. Failure to independently reconcile volumes of oil and gas produced with the amount of royalty paid by producers of said oil and gas under Osage oil and gas leases;
>
> c. Failure to obtain the price required to be paid the Osage for royalty under the terms of said oil and gas leases;
>
> d. Failure to collect the lawful rate of interest on late payments on the royalty proceeds on the sale of oil and/or gas from producers within Osage County . . . .

Based on these allegations, this Court, together with the parties, has designed a complex litigation schedule premised in large part on the need to complete discovery related specifically to the royalty claims. Indeed, the Government previously made this argument to the Court, and the Court disregarded it and approved a schedule that presumes the presence of these claims. Accordingly, there can be no doubt that the royalty claims are in this case.

In any event this argument is moot because the Osage Nation has filed, or will file within days of this Brief, a Motion for Voluntary Dismissal of Case No. 550L pursuant to Rule 41(a)(2) of the Rules of the United States Court of Federal Claims. Because there are no counter-claims or third-parties involved in that case, the case will be dismissed and the source of the Government's misplaced concerns regarding confusion or inconsistent results will be removed. Accordingly, the temporary existence of Case 550L provides no basis for dismissal of any part of this case.

**D. The Osage Nation's Claims Are Not Time Barred And The Government's Arguments Have Already Been Rejected By This Court And The Federal Circuit in *Shoshone***

Apparently recognizing the weakness of its arguments, the Government reaches for the proverbial kitchen sink by attempting to relitigate its previously denied argument that the Osage Nation's claims are barred by the statute of limitations. This argument is facially without merit because this Court has expressly held that the Osage Nation's claims are covered by the tolling the provision of the Consolidated Appropriations Act of 2005, Pub. L. No. 108-447, 118 Stat. 2809 ("Appropriations Act") and are not barred by any statute of limitation. *Osage Nation v. United States*, 57 Fed. Cl. 392 (2003).

Based on the Appropriations Act and this Court's prior ruling, the Government's lengthy arguments regarding 28 U.S.C. § 2501 (imposing six-year statute of limitations on claims in the Court of Federal Claims), Gov't Br. at 33-35, whether such a claim has been tolled, *id.* at 35, or whether the Osage Nation was aware of certain claims, *id.* at 35-38, are simply irrelevant. As this Court has already held, the Appropriations Act provides that the claims raised in this case have not begun to accrue because the Government has not provided an accounting of the Osage Trust.[9]

The Government attempts to avoid the binding nature of this Court's prior decision by arguing that the Federal Circuit's decision in *Shoshone Indian Tribe v. United States*, 364 F.3d 1339 (Fed Cir. 2004), somehow limits the scope of the Appropriations Act to exclude from its tolling provisions the Osage Nation's royalty claims. Gov't Br. at 38-41. This argument is utterly without merit and in no way warrants reconsideration of this Court's prior decision.

On its face the Government's argument is unsupportable because the Federal Circuit squarely held that the Appropriations Act tolled claims for

---

[9] In any event, as the affidavits of a number of Osage Nation officials and representatives submitted in opposition to the Government's rejected Motion to Dismiss indicated, the Osage Nation did not have knowledge of any claims within the statutory period.

> losses resulting from the Government's failure or delay in (1) collecting payments under the sand and gravel contracts, (2) depositing the collected monies into the Tribe's interest-bearing accounts, or (3) assessing penalties for late payment. Fiduciary breaches such as these result in losses to trust funds that are separate and distinct from the mismanagement of trust funds once collected.

*Shoshone*, 364 F.3d at 1350-51. Because the claims here relate to the Government's failure to collect royalty payments due the Osage Nation under oil and gas leases, this case falls squarely within the scope of the Federal Circuit's decision. Indeed, in denying the Government's prior Motion to Dismiss in this case, the Court relied on its prior decision rejecting the same argument in *Shoshone*, which decision the Federal Circuit affirmed. Accordingly, there is nothing about the Federal Circuit's decision that should cause this Court to reconsider its earlier decision here.

