# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | |
| Plaintiff, | Electronically Filed July 11, 2005 |
| v. | No. 00-169 L<br>Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

## APPENDIX OF EXHIBITS IN SUPPORT OF PLAINTIFF OSAGE NATION'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS, IN PART, PLAINTIFF'S TRANCHE ONE CLAIMS

WILSON K. PIPESTEM
Pipestem Law Firm, P.C.
1333 New Hampshire Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 419-3526
Fax: (202) 659-4931
wkpipestem@pipestemlaw.com

Attorney for Plaintiff
Osage Nation

| Exhibit Number | Description | Beginning Page Number |
|---|---|---|
| 1 | Deed from the Cherokee Nation to the United States in Trust for the Use and Benefit of the Osage and Kansas Tribe, as reprinted in *The Constitutions and Laws of the American Indians, Volume 4*. (Nov. 26, 1890). | 1 |
| 2 | Deposition of Carole Revard (June 20, 2005) Exhibit 8 | 6 |
| 3 | Deposition of Judy Hill (June 22, 2005) at 360:6-14; 360:15-22 | 14 |
| 4 | Deposition of Newell Barker (June 10, 2005) at 229:18:-231:13; 233:20-236:14; | 18 |
| 5 | Deposition of Charles Hurlburt (June 3, 2005) at 65:6-66:8 | 26 |
| 6 | Deposition of Jeanette Hanna (June 9, 2005) Exhibit 2 (Letter from Gordon Jackson, Superintendent, Osage Agency, to Principal Chief Charles O. Tillman, Jr., Osage Tribal Council 2 (October 18, 1996)) | 29 |
| 7 | Deposition of Newell Barker (June 8, 2005) at 92:8-93:15; 93:23-94:5 | 32 |
| 8 | Deposition of Judy Hill (June 22, 2005) Exhibit 14 | 36 |
| 9 | Bureau of Indian Affairs, Osage Agency, *Policies and Procedures Guide*, (May 2004) (excerpts; sample forms omitted | 41 |
| 10 | Deposition of Carole Revard (June 20, 2005) at 55:4 – 55:4; 150:2-16; | 123 |
| 11 | Deposition of Mary Lou Drywater (June 24, 2005) at 17:21-18:13, 25:11-27:9. | 128 |
| 12 | Deposition of Charles Hurlburt (June 1, 2005) at 143:7-144:8 | 134 |
| 13 | *United States v. Plains Res., Inc.*, Case No 02-CV-976-E(M) (N.D. Okl.) Complaint (filed Dec. 30, 2002) | 137 |
| 14 | *United States v. Plains Res., Inc.*, Case No 02-CV-976-E(M) (N.D. Okl.) Plaintiff's Memorandum in Support of Motion to Strike Affirmative Defenses | 154 |

# EXHIBIT 1

# TREATIES AND LAWS

OF THE

# OSAGE NATION,

AS PASSED TO

NOVEMBER 26, 1890.

---

COMPILED BY W. S. FITZPATRICK.

---

SR Scholarly Resources Inc.
Wilmington, Delaware · London

The undersigned interpreters of the said nation, do hereby certify that the foregoing treaty was read and interpreted by us to the above-named chiefs and headmen of the Osage Nation, and that they declared themselves satisfied therewith, and signed the same in our presence.

ALEXANDER BEYETT,
*United States Interpreter.*
LEWIS P. CHOUTEAU,
*Special Interpreter.*
AUGUSTUS CANTAIRE,
*Special Interpreter.*





DEED FROM THE CHEROKEE NATION, THROUGH ITS DELEGATES, TO THE UNITED STATES IN TRUST FOR THE USE AND BENEFIT OF THE OSAGE AND KANSAS INDIANS.

THIS INDENTURE, made and entered into this fourteenth day of June, A. D., eighteen hundred and eighty-three, between the Cherokee Nation, by Dennis W. Bushyhead, principal chief, Richard M. Wolfe and Robert B. Ross, delegates of said Cherokee Nation, for and in behalf of said Nation, of the first part, and the United States of America, in trust for the use and benefit of the Osage and Kansas Indians, of the second part, WITNESSETH that

WHEREAS, by the sixteenth article of the treaty concluded July nineteenth, A. D., eighteen hundred and sixty-six, between said Cherokee Nation and the United States, the said United States acquired the right "to settle friendly Indians on any part of the Cherokee country west of the ninety-six degree" of west longitude, under certain limitations therein mentioned, and

WHEREAS, under authority of an act of Congress, approved June fifth, A. D., eighteen hundred and seventy-two, a certain tract of said country was set apart for the Great and Little Osage tribe of Indians, with a proviso that said Great and Little Osage tribe shall permit the settlement within the limits of said tract of the Kansas tribes of Indians; and

WHEREAS, by virtue of a provision in the act of Congress of March third, eighteen hundred and seventy-three, there has been transferred from the proceeds of sale of

Osage lands in Kansas, and placed to the credit of said Cherokee Nation, the sum of one million, ninety-nine thousand, one hundred and thirty-seven and forty-one hundredths dollars, ($1,099,137.41,) in payment for said tract of land; and

WHEREAS, by an act of Congress, approved March third, A. D., eighteen hundred and eighty-three, three hundred thousand dollars, ($300,000,) was appropriated "to be paid into the treasury of the Cherokee Nation out of funds due under appraisement for Cherokee lands west of the Arkansas river:" PROVIDED, "That the Cherokee Nation. through its proper authorities, shall execute conveyances satisfactory to the Secretary of the Interior, to the United States in trust only for the benefit of the Pawnees, Poncas, Nez Perces, Otoes and Missourias and Osages now occupying said tract as they respectively occupy the same, before the payment of said sum of money;" now

THEREFORE, by authority of an act of the National Council of the Cherokee Nation aforesaid, approved May eighth, eighteen hundred and eighty-three, which recites: "That Dennis W. Bushyhead, principal chief, Richard M. Wolfe and Robert B. Ross, delegates of the Cherokee Nation, are hereby authorized and empowered, in the name of the Cherokee Nation, to execute deeds of conveyance as required by said act, March third, eighteen hundred and eighty-three, for the tracts of Cherokee land for the benefit of the Pawnees, Poncas, Nez Perces, Otoes and Missourias and Osages, as they respectively occupy the same, "said party of the first part, by the aforesaid principal chief, and delegates, and in consideration of the payment of the sum of money mentioned in the act of March third, eighteen hundred and eighty-three, aforesaid, as due under appraisement for Cherokee lands west of the Arkansas river, and of the further sum paid under the act of March third, eighteen hundred and seventy-three, as aforesaid, does by these presents bargain, sell, remise, release, relinquish and confirm unto the said party of the second part,



forever, in trust nevertheless and for the use and benefit of the said Osage and Kansas Indians, all those certain tracts of land lying and being in the Indian Territory. embracing the following townships.and fractional townships, north and east of the Indian meridian-- the fractional townships being on the left bank of the Arkansas river:

