# EXHIBIT 10

0001

IN THE UNITED STATES DISTRICT COURT
OF FEDERAL CLAIMS

THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA,

Plaintiff,

vs.

THE UNITED STATES OF AMERICA,

Defendant.

No. 00-169L
Judge Emily C. Hewitt

The Continuation of the videotape deposition of CAROLE REVARD taken on behalf of the Plaintiff before Pamela B. Stinchcomb, Certified Shorthand Reporter in and for the State of Oklahoma, on the 20th day of June, 2005, in the City of Pawhuska, State of Oklahoma, pursuant to the stipulations of the parties.

PAMELA B. STINCHCOMB, CSR #1544
DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

information in this database?
A. The oil technician, right now Heather Little.
Q. Someone in the accounting system is responsible for encoding it?
A. Yes.
Q. And this database is used by the technician to determine the amount of royalty that the Osage Agency thinks is due from a given purchaser in a given month?
A. Yes.
Q. And so what the technician is doing is comparing the amount of money that was received, according to the -- or going to be paid, whichever is, in fact, happened, according to the summary sheet, with the royalty payment that the Osage Agency expects to receive based on the database; is that correct?
A. Yes.
Q. And if the two don't agree, it's the technician's problem to find out why they don't agree and to bring them into balance?
A. Correct.
Q. If the problem is the company paying, the purchaser paying didn't use the highest posted price

or at least use the price that was less than the price that should have been used, then Ms. Little starts up a royalty collection action?

A. Yes.

Q. If they're not in balance because the check detail contains a payment for crude oil that doesn't show up on the database, then the technician makes certain that those crude oil runs get included in the database?

A. Correct.

Q. Are there any other reasons you can think of just right now why the two, the summary statement and the database, might not agree?

A. The royalty rate, they may pay us on a different one than what we show.

Q. And there could be other errors, I suppose, differences between the way the Osage Agency thought the royalty should have been computed and the amount of money that they actually received from the purchaser?

A. Yes.

Q. Now, let me make sure I understood the part of your testimony. You're saying if they're in balance, once the technician determines they're in balance, then Page 1 can be filled out for that

database that an additional royalty bill has been sent out?

A. No.

Q. Ms. Revard, is it a fair summary of your testimony that the way the technician checks the value of the royalty or the amount received is by using this database program, which basically does a comparison between the amount received and the amount that the Osage Agency expected to receive?

A. Yes.

Q. Can you explain how the technician determines whether the volumes reported on the summary reports are correct or incorrect?

A. Purchaser reports?

Q. Right.

A. What do you mean?

Q. Well, let me ask it this way. I'll ask a simpler question. Part of the technician's job, such as Heather Little, an oil technician, is to determine whether the amount received from a purchaser of the crude oil, such as Coffeyville Resources Crude Transportation, LLC, is the correct amount; isn't that correct?

A. Yes.

Q. And you've described in some detail now how

A. Yes.
Q. Is it your understanding that the Osage Agency, the accounting section that you worked in, that your primary role was to -- or not primary role, but one of your responsibilities was to verify that the information submitted by the purchasers was correct?
A. Yes.
Q. When we -- you would verify this information, it was by comparing the purchaser's reports to the lessee reports, correct?
A. Yes.
Q. The lessee reports contain similar information to the purchaser reports, such as royalty amounts and royalty volume?
A. Yes.
Q. I believe earlier you testified that the current procedures the purchasers submit the money to the Osage Agency directly?
A. Yes.
Q. They make the payments instead of the lessees typically?
A. Right.
Q. Is it your understanding that the lessees are still ultimately responsible for the payment?

# EXHIBIT 11

0001

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

THE OSAGE NATION and/or
TRIBE OF INDIANS OF OKLAHOMA,

Plaintiff,

vs. No. 00-169L
JUDGE EMILY C. HEWITT

THE UNITED STATES OF AMERICA,

Defendant

VIDEO DEPOSITION OF MARY LOU drywater, a witness called on behalf of the Plaintiff, on the 24th day of June, 2005, at 813 Grandview Avenue, in the City of Pawhuska, County of Osage, and State of Oklahoma, commencing at 9:45 a.m., before the undersigned, Elizabeth Davidson, a Certified Shorthand Reporter in and for the State of Oklahoma.

Fee for Original: $
Paid by Plaintiff.

ELIZABETH DAVIDSON, CSR #122

DAVIDSON REPORTING SERVICE
CERTIFIED SHORTHAND REPORTERS
5508 South Lewis
Tulsa, OK 74105
(918) 745-9959

A. The Osage -- Well, the superintendent of the Agency.

Q. But it was your job to coordinate with the appraiser to get the appraisal and --

A. Yes.

Q. -- to make sure that it got done and circulated to the relevant people at the Osage Agency?

A. Yes.

Q. Ms. Drywater, as a realty specialist, did you have any job duties related to the collection of the payments that were made to the landowners under these leases? Strike -- strike that question. Let me ask you another question.

Under these leases, who were the payments made to?

A. They were made to the Bureau of Indian Affairs.

Q. To the Osage Agency here?

A. Yes.

Q. Did your job duties have any role in the collection of those payments?

A. Yes, I would monitor to be sure they were paid timely.

Q. Any other duties with respect to those?

A. If they weren't paid timely, then we'd send out a letter to collect with -- also assessing them a late fee.

Q. And what was the late fee, if you recall?

A. I don't recall.

Q. Do you recall -- Did you have any job duties to determine whether the payments, timely or untimely, were the correct amount?

A. Yes, we verified that with the -- the lease file.

Q. Was that one of your job duties?

A. Sometimes, if the -- if the clerk was not available.

Q. After you were a realty specialist for approximately one year, you testified you were a supervisory realty specialist in minerals. Could you tell us what your job duties were in that position?

A. I was responsible for the records, overseeing the maintenance of the records, also processing assignments, division orders, processing all lease sales from beginning to end, also overseeing the accounting for the oil and the gas. And then at certain times when Mr. Barker was not present, I would act in his capacity as the minerals branch chief.

specialist, were you a part of the subsection of the minerals branch?

A. No.

Q. Were there any other -- any subsections at all at that time during approximately 1984 when you were a realty specialist?

A. Not that I recall.

Q. Were there subsections of the minerals branch in 1985 when you became a supervisory realty specialist?

A. Yes.

Q. Can you tell me what subsections there were, if you recall any of them?

A. The engineering section and the inspectors -- inspectors or -- I don't even remember exactly what they called them, that section, and then my staff.

Q. And what did they call your staff?

A. I don't recall.

Q. Could it have been realty and accounting?

A. That doesn't sound familiar.

Q. Who else was in your section besides realty specialists?

A. Accounting technicians, clerks, clerk typist was the name. I believe that was it.

Q. And there were realty specialists also working with you?

A. Not that I recall.

Q. Approximately how many employees were there in your section in 1985 when you became the supervisory realty specialist for minerals?