Undeterred by the actual holding in the case, the Government latches onto the court's dicta that the distinction in the Appropriations Act between losses to funds and other losses makes sense because it has certain "evidentiary advantages" in that an accounting would create some of the evidence needed to prove that there was a loss to funds. The Government extracts from that observation the conjecture that the Appropriations Act covers only claims that can be proven based solely on the accounting.

But neither the Federal Circuit nor Congress established such a rule. The Act requires "an accounting of such funds from which the beneficiary can determine whether there has been a loss." 118 Stat. at 3060-61. In this case, an accounting that at least indicated how the Government calculated royalty payments, the volume of oil and gas produced in each month for each lease and how much royalty it collected from each lease in each month would enable the Osage Nation to determine whether it had suffered a loss. There mere fact that proving the loss might require evidence of higher posted or offered prices than the Government used does not take the claim beyond the scope of the Appropriations Act because the accounting would have provided the basis

to determine whether a loss had occurred. Moreover, unlike the "asset maximization" claims discussed in *Shoshone*, it would not unduly burden the Government to reveal in an accounting how it applied its own royalty formula. Such information should be readily available in the records of the Osage Agency, and one would think that such an explanation would be a mandatory element of any accounting.

The Government's rule would turn the plain meaning of the Appropriations Act on its head by making the applicability of the Act depend on the quality of the accounting, not the nature of the claim, effectively rewriting the Act to read "a loss that can be determined from whatever accounting is provided." Indeed, this reading would allow the Government to place claims beyond the scope of the Act by failing to include information about the claims in the accounting. Clearly Congress did not intend to give the Government the means to destroy the very relief from the statute of limitations Congress conferred.

Reaching even farther for some colorable argument, the Government argues that the Osage Nation's royalty claim is not really a failure to collect claim, but is really an asset maximization claim which may not be covered by the Appropriations Act, because the claim "puts the basis for determining the royalty amount due and owing in dispute." Gov't Br. at 39. This argument is utterly without merit. First, the Government makes no effort to explain why a dispute about the proper manner of calculating the royalty is not a claim relating to the collection of trust funds. Nor is any explanation plausible. The issue here is whether the Government correctly applied its own formula for calculating the royalty amount. It is a question, simply, as to whether the royalty on a given quantity of oil should have been x or y. The Government's failure to apply correctly its own royalty formula and resultant failure to collect the correct royalty is indistinguishable from a claim that the Government failed to collect a royalty payment that was due. In both cases, the claim is that the trust lost funds due to a failure to collect funds properly due.

Second, it is clear that the royalty claims here are significantly different than the asset claims the *Shoshone* court found to be beyond the scope of the Appropriations Act. In *Shoshone* the court drew a distinction between a claim that the Government had failed to manage gravel and sand resources in a way that maximized revenue for the trust and a claim that the Government had failed to collect royalties due under a sand and gravel lease. The court found the latter claim covered by the tolling provision of the Appropriations Acts but the former claim not covered. No matter how the Osage Nation's royalty claim is parsed, it is a claim that the Government failed to collect funds due the Osage Nation under the express terms of a lease drafted by and approved by the Government itself; it does not call into question the Government's own royalty formula. Clearly, this claim is within the scope of the Appropriations Act under *Shoshone*.

### E. The Osage Nation Has Sufficiently Plead That The Government Breached Its Investment-Related Duties To Survive A Motion To Dismiss

The Government makes a series of broad statements regarding the applicable standard of review for the Osage Nation's investment-related claims. Gov't Br. at 41-50. As the Osage Nation understands it, the Government makes two points. First, that the Court should dismiss the Osage Nation's investment and deposit lag time claims to the extent the claims "entail a higher standard of care than the arbitrary and capricious or abuse of discretion standard." *Id.* at 48-49. Second, that the Osage Nation has not identified a source of law to support its "disbursement lag time" claim. *Id.* at 50. Neither point has any merit.