Fractional township twenty-four, (24.) twenty-five, (25.) and twenty-six. (26.) range two, (2.) east; fractional townships twenty-three. (23.) twenty-four. (24.) twenty-five. (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28.) twenty-nine. (29.) range three. (3.) east: fractional townships twenty-three. (23.) twenty-four. (24.) twenty-five. (25.) twenty-six. (26.) and twenty-seven, (27.) township twenty-eight. (28.) and fractional township twenty-nine, (29.) range four, (4.) east: fractional townships twenty-three, (23.) and twenty-four, (24.) townships twenty-five. (25,) twenty-six. (26.) twenty-seven, (27,) twenty-eight, (28,) and fractional township twenty-nine. (29.) range five. (5,) east: fractional townships twenty-two. (22.) and twenty-three. (23.) townships twenty-four, (24.) twenty-five. (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28,) and fractional township twenty-nine, (29.) range six. (6.) east: fractional townships twenty-one. (21.) and twenty-two. (22.) townships twenty-three. (23.) twenty-four. (24.) twenty-five, (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28.) and fractional township twenty-nine. (29,) range seven. (7.) east: fractional townships twenty-one. (21.) and twenty-two. (22.) townships twenty-three. (23.) twenty-four. (24.) twenty-five (25,) twenty-six. (26.) twenty-seven. (27.) twenty-eight, (28,) and fractional township twenty-nine. (29,) range eight, (8) east; fractional townships twenty, (20,) and twenty-one, (21,) townships twenty-two. (22,) twenty-three. (23.) twenty-four, (24.) twenty-five, (25,) twenty-six, (26,) twenty-seven. (27.) twenty-eight. (28,) and fractional township twenty-nine. (29,) range nine. (9,) east; fractional township twenty. (20.) townships twenty-one. (21.) twenty-

two. (22.) twenty-three. (23.) twenty-four. (24.) twenty-five. (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28) and fractional township twenty-nine. (29.) range ten. (10.) east: fractional township twenty. (20.) townships twenty-one. (21,) twenty-two. (22.) twenty-three. (23.) twenty-four. (24.) twenty-five. (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28.) and fractional township twenty-nine. (29.) range eleven. (11.) east: fractional townships twenty. (20.) twenty-one. (21.) twenty-two. (22.) twenty-three. (23.) twenty-four. (24.) twenty-five. (25.) twenty-six. (26.) twenty-seven. (27.) twenty-eight. (28.) and twenty-nine, (29.) range twelve. (12.) east: according to a plat of lands annexed hereto, marked "A." and made a part of this conveyance: containing in all one million. five hundred and seventy thousand. one hundred and ninety-six and thirty hundredths acres. (1.570.196.30.) hereby granted. Under the act aforesaid. there has been set apart for the Kansas Indians. as provided by said act. the following numbered townships and fractional townships. being a part of the lands above described and indicated upon the before-mentioned plat:

Fractional townships twenty-seven. (27.) twenty-eight. (28,) and twenty-nine. (29.) range three. (3.) east: fractional township twenty-seven. (27.) township twenty eight. (28.) and fractional township twenty-nine. (29.) range four. (4.) east; the west half of section three. (3.) ten. (10.) fifteen. (15.) twenty-two. (22.) twenty-seven. (27.) and thirty-two. (32.) and sections four. (4.) five. (5.) six. (6.) seven. (7.) eight, (8.) nine. (9.) sixteen. (16.) seventeen. (17.) eighteen. (18.) nineteen. (19.) twenty. (20.) twenty-one. (21.) twenty-eight. (28.) twenty-nine. (29.) thirty. (30.) and and thirty-one. (31.) of township twenty-seven. (27.) north. range five. (5.) east: the west half of sections three. (3.) ten. (10.) fifteen. (15.) twenty-two. (22.) twenty-seven. (27.) and thirty-four. (34.) and sections four. (4.) five. (5.) six. (6.) seven (7.) eight. (8.) nine. (9.) sixteen. (16.) seventeen. (17.) eighteen. (18.) nineteen. (19.) twenty. (20.) twenty-one. (21.)





twenty-eight. (28.) twenty-nine. (29.) thirty. (30.) thirty-one (31.) thirty-two. (32.) and thirty-three. (33.) of township twenty-eight. (28.) north. range five (5.) east: the west half of sections fifteen. (15.) twenty-two. (22.) twenty-seven. (27.) and thirty-four. (34.) and sections sixteen. (16.) seventeen. (17.) eighteen. (18.) nineteen. (19.) twenty, (20.) twenty-one. (21.) twenty-eight. (28.) twenty-nine. (29.) thirty. (30.) thirty-one. (31.) thirty-two. (32.) and thirty-three. (33.) of township twenty-nine. (29.) north. range five. (5.) east: containing an area of one hundred thousand. one hundred and thirty-seven and thirty-two hundredths acres. (100.137.32.) which aforesaid lands were paid for by the Osages to the Cherokees. and the Kansas Indians have paid for that portion assigned to them by proper transfer of the funds arising from the sale of their lands in Kansas: together with all and singular the hereditaments and appurtenances belonging or in any wise appertaining to the lands hereby granted.

To Have and To Hold the said premises as above described with the appurtenances unto the said party of the second part. for the use and purposes aforesaid.

In Witness Whereof, the party of the first part hath subscribed this conveyance by the said principal chief and delegates aforesaid. who have also hereunto set their hands and seals this fourteenth day of June. A. D.. eighteen hundred and eighty-three.

[CHEROKEE SEAL.] THE CHEROKEE NATION.

By DENNIS W. BUSHYHEAD. [L. S.]
*Principal Chief.*

RICHARD M. WOLFE. [L. S.]

ROBERT B. ROSS. [L. S.]
*Delegates of the said Cherokee Nation.*

Signed. sealed and delivered in the presence of Jos. K. McCammon. N. P. Loveridge. Wm. A. Phillips.

DISTRICT OF COLUMBIA, } ss.
COUNTY OF WASHINGTON, }

On this fourteenth day of June, A. D.. eighteen hundred and eighty-three, before me, a Notary Public, in and for the district aforesaid, personally came Dennis W. Bushyhead, Richard M. Wolfe and Robert B. Ross, to me known to be the persons who executed the foregoing instrument, and acknowledged the same to be their free act and deed, for the purposes and under the authority therein mentioned.

[SEAL.] GEO. M. LOCKWOOD.
*Notary Public.*

DEPARTMENT OF THE INTERIOR.
OFFICE OF INDIAN AFFAIRS.
WASHINGTON. D. C.. March 16th. 1892.

I, T. J. Morgan, Commissioner of Indian Affairs. do hereby certify that the paper hereto attached is a true and literal copy of a deed dated June 14th, 1883, from the Cherokee Nation, through its delegates, to the United States, in trust for the use and benefit of the Osage and Kansas Indians, conveying the tract of country in Indian Territory, known as the Osage Reservation and the Kansas Reservation, as the same appears on record in this office.

T. J. MORGAN,
*Commissioner.*

DEPARTMENT OF THE INTERIOR.
WASHINGTON, D. C., March 21st, 1892.

I, John W. Noble, Secretary for the Department of the Interior of the United States of America, do hereby certify that T. J. Morgan, whose name appears signed to the foregoing certificate, is now, and was at the time of signing the same, Commissioner of Indian Affairs, and that full faith and credit are due to his official acts as such.

IN TESTIMONY WHEREOF, I have hereunto set my hand and have caused the seal of said Department to be affixed on the day and year above written.

[SEAL.] JOHN W. NOBLE,
*Secretary.*







## CONSTITUTION OF THE OSAGE NATION.

The Constitution of the Osage Nation, prepared by the authorized committee and adopted by the National Council.

The Great and Little Osages having united and become one body politic, under the style and title of the Osage Nation; therefore,

We, the people of the Osage Nation, in National Council assembled, in order to establish justice, insure tranquility, promote the common welfare, and to secure to ourselves and our posterity the blessing of freedom—acknowledging with humility and gratitude the goodness of the Sovereign Ruler of the universe in permitting us so to do, and imploring his aid and guidance in its accomplishment—do ordain and establish this Constitution for the government of the Osage Nation.

ARTICLE I.

SECTION 1. The boundary of the Osage Nation shall be that described in the treaty of 1876 between the United States and the Great and Little Osages, except that portion purchased by the Kaws.

SEC. 2. The lands of the Osage Nation shall remain common property, until the National Council shall request an allotment of the same, but the improvements made thereon and in possession of the citizens of this Nation are the exclusive and indefensible property of the citizens respectively who made or may rightfully be in possession of them. PROVIDED, That the citizen of this Nation

# EXHIBIT 2

Carole

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

1. Agency Position No.: C53.5354A
6. OPM Certification No.:

2. Reason for Submission: [X] Redescription [ ] New [ ] Reestablishment [ ] Other

Explanation *(Show any position replaced)*:
Updates/Replaces Supv. Accounting Specialist, GS-0501-09, C53.5354A dated 3-7-01.

3. Service: [ ] Hdqtrs. [X] Field

4. Employing Office Location: Pawhuska, OK

5. Duty Station: Pawhuska, OK

7. Fair Labor Standards Act: [X] Exempt [ ] Nonexempt

8. Financial Statements Required: [ ] Executive Personnel Financial Disclosure [X] Employment and Financial Interests

9. Subject to IA Action: [ ] Yes [X] No

10. Position Status: [X] Competitive [ ] Excepted *(Specify in Remarks)* [ ] SES (Gen.) [ ] SES (CR) — *See item 24 Below

11. Position is: [X] Supervisory [ ] Managerial [ ] Neither

12. Sensitivity: [ ] 1-Non Sensitive [ ] 3-Critical Sensitive [X] 2-Noncritical Sensitive 6 HR/PT [ ] 4-Special Sensitive

13. Competitive Level Code:

14. Agency Use: BUS 8888

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | | | | | | |
| d. First Level Review | Supervisory Accounting Specialist | GS | 0501 | 09 | rnc | 07-15-03 |
| e. Recommended by Supervisor or Initiating Office | Supervisory Accounting Specialist | GS | 0501 | 09 | | |

16. Organizational Title of Position *(if different from official title)*:

17. Name of Employee *(if vacant, specify)*: Carole A. Revard

18. Department, Agency, or Establishment: DOI, Bureau of Indian Affairs

a. First Subdivision: Eastern Oklahoma Regional Office

b. Second Subdivision: Osage Agency

c. Third Subdivision: Branch of Minerals

d. Fourth Subdivision: Accounting Section

e. Fifth Subdivision:

PLAINTIFF'S EXHIBIT 7 Revard

19. Employee Review–This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*:

20. **Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.*

a. Typed Name and Title of Immediate Supervisor: Newell Barker, Chief Branch of Minerals

Signature: Newell Barker Date: 12/20/02

b. Typed Name and Title of Higher-Level Supervisor or Manager *(optional)*: Jim Fields, Superintendent

Signature: Date:

21. **Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action:
Ronda N. Cook
Human Resources Spec. (Classification)

Signature: Ronda N. Cook Date: 7-15-03

22. Position Classification Standards Used in Classifying/Grading Position:
USOPM, PCS, Job Family PCS for Professional & Admin Work in the Acct. & Budget Group, GS-500 dated 12-00. USOPM, PCS, General Schedule Supv. Guide, dated 1-99, HRCD-6.

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks

* Positions in the Bureau of Indian Affairs are in the competitive service unless occupied by an incumbent appointed under Schedule A 213.3112 (a) (7). In such cases the position is in the excepted service during the tenure of the excepted employee.
TRUST CODE IS T1.

25. Description of Major Duties and Responsibilities *(See Attached)*

SUPERVISOR'S COPY

OF 8 (Rev. 1-85)

# SUPERVISORY ACCOUNTING SPECIALIST
C53.5354A
GS-0501-09

## INTRODUCTION

The Bureau of Indian Affairs' mission is to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives. This is accomplished through the delivery of quality services, while maintaining government-to-government relationships within the spirit of Indian self-determination.

The Osage Agency will uphold and strive to accomplish the Bureau of Indian Affairs mission within the boundaries of the Osage Nation Reservation in Oklahoma. Through the Branch of Minerals, we are to serve and promote the daily operations of the Osage Mineral Estate and the welfare of the Osage Tribe.

The Branch of Minerals will prudently uphold the Bureau and Osage Agency mission by managing the Osage Minerals Estate for the Osage Tribe, which includes, but is not limited to, verifying volume and value of royalties of the Minerals Estate. Insuring that all monies are received in compliance with the Code of Federal Regulations and properly recorded in accordance with generally accepted accounting principles and generally accepted auditing standards.

This position is located in the Branch of Minerals, Accounting Section. The Branch of Minerals, Accounting Section is responsible for collecting and accounting for all income derived from mineral activity on the Osage mineral estate.

The incumbent contributes to the mission of this office as shown below:

## MAJOR DUTIES:

The incumbent works in the Minerals Accounting Section, under the general supervision of the Supervisory Petroleum Engineer/Branch Chief, who defines areas of responsibility, establishes overall objectives and is available for advice and guidance when policy questions are involved. Incumbent proceeds on own initiative with latitude to make independent and final decisions. Incumbent is responsible for ensuring that all volumes are accurately reported and value obtained is in accordance with Federal Regulations.

1. Volume Verification - Reviews oil/gas and other mineral lease production and operation data ensuring that the reported production information is complete, accurate and in conformity with current procedures, policies and regulations.

2. Value Verification - Ensures that the highest posted price for oil sales is being paid and the correct royalty rate is applied and is consistent with the appropriate lease/contract as approved by the Superintendent.

Value Verification – Ensures that the highest price for gas is being paid and the correct royalty rate is applied in accordance with terms of the gas contract and/or agreement as approved by the Superintendent.

3. Gather's data, and performs necessary calculations and/or formulas to prepare the Highest Posted Price Bulletin. Prepares monthly Highest Posted Price Bulletin, distributes to all Osage Mineral Purchasers within established deadline, normally the 5th working day of the following month. The current procedure involves facsimile bulletins to the purchasers and mailing bulletins to approximately 600 lessees. Maintains accurate mailing list of lessees, instructs lower level employees in mailing procedures for bulletin. Assures that bulletins are timely processed and mailed.

4. Prepares quarterly gross production tax report for the State of Oklahoma. Prepares initial documents required to process payments for gross production taxes. Works with the Oklahoma Tax Commission and the Office of Special Trustee to follow through with payment procedure.

5. Incumbent participates in training, conferences and meetings with office personnel, oil and/or gas industry representatives. Incumbent also participates in conference and meetings with lessees, officials of other government agencies, and the Osage Tribal Council. Incumbent conveys information to lower level accounting technicians pertaining to the oil and gas industries. This incumbent will determine any changes in policies or procedures that affect the minerals accounting section, and make recommendations to implement these changes. Incumbent is the agency expert for procedures used in the minerals accounting.

6. Continually implements governing regulations, policies and procedures, which are general in nature, and through independent interpretation, develops specific procedures for all work processed necessary to properly administer the Osage Minerals Estate, Accounting operations for the Osage Agency accordingly.

7. Reviews payment terms, acreage requirements and complex royalty payments on Water Flood leases and Blanket Oil and/or Gas leases as well as individually negotiated Oil and/or Gas Leases.

8. Incumbent reviews any agreements such as marketing agreements, concession agreements and exploration and development agreements negotiated with the Osage Tribe. The incumbent advises management, tribal officials or other government entities that all bonuses or royalties are within the guidelines of these agreements.

9. Reviews gas contracts, surnames for approval concerning royalty rates, price and payment terms. Reviews Tribal concession agreements, such as Coal Bed Methane, Acreage Banks, Royalty in Kind, etc. Agreements are reviewed concerning royalty, price and payment terms as well as general benefit to the Osage Tribe.

10. Collects production and royalty information and resolves highly complex issues and/or extensively high number of errors in information being submitted by oil/gas and other

mineral lessees or purchasers. Advises and/or assist Accounting Technicians in resolving complex reporting discrepancies for oil, gas and other minerals.

11. Incumbent applies a comprehensive knowledge of the Bureau of Indian Affairs Manuals for the analysis of all type of financial documents pertaining to the operation of the OMNI Trust Program for the Osage Agency. Ensures cash collections documents are cost coded correctly on documents processed and are consistent with the type of transaction involved and that accounts will be debited and credited accordingly.

12. As indicated, by analysis of the operation of the Minerals accounting unit (OMNI Trust) recommends revision to the existing Osage Minerals Estate Trust Fund accounting system. Adapts and applies directives (e.g., instruction on revised cost features such as additions, statements pertaining to OMNI Trust operations) to specific operations. Reviews authority as to operational effect and applicability. Makes studies and surveys to determine the need for new procedures in the Osage Minerals Estate Trust operation and makes recommendations for the adoption and implementation to the supervisor.

13. Reconciliation Reports are prepared on a monthly basis to verify accuracy of BIA Trust Accounting Records to the subsidiary records maintained by Minerals Accounting.

14. Incumbent has final review and or verification of lessee/purchaser royalty calculations. Assures that lease/contract terms are met. By preparation of monthly statistical data, has final review to confirm payment by EFT from purchasers and verification of EFT payments on OMNI Trust system. Provides instructions to interested parties on the policy and procedures of submitting an EFT transfer for payment of royalty.

15. Prepares special monthly statistical reports requested by management pertaining to oil/gas and other minerals production and royalty such as: (1) production report for quantities of oil/gas and other minerals sold and royalty received for each type of mineral, (2) cumulative report on production and income, (3) statistical report on lease development forwarded to administrative heads and Osage Tribal Council, and (4) quarterly tax report on both oil and gas showing production and income per purchaser, and (5) prepares and/or assists in preparing a variety of periodic and special narrative or statistical narrative or statistical reports.

16. Initiates written correspondence required for submission to lessees or other interested parties pertaining to oil. gas and other minerals, for approval by the Branch Chief or Agency Superintendent. Provides customer service to all clients of the Osage Agency including telephone coverage. Provides information and assistance in written or oral form, as requested. Maintains and verifies that all files are in accordance with applicable BIA manuals.

17. Incumbent works with Computer Specialist in the design and development of clear and concise operating procedures for use by Minerals accounting into the internal Dbase.

18. Assists at the oil and gas lease sales, recording bids and computing amount of bonus to be paid by prospective lessees. Is second in command to serve as acting supervisor for the

Minerals Lease Management Section. Provides assistance and support to Lead Accounting Technician.

19. Provides guidance to the various lessees to meet with the regulatory requirements mandatory to the Bureau of Indian Affairs accounting program. Provides technical training to the Lead Accounting Technician and accounting technicians in interpreting the terms and monitoring devices resulting from complex lease and Exploration and Development Agreements to administer the collection and compliance of the accounting process.

20. Incumbent is responsible for providing technical assistance, advice, and guidance to Indian mineral owners and the Osage Tribal Council, and agency personnel. Maintains relationships with restricted and fee landowners, lessees, transporters and purchasers to resolve accounting disputes, assignments, permits, easements and division orders.

21. Incumbent processes applications of individual bonds and/or escrow agreements for other minerals (rock, gravel, sandy soil and clay) and commercial saltwater easements as well as processing of the permit, for approval by the Superintendent and/or Osage Tribal Council. Processes application for approval and termination of individual bonds and/or escrow agreements for approval by the Superintendent. Provides administrative and technical assistance to agency personnel, other Bureau of Indian Affairs agencies and Osage Tribal Council in preparing and monitoring the terms, royalty rates and other information in regards to said permits.

22. Incumbent monitors the Osage Dbase to oversee that information is properly encoded, discrepancies corrected, maintain mailing list with updated addresses and changes and confers with Computer Specialist on changes and/or problems that may arise.

**FACTORS:**

1. **Knowledge required by the Position:**

Knowledge and understanding of the mineral industry's production and revenue accounting practices and terminology in order to analyze complex transactions submitted by the various reporting entities.

Knowledge and full comprehension of the 25 CFR rules and regulations, and other applicable Federal, State and Tribal laws, regulations, and policies governing royalty collections, reporting requirements and assessment of penalties for regulatory non-compliance pertaining to Osage Minerals Estate.

Provide management concepts to special projects and the ability to utilize related tools and techniques to achieve goal. Skill in applying such tools in daily work as well as special projects. Good organizational and time management skills are required to meet established dead lines.

Knowledge of the Bureau's Trust Fund Accounting System (FTAS) to ensure accurate and timely accounting for the Osage Minerals Trust, through the OMNI Trust Accounting system, and the Osage Quarterly Annuity System. Knowledge of the mechanized fiscal account code structure and the procedures in maintaining the system in sufficient depth in order to be able to recommend procedural change.

Knowledge of Generally Accepted Accounting Principles and Generally Accepted Auditing Standards to insure that all transactions are properly recorded in the official BIA accounting records in order to assure a valid audit trail.

Knowledge of personal computers and application software, such as, but not limited to, Microsoft Word, Excel and the Osage Dbase system. Ability to utilize computer skills to interface with Agency LAN, Minerals database and/or BIA mainframe.

To effective communicate, oral and written, to a wide range of contacts concerning the principles, practices and policies of the royalty management system.

2. **Supervisory Control:**

The incumbent works under the general supervision of the Supervisory Petroleum Engineer who defines areas of responsibility, establishes overall objectives and is available for advice and guidance when policy questions are involved. Incumbent proceeds on own initiative with latitude to apply technical knowledge on problems within their assigned area of responsibility. Incumbent's work is reviewed through discussions and the Supervisory Petroleum Engineer for over-all adequacy of results.

3. **Guidelines**:

Written guidelines consist of the Indian Affairs Manual, the Department of the Interior Trust Fund Accounting Manual, General Accounting Office Policy, and procedures Manual for Guidance of Federal Agencies, Bureau of the Budget Regulations and Programs, memorandum and technical manuals covering IIM operations throughout the Bureau of Indian Affairs.

The wide variety of transactions involve numerous variations requiring a good understanding of the transactions and of accounting procedures and techniques in interpreting guidelines and determine their applicability to situations which are not specifically covered. Limited guidelines are available for assistance when analyzing procedural deficiencies to the processing of accounting data.

4. **Complexity**:

Incumbent's role in verifying volume and value entails reconciliation and verification of oil and other minerals production reports from lessees and purchasers. Reviews sales and production records, in document form, from a large number of leases. Checks transactions to ensure that lessees and purchasers are complying with applicable regulations and that the royalty minerals produced are duly reported, requires recognition

of the relationship of problems and practices related to many different production accounting systems used by operator and purchasing companies. The work is greatly complicated by the number of small independent operators with non-professional accounting personnel, which leads to a high rate of miscalculations the incumbent has to reconcile.

Incumbent must effectively communicate with production executives/comptrollers, tribal auditor, the general public, and other government agencies representing the royalty management program both in person and in oral and written communication.

Incumbent must keep abreast with the computer specialist in regards to the internal computer Dbase system to see that the system is functioning in an effective manner, as royalty calculations and data entries are depended on by all employees of the Bureau of Indian Affairs/Osage Agency.

The employee is responsible for assuring files, back-up documentation, and other associated materials are readily available and in good order for auditors or other reviews. The documentation will indicate proper dollar amounts collected and reconciled to ensure an adequate audit trail is maintainable.

5. **Scope and Effect:**

Insuring that production and payment data, submitted on behalf of the Osage Minerals Estate is adequately verified and documented as to volume, value, proper calculations, and that payments are posted to the BIA official accounting records in an accurate and timely manner and providing an adequate audit trail.

6. **Personal Contacts:**

Personal contacts are employees of the Bureau of Indian Affairs, Osage Agency, Eastern Oklahoma Regional Office, Superintendent, Tribal Officials, oil and gas lessees, Field Solicitor's office personnel, Central Office personnel, other branches of the Department and state and local officials.

7. **Purpose of Contacts:**

The purpose of contact is to plan and discuss lease and accounting methods, offer assistance to clients, gather and present information, and influence or persuade managers and supervisors of the organization to accept findings and recommendations which will facilitate a faster and smoother administration of Trust Funds. Takes an active part in the execution of policy and procedures, regulations and management of all activities concerning the accounting section.

8. **Physical Demands:**

Work is sedentary. Occasional walking, bending and light lifting may be necessary when working with files away from immediate work area.

9. **Work Environment:**

The work is performed in an office environment.

**Supervision Exercised:**

Incumbent supervises the Accounting Section in the Branch of Minerals. Incumbent determines short and long term goals. Develop performance standards and evaluates employees. Defines objectives, priorities and deadlines of assignments and assists employees with situations that have no clear precedents. Evaluates work for technical accounting soundness, appropriateness and conformity to policies and procedures. Incumbent reviews individual development plans, provides guidance and recommends training. Motivates employees, disciplines and assigns work to the following positions: Lead Accounting Technician, two Accounting Technicians and an Accounts Maintenance Clerk.

Additional temporary and/or term Office Automation Clerks are frequently assigned. Employee identifies task or projects to be completed, prepares plan of action and request for temporary assistance as needed. Provides supervision and guidance to temporary employees.

**OTHER:**

The incumbent of this position may be required, as an incidental duty, to operate a government owned or leased motor vehicle in the performance of duties.

# EXHIBIT 3

0328

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

THE OSAGE NATION and/or
TRIBE OF INDIANS OF OKLAHOMA,

Plaintiff,

vs. No. 00-169L
JUDGE EMILY C. HEWITT

THE UNITED STATES OF AMERICA,

Defendant

CONTINUATION OF THE VIDEO DEPOSITION OF
JUDI HILL,

a witness called on behalf of the Plaintiff, on the 22nd day of June, 2005, at 813 Grandview Avenue, in the City of Pawhuska, County of Osage, and State of Oklahoma, commencing at 4:30 p.m., before the undersigned, Elizabeth Davidson, a Certified Shorthand Reporter in and for the State of Oklahoma.
Fee for Original: $
Paid by Plaintiff.

ELIZABETH DAVIDSON, CSR #122

DAVIDSON REPORTING SERVICE
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis
Tulsa, OK 74105
(918) 745-9959

Q. Did Mr. Parris coordinate with you on -- on some of the issues that you've been discussing that the tribal auditor would --

A. Yes, he would work, and, you know, was trying to do a work flow analysis and different things on how work processes were done.

Q. When was Mr. Vale the tribal auditor, approximately, from what time to what time?

A. John Vale and Jim Parris were here at the same time for that brief time; and then after Mr. Parris went to Albuquerque, Mr. Vale continued, and he was still here whenever I left in December or January of '97, and I think he kind of just started coming more or less on a monthly basis, after I left, until recently, and then Mr. Swan took over, Jim Swan.

MR. BURTON: I don't have any further questions.

MR. ROTHROCK: Off the record for one second.

(Off the record.)

REDIRECT EXAMINATION

BY MR. ROTHROCK:

Q. Ms. Hill, I have a few more questions for you.

At the time Bert Pappan was the tribal auditor, I believe you said middle eighties, how many people were employed at the Osage Agency?

A. Probably about 50.

Q. And when Jim Parris was tribal auditor, how many employees were there at the Osage Agency?

A. At least 50. We maintain a staff of, you know, around 50 people or more at that time.

Q. How about when Jim Vale was the --

A. John Vale?

Q. John Vale?

A. The same.

Q. Was there ever more than one tribal auditor at any given point in time, that you recall?

A. Yes, John Vale and Jim Parris worked together for a short time.

Q. Approximately one year, I believe you testified?

A. Yes.

Q. Other than that one year, has there ever been more than one tribal auditor?

A. No, not to my knowledge.

Q. Do you know who the tribal auditor is today?

A. Jim Swan.

A. I'm not sure to what in-depth that Mr. Vale and Mr. Pappan analyzed the royalties, that they went to -- and actually looked at the run tickets, but they didn't go out into the field to gauge tanks or any of that kind of activity.

Q. (By Mr. Rothrock) Do you know if any of the tribal auditors could access the Osage Agency D base from their own computers?

A. To my knowledge, they didn't have access to our stand alone D base system.

Q. If they wanted information from that system, they'd have to request it from someone at the Osage Agency?

A. Yes.

Q. Did the tribal auditors have the authority to issue a request to a lessee or a purchaser to pay additional royalty?

MR. BURTON: Objection, calls for a legal conclusion.

You may answer the question.

A. To my knowledge, they wouldn't have had the authority to do that.

Q. (By Mr. Rothrock) If a lessee complained to the Osage Agency that a tribal auditor was taking actions inconsistent with those directed by the Osage

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
OF FEDERAL CLAIMS

| | |
|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, Plaintiff, | |
| vs. | No. 00-169L Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, Defendant. | |

The Continuation of the videotape deposition of NEWELL BARKER taken on behalf of the Plaintiff before Pamela B. Stinchcomb, Certified Shorthand Reporter in and for the State of Oklahoma, on the 10th day of June, 2005, in the City of Pawhuska, State of Oklahoma, pursuant to the stipulations of the parties.

PAMELA B. STINCHCOMB, CSR #1544
DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

description?

A. I really couldn't identify a specific item. There were probably numerous instances.

Q. Mr. Barker, were any of the descriptions you gave me of the job duties that you performed as branch chief factually inaccurate?

A. To the best of my knowledge, no.

Q. When you gave me a factual description of what you did, to the best of your knowledge, that was a factual description of what you, in fact, did as branch chief?

A. Yes.

Q. And when you gave me descriptions of what the different sections in your minerals branch did, those were accurate factual descriptions of those jobs?

A. Yes.

Q. Mr. Barker, could you look again at Plaintiff's Exhibit 11, and would you look at the second page of that plaintiff's exhibit. It's actually numbered one at the bottom of the page, but it's the second page in the exhibit. And in particular, could I call your attention to the first, second, third paragraph, which consists of two sentences and just ask you if you could read those

two sentences to yourself.

A. Which one, the --

Q. The third paragraph, the one that begins: "The branch of minerals".

A. Okay. Yes.

Q. I believe you testified earlier that this document is a description of the position held by Carole Revard?

A. Yes.

Q. As a supervisory accounting specialist?

A. Yes.

Q. And I believe you testified earlier, too, that at least part of the time you were chief of the minerals branch, Ms. Revard was the head of the accounting section in that branch --

A. Yes.

Q. -- is that correct?

Calling your attention back to that third paragraph, the first sentence is -- reads: The branch of minerals will prudently uphold the Bureau and Osage Agency mission by managing the Osage mineral [sic] estate for the Osage Tribe, which includes, but is not limited to, verifying volume and value of royalties of the minerals estate.

Mr. Barker, is that an accurate description

of what Ms. Revard factually did in her -- in the performance of this job?

A. Yes.

Q. The sentence -- second sentence reads: Insuring that all monies are received in compliance with the Code of Federal Regulations and properly recorded in accordance with generally accepted accounting principles and generally accepted auditing standards.

Mr. Barker, is that an accurate description of Ms. Revard's position when she was head of the accounting section?

A. Yes.

Q. And it was your job as branch -- as chief of the branch to supervise her work?

A. Yes.

Q. Do you have any reason to believe that she failed to carry out the description of the job as set forth in that Paragraph 3?

A. No.

Q. If you were aware of any instance when she failed to collect all the royalties that were due under an oil and gas lease, what action would you have taken, if any?

MR. BURTON: Objection. Calls for

Q. Have you seen any kind of position description that the Osage Tribe has prepared for Mr. Daley?

A. No.

Q. Have you ever reviewed a contract between Mr. Daley and the Osage Nation?

A. Not me specifically.

Q. Would it be fair to say that your knowledge of Mr. Daley's job duties are based solely on what you learned from talking to Mr. Daley and observing him at Osage Tribal Council meetings?

A. And talking to the Osage Tribal Council, yes.

Q. Who on the Osage Tribal Council would have told you about Mr. Daley's job description?

A. Well, I don't remember specific ones.

Q. Do you remember the time period in which those discussions took place?

A. Not specifically.

Q. Mr. Barker, did Mr. Daley have any ability to veto your decisions?

MR. BURTON: Objection. Calls for a legal conclusion.

You may answer the question.

A. Well, I would say that he could talk to the

tribal council and the tribal council could object to it and then depending on what the superintendent said.

Q. (By Mr. Rothrock) If I understand your testimony, Mr. Barker, Mr. Daley only had the ability to argue with the superintendent about whether your decision was correct or not. He didn't actually have the authority to overturn your decision; is that correct?

A. Him personally, no. But he could talk to the tribal council, tribal council could talk to the superintendent, and the superintendent was my boss.

Q. Right. The tribal council wasn't your boss; is that correct?

A. What's that?

Q. The tribal council wasn't your boss; is that correct?

A. They were not directly, but they had involvement. That's why I was moved from Osage County.

Q. Could you explain what you meant by "that's why I was moved from Osage County".

A. Well, they complained to the area director.

Q. But wasn't the superintendent of the Osage Agency the only person that could hire you?

A. That's correct.
Q. The Osage Tribal Council couldn't hire you; is that correct?
A. That's correct.
Q. Isn't the superintendent of the Osage Agency the only person that could reassign you from chief of the minerals branch to some other position?
A. The area director could.
Q. And so it would be the superintendent or somebody that had higher authority than the superintendent?
A. Yes.
Q. The Osage Tribal Council didn't have the authority to unilaterally reassign you; isn't that correct?
A. Directly, no. But indirectly, yes.
Q. But by indirectly you mean only if they could persuade the superintendent or somebody with higher authority to do it?
A. That's correct.
Q. They couldn't do it themselves?
A. That's correct.
Q. If Mr. Daley reviewed a gas contract and thought it was a fair contract and someone on the minerals branch staff reviewed it and thought it was

an unfair contract, would you follow Mr. Daley's advice or would you follow the advice of the people on your staff?

A. I would --

MR. BURTON: Objection. That calls for speculation.

You may answer the question.

A. I would follow the advice of the superintendent.

Q. (By Mr. Rothrock) If the superintendent had an opinion that disagreed with Mr. Daley's, you would follow the superintendent's opinion, not Mr. Daley's opinion?

A. That's correct.

Q. Mr. Barker, I believe you testified earlier that you were not speaking on behalf of the Department of Interior?

A. That's correct.

Q. I want to give you an opportunity to clarify that statement because you certainly were describing your job duties as an employee or former employee of the Department of Interior.

A. I'm no longer with the Department of the Interior.

Q. But you were describing the job duties you

# EXHIBIT 5

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

THE OSAGE NATION and/or TRIBE )
OF INDIANS OF OKLAHOMA, )
)
Plaintiff, )
)
vs. ) Case No. 00-169L
)
THE UNITED STATES OF AMERICA, )
)
Defendant. )

DEPOSITION OF CHARLES HURLBURT,

a witness called on behalf of the Plaintiff, on the 3rd day of June, 2005, at 813 Grandview Avenue, in the City of Pawhuska, County of Osage and State of Oklahoma, commencing at 9:15 A.M., before the undersigned, Joni Humphries, a Certified Shorthand Reporter in and for the State of Oklahoma.

Fee for Original: $____________
Paid by Plaintiff.

________________________
JONI HUMPHRIES, CSR #1236

DAVIDSON REPORTING
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
Phone: (918) 745-9959

Q So you're basically giving Mr. Hughlett a heads up about the complaint?
A Yes, sir, and sometimes that goes in reverse. If he gets a complaint, he'll pass that on to me or ask for some sort of assistance in getting information or whatever.
Q Now who files these complaints?
A Generally speaking the ones I'm referring to now are by lessees for a variety of reasons, perhaps we have cancelled the lease or terminated a lease or maybe they're having trouble with the landowner or another lessee and don't think that we have provided enough support. Anytime somebody tells me that they're going to complain to the next level, one of the people that are at that next level would be Mr. Hughlett and the Tribal Counsel.
Q Isn't it the Osage Agency's job to resolve all such complaints?
MR. BURTON: Objection. Vague and calls for a legal conclusion.
You may answer.
A It is our job to try to resolve complaints, but quite often the resolution may not suit everybody involved. Quite often, for example, in a landowner versus an oil lessee case, you can't make both sides happy, although you might very easily make both sides unhappy with the decision.

Q (By Mr. Rothrock) But the Osage Nation doesn't have any authority at all to resolve a complaint with a landowner, isn't that right?

MR. BURTON: Objection. Calls for a legal conclusion.

You may answer that question.

A That's essentially true, but that doesn't prevent the landowner from complaining to the Tribal Counsel.

Q (By Mr. Rothrock) Wouldn't they be complaining to the Tribal Counsel just in the hopes that the Tribal Counsel might side with their view of the issue and make those views known to the Osage Agency?

MR. BURTON: Objection. Calls for speculation.

You may answer the question.

A I can't tell you why people would do that.

Q (By Mr. Rothrock) Well the Osage Tribal Counsel doesn't have any authority at all to resolve a dispute, so why would somebody complain to them unless they wanted them to go talk to the person who did have the authority to resolve the dispute, which would be the Osage Agency?

MR. BURTON: Objection. Speculation. I'll just make, at this point, a continuing objection to legal -- questions requiring a legal conclusion about the authority of the Osage Nation.

A I can't give you a definitive answer on many cases

# EXHIBIT 6

# United States Department of the Interior

BUREAU OF INDIAN AFFAIRS
Osage Agency
P.O. Box 1539
Pawhuska, Oklahoma 74056-1539

PLAINTIFF'S EXHIBIT 2 Hanna

October 18, 1996

Osage Tribal Council
Principal Chief Charles O. Tillman, Jr.
Box 779
Pawhuska, Oklahoma 74056

Dear Chief Tillman:

I appreciate the opportunity to sign your "temporary division order" presented to BIA staff on October 17, 1996. However, we must decline to sign the division order for the following reasons.

The record will indicate that we share and support the vision of the Osage Tribe operating its own wells, particularly on an experimental basis using the oil and gas property located in the S1/2, SE1/4, Section 11, T24N, R8E also known as the Meyers lease. My written dialogue with the Osage Tribal Council (OTC) began with my discussion paper dated August 14, 1996 where I attempted to outline concerns my office had about the OTC becoming a producer. We have had verbal discussion on this topic for probably the last three years.

In that August 14 paper I suggested a 30-day comment period for various stakeholders to voice their concerns. Some did express concerns and you were provided copies of some of the responses I received. Probably the most notable comments came from the Osage Shareholders Association (which did not support the OTC as producer), and also a copy of a 1990 policy memorandum issued by the Deputy to the Assistant Secretary - Indian Affairs about tribes operating marginal oil and gas properties (which required some sort of lease or agreement).

My office put together a draft Osage Minerals Agreement dated September 19, 1996 which extracted what I saw as minimal regulation language to be used in a mineral agreement that would establish guidelines for production of the trust oil and gas resource by the OTC. The Tulsa solicitor's office used that draft and further refined the agreement calling the later versions a memorandum of understanding (MOU) for the development of oil and gas by the OTC. You were provided copies of this document dated September 30, 1996.

In my October 2, 1996-letter to you I urged further development of the MOU and also called to your attention 25 U.S.C. section 81, Contracts with Indian Tribes, and the 1990 policy memorandum from the Deputy to the Assistant Secretary - Indian Affairs. We discussed these items and the MOU in the October 2, 1996 OTC meeting outlining the importance we were placing on some sort of written



Received
OCT 18 1996
Osage Tribal Council

agreement that would govern development of the trust asset by the OTC.

After our October 2, 1996 meeting I drafted another letter to you asking for 30 days to develop the MOU and that to proceed further may be premature and if the oil were removed without secretarial approval could be construed as unlawful. The OTC has obviously proceeded without agency approval, the lease has been placed on production, and now the oil produced needs to be sold soon.

Representatives of the OTC have met with BIA staff during my recent absence and another version of the MOU was discussed. Solicitor Rice has drafted another version but I have not reviewed the draft in detail.

The bottom line is this. We believe BIA lacks statutory authority to approve a division order (which offers instructions on royalty payments and gives authority for the producer to sell oil or gas) absent an approved lease or contract (agreement). During our October 17, 1996 meeting in my office I restated this fact once again and offered to sign the division order if you would sign the MOU. You declined to sign the MOU.

In your appeal of the superintendent's decision to approve assignments of leases on the North Burbank Unit to Calumet Oil Company you waved the fiduciary banner in our face citing United States v. Helen Mitchell, ectal (Mitchell). Mitchell basically held that the U.S. Government was accountable for money damages for alleged mismanagement of forest resources on the allotted Quinault Indian Reservation. We agreed with your line of thinking that a high fiduciary responsibility does exist as defined by the 1906 Osage Allotment Act which offers specific guidance in the management of oil and gas trust resources. We place considerable weight in protecting the interests of the Osage mineral owners or annuitants as provided in the 1906 Act as amended.

It is this office's belief that we owe a fiduciary responsibility to all the Osage mineral owners not just the Osage Indians who have a headright interest. As you are well aware about one third of the headright shares are owned by non-Indians or Indians not Osage who cannot vote or hold office in the OTC elections held every four years. Accountability to the annuitants has to be the key word in directing our collective actions as we launch tribal mineral production efforts.

Those "burdensome" regulations that the OTC wants to shuck aside have served to protect the trust asset from waste for many years. The Federal government by promulgating those regulations, which are based on the statutes unique to Osage, have also placed on the Federal government a heavy responsibility to ensure that the trust asset is developed for the benefit of the Indians or resource owners. And that the management of the trust resources is now governed by a set of written rules that allow Federal officials to control producer operations by forcing them to meet acceptable standards of resource disposition and management.

We must advise caution and restraint in removing the regulatory structure that is important in managing the trust asset. It is our opinion that once the written regulatory structure is removed,

considerable weight is lifted from the Federal government's fiduciary responsibility because there will be little to measure producer performance. If the OTC wants to embark on that journey then it is to their peril. The Federal government cannot be expected to pay monetary damages should breach of trust charges occur later.

A written document is essential in defining what each of our respective responsibilities will be in tribal mineral production actions. The document will be key in developing written performance standards of accountability that we can defend in appeal or court actions should they arise. A written agreement protects all interests.

It is this office's opinion that should we proceed without doing rigorous legal research and developing technical agreement language that allows sound resource management from a trust asset perspective, would open doors of opportunity for breach of trust actions.

We also are aware that the Muskogee Area Director and his staff are reviewing your request for BIA approval of a "temporary division order" and we respectfully submit to his lead in this matter. Therefore, no appeal rights are given here because a decision for the BIA has not been made on this issue.

Questions regarding this correspondence can be directed to the Office of the Superintendent, telephone (918) 287-1032.

Sincerely,

Gordon Jackson
Superintendent

cc: Muskogee Area Director
Tulsa Field Solicitor
Office of Special Trustee

C:\OFFICE\WPWIN\WPTRIB\MINERL3C.OTC

# EXHIBIT 7

0001

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

THE OSAGE NATION and/or
TRIBE OF INDIANS OF OKLAHOMA,

Plaintiff,

vs. No. 00-169L
JUDGE EMILY C. HEWITT

THE UNITED STATES OF AMERICA,

Defendant

DEO DEPOSITION OF NEWELL BARKER,

a witness called on behalf of the Plaintiff, on the 8th day of June, 2005, at 813 Grandview Avenue, in the City of Pawhuska, County of Osage, and State of Oklahoma, commencing at 10:30 a.m., before the undersigned, Elizabeth Davidson, a Certified Shorthand Reporter in and for the State of Oklahoma.

Fee for Original: $
Paid by Plaintiff.

ELIZABETH DAVIDSON, CSR #122

DAVIDSON REPORTING SERVICE
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis
Tulsa, OK 74105
(918) 745-9959

insurance company.
Q. (By Mr. Rothrock) You might impose a penalty in that instance?
A. Yes.
Q. What would the penalty be?
A. A proportion of the amount of oil that was lost as a result of the fire.
Q. Mr. Barker, let me return now to the accounting department a little bit, in a little bit more detail. You testified that it was the duty of the accounting section to collect royalties under oil and gas leases; is that correct?
A. Yes.
Q. Were they also responsible for collecting other types of payments under oil and gas leases?
A. Such as?
Q. Such as rentals?
A. Yes.
Q. Were they responsible for collecting bonuses that were paid when leases were taken?
A. That was combination lease accounting and accounting.
Q. Any other payments under oil and gas leases that the accounting department was responsible for collecting?

MR. BURTON: I'd object, once again, to the term collection as being vague.
You may answer the question.
A. Offhand I can't think of any, but.
Q. (By Mr. Rothrock) Was it the job of the accounting department to collect the payments that were due under oil and gas leases?
A. Yes.
Q. How about the non-oil and gas leases, was -- did the accounting department have any duties there?
A. Yes.
Q. Were they supposed to collect the payments under the non-oil and gas leases also?
A. Yes.
Q. Mr. Barker, I believe you testified you're familiar with the form leases that were used for oil, gas and the combination of oil and gas lease. Under the combination oil and gas lease, did the royalty payments depend on the value of the crude oil and natural gas?
A. Yes.
Q. With respect to crude oil, was it the job of the accounting department to make sure that the royalty was based on the correct value of crude oil,

as well as the correct volume?
A. Yes.
Q. And they also checked the math to make sure the payment had been calculated correctly?
A. Yes.
Q. Now, in determining the correct volume, I believe you've testified that the accounting department didn't really have a duty there, that was performed by the field section?
A. Yes.
Q. Was it the accounting sections duty, though, to determine the value of the crude oil for royalty purposes?
A. Yes.
Q. Can you describe briefly how that was done during the time you were branch chief from 1973 to 2004?
MR. BURTON: Objection, calls for a narrative.
You may answer the question.
A. It would be based on the regulations per se, but no less than the regulations.
Q. (By Mr. Rothrock) Did the royalty depend in part on a posted price for crude oil?
A. In part.

# EXHIBIT 8

1066

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

1. Agency Position No.: ITF8460

2. Reason for Submission: Redescription / [X] New / Reestablishment / Other

Explanation (Show any positions replaced): Standard Agency PD

3. Service: Hdqtrs. / [X] Field

4. Employing Office Location: Albuquerque, NM ~~Pawhuska, OK~~

5. Duty Station: Pawhuska, OK

6. OPM Certification No.:

7. Fair Labor Standards Act: Exempt / [X] Nonexempt

8. Financial Statements Required: Executive Personnel Financial Disclosure / Employment and Financial Interests

9. Subject to IA Action: [X] Yes / No

10. Position Status: [X] Competitive / Excepted (Specify in Remarks) / SES (Gen.) / SES (CR)

11. Position Is: Supervisory / Managerial / [X] Neither

12. Sensitivity: 1—Non-Sensitive / 2—Noncritical Sensitive / 3—Critical Sensitive / 4—Special Sensitive — 5

13. Competitive Level Code:

14. Agency Use: FPL=GS-7

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. U.S. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | | | | | | |
| c. Second Level Review | Accounting Technician | GS | 525 | 7 | DH | 10/28/98 |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | Trust Account Specialist (TAS-II) | GS | 0501 | 7 | | |

16. Organizational Title of Position (if different from official title)

17. Name of Employee (if vacant, specify): LEDBETTER / HILL

18. Department, Agency or Establishment: Department of the Interior

a. First Subdivision: Office of the Special Trustee for American Indians

b. Second Subdivision: Principal Deputy Special Trustee

c. Third Subdivision: Deputy Special Trustee – Field Operations

d. Fourth Subdivision: Regional Fiduciary Trust Administrator – Region 4

e. Fifth Subdivision: Beneficiary Processing Compliance – Osage

19. Employee Review—This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee (optional)

20. **Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.*

a. Typed Name and Title of Immediate Supervisor: Gary L. Rogers, Chief, Division of Field Operations

Signature: Gary L. Rogers — Date: 8/27/98

b. Typed Name and Title of Higher-Level Supervisor or Manager (optional): Doug Lords, Deputy Director, OTFM

Signature: Douglas A. Lords — Date: 9/2/98

21. **Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action: Personnel Management Specialist

Signature: Donna R. Houston — Date: 10/28/98

22. Position Classification Standards Used in Classifying/Grading Position: GS-525- 12/97

**Information for Employees.** The standards, and information on their application are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee (optional) | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

24. Remarks: Career Ladder GS-5 = PD# ITF 8458 GS-6 = PD# ITF 8459

BUS CODE 0066

@ FPL

PLAINTIFF'S EXHIBIT 14 Hill

# OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS (OST)
## Deputy Special Trustee – Field Operations
## Beneficiary Processing Compliance
## ACCOUNTING TECHNICIAN, GS-0525-07

A. INTRODUCTION

The mission of the OST is: To assure the highest level of accuracy, responsiveness, and service in the receipt, investment and disbursement of all judgment awards, special acts, and income from trust resources belonging to Native Americans in accordance with the American Indian Trust Fund Management Act of 1994.

This position primarily performs non-professional accounting and financial service functions at the field level, including collections of IIM monies, examination, verification and maintenance of accounts and accounting data.

B. MAJOR DUTIES AND RESPONSIBILITIES

Prepares a variety of complex financial documents for accounting of all transactions. Classifies and codes all transactions for input of financial data into the automated TFAS accounting systems. This involves subsidiary accounts; reconciles accounts with responsibility for comparing document balances with related data to assure proper balance, identifies discrepancies between recorded documents and source documents, and determines adjusting entries required to bring accounts into balance.

Maintains accounts which include the preparation and review of financial documents to verify accounting data and necessary entries. Would include, but is not limited to, Integrated Records Management System (IRMS), Trust Funds Accounting System (TFAS), Land Records Information System (LRIS), Land Title and Records Office (LTRO), CustomerStrataStation (CSS), and Trust Assets and Accounting Management System (TAAMS), Individual Indian Monies (IIM) subsystem subsidiary accounts, and SF1081 Reconciliation oil and gas system.

Responsible for scheduled reconciliation of subsidiary accounts to the respective Agency control accounts, various types of automated accounting reports, and in turn to general ledger periodically. This requires detailed checking of many possible sources of disagreements, including time consuming reconstruction of probable transactions. Performs the research necessary to identify the cause of any discrepancies and initiates adjusting entries to correct the ledger.

Reviews and audits the monthly interest report calculated by computer on interest earned by individual Indian and tribal accounts; verifies results; and processes any necessary corrections.

Packages documents to Regional Trust Office in support of disbursements, collections, internal transfers, investments, and other activities assigned to that organization.

Closes accounts by determining necessary entries to reflect information not recorded or posted to the OST/OTFM's automated accounting systems and prepares supporting documentation for such entries. Validates files in preparation for closing accounts. Computes interest to close accounts before the end of interest period.

Responsible for timely processing of all IIM disbursements and assures that all disbursements are supported by a bona fide authorization which indicates applicable section of CFR authority for expenditure or special authorization for issuance of check. In addition to routine disbursements,

incumbent may be responsible for making special allowances and disbursements.

Coordinates work with Bureau of Indian Affairs (BIA) Agency programs (Realty, Social Services, Forestry, Roads, Tribal Operations, etc.) at the Agency level in connection with the IIM and Indian Tribal accounts. Works closely with them on closing estate accounts, distribution of lease monies, per capita payments, etc.; and keeps their representatives apprized of the status of these activities to completion. Provides technical assistance to these programs concerning IIM procedures, regulations, and requirements.

Coordinates work with other Federal, State, Municipal, and Tribal agencies and offices in connection with IIM and Tribal accounts.

Prepares brief memoranda or letters responding to inquiries of routine to non-routine nature. These letters will explain various aspects of accounting in varying degrees. Some will be general in nature while others will be very detailed in nature and cover all aspects of accounting.

Actively performs research of current accounts, historical data, source documents, etc., to develop and explain detailed information not otherwise readily available, develops comparative data which may reflect complex relationships between accounts, time periods, etc., identifies significant changes and determines related transactions and causes, performs similar analytical activities, and provides detailed interpretations, suggestions for action, and recommendations for improvements based on the above processes and extensive knowledge of the OST accounting systems.

Responds to questions of a routine to complex nature. Researches, takes correction action, and responds to customer problems in assigned area of responsibility. Explains accounting data and procedures. Researches problems covering all aspects of processing or technical data. Based on this research, takes appropriate action. Some ingenuity in checking the system will result in possible new procedures.

Establishes and maintains individual jacket files on all accounts throughout the life cycle of the account. These files should include all records of initial account establishment through retirement of records to the appropriate Federal Records Center/Archives. Audits files periodically to ensure all transactions are processed in accordance with Federal regulations and OST policies. Establishes and maintains other working files and records.

Performs other duties as assigned.

**C. FACTORS**

**1. Knowledge Required by the Position** Level 1-4 550 Points

Knowledge of the account structure, associated machine code and types of input documents necessary to process items correctly in an automated system.

Knowledge of the Office of Trust Funds Management automated accounting system, procedures and techniques, used in maintaining and analyzing the various classes of accounts.

Knowledge of general ledger and subsidiary accounts in an account structure requiring a number of funds as receipts and disbursements, liability, and capital control accounts and considerable sub-division of accounts.

Comprehensive knowledge of accounting techniques and procedures to make a thorough analyses involving analytical and accounting references.

Skill in written and oral communication sufficient to prepare memoranda or letters responding to inquiries of a nonroutine nature

Skill to tactfully and effectively communicate with representatives of the various tribes, and individual Indians regarding the status of their accounts.

**2. Supervisory Controls** Level 2-3 275 Points

Supervisor or other designated employee assigns work with standing instructions on objectives, priorities and deadlines. The incumbent works on a continuous flow of accounting and financial documents evolving from the financial service functions of the Office without on-site supervision or instructions. However, the supervisor is readily available via telephone to assist in unusual situations such as providing guidance on technical problems not previously encountered or to advise on complex and unusual situations which are not covered by established operating procedures. Otherwise, the incumbent is expected to perform and carry out assignments independently within timeframes and in accordance with established instructions, policies and procedures. Supervisory review is accomplished through reports and discussions between the incumbent and the supervisor, covering actions taken or recommendations for resolving the matter. Completed assignments are generally evaluated for conformance to established policies and procedural requirements, timeliness of activities, and soundness of technical decisions.

**3. Guidelines** Level 3-3 275 Points

The incumbent uses Treasury, Interior, GAO, and OST manuals, regulations, directives and policies. A variety of transactions involve variations requiring a good understanding of financial procedures and techniques in interpreting guidelines and determining their applicability to situations which are not specifically enumerated and may require developing approaches or detailed work methods. Problems are referred to supervisor when deviation is unprecedented or of such a nature it requires a professional accounting determination.

**4. Complexity** Level 4-4 225 Points

The incumbent is required to perform the full range of accounting and financial service functions, including collection, classification, entry, maintenance and reconciliation of IIM and tribal trust accounts. These accounts are characterized by complex unusual transactions which may require substantive analysis of data elements and circumstances involved in order to properly classify information into the proper account and to provide a complete and accurate reconciliation of data in order to restructure and adjust accounts. Reconciliation of the data is complicated by the many possible sources of error, and it may require examining and reconstructing all transactions that have occurred since the affected accounts were established. Funds are generated from proceeds of various sources of revenue including oil, gas, and other mineral lease bonuses and royalties, timber stumpage; agricultural leases; and miscellaneous receipts held in trust status. The type of accounts include minors, estates allottees, involuntary supervised accounts and tribal funds. The funds are collected over the counter and via Electronic Fund Transfers (EFT). All encoding for Individual Indian monies is done at the Agency level. All encoding for Tribal Funds is done at OST/OTFM-Albuquerque based on code sheets faxed in from the Agencies and Areas. The fund sources are subject to a wide range of restrictions which are founded on statutes or treaties.

The incumbent is also required to perform research of current accounts, historical data, source documents, etc., to develop and explain detailed information not otherwise readily available, develop comparative data which may reflect complex relationships between accounts, time periods, costs of different operations, etc., identify significant changes and determine related transactions and causes, and perform similar analytical activities.

**5. Scope and Effect** Level 5-3 150 Points

The purpose of the position is to provide accounting for trust monies through a combination of commercial and governmental procedures, both manual and computer, by recording the depositing and disbursement of funds. The incumbent also provides the day-to-day financial services to individual Indians and tribes at the field level. The incumbent's duties are essential in enabling the OST to properly execute its trust responsibility in accurate and proper accounting for funds deposited into and disbursed from tribal and individual tribal members accounts. Improper accounting results in inaccurate balances invested, disbursement in excess of available funds, and other similar deficiencies which could result in legal action against the Federal government for failure to act as a prudent trustee.

**6. Personal Contacts** Level 6-2 25 Points

Contacts include individual Indian account holders, tribal officials and representatives, BIA Agency personnel, OST management and staff, and other local Federal agencies.

**7. Purpose of Contacts** Level 7-2 50 Points

Contacts are for the purpose of obtaining information, providing technical assistance, providing customer service, clarifying data and resolving operating problems or coordinating work flow between Agency and Regional Trust Office, OST/OTFM.

**8. Physical Demands** Level 8-1 5 Points

The work is primarily sedentary with some carrying of computer reports, boxes, and ledgers.

**9. Work Environment** Level 9-1 5 Points

The work is usually performed in an office setting.

**Total Points 1560**