A. Maybe ten.

Q. And how many of these people were accounting technicians, if you recall?

A. Maybe six.

Q. Could you give us a description of the job duties of these accounting technicians in 1985 when you became the supervisory realty specialist for minerals?

A. They would account for all the oil or gas that was produced, would receive the payments each month, would verify production and payments. If there was any underpayment, they would collect what was due.

Q. Any other duties for the accountant technicians in your section?

A. Just verifying that the proper amounts were paid.

Q. These would be for the royalties for oil and gas?

A. Yes.

Q. In order to do that, would they have to verify that the volumes reported for royalty purposes were correct?

A. Yes.

Q. Okay. Would they also have to verify that the amounts that were reported for royalties were correct?

A. Yes.

Q. Do you recall the names of any of the accounting technicians that worked in your section during this seven years that you were the supervisory royalty specialist for minerals?

A. Charlene Cozad, Lorraine Wilcox, Carol Revard, that's all I recall.

Q. Could you describe how the accounting technicians verified that the royalty amounts that had been paid to the Osage Agency were correct?

MR. BURTON: Objection, calls for a narrative, lack of foundation.

You may answer the question.

A. Once the payment was received each month, they would verify the royalty amount was accurate, taking the report, also verifying that the production amount was correct. For the oil, they would also

# EXHIBIT 12

0001

IN THE UNITED STATES DISTRICT COURT
OF FEDERAL CLAIMS

| | | |
|---|---|---|
| THE OSAGE NATION AND/OR TRIBE OF INDIANS OF OKLAHOMA, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 00-169L |
| | ) | Judge Emily C. Hewitt |
| THE UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

The videotape deposition of CHARLES HURLBURT taken on behalf of the Plaintiff before Pamela B. Stinchcomb, Certified Shorthand Reporter in and for the State of Oklahoma, on the 1st day of June, 2005, in the City of Pawhuska, State of Oklahoma, pursuant to the stipulations of the parties.

PAMELA B. STINCHCOMB, CSR #1544

DAVIDSON REPORTING SERVICE
5508 South Lewis Avenue
Tulsa, Oklahoma 74105
(918) 745-9959

A. The relationship that the Osage Agency has with the MMS is practically nil. For other oil and gas segments of the Bureau of Indian Affairs the Minerals Management Service does the royalty accounting and collection for both tribal and allotted minerals.

Q. (By Mr. Rothrock) Mr. Hurlburt, are you saying that the function that the MMS performs for tribes other than the Osage and allotted tracts other than Osage is essentially the same function that BIA performs for the Osage?

A. It -- it's the same as part of our function here at Osage. The nearest analogy would be our accounting section.

Q. And what is the analogy you draw there?

A. Well, that in both cases, the groups involved account for royalty and verify that the money being collected is the correct amount.

Q. Are they similar, also, in that when either of them determines that the amount collected isn't the right amount, they take steps to collect the difference?

A. Well, I can swear as to the actions of the minerals accounting section here. I don't know from my direct knowledge about the Minerals Management

Service.

Q. So your testimony is it's certainly with respect to the Osage tribe, the minerals branch here has the job to not only determine if the amount collected was correct but to take steps to collect?

A. To attempt to collect it, yes, sir.

Q. When they decide it's not correct?

A. Yes, sir.

Q. Mr. Hurlburt, the reporter has also handed you something marked Plaintiff's Exhibit 3. Can you tell me whether you can identify that.

A. Yes, sir. This is the audit report from the Office of the Inspector General several years prior to the MMS audit. This was the first audit that I mentioned to you in previous testimony.

Q. Could you tell us what role you had in this audit, if you had any role at all?

A. As far as the -- prior to the audit report, I don't remember having any specific role, although, again, this is another case where almost anyone in the branch of minerals probably ended up providing information to the auditors.

Q. What about after the audit report was issued? Did you have any involvement with it after that?

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

FILED
DEC 3 0 2002
Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | |
| PLAINS RESOURCES, INC., successor to Plains Marketing & Transportation, Inc., | ) | 02CV976 E (M) |
| | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' COMPLAINT**

The United States of America ("United States") by David E. O'Meilia, United States Attorney for the Northern District of Oklahoma, through Phil Pinnell, Assistant United States Attorney, for its Complaint against the Defendant, Plains Resources, Inc., successor to Plains Marketing & Transportation, Inc. ("Plains"), alleges and states as follows:

INTRODUCTION

1. This is an action to recover damages for breach of contract, unjust enrichment and false claims, records, and statements presented, made, used or caused to be made or used by Plains regarding Plains' failure to properly pay royalty oil under the agreement more fully described below.

JURISDICTION AND VENUE

2. The United States brings this action pursuant to 28 U.S.C. §§ 1331 (federal question), 1345 (United States as Plaintiff), 1355 (fine, penalty, or forfeiture) and 31 U.S.C. § 3732 (False Claims Act).

3. Venue is proper pursuant to 28 U.S.C. § 1391 (venue generally).

PARTIES

4. This action is initiated by the United States on its own behalf and pursuant to its trust responsibilities to the Osage Nation, as more fully set forth in paragraphs 8 and 10 below.

5. The Osage Nation is a federally recognized tribe of Indians who have certain responsibilities and enjoy certain benefits with respect to the Osage mineral estate pursuant to the Act of June 28, 1906, 34 Stat. 539 ("1906 Act").

6. The Defendant Plains is a corporation with its headquarters in Texas doing business in the Northern District of Oklahoma during the relevant period of time as Plains Marketing & Transportation, Inc. The United States, upon information and belief, states that Plains Marketing & Transportation, Inc. merged into Plains Resources, Inc. in 1998 and is a Delaware corporation.

BACKGROUND

7. The Osage mineral estate underlies the Osage Reservation (now Osage County, Oklahoma) within the Northern District of Oklahoma.

8. Under Section 4 of the 1906 Act royalties received from leases of the mineral estate are required to be paid into the treasury of the United States and distributed per capita to the persons on the 1906 Tribal Roll or their heirs. The regulations at 25 C.F.R. Part 226 require that royalty payments be made to the Superintendent, Osage Agency, Bureau of Indian Affairs (BIA) [25 C.F.R. § 226.11(a)(1)] by either the lessee or the purchaser [25 C.F.R. § 226.13(a)].

9. 25 C.F.R. § 226.11 recognizes the right of the Osage Nation to take its royalty in kind. In 1995, the Osage Nation elected to do so, whereupon it entered into the agreement at issue here.

10. Pursuant to said agreement, a copy of which is attached hereto and made a part hereof (Exhibit A), Plains agreed to purchase royalty oil in kind and then market the oil. At paragraph 7 of the agreement, Plains agreed to pay the BIA for royalty barrels of crude oil sold to Plains in accordance with a price established by the Code of Federal Regulations, Title 25, Indians, Section 226.11(a)(2) which requires the payment of the highest posted price. In addition thereto, Plains agreed to pay the BIA any per barrel premium that the lessee or operator was receiving for sale of its working interest oil. In addition, Plains was to pay the BIA each month, certain "net profits" as defined in the agreement at paragraph 7 realized from the sale, resale or exchange or trading of all royalty interest and all leasehold interest crude oil that was purchased under this agreement.

11. Plains began receiving the royalty oil in January, 1996 and continued its operation under the contract through June, 1998.

<u>MISCONDUCT</u>

12. Plains did not pay the per barrel premium in accordance with the terms of the agreement in that it only paid a premium price of 35 cents per barrel beginning in January, 1996 through June, 1998. It paid this premium price of 35 cents per barrel notwithstanding the fact that the actual premiums received by working

interest owners for the working interest oil produced from the same well exceeded 35 cents per barrel. The applicable premiums paid to other working interest owners during this period of time varied, but in substantially all the transactions during the relevant period of time the premium per barrel exceeded 35 cents per barrel.

13. The Bureau of Indian Affairs has made demand on Plains to pay in accordance with the terms of the contract and Plains has wholly refused to make payment on its debt.

14. Plains has also refused to pay a share of the profits due and owing to the Osage Nation pursuant to the agreement for the sale of oil received by Plains.

FIRST CAUSE OF ACTION

15. The United States adopts by reference and incorporates herein the allegations in paragraphs 1 through 14 above.

16. According to the subject agreement, attached hereto, Plains agreed to pay the BIA for the benefit of the Osage Nation the highest posted price for the oil in accordance with applicable regulations cited above and a per barrel premium that other operators and lessees received for sale of their working interest even in those situations where the working interest oil was sold to parties other than Plains. Plains furthered agreed that certain net profits were to be paid by Plains in accordance with a formula set forth in the agreement.

17. Plains did not pay in accordance with the terms of the agreement as set forth above and as a result of said breaches, the United States on behalf of the Osage Nation was damaged.

SECOND CAUSE OF ACTION

18. The United States adopts by reference and incorporates herein the allegations in paragraphs 1 through 17 above.

19. Plains has been unjustly enriched at the expense of the United States by the amounts of money that it failed to pay over to the BIA under the terms of the agreement as set forth above.

20. Plains holds the money in trust for the rightful owner, the United States of America in its capacity as trustee for the Osage mineral estate.

21. Plains is liable to pay and transfer to the United States, and the circumstances are such that in equity and good conscience the money should be paid to the United States in the amount to be determined by the Court.

THIRD CAUSE OF ACTION

22. The United States adopts by reference and incorporates herein the allegations in paragraphs 1 through 21 above.

23. In the performance of the agreement described above, Plains in many instances had actual knowledge of prices it was paying to lessees and operators for their working interest oil which Plains was purchasing for its own account. Attached hereto and made a part hereof (Exhibit B) is a summary of transactions for particular months in 1997 and 1998 in which Plains purchased 100 percent of production. Exhibit B reflects that Plains continued to report and pay a premium of approximately 35 cents per barrel for royalty oil to the Osage Nation while at the same time, for its own account, pay a higher per barrel premium to the lessee or operator for the working

interest oil. As stated above, the agreement required Plains to pay the Osage Nation the same price for the royalty oil as it was paying the working interest owner for its oil. In the vast majority of the transactions listed in Exhibit B hereto, Plains knew, or should have known, that it was not paying the appropriate amount of per barrel premium to the Osage Nation as required under the agreement.

24. Accordingly, Plains knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money to the government in violation of the False Claims Act (31 U.S.C. § 3729(a)(7).

WHEREFORE, the United States requests that the following judgment be entered against Plains and in favor of the United States:

(a) With respect to the first cause of action for breach of contract Plains owes the United States of America ex rel. Bureau of Indian Affairs, an amount to be proven at trial for principal, interest and profits in excess of $500,000.

(b) With respect to the second cause of action for unjust enrichment that Plains be ordered to pay the United States all the amounts set forth above with respect to the first cause of action and in addition a constructive trust be impressed on all moneys due and owing the United States pursuant to the agreement.

(c) With respect to the third cause of action for violation of the False Claims Act, that judgment be entered for all civil penalties and three times the amount of damages to be proven at trial to which the United States is entitled;

(d) And for all causes of action any other costs and such other relief in the United States favor as the Court deems just and proper.

Respectfully submitted,

UNITED STATES OF AMERICA

DAVID E. O'MEILIA
United States Attorney

PHIL PINNELL, OBA #07169
Assistant United States Attorney
333 West 4th Street, Suite 3460
Tulsa, Oklahoma 74103
(918) 581-7463

USA v. Plains Marketing & Transportation, Inc.
United States' Complaint

PP:css

## OIL PURCHASING AND MARKETING AGREEMENT

THIS AGREEMENT is made and entered on this 27 day of October, 1995, by and between the Osage Tribe of Indians, acting by and through the Osage Tribal Council, hereafter "Tribe" and Plains Marketing & Transportation Inc., hereafter "Company".

**WITNESSETH:**

In consideration of the premises and mutual covenants and agreements herein contained, the parties hereby contract and agree as follows:

1. **PURPOSE OF AGREEMENT.**

Company desires to enter into this Agreement with Tribe under the terms of which Company will buy both royalty and working interest barrels of crude oil and condensate produced from the Osage mineral estate in Osage County, Oklahoma. For purposes of this Agreement and all attachments thereto, the term "crude oil" will mean both crude oil and condensate. Company will then sell, trade, exchange, transport, or otherwise market this product to enhance the value received by the Tribe. This is expected to be a profitable endeavor for both parties hereto. Company shall share all of these marketing profits with Tribe using the formula hereinafter set forth in paragraph 7.(B). Profit sharing hereunder shall continue on all barrels of Osage crude oil so long as Company or any of its subsidiaries or affiliates has ownership of such barrels.

The Tribe has the right to take royalty oil and condensate from the Osage mineral estate in-kind from its lessees and producers pursuant to the provisions of 25 C.F.R. Section 226.11. Tribe is willing to sell all of this crude oil to Company. The parties expressly recognize that the call on the royalty barrels in-kind and their subsequent sale to Company could significantly enhance Company's ability to purchase working interest and other barrels of crude oil that are produced from the Osage mineral estate.

2. **COORDINATION.**

The Tribe plans to assist the Company's effort to procure lessee working interest crude oil. The parties expressly recognize that the Tribe has a special relationship with lessees of the Osage mineral estate that has developed over many years of experience, dealings and transactions. Tribe is, therefore, in the best position to communicate with such lessees about selling their working interest share of production to Company and/or about setting aside Tribe's royalty interest share of production if the total production from any given well is not all sold to Company. The parties therefore agree that Tribe will appoint qualified personnel who will be employed by Tribe to assist Company to

EXHIBIT "A"

purchase such barrels of crude oil. All contacts with the lessees initiated by Company or tribal designees will be mutually coordinated so that both parties may participate concerning the aforesaid transaction. A contact and lessee servicing plan will be mutually agreed upon by Tribe and Company.

3. **CONSIDERATION.**

The mutual promises of the parties hereto and the acts to be performed hereunder shall constitute the consideration for this Agreement.

4. **TERM.**

The term of this Agreement shall be for an initial term of one (1) year from and after the approval of this Agreement by the Secretary of the Interior or his authorized representative and ending twelve (12) months thereafter, and from year to year thereafter, if extended by the mutual consent of the parties for each additional one (1) year or twelve (12) month period and approved by the Secretary of the Interior or his authorized representative, **PROVIDED**, however, that this Agreement may be terminated by either the Tribe or Company at any time within any twelve month's term upon the service of written notice upon the other party at least thirty (30) days in advance of the proposed effective termination date, termination to be effective at the end of the month next succeeding the service of the written notice.

5. **QUANTITY.**

Tribe agrees to provide to Company, on a best efforts basis, and Company agrees to buy and market hereunder, all of the Tribe's royalty crude oil that may be taken in-kind and additional amounts of crude oil produced in the Osage mineral estate that Tribe may obtain from other sources including working interest crude oil in instances where Tribe may own the working interest; provided that Company shall not be required to purchase working interest crude oil belonging to Tribe or to other lessees or royalty crude oil that will not generate a profit. In such instances Company will give Tribe adequate advance notice of Company's election not to purchase such crude oil so that Tribe may continue to sell its royalty interest crude oil to the same purchaser who buys the lessee's crude oil so that Tribe may continue to obtain any premiums paid above the highest posted price. Should Company fail to properly advise Tribe with adequate advance notice in any such circumstance, Company will reimburse Tribe for all losses sustained in either or both of diminished premiums or basic selling price so that Tribe will sustain no loss. In the alternative Company will purchase such crude oil at the price, including premium, that Tribe might have received for such crude oil.

All oil and condensate that is produced from wells in Osage County, Oklahoma, that has a sulfur content of .5% or less by weight shall be deemed to be Oklahoma sweet type crude oil. Company will utilize its best efforts to maintain an aggregate stream of sweet crude which may require the blending of certain crude oil purchased hereunder. Any and all crude oil that Company may purchase from working interest owners in Osage County, Oklahoma, during the term of this Agreement, will also be subject to the terms of this Agreement, including, but not limited to the profit sharing arrangements hereinafter set out.

Tribe's sales of Tribe's royalty interest crude oil and Tribe's sales of working interest crude oil where it owns the working interest and Company's purchases of working interest crude oil directly from working interest owners shall be based upon and documented by either truck or pipeline run tickets issued by gathering companies or by allocation statements issued by gathering companies.

6. **TRIBAL TAX.**

All purchases of crude oil from either Tribe or any of its subordinate entities or from any and all lessees by Company will be subject to a tribal petroleum excise tax of $ .25 per barrel to be imposed by the Osage Tribal Council. Company will be solely liable for the payment of this tax. The full amount of taxes due for each month's purchases will be paid by electronic deposit on the 25th day of the month succeeding the month such crude oil is produced to the account of the Osage Tribal Council Mineral Tax Treasury Account at the First National Bank, Pawhuska, Oklahoma. On the same day of the electronic transfer payment, Company will electronically transmit by facsimile to the Osage Minerals Tax Commission a tax return for that month's activities utilizing a summary format tax form to be provided to Company by the Osage Mineral Tax Commission.

7. **PRICE.**

(A) The purchase price payable by Company to the Bureau of Indian Affairs for royalty barrels of crude oil sold to Company under this Agreement shall be in accordance with the price established by the Code of Federal Regulations, Title 25, Indians, Section 226.11(a)(2) which requires the payment of the highest posted price. In addition thereto, Company will pay to the Bureau of Indian Affairs for the Tribe's royalty barrels any per barrel premium that the lessee is receiving for sale of its working interest oil where such lessee is selling its oil to entities other than Company, provided however, that Company may elect not to purchase either royalty or working interest oil in such instances if the purchase will not result in a profit. In such instances the crude oil will continue to be sold to lessee's purchaser to permit

Tribe to obtain the maximum profit. The advance notice and reimbursement provisions of numerical paragraph 5., above, shall apply in such instances. In addition to the foregoing amounts Company shall pay to the Bureau of Indian Affairs each month the net profits as defined in Sub-paragraph (B) below, that Company realizes from the sale, resale, exchange or trading of all royalty interest and all leasehold interest crude oil that is purchased under this Agreement. The purchase price and net profits earned under Sub-paragraph (B) below derived from sales of lessee interest crude oil belonging to Tribe will be paid directly to the account of the Tribal Council at the First National Bank, Pawhuska, Oklahoma, on or before the 25th day of the month succeeding the month in which such purchases are made. The purchase price for working interest crude oil sold to Company by Tribe will be the average highest price paid by Company to private leaseholders of the Osage mineral estate, with profit sharing thereon to be the same as for all other barrels of crude oil purchased by Company. Profit sharing hereunder shall continue on all barrels of Osage crude oil so long as Company or any of its subsidiaries or affiliates has ownership of such crude oil. Company shall not be entitled to apply losses from any month in reduction of profits in a different month. No losses shall ever be allocated to Tribe or to any of its entities. For purposes of price, non-royalty crude oil delivered during any month shall be deemed to be delivered in equal daily quantities.

(B) Net profits to be paid to Tribe shall be defined by using the following formula:

NP= [SP-HP-WI-TC-TT-LC (limited to $ .03 x B)-P-CP] x B x 75%.

NP = Net Profits
SP = Average sales price: determined by dividing gross sales income by total barrels sold by Company.
HP = Average cost for royalty oil: determined by dividing total dollar cost to buy royalty oil by total barrels sold to Company.
WI = Average cost for working interest oil: determined by dividing gross cost to buy working interest oil by total barrels sold to Company.
TC = Transportation cost: determined by dividing total transportation charges by total barrels sold.
TT = Tribal tax: determined by contract as $ 0.25/bbl.
LC = Letter of credit cost: determined by dividing total letter of credit charges by total barrels sold [not to exceed $ .03 per barrel.]
P = Premium cost: This cost, where applicable, in included in (HP) and (WI) above; therefore P = 0.
CP = Plains marketing cost: determined by contract as $ 0.10/bbl.
B = Total barrels sold.

Company shall be solely responsible for any storage costs that may be required after title has passed to Company and Company will bear all administrative costs and expenses out of the $ .10 per barrel set aside to Company under "CP" in the profit sharing formula above.

Each payment to the Bureau of Indian Affairs or to the Tribe under this Agreement shall be preceded by Company's computation of the amounts payable and by documentation supporting the revenues and allowable deductible costs as specified above. The Tribe and the Bureau of Indian Affairs shall be entitled upon written request to Company to all information and records that relate to the verification of the costs. All other costs are established and set per formulation set out above. Tribe, Company and the Agency Superintendent will mutually agree upon the precise documentation to be furnished so that each may properly account for all transactions.

8. **PAYMENT TERMS.**

Payment for royalty crude oil shall be made in accordance with the Code of Federal Regulations, Title 25, Indians, Section 226.13, and will be paid directly to the Bureau of Indian Affairs as it shall direct. Payment for any other crude oil that Tribe may obtain and sell to Company shall be made directly to Tribe by electronic transfer to the Tribal Council account at the First National Bank, Pawhuska, Oklahoma, on or before the 25th day of the month next following all purchases. An itemized listing of such purchases shall be transmitted to Tribe on the same day as the electronic transfer of funds. Company will furnish all additional data necessary to enable the Tribe and the Bureau of Indian Affairs to fully account for all purchases, costs and income to be received under this Agreement. Payments of net profits realized on sales of royalty crude oil and on sales of leasehold interest crude oil, other than for leasehold interest crude oil belonging to Tribe, shall be made directly to the Bureau of Indian Affairs on or before the 25th day of each month succeeding the sales of the crude oil and the computation of net profits. Payments for net profits realized on sales of leasehold interest crude oil belonging to the Tribe shall be made directly to the account of the Osage Tribal Council at the First National Bank, Pawhuska, Oklahoma, on or before the 25th day of each month next succeeding the sales of the crude oil and the computation of net profits. Tribal taxes due will be paid according to the provisions of numerical paragraph 6., above.

9. **LIABILITY.**

Neither Tribe nor any lessees or producers who sell their crude oil to Company for marketing under this contract shall have any obligation or liability with respect to any losses incurred by

Company in connection with Company's sale, trade, exchange, transportation or other marketing costs or arrangements relating to the crude oil purchased by Company pursuant to this Agreement. All such transactions shall be in the name of Company and Company shall not be deemed to be acting as the agent, partner or in any other respective capacity for either Tribe for any lessee or producer. Company shall indemnify and hold Tribe and such lessees and producers harmless from any and all claims, costs, liability or expense (including court costs and attorneys' fees) arising from or related to Company's activities relating to this Agreement.

10. **TITLE AND DELIVERY POINT.**

Title to and risk of loss, including, but not limited to, evaporation and deterioration of all crude oil subject to sale, and liability concerning the same shall pass to Company at the flange by which oil and condensate passes in transfer from storage tanks to the pipeline or other transportation medium which Company designates for transport of production away from the storage tanks.

11. **TAXES OTHER THAN TRIBAL TAXES.**

Each party shall be responsible for the payment of all taxes lawfully attributable to the activities of that party.

12. **GOVERNING LAWS AND REGULATIONS.**

The performance of this Agreement shall be subject to all applicable governing federal laws or regulations.

Further, Tribe has informed Company that Tribe's capacity and authority to bind is strictly limited by provisions of laws and regulations of the United States of America governing contract liability. Company's rights, if any, to enforce provisions of this Agreement, are limited as a matter of law by the laws and regulations of the United States of America which govern Tribe's operations and Tribe's rights and authority to enter into covenants of this agreement in favor of Company.

Notwithstanding any obligation or covenant running in favor of Company or imposed upon Tribe by the plain language of any term or this Agreement, Company acknowledges that this agreement and the terms of any addendum, notice, nomination, purchase order, or any other agreement by reference, is strictly subordinate and inferior to the Constitution and laws of the United States. Construction of any obligation of Tribe shall be limited as provided in the Constitution and laws of the United States of America.

13. **ENTIRETY AND ASSIGNMENT.**

This Agreement and the Exhibits hereto constitute the entire understanding of the parties to the subject matter hereof. There

shall be no modification or amendment of this Agreement except by written agreement signed and approved in accordance with law by both of the parties hereto or the successors or assigns of Company stating in such writing that the same is intended to constitute a modification or amendment hereof. This Agreement shall not be modified or amended by any nomination, purchase order, or printed form of letter hereunder, if signed by only one of the parties to be charged hereunder.

Waiver of either party of any act of default by the other party hereunder shall not operate as a waiver of any future or other default or act of default whether of a like or different character. This Agreement shall inure to the benefit of and be binding upon the successors and assigns of the parties hereto. In this connection, Company may, with the written approval of Tribe and the Bureau of Indian Affairs in accordance with law, assign or pledge this agreement, in whole or in part at any time, provided that such written approval by Tribe and by the Bureau of Indian Affairs has been sought and obtained in writing at least thirty (30) days prior to the proposed effective date of the assignment.

14. <u>ASSURANCE OF TRUST PAYMENTS TO HEADRIGHT OWNERS ON A QUARTERLY BASIS PURSUANT TO APPLICABLE LAW AND REGULATIONS.</u>

Company will furnish an irrevocable letter of credit or bond to the Bureau of Indian Affairs, to be in a format, from a company, and for an amount to be approved by the Bureau of Indian Affairs and Tribe, which assures that timely and prompt payments will be made to the Tribe and to the Bureau of Indian Affairs for all sums that may become due hereunder, including the payment of the tribal tax. No costs exceeding $ .03 per barrel for all barrels of crude oil purchased in a particular month shall be deducted as costs for purposes of profit computation and sharing. Any costs exceeding $. 03 per barrel will be borne by Company.

15. <u>ATTORNEY FEES.</u>

In the event that it should be reasonably necessary for Tribe to resort to the services of an attorney to collect, or assist in the collection of any amount due Tribe, then Company agrees to pay to Tribe in addition to all other amounts due Tribe hereunder, reasonable attorneys' fees and investigative costs for the services of such attorneys, plus all costs of collection.

16. <u>NOTICES.</u>

All statements and notices given pursuant to this Agreement shall be in writing and shall be delivered when received and acknowledged by mail, overnight delivery, or telefax by the other party at the addresses specified below:

Osage Tribal Council
813 Grandview
P. O. Box 779
Pawhuska, Oklahoma 74056
Attn: Principal Chief
Fax No. (918) 287-2257

Plains Marketing & Transportation, Inc.
Attn: President
1600 Smith Street, Suite 1300
Houston, Texas 77002
Fax No. (713) 652-2730

An additional copy of all notices shall be sent to the following:

Bureau of Indian Affairs
P. O. Box 1539
Pawhuska, Oklahoma 74056
Attn: Superintendent
Fax No. (918) 287-4320

17. MEASUREMENTS AND TESTS.

All measurements hereunder shall represent one hundred percent (100%) volume with such volume and gravity adjusted to sixty degrees Fahrenheit temperature. Procedures for measuring and testing, except for deliveries through positive displacement-type liquid meters, shall be according to the latest ASTM published methods then in effect. Procedures for such metered-type delivery shall be according to the latest ASME-API published methods then in effect. The crude oil delivered hereunder shall be merchantable and acceptable to the carriers involved. Each party shall have the right to have a representative present to witness all gauges, tests and measurements; however should either party hereto fail to have a representative present during such measuring and testing, the measurements and tests of the other party will be accepted.

18. CONFIRMATION OF DELIVERY.

Confirmation of delivery shall be based on run tickets evidencing such delivery or allocation statement issued by the carriers involved.

19. AUDIT.

Each party and its duly authorized representatives shall have access to the accounting records and other documents maintained by the other party which relate to this Contract, and shall have the right to audit such records at any reasonable time or times within twenty-four (24) months of the date a statement is rendered.

20. **WAIVER.**

No waiver by either party of any breach of any of the covenants or conditions herein contained to be performed by the other party shall be construed as a waiver of any succeeding breach of the same or of any other covenant or condition hereof.

21. **AMENDMENTS.**

This Agreement may be amended from time to time to enable the parties to achieve greater success in earning profits from the marketing of Osage crude oil upon the written agreement of both parties with the approval of the Secretary of the Interior or his lawful designee.

IN WITNESS THEREOF, the parties have executed this Agreement the day and year first above written.

OSAGE TRIBAL COUNCIL

By: ______________________
Principal Chief

PLAINS MARKETING & TRANSPORTATION INC.

By: ______________________
Harry N. Pefanis, President

Attest: ______________________
Secretary

APPROVED:

______________________ 10/27/95
Acting Area Director Date
Muskogee Area Office
Bureau of Indian Affairs

## February 1997

| DATE | LEASE # | TICKET # | GROSS BBLS | ROY BBLS | ROY PRICE | WI PRICE |
|---|---|---|---|---|---|---|
| 2/27 | 3161437056 | 000278 | 160.06 | 26.68 | 19.60 | 20.25 |
| 2/28 | 2770537056 | 220643 | 1,851.97 | 308.66 | 21.14 | 19.65 -[1] |
| | | | | | | 23.4 |
| 2/28 | 2620237056 | 085390 | 280.69 | 46.78 | 20.21 | 19.60 - |
| | | | | | | 21.60 |
| 2/25 | 2770237056 | 220624 | 660.58 | 110.10 | 21.35 | 20.40 - |
| | | | | | | 23.40 |
| 2/11 | 2770137056 | 209323 | 161.05 | 26.84 | 20.60 | 21.90 |
| 2/25 | | 220625 | 161.14 | 26.86 | 20.60 | 20.40 |
| 2/21 | 2150337056 | 086213 | 159.68 | 26.61 | 20.10 | 20.60 |
| 2/25 | 2770437056 | 220622 | 1,173.64 | 193.94 | 21.14 | 20.40 - |
| | | | | | | 23.90 |

[1]Certain run statements submitted by Defendant show several purchases of oil from a particular lessee. In certain instances, those purchases reflect several different prices. The amounts shown in the working interest column represent the lowest and highest prices for all of the purchases shown on the same run statement. The United States has not attempted to average the amounts over the barrels of oil purchased to arrive at a single figure. The amounts shown are direcly stated on the run statements.



EXHIBIT "B"

# EXHIBIT 14

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA )
Plaintiff, )
v. )
PLAINS MARKETING, L.P., )
Defendant. ) CIVIL ACTION NO. 02-CV-976-E (M)

FILED
MAY 09 2003
Phil Lombardi, Clerk
U.S. DISTRICT COURT

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF**
**MOTION TO STRIKE AFFIRMATIVE DEFENSES**

In support of its Motion to Strike Affirmative Defenses, the United States avers as follows:

**BACKGROUND**

On December 30, 2002, the United States on behalf of the Bureau of Indian Affairs in its fiduciary capacity for the Osage Nation filed the instant suit under the False Claims Act, 31 U.S.C. § 3730, and the common law theories of breach of contract and unjust enrichment. The thrust of the complaint is that the Defendant failed to properly pay royalty oil to the BIA on behalf of the Osage Nation under an oil purchasing and marketing agreement dated October 27, 1995. On February 10, 2003, the Defendant served its Answer and again on April 21, 2003 filed its Answer and Counterclaim listing a number of affirmative defenses, some of which are inapplicable as a matter of fact and law. By the instant motion to strike, the Government seeks to remove those affirmative defenses (statute of limitations, failure to exhaust administrative remedies, latches, estoppel, and waiver,

including the promissory estoppel and estoppel - declaratory judgment counts of the Counterclaim filed by the Defendant, which are unavailable as a matter of law against the Government in these circumstances and which are likely to confuse the issues and needlessly burden discovery - all to the prejudice of the Government.

## ARGUMENT

As set forth below, the Court should strike the following legally defective defenses: paragraph 28 (statute of limitations), paragraph 29 (failure to exhaust administrative remedies), paragraph 30 (latches, estoppel and waiver), Count II of Counterclaim (promissory estoppel) and Count III of Counterclaim (estoppel - declaratory judgment).

Defendant has included a laundry list of so called affirmative defenses in its Answer filed April 21, 2003. Despite the clear pleading requirements mandated by the Federal Rules of Civil Procedure, Defendant boldly asserts these affirmative defenses by merely listing legal terms. The Defendant failed to identify a single fact in support of any of these defenses, or even to identify the elements of those defenses. The only possible purpose for the Defendant including such a long list of "defenses" without a shred of support is to unnecessarily broaden the scope and burden of discovery in these already complex proceedings. Because the affirmative defenses listed in paragraphs 28, 29, and 30 of the Answer are nothing more than a litany of legal terms without any averment indicating how those terms actually might apply to the facts of this case, all the Defendant's so called affirmative defenses listed in said paragraphs must be stricken. As explained below, even if the Defendant had met its obligation to allege the basis for these defenses, most of the

defenses still would be legally insufficient because they are, as a matter of law, unavailable in this case.

A. <u>Standard of Review for Motions to Strike</u>.

Although motions to strike are generally viewed with disfavor, "a defense that might confuse the issues in the case and would not, under the facts alleged, constitute a valid defense to the action can and **should be deleted.**" *Waste Management Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001), *cert. denied*, *Murphy v. Waste Management Holdings, Inc.*, 535 U.S. 904 (2002) (emphasis added). *Accord Kaiser Aluminum & Chemical Sales v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982), *cert. denied*, 459 U.S. 1105 (1983) (motion under Rule 12(f) to strike defenses should be granted where such defenses are insufficient as a matter of law); *Fabricana Italiana Lavorazione Materie Organiche, S.A.S. v. Kaiser Aluminum & Chemical Corp.*, 684 F.2d 776, 779 (11th Cir. 1982). By striking insufficient defenses, the court forces parties to focus on the essential issues and avoid litigating spurious ones. *United States v. Union Gas Co.*, 743 F. Supp. 1144, 1150 (E.D. Pa. 1990); *F.D.I.C. v. Eckert Seamans Cherin & Mellott*, 754 F. Supp. 22, 23 (E.D.N.Y. 1990).

Indeed, in cases such as this, motions to strike can play an important role because they "remove unnecessary clutter from the case" and thereby "serve to expedite, not delay" the case. *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). In the context of a motion to strike insufficient defenses, "[w]hen an affirmative defense is purely a question of law, an early adjudication of that question of law will expedite

the litigation and facilitate the administration of justice." *Grason Elec. Co. v. Sacramento Municipal Utility District*, 526 F. Supp. 276, 281 (E.D. Cal. 1981). Moreover, "[i]f it is impossible for defendants to prove a set of facts in support of the affirmative defense that would defeat the Complaint, the matter [should] be stricken as legally insufficient." *Van Schouwen v. Connaught Corp.*, 782 F. Supp. 1240, 1245 (N.D. Ill. 1991).

**B. Affirmative Defenses Should Be Stricken as Unsupportable, as a Matter of Fact, and Inapplicable, as a Matter of Law.**

**1. Laches (Paragraph 30).**

The equitable defense of laches may not be asserted against the United States where, as here, it acts in its sovereign capacity to enforce a public right or protect the public interest. *See United States v. Summerlin*, 310 U.S. 414, 416 (1940); *Begay v. Albers*, 721 F.2d 1274, 1280-81 (10th Cir. 1983); *FDIC v. Hulsey*, 22 F.3d 1472, 1490 (10th Cir. 1994); *United States v. Distefano*, 279 F.3d 1241 (10th Cir. 2002) (laches may not be asserted against the United States in an action brought to enforce a public right or a public interest); *Board of County Com'rs for Garfield County, Colo. v. W.H.I., Inc.*, 992 F.2d 1061, *rehearing denied*, (10th Cir. 1993) (holding that "[a]s to its governmental function, the doctrine of laches does not apply to the United States"); *United States v. Popovich*, 820 F.2d 134, 136 (5th Cir.), *cert. denied*, 484 U.S. 976 (1987).

This principle particularly applies when the statute under which the United States brings its action prescribes a limitations period and the United States files its Complaint prior to the expiration of such period. *Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946) ("[i]f

Congress explicitly puts a [statutory] limit upon the time for enforcing a right, which it has created, there is the end of the matter. . . . The Congressional statute of limitations is definitive"); *see also United States v. Thornburg*, 82 F.3d 886, 893 (9th Cir. 1996) ("'In the absence of a federal statute expressly imposing or adopting one, the United States is not bound by any limitations period'") (*citing United States v. Dos Cabezas Corp.*, 995 F.2d 1486, 1489 (9th Cir. 1993)); *United States v. Essley*, 284 F.2d 518, 521 (10th Cir. 1960) ("[W]ithout a clear manifestation of Congressional intent, the United States is not subject ... to the defense of laches in enforcing its rights"); *SCNB*, 140 F.3d at 1427 (court refused to apply laches to bar claims by United States under Employee Retirement Income Security Act). Thus, because the False Claims Act contains a detailed statute of limitations (*i.e.*, 31 U.S.C. §3731(b)), laches is inapplicable to the United States' False Claims Act claims.

Similarly, limitations to the United States' common law claims generally are governed by 28 U.S.C. § 2415(a), which provides a six year limitation period after accrual of the right of action or within one year after the final decisions have been rendered in applicable administrative proceedings, whichever is later. The tolling provision contained in 28 U.S.C. § 2416(c), does, however, exclude "all periods during which . . . facts material to the right of action are not known and reasonably could not be known." Because Congress specified a statute of limitations, laches is inapplicable to the United States' common law claims as well as to its FCA claims.

2. **<u>Estoppel and Waiver (Paragraph 30) and Counts II and III of Counterclaim</u>.**

Waiver and estoppel are equitable defenses generally not available against the United States, and are not available, as a matter of law, against the United States in these particular circumstances. To permit these legally insufficient defenses to remain will confuse the simple issue in this case regarding allowability (and for the False Claims Act portion of the case Defendant's knowledge of falsity) and it wastes precious time and diverts litigation resources. The government should not be required to address during discovery and in trial preparation defenses that cannot arise under the facts if this case.

a. <u>Estoppel</u>.

The general elements of estoppel in a private suit are as follows: (1) the party estopped must know the facts; (2) the party estopped must intend that his conduct will be acted upon or must so act that the party asserting the estoppel has the right to believe that it was so intended; (3) the party asserting must be ignorant of the true facts; (4) reliance. *Penny v. Giuffrida*, 897 F.2d 1543, 1545 (10th Cir. 1990). The principle that the United States "may not be estopped on the same terms as other litigants" is well-settled. *Id.* at 1546; *See Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 60 (1984); *see also United States v. Walcott*, 972 F.2d 323, 327 (11th Cir. 1992); *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380 (1947).

The Supreme Court has stated that a defendant must prove that the government acted with affirmative misconduct and that such egregious conduct must have caused a loss of a legal right of the defendant. *Heckler*, 467 U.S. at 64-65. This additional element has been equated with a requirement that defendant prove that "the government's conduct to be

egregious and resulting in prejudice of 'a constitutional magnitude.'" *Securities and Exchange Commission v. Rivlin*, 1999 WL 1455758 (D.D.C. Dec. 20, 1999) (granting government's motion to dismiss the claim of estoppel).

Here, Plains has not alleged any affirmative conduct, let alone that the conduct of a particular government official was egregious. Even though the Supreme Court may have left open a door for a hypothetical egregious case, it did not intend to allow a defendant to hold such a claim close to its vest and reveal it only after discovery. *See TECSEC, Inc. v. Protegrity, Inc.*, 2001 WL 802064 (E.D. Va. June 27, 2001) (granting motion to strike bare bones defense that failed to provide specific statement of grounds of defense). Plains knows today whether or not it was the victim of false representations and egregious affirmative misconduct, yet it has not been able to plead the basis or a single fact in support. If Plains argues that it needs discovery to figure out this defense, it concedes it was not a victim at all. If such misconduct had occurred, the very nature of it would be obvious to Plains and it would not require discovery to establish it. On the other hand, if Plains knows of false representations and affirmative misconduct, but chooses to hide it from the government (and now from the Court in response to this motion), it violates letter and spirit of discovery as well as the pleading requirements.

Plains faces still yet another hurdle with respect to its estoppel defense, one it cannot overcome as a matter of law. The Supreme Court has made clear that in **no event** would the hypothetical estoppel case be one in which the United States is seeking a legal action to recover public funds. *Office of Personnel Management v. Richmond*, 496 U.S. 414, 427

(1990) (equitable defenses do not apply in actions where public money is at stake); *Heckler*, 467 U.S. at 63-64 ("Protection of the public fisc requires that those who seek public funds act with scrupulous regard for the requirements of the law"; rejecting estoppel defense where Medicare fiscal intermediary provided incorrect information to defendant); *Utah Power & Light Co. v. United States*, 243 U.S. 389, 408-09 (1917) ("Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.").

In *Richmond*, the Supreme Court reaffirmed long-standing precedent emphasizing that claims for estoppel cannot be entertained where public money is at stake. 496 U.S. at 434. Following a review of cases involving claims of estoppel against the United States, the Court noted that "we have reversed every finding of estoppel that we have reviewed," *id.* at 422, and that "[e]ven our recent cases evince a most strict approach to estoppel claims involving public funds." *Id.* at 426. The Court held that an estoppel defense cannot be asserted against the United States where the defendant is claiming money against the treasury contrary to the provisions of a federal statute. *Id.* at 434. In the absence of "affirmative misconduct," which defendant does not allege in these cases, the statements, actions or omissions of agents and employees of the United States are insufficient as a matter of law to prevent the United States from asserting its rights over money that properly belongs in the public fisc. *See id.* at 422. *See also State of New Mexico v. Aamodt*, 537 F.2d 1102, 1110 (10th Cir. 1976) (estoppel does

not run against the United States when it acts as trustee for an Indian tribe) (citing *United States v. Ahtanum Irrigation District*, 236 F.2d 321, 334 (9th Cir. 1956).

In sum, Plains does not even allege facts that could support the traditional elements, let alone the egregious conduct that the Supreme Court left the door open. Moreover, because the only harm Plains might suffer is to repay unallowable costs, it is not the type of case estoppel can apply, as a matter of law. *Richmond*, 496 U.S. at 427 and *New Mexico v. Aamodt*, 537 F.2d at 1110. Consequently, the affirmative defense and counterclaims based on estoppel are legally invalid in the circumstances of this case.

**b. __Waiver__.**

The same principles that bar Defendant's estoppel "defense" apply with equal force to its waiver defenses. Waiver involves the voluntary, intentional relinquishment of a known right. *See, e.g.*, *Trane Co. v. Whitehurst-Lassen Const. Co.*, 881 F.2d 996, 1003 (11th Cir. 1989); *Olney Saving & Loan Assoc. v. Trinity Banc Savings Assoc.*, 885 F.2d 266, 270 (5th Cir. 1989) (essential elements of ratification parallel those of waiver). Defendant has alleged no such conscious decision by any authorized agent of the United States permanently to abandon a right to recovery against them. Moreover, no inadvertent or unauthorized conduct by any employee of the United States other than the Attorney General or his authorized delegee could suffice to waive or release the United States' right to recover funds rightfully belonging to the U.S. Treasury. *See Merrill*, 332 U.S. at 384. As the Supreme Court has long held:

> Of this it is enough to say that the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or an agreement to do or cause to be done what the law does not sanction or permit.

*Utah Power & Light Co.*, 243 U.S. at 408-09.

No amended answer and no amount of discovery can fill the missing elements to Plains' affirmative defenses. Plains has not (and cannot) allege that an official with responsibility to act voluntarily, intentionally relinquished a known right. This is a legally insufficient basis for waiver, and the plaintiff should not be forced to divert its energies disproving legally defective defenses.

In sum, Plains cannot, as a matter of law, provide a factual basis for its laches, estoppel, or waiver defenses. Moreover, the government will be prejudiced by continued inclusion of these legally deficient defenses, both in terms of the time it will take away from proving its case and because it will unnecessarily clutter the issues before the Court.

3. **<u>Statute of Limitations (Paragraph 28)</u>.**

Similarly, Defendant broadly asserts that Plaintiff's claims for relief are barred by the applicable statute of limitations. Defendant does not identify which causes of action they believe are barred, which statute of limitations provisions bar the action, or why the statute of limitations bars the action. Thus, the United States is left to guess, and may be prejudiced thereby. If Defendant is correct in this defense with respect to some or all claims at issue (although Plaintiff has no basis to believe Defendant is correct), then Plaintiff could waste a tremendous amount of time and energy in discovery with respect to claims that Defendant believes and ultimately proves to be barred. With proper notice, Plaintiff potentially could

avoid this situation. Moreover, if Defendant pursues extensive discovery relating to this defense but are unable to prevail for legal reasons which could be resolved at this stage, rather than factual reasons that could be learned only through discovery, Plaintiff again would be injured by the preventable expense of unnecessary, broad discovery.

4. **Failure to Exhaust Administrative Remedies (Paragraph 29).**

Defendant also asserts that the Court lacks jurisdiction (presumably referring to the FCA cause of action) because the Plaintiff failed to exhaust its administrative remedies. This affirmative defense is also legally insufficient and should be stricken.

Defendants do not assert any facts or other support for this affirmative defense, so the Government is at a loss as to what administrative remedies Defendants believe are required. The United States also is aware of no regulatory requirement that it pursue any administrative remedy and, in fact, the False Claims Act requires none.

Because the Defendants have not alleged any specific provision of law that they contend requires the Government to exhaust any administrative remedies, and because the FCA contains no administrative exhaustion prerequisite provision, this defense should be stricken as legally insufficient.

## CONCLUSION

Based upon the arguments and authorities set forth above, the United States requests that this Court strike the following affirmative defenses because they are inapplicable, as a matter of law, regardless of any factual allegations Defendant could assert, and because they would confuse the issue and prejudice the Government: paragraph 28 (statute of limitations),

paragraph 29 (failure to exhaust administrative remedies), paragraph 30 (laches, estoppel and waiver), Count II of Counterclaim (promissory estoppel) and Count III of Counterclaim (estoppel - declaratory judgment).

Respectfully submitted,

Dated: May 9, 2003

DAVID E. O'MEILIA
United States Attorney

Phil Pinnell

PHIL PINNELL, OBA #07169
Assistant United States Attorney
333 West 4th Street, Suite 3460
Tulsa, Oklahoma 74103
(918) 581-7463

CERTIFICATE OF SERVICE

This is to certify that on the 9th day of May, 2003, a true and correct copy of the foregoing was mailed, postage prepaid thereon, to:

Michael J. Gibbens, Esq.
Crowe & Dunlevy
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK 74103-3313

Connie S. Sullivan
Paralegal Specialist

PP:css