Fundamentally, these points concede the fact that the Government has a fiduciary duty regarding the handling of trust funds, a matter which is beyond dispute in any event. 25 U.S.C. §§ 155, 161a, 161b and 162a; 1906 Act at §§ 3 & 4. Having conceded the existence of a fiduciary duty, the Government has conceded that this Court has jurisdiction over claims that the Government breached those duties. As the Supreme Court held in *Mitchell II*, in reversing a decision of this Court to dismiss a damages claim against the Government, ("[b]ecause the statutes

and regulations at issue in this case clearly establish fiduciary obligations of the Government in the management and operation of Indian lands and resources, they can fairly be interpreted as mandating compensation by the Federal Government for damages sustained." *Mitchell II*, 463 U.S. at 226. There is, quite simply, no basis to dismiss a case for lack of jurisdiction based on a putative argument regarding the precise definition of the standard of care

As for the so-called late disbursement claim, the Government seeks to sow confusion where there is none. In its Statement of Trust Fund Mismanagement Claims for Tranche One at 6 the Osage Nation described this claim as follows: "the United States failed to credit the Osage Nation with the full amount of investment income that the funds earned prior to the time the funds were disbursed to the beneficiaries of the trust."

The claim, simply stated, is that there was a period of time between the time the Government recorded a disbursement from the Osage Trust and the time the funds were actually withdrawn from the account during which time the Government retained the funds but the Osage Nation did not receive interest on the funds. Pursuant to the 1906 Act at § 4, 25 U.S.C. §§ 155, 161a, 161b and 162a, and general trust law, the Osage Nation, not the Government, was entitled to interest income from the Trust. By failing to credit the Osage Nation with all interest earned (or that could have been earned) on the Trust, the Government breached its fiduciary duties. That was clearly stated by the Osage Nation, and is a valid claim for breach of trust. Accordingly there is no basis to dismiss the disbursal lag time claim.

Finally, it is beyond the scope of the Court's Scheduling Order to brief the issue of standard of care at this time. The Osage Nation disagrees with the Government's assertion that its duty of care is the "arbitrary and capricious standard. As the court noted in *Minnesota Chippewa Tribe v. United States*, 14 Cl. Ct. 116, 129-30 (1987), in refusing to apply the arbitrary and capricious standard in an Indian trust case, courts hold the Government to a more exacting duty of

care, particularly where the issues relate to the handling of and accounting for trust funds. *See, e.g. Yankton Sioux Tribe v. United States*, 623 F.2d 159, 163 (Ct. Cl. 1980) ("It is well-settled that 'the standard of duty for the United States as trustee for Indians is not mere 'reasonableness, but the highest fiduciary standards.") (citations omitted); *Navajo Tribe of Indians v. United States*, 9 Cl. Ct. 336, 376 (1986) ("The general rule is that [government] is held to the standards of a private fiduciary in administering Indian property. F. Cohen, *Handbook of Federal Indian Law* 226 (2d ed. 1982). A private trustee must 'exercise such care and skill as a man of ordinary prudence would exercise in dealing with his own property.' II A. Scott, *Law of Trusts* § 174 (1967)."); *Coast Indian Cmty. v. United States*, 550 F.2d 639, 652 (Ct. Cl. 1977) ("The United States, when acting as trustee for the property of its Indian wards, is held to the most exacting fiduciary standards."). The Osage Nation reserves the right to brief this issue at the appropriate time.

## IV. CONCLUSION AND REQUEST FOR ORAL ARGUMENT

For the foregoing reasons, the Government's Motion to Dismiss, in Part, Plaintiff's Tranche One Claims should be denied. Further, the Osage Nation believes that the Court could benefit from oral argument on the Government's motion. Accordingly, the Osage Nation respectfully requests that the Court schedule oral argument on the Government's motion.

Dated this July 11th, 2005

Respectfully submitted,

*s/Wilson K. Pipestem*
WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation